Exhibit 1 to 5/9/23 SDR

# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
North Dakota Field Office
99 23rd Avenue West, Suite A
Dickinson, North Dakota 58601
www.blm.gov/mt

SDR-922-22-10

March 7, 2023

CERTIFIED MAIL NO 7020 0090 0002 1460 8555
RETURN RECEIPT REQUESTED

Slawson Exploration Company Incorporated
Attn: Eric Sundberg
1675 Broadway Suite 1600
Denver, CO 80202

Re: SDR 922-22-10

Dear Mr. Sundberg:

The decision to deny the request of royalty free flaring for the subject case as originally rendered by the North Dakota Field Office (NDFO) is affirmed.

The BLM NDFO has determined that the flared volumes reported in this sundry notice are avoidably lost and have a royalty obligation. "Royalty is due for that gas subject to payment at the time it is flared or vented" per CDM 644.5.3K and 43 CFR 3162.7-1(d).

| | | | | |
|---|---|---|---|---|
| **Sundry ID#:** | 485517 | | | |
| **Operator:** | Slawson Exploration Company | | | |
| **Agreement:** | NDM 107646 | | | |
| **Time period:** | Sept 2014-Dec 2016 | | | |
| **Well(s)** | | **API** | **Lease(s)** | **Total avoidable/ unavoidable loss determination**** |
| Jore Federal 2-12H | | 33-053-06052 | 14-20-A04-2603<br>14-20-A04-2333 | Avoidable:<br>223,349 Mcf<br><br>Unavoidable:<br>Volume: 0 Mcf |

*** Total avoidable/unavoidable loss determination volumes are based on flared volumes provided on the subject sundry notice. The BLM NDFO has determined that avoidably lost flared volumes*

*reported in this sundry notice have a royalty obligation. "Royalty is due for that gas subject to payment at the time it is flared or vented" per 43 CFR 3162.7-1(d). Avoidably lost volumes reported in this sundry notice are subject to review and reconciliation by ONRR.*

*Background*

The Jore Federal 2-12H (API # 33-053-06052) was completed on September 4, 2014, and initiated production on the same date. The well was not connected to a pipeline and did not sell gas until October of 2019. On September 27, 2019, Slawson Exploration Company Incorporated (Slawson) requested via sundry notice (Enclosure 1) that the gas flared from the subject well from September 2014 through December of 2016 be considered unavoidably lost per CDM 644.5 and NTL-4A and that no royalty obligation should apply. On February 18, 2022, the NDFO denied the request and Slawson subsequently filed a State Director Review (SDR 922-22-10) on March 22, 2022, in which the Montana State Office (MSO) affirmed the NDFO's decision on April 20,2022. This decision was appealed to the Interior Board of Land Appeals (IBLA) which remanded the case on October 7, 2022, per the request of the BLM, to allow for additional information pertinent to the case to be considered.

*Applicable Law*

The subject wells involve the production of Indian minerals. The Indian mineral leasing statutes share a common purpose of promoting the development of Indian oil and gas resources for the financial benefit of the Indian mineral owner. The promulgating regulations that implement leasing of Indian minerals are intended to ensure that the Indian mineral owners' interests are developed in a manner that maximizes their best economic interests and minimizes any adverse environmental impacts resulting from such development. Moreover, the lessee is charged with having due regard for the prevention of waste of oil or gas. (25 C.F.R. §211.47(d); 25 C.F.R. §225.21(b)(8) and (20); 25 C.F.R. 225.3; 25 USC §2103(b); 25 C.F.R. §211.3; 25 C.F.R. §211.1(a); 25 C.F.R. §212.3; and, 25 C.F.R. §212.1(a).

The Federal Oil and Gas Management Act of 1982 (FOGRMA) establishes royalty liability for "oil or gas lost or wasted . . . when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order or citation issued under [the mineral leasing laws]." (30 U.S.C. 1756). In the Federal Land Policy Act of 1976 (FLPMA), as amended, Congress declared "that it is the policy of the United States that . . . the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals . . . (43 U.S.C. 1701).

Notice to Lessees (NTL)-4A II. A & C and III. A, provide as follows:

## II. DEFINITIONS

As used in this Notice, certain terms are defined as follows:

A. "Avoidably lost" production shall mean the venting or flaring of produced gas without the prior authorization, approval, ratification, or acceptance of the Supervisor and the loss of produced oil or gas when the Supervisor determines that such loss occurred as a result of (1) negligence on the part of the lessee or operator, or (2) the failure of the lessee or operator to take all reasonable measures to prevent and/or to control the loss, or (3) the failure of the lessee or operator to comply fully with the applicable lease terms and regulations, appropriate provisions of the approved operating plan, or the prior written orders of the Supervisor, or (4) any combination of the foregoing.

C. "Unavoidably lost" production shall mean … (2) that oil or gas which is lost because of line failures, equipment malfunctions, blowouts, fires, or otherwise except where the Supervisor determines that said loss resulted from the negligence or the failure of the lessee or operator to take all reasonable measures to prevent and/or control the loss.

## III. AUTHORIZED VENTING AND FLARING OF GAS

Lessees or operators are hereby authorized to vent or flare gas on a short-term basis without incurring a royalty obligation in the following circumstances:

A. Emergencies,
B. Well-purging and evaluations tests,
C. Initial production tests, or
D. Routine or Special well tests.

III.C. Initial production tests. During initial well evaluation tests, not exceeding a period of 30 days or the production of 50 MMcf of gas, whichever occurs first, unless a longer test period has been authorized by the appropriate State regulatory agency and ratified or accepted by the Supervisor.

## IV. OTHER VENTING OR FLARING

Oil well gas. Except as provided in II.C and III above, oil well gas may not be vented or flared unless approved in writing by the Supervisor.

[t]he Supervisor may approve an application for the venting or flaring of oil well gas if justified . . . .by the submittal of (1) an evaluation report supported by engineering, geologic, and economic data which demonstrates to the satisfaction of the Supervisor that the expenditures necessary to market or beneficially use such gas are not economically justified and that conservation of the gas, if required, would lead to premature abandonment of recoverable oil reserves and ultimately to a greater loss of equivalent energy than would be recovered if the venting or flaring were permitted to continue or (2)

an action plan that will eliminate venting or flaring of the gas within 1 year from the date of application (NTL-4A, VI (B), pg. 4).

*Economic Case*

In Slawson's initial request (Enclosure 1), the cost to connect to a pipeline for the subject well was cited at approximately $2.5 million dollars. In this initial request Slawson performed their economic evaluation based solely on the production of the Jore Federal 2-12H and determined that the payout of the infrastructure necessary to capture the gas was excessively long and thus uneconomic.

Per CDM 644.5.3F "Economics of conserving gas must be on a field-wide basis, and the Supervisor must consider the feasibility of a joint operation between all other lessees/operators in the field or area." Since the operator performed their analysis based on a single well the field office cited the inadequate economic analysis in the initial decision rendered.

The "Field" described either-as the Clarks Creek Field, as defined by the North Dakota Industrial Commission (NDIC) or the Township and Range (T.151., R. 95W., McKenzie County, North Dakota) in which the well is located experienced robust development and production during the time in which an unavoidably lost determination from the subject well was requested. In 2010 The Clarks Creek Field contained one producing well, by 2020 an additional 77 wells had been drilled in the subject field. Much of this development occurred from September 2014 to December 2016, the time in which a flaring determination was requested. Enclosure 4 depicts the development and production that occurred in the Clarks Creek Field highlighting the period in which a flaring determination was requested. This robust production reflects the wider production and development that occurred in the Williston Basin as a whole (see Enclosure 5 depicting Bakken Region Natural Gas and Oil Production). The robust development that occurred specifically in the field in which the Jore Federal 2-12H is located and mirrored by the production and development trends in the Williston Basin writ large, would have supported the $2.5 million dollar pipeline connection cost within the payout parameters defined by the CDM, or the reasonable standards of a prudent operator.

*Field Wide Economic Analysis*

In SDR 922-22-10 Slawson objected to the NDFO's position that an economic analysis of gas capture should take place on a field wide basis. CDM 644.5.3F recognizes that the economics of a single well or lease might not be sufficient to put gas to beneficial use or to justify its capture, stating that "Many times, it may be uneconomical for an individual lease to put casinghead gas to beneficial use. However, economics of conserving gas must be on a field wide basis…".

The Jore Federal 2-12H is located in the heart of the Williston Basin within the Clarks Creek Field and is surrounded by gas gatherers, intrastate pipelines, and gas plants, see Enclosure 6 depicting the existing gas infrastructure as of March 2018 as reported by the North Dakota Pipeline Authority. While this map depicts the infrastructure after the time the subject flaring

was requested to be unavoidably lost, extensive gas infrastructure was either actively being developed or was available in close proximity to the subject well. A prudent observer could tell that the subject wells' central location in an oil and gas *Field* undergoing active and exponential growth practically guaranteed the wells ultimate connection to a pipeline.

Slawson further asserted that the BLM's suggestion that "Slawson should have analyzed the economics of capturing gas from other operators' wells is untimely, is infeasible and ignores the operational realities of the field" (Enclosure 2 SDR 922-22-10 Additional Data). CDM 644.5.3F specifically considers that an analysis of gas capture can be conducted on a field wide basis and that the analysis considers all production and development regardless of diverse ownership, stating that "...economics of conserving gas must be on a field wide basis and the Supervisor must consider the feasibility of a joint operation between all other lessees/ operators in the field or area."

At the time the CDM was issued it was fundamentally focused on new wells coming online and providing guidance for the BLM in determining whether the operator was required to build the additional infrastructure required to market the gas or whether it could flare gas. It is fair to say that the CDM did not envision the unique circumstances that arose 30-plus years later in the Williston Basin whereby most of the flaring occurred due to constraints of the infrastructure and wells already connected to gathering pipelines routinely flared gas. While this may be the case for many Bakken wells, there is no indication that this was the case for the subject well.

The flaring that occurred from the Jore Federal 12-2H is uniquely well suited to be evaluated using the guidance provided by the CDM as the circumstances that caused the flaring and the capital expenditures necessary to capture the gas are similar if not identical to the examples provided within the CDM. Likewise, an analysis conducted on a field wide basis, a requirement reiterated throughout the CDM and found within the criteria for requiring gas conservation itself (CDM 644.5F, Exhibit 2, 5., a., iii.) represents an analysis which considers the wider economic picture by evaluating the flaring in accordance with long standing regulations and guidance by considering the feasibility of a joint operation within a field or area (CDM 644.5F).

Slawson's initial request (Enclosure 1) conducted on a single well ignores the development of additional reserves in the field and did not consider the feasibility of joint operations within the field.

*Lack of a pipeline Connection*

CDM 644.5.3F foresaw that well completion and the necessary construction and extension of appropriate infrastructure to market gas might not always coincide. CDM 644.5.3F provides generous avenues to accommodate operators in these circumstances stating "When justified by the lessee/operator, temporary flaring of gas production not exceeding one year may be allowed while evaluating reserves, ***awaiting pipeline construction***, negotiating sales contracts, or awaiting plant construction, provided total monthly per-well gas flared does not exceed 10 MMcf. The fact that a lessee/operator is not financially able to properly dispose of all production from the leasehold is not automatic justification for allowing the loss of nonrenewable resources". NTL-4A mirrors this sentiment in NTL-4A, VI (B) which allows the Authorized Officer to approve

flaring of oil well gas upon submission of "an action plan that will eliminate venting or flaring of the gas within 1 year from the date of application" (NTL-4A, VI (B)).

After completing and initiating production from the Jore Federal 2-12H Slawson did not request temporary flaring while awaiting pipeline construction as allowed by CDM 644.5.3F nor did Slawson justify the flaring or provide evidence that positive action was being taken which would eliminate flaring or venting within one year (CDM 644.5.3E & NTL-4A, VI (B)). Instead Slawson flared gas for 60 months and did not request a determination on the subject flaring until September of 2019.

*Ultimate connection to a pipeline*

CDM 644.5.3F provides that "...if the lessee contends that reserves of casinghead gas are inadequate to support the installation of facilities for gas collection and sale, this contention must be justified by the submittal of: (1) an economic reserve estimate, (2) a cost estimate for the facilities necessary to market or otherwise conserve the gas, and (3) estimates of operating income with and without gas conservation."

Slawson did in fact contend that gas production from the subject well did not support the installation of facilities necessary for gas capture. While Slawson did provide a cost estimate for the facilities necessary to market or otherwise conserve gas in their initial request (Enclosure 1) cited at $2.5 million dollars, at no point did Slawson submit an economic reserve estimate or an estimate of the operating income with and without gas conservation.

At this point an economic reserve estimate is not necessary. Slawson stated itself in SDR 922-10 (Enclosure 2) that "Slawson did not connect the well to capture infrastructure until 2019, after Slawson had drilled additional wells on the pad. These additional wells made connection costs economic." The wells ultimate connection to a pipeline and the development of additional reserves has shown that indeed there were sufficient reserves to warrant gas capture.

The subsequent development that took place is proof sufficient reserves were indeed in place to warrant the capture of gas flared from the subject well. Slawson did not take proactive steps to address or minimize the flared gas even though its capture was warranted.

*Reasonably Prudent Operator Standard*

Under the reasonably prudent operator standard, the lessee or operator is obligated to make reasonable efforts to develop the interest for the common advantage of both the lessor and lessee. The implied covenants of a reasonably prudent operator standard include the duty to develop, the duty to protect against drainage, the duty to market and the duty to conduct operations with reasonable care and due diligence.

Slawson did not fulfill its duty to market the gas for more than 5 years even though reserves warranted such development. Further Slawson did not seek an unavoidable loss determination or

provide any justification to the BLM for nearly 5 years. Slawson has not demonstrated that it took any action to curtail production or shut the well in until the appropriate infrastructure was in place to market the gas. Slawson elected to flare gas for more than 5 years so that oil production and sales could continue with little regard for the waste of the nonrenewable resource of the lessor. These actions do not represent a common interest of the lessor and lessee, nor do they constitute reasonable care and due diligence on the part of Slawson.

*Meaningful Analysis*

Despite Slawson's contention that a field wide economic analysis is unnecessary, Slawson did provide a field wide economic analysis in the additional data submitted during SDR 922-22-10 (Enclosure 2). In this analysis Slawson based their capital expenditure on all wells in the Clarks Creek Field even those already connected to a pipeline. This analysis is therefore based on pipeline capacity constraint issues and the redundancy cited in their infrastructure costs are based on this premise. The flaring at issue in this case was not flared due to pipeline capacity constraints and no amount of redundant infrastructure of the existing system would have served to capture the flared gas. The infrastructure cost used in the analysis should be the "expenditures necessary to market the gas" (NTL-4A, VI (B)), in this case the cost to connect the subject well to a pipeline.

In a series of cases dating back to the 1980s, we have "upheld NTL-4A as a proper exercise of the Department's authority pursuant to the regulations . . . to require the lessee to market oil and gas produced from the lease if *economically feasible* and to conduct operations in such a manner as to prevent avoidable loss of oil and gas." We have also noted that the question of whether preventing a release would have been *economically feasible* is "a question of fact that must be answered on a case-by-case analysis of data presented by the lessee." (197 IBLA 100).

The circumstances under which flaring occurred in this case are fundamentally different than the majority of flaring that occurred in the Williston Basin during this time. The flaring in this case was a result of a complete lack of a pipeline instead of simply pipeline capacity constraints. A well that is connected to a pipeline and flares intermittently due to capacity constraints of the existing infrastructure will still sell and market a portion of the gas it produces. Whereas a well that is not connected to a pipeline will flare 100% of the gas it produces since there is no mechanism by which the gas can be marketed. Unlike oil which can be stored on site and sold via tank gauging, and trucked off location without ever entering a pipeline, a pipeline is a prerequisite to market and transport gas.

Had the subject well been connected to a pipeline when production was initiated, it is possible it would still have flared some portion of gas it produced, that volume is a hypothetical volume that cannot be known. What is known is that due to the lack of a pipeline connection the subject well flared 100% of the gas it produced. The lessee stated that the infrastructure necessary to capture that gas was approximately $2.5 million dollars. The robust development and production of the field would have supported this expenditure within a reasonable payout timeframe.

Slawson cannot pick and choose those circumstances that are convenient to arrive at a conclusion that gas capture was not economically feasible if those circumstances do not reflect the reality of

why gas was flared. Evaluating flaring based on pipeline capacity constraints for flaring that occurred because a well was not connected to a pipeline is not an appropriate evaluation method and simply does not reflect the facts of this case or the actual cost of marketing the gas.

*Alternatives to Flaring*

There existed several options that Slawson could have taken to either eliminate or reduce flaring from the subject well.

Slawson could have elected to shut the well in. This action would have resulted in a temporary delay in production but would have prevented waste of a nonrenewable resource. It is understandable that in some instances infrastructure expansion will not perfectly coincide with development and CDM 644.5.3F provides provisions and limitations for approving this type of temporary flaring. It is unlikely Slawson intended to flare gas from the subject well for 60 months however, after 1 year of flaring gas and still no pipeline connection having been made, shutting in the well would have been a prudent exercise to prevent waste since additional reserves did indeed justify the expenditures necessary to market the gas as subsequent development demonstrated.

Shutting in a producing oil well to conserve gas constitutes a suspension of production. If there were concerns with maintaining the lease(s) during the period of non-production the operator could have requested a suspension according to the lease terms and 25 CFR 211.44.

Slawson could have utilized a vapor recovery unit to capture the natural gas liquids which would not have required a pipeline. Slawson provided no evidence that natural gas liquids recovery was attempted or considered for the flared gas stream.

Slawson could have curtailed production to limit the amount of flared gas and waste that was occurring from the subject well. Slawson provided no evidence that curtailment of production was undertaken to limit the amount of flaring that was occurring.

Slawson provided no evidence that reasonable measures were taken to prevent or control the loss of gas which was flared nearly continuously for 5 years from the subject well.

*Fiduciary Trust Responsibility*

The trust responsibility consists of the highest moral obligations that the United States must meet to ensure the protection of tribal and individual Indian lands, assets, resources, and treaty and similarly recognized rights. See generally Cohen's Handbook of Federal Indian Law§ 5.04[3] (Nell Jessup Newton ed., 2012); Seminole Nation v. United States, 316 U.S. 286, 296-97 (1942).

One of the fundamental common-law duties of a trustee is to preserve and maintain trust assets. United States v. White Mountain Apache Tribe, 537 U.S. 465, 475 (2003) (internal citations

omitted). Furthermore, it is undisputed that the regulations governing the leasing of Indian minerals provide that the lessee should have due regard for the prevention of the waste of gas. The information that Slawson has submitted does not show that it exercised diligence in the prevention of waste, the specific additional measures that could have been taken by Slawson are discussed above. Moreover, a determination that the flared gas is avoidable and thus royalty bearing is in the best interest of the Indian mineral owners as it maximizes their economic interests and recovers royalties on the gas resources that were wasted.

Gas flared from the subject well is considered a resource and asset of the trust and had an intangible future value that cannot be ignored. Given the NDFO's findings that the volumes cited in this case are considered avoidably lost the Indian lessor is entitled to appropriate compensation of the gas flared from the subject well.

*Summary*

The economic data and evaluation submitted by Slawson do not demonstrate that the expenditures necessary to market or beneficially use the gas were not economically justified. On the contrary the $2.5 million dollar estimate to market the gas would easily have been supported by the robust production and development in the field.

Flaring 100% of the gas produced from the subject well for more than 5 years on a nearly continuous basis without taking measures to prevent or control the loss of the gas, when marketing that gas was economically feasible, is not in the best interest of the Indian mineral lessor, does not provide due regard for a nonrenewable resource or represent the actions of a reasonable and prudent operator.

The BLM NDFO has determined that the flared volumes reported in this sundry notice from September 2014- December 2016 are avoidably lost and have a royalty obligation. "Royalty is due for that gas subject to payment at the time it is flared or vented" per CDM 644.5.3K and 43 CFR 3162.7-1(d).

Any adversely affected party may request an administrative review of this decision before the state director either with or without oral presentation. Such a request, including all supporting documentation, shall be filed in writing with the Montana State Office, State Director (MT-920), 5001 Southgate Drive, Billings, MT 59101, within twenty (20) business days of receipt of this Notification of Decision (see 43 CFR 3165.3)

For questions concerning this matter, please contact Caitlin Heryford, Petroleum Engineer at the BLM NDFO, at (701) 227-7770 or cheryford@blm.gov.

Sincerely,

Loren Wickstrom
Field Manager

Enclosure 1 Sundry Notice (EC # 485517) requesting royalty free flaring submitted 9/27/2019
Enclosure 2 SDR 922-22-10 Additional Data
Enclosure 3 Area Map
Enclosure 4 Production and Development Trends Clarks Creek Field
Enclosure 5 North Dakota Bakken Region Natural Gas and Oil Production
Enclosure 6 Jore Federal 2-12H in Relation to North Dakota Gas Gathering Systems

Exhibit 2 to 5/9/23 SDR

Form 3160-5
(June 2015)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

FORM APPROVED
OMB NO. 1004-0137
Expires: January 31, 2018

**SUNDRY NOTICES AND REPORTS ON WELLS**
***Do not use this form for proposals to drill or to re-enter an abandoned well. Use form 3160-3 (APD) for such proposals.***

5. Lease Serial No. 1420A042052

6. If Indian, Allottee or Tribe Name

***SUBMIT IN TRIPLICATE - Other instructions on page 2***

7. If Unit or CA/Agreement, Name and/or No. NDM 107646

1. Type of Well
☒ Oil Well ☐ Gas Well ☐ Other

8. Well Name and No. JORE (FEDERAL) 2-12H

2. Name of Operator SLAWSON EXPLORATION COMPANY Contact: TONI DOMENICO E-Mail: TDOMENICO@SLAWSONCOMPANIES.COM

9. API Well No. 33-053-06052

3a. Address 1675 BROADWAY SUITE 1600 DENVER, CO 80202

3b. Phone No. (include area code) Ph: 720-457-9820 Fx: 303-592-8881

10. Field and Pool or Exploratory Area CLARKS CREEK

4. Location of Well *(Footage, Sec., T., R., M., or Survey Description)*
Sec 12 T151N R95W 255FNL 1244FWL

11. County or Parish, State MCKENZIE COUNTY, ND

12. CHECK THE APPROPRIATE BOX(ES) TO INDICATE NATURE OF NOTICE, REPORT, OR OTHER DATA

| TYPE OF SUBMISSION | TYPE OF ACTION | | | |
|---|---|---|---|---|
| ☐ Notice of Intent | ☐ Acidize | ☐ Deepen | ☐ Production (Start/Resume) | ☐ Water Shut-Off |
| ☒ Subsequent Report | ☐ Alter Casing | ☐ Hydraulic Fracturing | ☐ Reclamation | ☐ Well Integrity |
| ☐ Final Abandonment Notice | ☐ Casing Repair | ☐ New Construction | ☐ Recomplete | ☒ Other Venting and/or Flaring |
| | ☐ Change Plans | ☐ Plug and Abandon | ☐ Temporarily Abandon | |
| | ☐ Convert to Injection | ☐ Plug Back | ☐ Water Disposal | |

13. Describe Proposed or Completed Operation: Clearly state all pertinent details, including estimated starting date of any proposed work and approximate duration thereof. If the proposal is to deepen directionally or recomplete horizontally, give subsurface locations and measured and true vertical depths of all pertinent markers and zones. Attach the Bond under which the work will be performed or provide the Bond No. on file with BLM/BIA. Required subsequent reports must be filed within 30 days following completion of the involved operations. If the operation results in a multiple completion or recompletion in a new interval, a Form 3160-4 must be filed once testing has been completed. Final Abandonment Notices must be filed only after all requirements, including reclamation, have been completed and the operator has determined that the site is ready for final inspection.

Slawson Exploration Company, Inc. respectfully requests a flaring extension on the referenced well for production from September 2014 through December 2016, and the flaring be considered unavoidable per CDM 644.5 and NTL-4A. Slawson was working with Arrow Midstream during that production period to connect the referenced well site to a gas gathering system. The economics associated with a connection to a gas gathering system did not support a natural gas sales pipeline to be constructed to the well site.

See attached economic justification for unavoidable gas flaring associated with the referenced well.

DENIED

14. I hereby certify that the foregoing is true and correct.
Electronic Submission #485517 verified by the BLM Well Information System For SLAWSON EXPLORATION COMPANY, sent to the Dickinson

Name *(Printed/Typed)* TONI DOMENICO Title PRODUCTION & REGULATORY TECH

Signature (Electronic Submission) Date 09/27/2019

**THIS SPACE FOR FEDERAL OR STATE OFFICE USE**

Approved By [signature] Title Field Manager Date 2/18/22

Conditions of approval, if any, are attached. Approval of this notice does not warrant or certify that the applicant holds legal or equitable title to those rights in the subject lease which would entitle the applicant to conduct operations thereon. Office ND Field Office

Title 18 U.S.C. Section 1001 and Title 43 U.S.C. Section 1212, make it a crime for any person knowingly and willfully to make to any department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

(Instructions on page 2)

**** OPERATOR-SUBMITTED ** OPERATOR-SUBMITTED ** OPERATOR-SUBMITTED ****

PE [initials] 2/17/2022

Reprinted 2/16/2022 [initials]

Exhibit 2 to 5/9/23 SDR

**Additional data for EC transaction #485517 that would not fit on the form**

**32. Additional remarks, continued**

CA NDM107646

QTR/QTR=LOT1

Exhibit 2 to 5/9/23 SDR

# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
North Dakota Field Office
99 23rd Avenue West, Suite A
Dickinson, North Dakota 58601
http://www.blm.gov/mt

## NOTIFICATION OF DECISION

**Request for royalty-free flaring under NTL-4A**

| | | | | |
|---|---|---|---|---|
| **Sundry ID#:** | 485517 | | | |
| **Operator:** | Slawson Exploration Company | | | |
| **Time period:** | September 2014- December 2016 | | | |
| **Well(s)** | | **API** | **Agreement or Lease** | **Total volume flared as provided on the subject sundry notice** |
| Jore Federal 2-12H | | 33-053-06052 | NDM107646 | 223,349 Mcf |

The Bureau of Land Management's North Dakota Field Office (BLM NDFO) has reviewed your request for royalty-free flaring per the requirements of Notice to Lessees and Operators of Onshore Federal and Indian Oil and Gas Leases (NTL-4A).

The subject sundry notice reports oil-well gas flared due to a lack of pipeline connection. This constitutes a chronic and recurring instance of flaring and does not qualify as an emergency under NTL-4A III. A. per Interior Board of Land Appeals' (IBLA) 197 IBLA 100.

The flared volumes do not meet the conditions of unavoidably lost as defined under NTL-4A II. C. Inadequate economic justification was submitted as prescribed by NTL-4A IV. and the Conservation Division Manual (CDM) 644.5. Per CDM 644.5.3I, "the burden of proof rests with the lessee/operator to justify that [their operating] practices are not wasteful." The economic justification is inadequate as follows:

1. "Economics of conserving gas must be on a field-wide basis, and the Supervisor must consider the feasibility of a joint operation between all other lessees/operators in the field or area." The analysis provided by the operator considers the economics of a single well not the fieldwide operations:
    a. Gas and oil volumes cited are consistent with the production from a single well.
    b. Only the estimated life of the specific well not the field is provided.
    c. Payout periods cited are excessively long since the burden of gas capture is evaluated on a single well.
    d. The capital investment for gas recovery operations cited at approximately 3 million dollars would have in fact justified gas capture had the economic analysis been conducted on a field wide basis further indicating the analysis was conducted on a single well.

The CDM is clear in that the analysis must be conducted on a field wide basis to demonstrate that the collective production and capital expenditure of the fieldwide operations support the analysis and not one well, lease, or communitization agreement is unduly burdened. The economic justification provided considered conserving gas on a well basis only (see CDM 644.5.3F).

2. "Future developments, such as extension of gathering facilities or the development of additional reserves, warrant a re-evaluation" of economic analysis. Due to the rapid rate of development that occurred in the given field over the requested time frame, the economic analysis must be conducted at subsequent intervals from the initiation of production in the field otherwise the production that occurred at later dates is unfairly discounted. The economic justification provided does not accurately represent the field since the development of additional reserves was not accounted for (see CDM 644.5.3I).

The inadequacies cited above may not exhaustive or all-inclusive and the operator must refer to NTL-4A and CDM 644.5 for procedures. Since the economic justification is inadequate, an avoidable/unavoidable loss determination cannot be made based on economic considerations.

Per 197 IBLA 100, the "BLM is obligated to reach a decision that has a rational basis and is supported by the record." In this case, the "lessee's failure to provide adequate information and analysis constitutes, in itself, a rational basis for denying its request for royalty free flaring."

The operator did not report flare volumes only a specified timeframe. The volume cited in the header of this decision was obtained from OGOR-B and represents those volumes reported to the Office of Natural Resources Revenue (ONRR) coded as disposition code 21 *Flared Oil Well Gas* for the specified timeframe.

The BLM NDFO has determined that the flared volumes reported in this sundry notice are avoidably lost and have a royalty obligation. "Royalty is due for that gas subject to payment at the time it is flared or vented" per CDM 644.5.3K and 43 CFR 3162.7-1(d).

Appeal rights: Any adversely affected party may request an administrative review of this decision before the state director either with or without oral presentation. Such a request, including all supporting documentation, shall be filed in writing within twenty (20) business days of receipt of this Notification of Decision with the Montana State Office, State Director (MT-920), 5001 Southgate Drive, Billings, MT 59101 (see 43 CFR 3165.3).

For questions concerning this matter, please contact Caitlin Heryford, Petroleum Engineer at the BLM NDFO, at (701) 227-7770 or cheryford@blm.gov.

Exhibit 3 to 5/9/23 SDR

# Application for Flaring

Slawson Exploration Company, Inc.

Jore Federal 2-12H – API: 33-053-06052

(1) Reserve Estimation Scenario:

a. **Assumptions:**

i. Oil prices used actual received oil prices for the Jore Federal 2-12H well where available, months with no oil sales used WTI spot price from EIA data less a $7/Bbl deduction through 8/2019. For 9/2019 and onward used futures strip pricing as accessed from the Chicago Mercantile Exchange Data at 11:08 AM MDT on 9/16/2019.

ii. Gas prices used EIA Henry Hub pricing for historical data and futures strip pricing as accessed from the Chicago Mercantile Exchange Data at 11:08 AM MDT on 9/16/2019.

iii. Gas marketing and quality adjustments used 1588 BTU/$ft^3$ per analysis of gas performed 5/6/2019 by Astro-Chem Lab, Inc. Used assumed $2.65/mcf deduction to account for gathering contract for this acreage which includes a $1.15/mcf fixed fee, $1.01/mcf as an estimate of the gathering company's percent of proceeds which were contractually agreed at 25%, and $0.49/mcf as a recent average of variable fees such as electricity.

iv. Lifting costs used actual costs for historical periods and $6,500 plus $3.50/Bbl of oil produced as a model of the costs moving forward. All costs were assumed to be associated with the oil operation.

v. For Capital Expense Used Actual amount of AFE for the Jore Federal 2-12H well through the 8/2019 accounting month for oil recovery - $7,378,746.

b. **Estimated Economic Life of Well: 30 Years, 11 Months** (9/2014 to 7/2045). See Decline Curve and Reserve Cashflow Scenario on Following Pages.

c. **Net Operating Income from Oil Recovery Operations.** See Table Column A and Attached Cashflow.

(2) **Estimated Capital Investment and Annual Net Operating income from gas recovery operations.** See Table Column C and Attached Cashflow. Capital Expense Used AFE provided by Arrow Midstream in 9/2016 as estimate of what the cost would have been to connect the Jore, but backed out oil-specific items such as LACTs since AFE was prepared on the basis of laying a line for both Oil and Gas - $2,499,845.

(3) **PV12 Discounted Annual Cashflows.** See Table Column B and D and attached cashflows.

(4) **Payout Period for Oil and Gas Operations on PV12 Basis**

a. Oil: 7 Years, 3 Months - 87 Months, 11/2021

b. Gas: Never, in excess of 371 Months

c. Combined: Never, in excess of 371 Months

(5) **Criteria for requiring gas conservation in New Field**

a. Combined payout does not occur but would be in excess of 371 months.

b. Payout for gas-only operation does not occur but would be in excess of 371 months.

c. The life of the field/lease is less than the longest payout period calculated

(6) Based on the results in (5) conservation was not required and the flaring was unavoidable. The Gas connection was only economically justifiable with the addition of new wells in 2019 and beyond. It was not justified with the production from only the Jore Federal 2-12H well.

Exhibit 3 to 5/9/23 SDR

| Jore Federal 2-12H | Column A | Column B | Column C | Column D |
|---|---|---|---|---|
| | Oil Recovery Net Operating Income | Net Present Value of Oil Recovery Net Operating Income PV12 | Gas Recovery Net Operating Income | Net Present Value of Gas Recovery Net Operating Income PV12 |
| Capital Expense | $ (7,378,746) | $ (7,378,746) | $ (2,499,845) | $ (2,499,845) |
| 2014 | $ 3,152,031 | $ 3,102,989 | $ 1,178,062 | $ 1,174,983 |
| 2015 | $ 845,042 | $ 775,807 | $ 43,940 | $ 40,677 |
| 2016 | $ 1,355,947 | $ 1,086,266 | $ 56,272 | $ 44,636 |
| 2017 | $ 450,218 | $ 343,281 | $ 33,772 | $ 25,199 |
| 2018 | $ (348,042) | $ (212,159) | $ 764 | $ 483 |
| 2019 | $ 817,360 | $ 439,910 | $ 52,974 | $ 29,680 |
| 2020 | $ 2,491,327 | $ 1,293,618 | $ 93,293 | $ 48,586 |
| 2021 | $ 1,266,583 | $ 583,525 | $ 45,631 | $ 21,085 |
| 2022 | $ 903,115 | $ 371,064 | $ 47,611 | $ 19,555 |
| 2023 | $ 726,814 | $ 266,433 | $ 39,252 | $ 14,386 |
| 2024 | $ 616,701 | $ 201,779 | $ 33,881 | $ 11,084 |
| 2025 | $ 538,693 | $ 157,338 | $ 30,077 | $ 8,783 |
| 2026 | $ 476,561 | $ 124,275 | $ 27,047 | $ 7,052 |
| 2027 | $ 421,105 | $ 98,050 | $ 24,342 | $ 5,667 |
| 2028 | $ 371,194 | $ 77,170 | $ 21,908 | $ 4,554 |
| 2029 | $ 326,275 | $ 60,566 | $ 19,717 | $ 3,659 |
| 2030 | $ 285,847 | $ 47,378 | $ 17,745 | $ 2,940 |
| 2031 | $ 249,463 | $ 36,919 | $ 15,971 | $ 2,363 |
| 2032 | $ 216,716 | $ 28,637 | $ 14,374 | $ 1,899 |
| 2033 | $ 187,245 | $ 22,093 | $ 12,936 | $ 1,526 |
| 2034 | $ 160,720 | $ 16,933 | $ 11,643 | $ 1,226 |
| 2035 | $ 136,848 | $ 12,874 | $ 10,478 | $ 985 |
| 2036 | $ 115,363 | $ 9,691 | $ 9,431 | $ 792 |
| 2037 | $ 96,027 | $ 7,203 | $ 8,487 | $ 636 |
| 2038 | $ 78,624 | $ 5,267 | $ 7,639 | $ 511 |
| 2039 | $ 62,962 | $ 3,767 | $ 6,875 | $ 411 |
| 2040 | $ 48,866 | $ 2,611 | $ 6,187 | $ 330 |
| 2041 | $ 36,179 | $ 1,727 | $ 5,569 | $ 265 |
| 2042 | $ 24,761 | $ 1,056 | $ 5,012 | $ 213 |
| 2043 | $ 14,485 | $ 553 | $ 4,511 | $ 171 |
| 2044 | $ 5,237 | $ 180 | $ 4,060 | $ 138 |
| 2045 | $ 49 | $ 2 | $ 2,178 | $ 67 |

Confidential Information

Exhibit 3 to 5/9/23 SDR

# ASTRO-CHEM LAB, INC.

4102 2nd Ave. W.
Williston, North Dakota 58802-0972
Phone: (701) 572-7355
P.O. Box 972

## NATURAL GAS ANALYSIS

Sample Number: 19-01757 Date of Analysis: 5/6/2019

Company: Slawson Exploration Co.

City: Denver State: CO

Well Number: Jore Federal 2-12H

Sample Source: Treater

Date Received: 5/6/2019 Date Sampled: 5/6/2019

Temperature: Pressure: 22.0 PSI

Formation: Depth:

Location: Section: Twp: Rng: County: McKenzie

Distribution: Distribution List

| COMPONENT | MOLE % | GPM |
|---|---|---|
| Nitrogen | 1.56 | 0.000 |
| Methane | 57.98 | 0.000 |
| Carbon Dioxide | 0.44 | 0.000 |
| Ethane | 18.16 | 4.849 |
| $H_2S$ | 0.00 | 0.000 |
| Propane | 10.78 | 2.956 |
| Iso-Butane | 1.30 | 0.424 |
| N-Butane | 4.57 | 1.435 |
| Iso-Pentane | 0.68 | 0.247 |
| N-Pentane | 1.37 | 0.493 |
| Hexanes + | 3.16 | 1.384 |
| Oxygen/Argon | 0.00 | 0.000 |
| Total | 100.00 | 11.788 |

Calculated Specific Gravity 0.9644 (Air = 1.0000)

Calculated Gross BTU/ft$^3$ 1588 (Saturated) 1616 (Dry) at 14.73 psi and 60°F

Remarks: Sampled by M. Fick (ACL)

Analyzed By: C. Jungels

Confidential Business Information

Exhibit 3 to 5/9/23 SDR

# AUTHORITY FOR EXPENDITURE

slawson exploration company, inc.

**WELL:** JORE FEDERAL 2-12H
**OPERATOR:** SLAWSON EXPLORATION CO, INC
**AFE#:** 05600

**LOCATION:** NWNW Section 12-151N-95W
**COUNTY/STATE:** MCKENZIE/NORTH DAKOTA
**CREATED:** June 23, 2014

**PURPOSE:** Drill and complete a Bakken single lateral horizontal well on 640 acre spacing.
**ACCT DATE:** 8/2019

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 171, 057- |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 405, 877 |
| 095 | HEALTH/SAFETY/ENVIRONMENT | | | 92 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 222, 255 |
| 105 | DRILLING SUPERVISION | 46, 400 | 46, 400 | 52, 955 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 17, 898 |
| 120 | WATER | 20, 000 | 20, 000 | 93, 789 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 50, 713 |
| 150 | FOOTAGE __,___FT @ $__.__/FT | | | 23, 758 |
| 160 | DAYWORK 24 DAYS @ $21,000/DAY | 504, 000 | 504, 000 | 693, 520 |
| 175 | CREW LODGING & PER DIEM | 39, 600 | 39, 600 | |
| 180 | RIG FUEL AND BOILER | 163, 200 | 163, 200 | 172, 507 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 300, 000 | 300, 000 | 169, 593 |
| 200 | DRILL BITS | 50, 000 | 50, 000 | 89, 157 |
| 210 | SUBSURFACE RENTAL EQUIPMENT | 120, 000 | 120, 000 | 159, 420 |
| 215 | DIRECTIONAL DRILLING SERVICES | 210, 000 | 210, 000 | 218, 717 |
| 230 | SURFACE EQUIPMENT RENTALS | 156, 000 | 156, 000 | 373, 690 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 28, 745 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 59, 085 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 68, 976 |
| 320 | MUD LOGGING SERVICES $ | 14, 000 | 14, 000 | 27, 717 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES $ | 14, 000 | 14, 000 | 22, 717 |
| 350 | FREIGHT & TRUCKING $ | 96, 000 | 144, 000 | 176, 129 |
| 360 | CONTRACT LABOR $ | 90, 000 | 135, 000 | 190, 788 |
| 370 | ADMINISTRATIVE OVERHEAD $ | 18, 000 | 21, 500 | 26, 457 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 34, 330 |
| 385 | COMMUNICATIONS | 18, 000 | 18, 000 | 31 |
| 390 | MISCELLANEOUS | | | 13 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 58, 663 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 9, 400 |
| 425 | WIRELINE SERVICES | | | 10, 242 |
| 430 | COMPL. RIG 7 DAYS @ $20,000/DAY W | | 140, 000 | 16, 891 |
| 435 | COILED TUBING SERVICES | | 175, 000 | 18, 554 |
| 440 | COMPLETION TOOL RENTALS | | 35, 000 | 105, 480 |
| 450 | CASED HOLE LOGS & PERFORATING | | 250, 000 | 188, 405 |
| 455 | WATER FOR STIMULATION | | 300, 000 | 226, 147 |
| 460 | FORMATION STIMULATION | | 1, 875, 000 | 1, 869, 934 |
| 470 | COMPLETION SUPERVISION | | 24, 500 | 34, 304 |
| 490 | SALES TAX ON EQUIPMENT | 24, 615 | 106, 880 | 49, 605 |
| | TOTAL INTANGIBLES | $2, 501, 815 | $5, 551, 080 | $5, 990, 497 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 52, 148 |
| 630 | INTERMEDIATE __,___' OF __/_" | | | 15, 221 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 329, 037 |
| 700 | LINER 5,000' OF 4-1/2" 13.5# P- | | 100, 000 | 58, 677 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 66, 431 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 400, 000 | 43, 524 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 103, 499 |
| 820 | PUMPING UNIT | | 200, 000 | 24, 689 |
| 830 | PRIME MOVER ELECTRICITY + MOTO | | 50, 000 | 27, 503- |
| 840 | SUCKER RODS | | 40, 000 | |
| 850 | SUBSURFACE PUMP | | 7, 600 | |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 342, 612 |
| 880 | COMBUSTOR | | 50, 000 | 23, 850 |
| 890 | OIL STOCK TANKS | | 50, 000 | 80, 962 |
| 900 | SEPARATORS | | | 4, 646 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 111, 636 |
| 930 | LABOR & TRUCKING | | 75, 000 | 147, 060 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 11, 760 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 645, 315 | $1, 388, 249 |
| | TOTAL WELL COSTS | $2, 994, 115 | $7, 196, 395 | $7, 378, 746 |

9/16/19

CAR 000068

Exhibit 3 to 5/9/23 SDR

Crestwood

Crestwood Midstream Partners LP/Arrow Pipeline LLC
Authorization for Expenditure
Well Connect Project Estimate

| | | | |
|---|---|---|---|
| Project Name | Slawson Jore | Project # | |
| Project Manager | Kyle Smith | AFE Amount | $2,942,171 |
| Producer | Slawson | AFE Type | Full Scope |

| WBS | Description of Expenditure | Quantity | Full Scope - Original | Supplemental | Total Budget | Shared Cost/Well |
|---|---|---|---|---|---|---|
| 501 | Project Management Labor | 1 | $ 15,000 | $ | $ 15,000 | $ 1,363.64 |
| 502 | Operations & Maintenance Internal Labor | 1 | $ 25,000 | $ | $ 25,000 | $ 2,272.73 |
| 503 | Company Expenses (Pcard Expenses) | 0 | $ | $ | $ | $ |
| 510 | Contract Engineering, Land Survey, Consulting Services | | $ - | $ - | $ | $ |
| 511 | Outside Engineering | 1 | $ 5,000 | $ - | $ 5,000 | $ 454.55 |
| 512 | Land Survey | 6,180 | $ 162,080 | $ - | $ 162,080 | $ 14,734.55 |
| 516 | Geotechnical Drilling and Testing | | $ - | $ - | $ - | $ - |
| 520 | Environmental, Health, and Safety | | $ - | $ | $ - | $ - |
| 521 | Natural Resources Permitting | 6,180 | $ 15,450 | $ | $ 15,450 | $ 1,404.55 |
| 522 | Cultural Resources Permitting | | $ - | $ - | $ - | $ - |
| 524 | PSM / RMP / PHA | | $ | $ - | $ - | $ - |
| 525 | Air Compliance | | $ - | $ - | $ - | $ |
| 527 | Environmental Inspection | | $ - | $ | $ - | $ - |
| 530 | Land and ROW Acquisition and Leases | | $ | $ | $ - | $ - |
| 531 | ROW Agent Fees | 6,180 | $ 47,310 | $ - | $ 47,310 | $ 4,300.91 |
| 532 | Land Acquisition Fees | 6,180 | $ 92,700 | $ - | $ 92,700 | $ 8,427.27 |
| 536 | Government and Public Affairs | 1 | $ 16,440 | $ - | $ 16,440 | $ 1,494.55 |
| 540 | Contract Construction Management | | $ | $ - | $ - | $ - |
| 541 | Contract Inspection Services | 60 | $ 150,000 | $ - | $ 150,000 | $ 13,636.36 |
| 543 | Commissioning / Start-up Support | 1 | $ 5,000 | $ | $ 5,000 | $ 454.55 |
| 544 | Radiographic Inspection | 50 | $ 125,000 | $ | $ 125,000 | $ 11,363.64 |
| 545 | Lab Services | | $ - | $ - | $ - | $ - |
| 546 | Testing Services | | $ - | $ - | $ - | $ - |
| 550 | Construction | | $ - | $ - | $ - | $ - |
| 551 | General / Mechanical Construction | 100 | $ 85,000 | $ | $ 85,000 | $ 7,727.27 |
| 552 | Pipeline Construction (including Hot Taps & Pig L/R) | 5,780 | $ 725,800 | $ | $ 725,800 | $ 65,981.82 |
| 553 | Electrical / Instrumentation Construction | 3 | $ 111,900 | $ - | $ 111,900 | $ 10,172.73 |
| 554 | Site Civil / Structural Construction | 3 | $ 40,500 | $ - | $ 40,500 | $ 3,681.82 |
| 555 | HDD / Boring Construction | 400 | $ 72,000 | $ - | $ 72,000 | $ 6,545.45 |
| 560 | Materials and Equipment | | $ - | $ - | $ - | $ - |
| 561 | Foundations | | $ - | $ - | $ - | $ |
| 565 | Line Pipe | 6,180 | $ 166,556 | $ - | $ 166,556 | $ 15,141.45 |
| 566 | Pipe Bends, Fittings, Bolts & Flanges | 1 | $ 41,639 | $ - | $ 41,639 | $ 3,785.36 |
| 567 | Valves & Valve Actuators | 1 | $ 93,000 | $ - | $ 93,000 | $ 8,454.55 |
| 568 | Packaged Piping Assembly or Skid | 2 | $ 90,000 | $ - | $ 90,000 | $ 8,181.82 |
| 572 | Pumps & Drivers | 1 | $ 60,000 | $ - | $ 60,000 | $ 5,454.55 |
| 573 | Electric Motors, Engines, Turbines, Generators | | $ - | $ - | $ - | $ - |
| 575 | Storage Vessels and Tanks | | $ - | $ - | $ - | $ - |
| 576 | Measurement (2 Oil LACT; 1 Gas Meter Skid) | 3 | $ 487,326 | $ | $ 487,326 | $ 44,302.36 |
| 578 | Cathodic Protection | | $ | $ - | $ - | $ |
| 579 | Electrical | 3 | $ 42,000 | $ - | $ 42,000 | $ 3,818.18 |
| 580 | Instrumentation & Controls | | $ | $ | $ - | $ - |
| 581 | SCADA / Comm / IT Equipment | | $ | $ - | $ - | $ - |
| 582 | Heat Tracing, Insulation & Fireproofing | | $ | $ | $ | $ |
| 583 | Protective Coatings | | $ - | $ - | $ | $ |
| 590 | Other and Miscellaneous | | $ - | $ - | $ - | $ - |
| 599 | Contingency (10%) | | $ 267,470 | $ - | $ 267,470 | $ 24,315.46 |
| X | TOTAL PROJECT ESTIMATE | | $ 2,942,171 | $ - | $ 2,942,171 | $ 267,470.10 |
| XX | Estimated Adder For Winter Construction | | $ 394,560 | $ - | $ 394,560 | $ 35,869.09 |

Notes:

| | |
|---|---|
| Line 576 | LACT building (5,000 BPD capacity) is based on a Coriolis Meter for oil flow measurement and includes a charge pump, booster pump, and all associated piping in a skid mounted, fully enclosed and heated building |
| Line 576 | Meter Building includes 3" Daniel Orifice meter run with a Total Flow computer for gas flow measurement |
| Line X | Represents the total multi-well pad pipeline connection costs that are shared equally with each individual well connection on the respective pad. |
| Line XX | Construction based on normal rates for construction in the summer. Operator will be invoiced for Winter Construction adder in the event construction occurs during the winter months. The commencement of construction shall be at the sole discretion of Crestwood. |

| LACT Prices | | Gas/Water Meter Prices | |
|---|---|---|---|
| $ 221,163 | 5000 BPD | $ 84,443 | 3" Gas/2" Water |
| $ 401,620 | 5000/2500 BPD | $ 99,449 | 2" & 3" Gas/2" Water |
| $ 390,400 | 2500/2500 BPD | $ 57,560 | 2" Water Only |
| $ 357,264 | 1000/1000 BPD | $ 45,000 | 3" Dual Gas Only |



CAR 000069

Exhibit 3 to 5/9/23 SDR

## Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Reserves v9.4.mdb

Date: 9/16/2019
Time: 1:28 PM

Lease Name: Jore Federal (2-12H)
County, ST: MCKENZIE, ND
Location: N151 W95 12 NW

Operator: Slawson Exploration Co., Inc.
Field Name: CLARKS CREEK



Exhibit 3 to 5/9/23 SDR

# Jore Federal 2-12H Cashflow with Actuals through 8/2019

Date: 9/16/2019
Time: 1:38 PM

Project: W:\SECI Well Information\IHS Energy\Projects\Reserves v9.4.mdb

## Strip Futures Pricing Thereafter

Lease Name: Jore Federal (2-12H)
County, ST: MCKENZIE, ND
Location: N151 W95 12 NW

Operator: Slawson Exploration Co., Inc.
Field Name: CLARKS CREEK

| Date | Well Count | Gross Production Oil (Bbl) | Gross Production Gas (Mcf) | Net Production Oil (Bbl) | Net Production Gas (Mcf) | Average Prices Oil ($/Bbl) | Average Prices Gas ($/Mcf) | Sales Total ($) |
|---|---|---|---|---|---|---|---|---|
| 12/2014 | 1 | 71,609 | 0 | 55,139 | 0 | 70.02 | 0.00 | 3,860,591 |
| 12/2015 | 1 | 38,509 | 0 | 29,652 | 0 | 37.97 | 0.00 | 1,125,736 |
| 12/2016 | 1 | 55,533 | 0 | 42,760 | 0 | 38.02 | 0.00 | 1,625,577 |
| 12/2017 | 1 | 22,691 | 0 | 17,472 | 0 | 45.40 | 0.00 | 793,173 |
| 12/2018 | 1 | 494 | 0 | 380 | 0 | 62.52 | 0.00 | 23,782 |
| 12/2019 | 1 | 41,934 | 42,457 | 32,289 | 22,885 | 55.55 | 1.74 | 1,833,570 |
| 12/2020 | 1 | 82,423 | 123,634 | 63,466 | 66,639 | 50.03 | 1.47 | 3,273,379 |
| 12/2021 | 1 | 47,015 | 70,523 | 36,202 | 38,012 | 46.32 | 1.27 | 1,725,156 |
| 12/2022 | 1 | 35,439 | 53,158 | 27,288 | 28,652 | 45.00 | 1.73 | 1,277,595 |
| 12/2023 | 1 | 29,217 | 43,825 | 22,497 | 23,622 | 44.80 | 1.73 | 1,048,791 |
| 12/2024 | 1 | 25,219 | 37,829 | 19,419 | 20,390 | 44.80 | 1.73 | 905,298 |
| 12/2025 | 1 | 22,387 | 33,581 | 17,238 | 18,100 | 44.80 | 1.73 | 803,643 |
| 12/2026 | 1 | 20,132 | 30,198 | 15,502 | 16,277 | 44.80 | 1.73 | 722,675 |
| 12/2027 | 1 | 18,119 | 27,178 | 13,951 | 14,649 | 44.80 | 1.73 | 650,407 |
| 12/2028 | 1 | 16,307 | 24,460 | 12,556 | 13,184 | 44.80 | 1.73 | 585,367 |
| Remainder: | | 121,187 | 181,781 | 93,314 | 97,980 | 44.80 | 1.73 | 4,350,265 |
| Grand Total: | | 648,215 | 668,625 | 499,125 | 360,389 | 48.11 | 1.64 | 24,605,004 |

| Date | Operating Expenses ($) | Taxes ($) | Operating Income ($) | Other Costs ($) | Periodic Cash Flow ($) | Cumulative Cash Flow ($) | 12% Cash Flow ($) |
|---|---|---|---|---|---|---|---|
| 12/2014 | 322,501 | 386,059 | 3,152,031 | 7,374,478 | -4,222,447 | -4,222,447 | -4,271,489 |
| 12/2015 | 168,120 | 112,574 | 845,042 | 0 | 845,042 | -3,377,405 | 775,807 |
| 12/2016 | 107,073 | 162,558 | 1,355,947 | 0 | 1,355,947 | -2,021,458 | 1,086,266 |
| 12/2017 | 263,637 | 79,317 | 450,218 | 0 | 450,218 | -1,571,240 | 343,281 |
| 12/2018 | 369,446 | 2,378 | -348,042 | 0 | -348,042 | -1,919,282 | -212,159 |
| 12/2019 | 796,951 | 180,997 | 855,622 | 0 | 855,622 | -1,063,660 | 460,920 |
| 12/2020 | 366,480 | 322,279 | 2,584,620 | 0 | 2,584,620 | 1,520,960 | 1,342,204 |
| 12/2021 | 242,554 | 170,388 | 1,312,214 | 0 | 1,312,214 | 2,833,174 | 604,610 |
| 12/2022 | 202,035 | 124,834 | 950,726 | 0 | 950,726 | 3,783,900 | 390,619 |
| 12/2023 | 180,258 | 102,468 | 766,065 | 0 | 766,065 | 4,549,965 | 280,820 |
| 12/2024 | 166,268 | 88,448 | 650,582 | 0 | 650,582 | 5,200,547 | 212,863 |
| 12/2025 | 156,356 | 78,516 | 568,770 | 0 | 568,770 | 5,769,317 | 166,121 |
| 12/2026 | 148,462 | 70,606 | 503,607 | 0 | 503,607 | 6,272,925 | 131,327 |
| 12/2027 | 141,415 | 63,545 | 445,447 | 0 | 445,447 | 6,718,371 | 103,717 |
| 12/2028 | 135,074 | 57,191 | 393,102 | 0 | 393,102 | 7,111,473 | 81,724 |
| Remainder: | 1,717,656 | 425,024 | 2,207,586 | 0 | 2,207,586 | 9,319,059 | 275,563 |
| Grand Total: | 5,484,285 | 2,427,183 | 16,693,537 | 7,374,478 | 9,319,059 | 9,319,059 | 1,772,193 |

**Discount Present Worth:**

| | |
|---|---|
| 0.00 % | 9,319,059 |
| 8.00 % | 3,317,680 |
| 10.00 % | 2,472,630 |
| 12.50 % | 1,615,789 |
| 15.00 % | 926,071 |
| 17.50 % | 362,172 |
| 20.00 % | -105,198 |
| 25.00 % | -829,722 |
| 30.00 % | -1,360,204 |
| 40.00 % | -2,074,808 |
| 50.00 % | -2,527,825 |

**Economic Dates:**

| | |
|---|---|
| Effective Date | 09/2014 |
| Calculated Limit | 07/2045 |
| Economic Life | 371 Months |
| | 30 Years 11 Months |

**Economics Information:**

| | |
|---|---|
| Net Payout Date: | 04/2020 |
| Rate of Return: | 19.40 % |
| Return on Investment: | 2.26 |
| Disc Return on Invest: | 1.24 |

**Economics Summary:**

| | Bbl Oil | Mcf Gas |
|---|---|---|
| Ultimate Gross | 648,215 | 668,625 |
| Historic Gross | 202,465 | 0 |
| Gross at Eff Date | 0 | 0 |
| Remaining Gross | 648,215 | 668,625 |
| Remaining Net | 499,125 | 360,389 |

Initial Division of Interest:

| | | | NRI | ORI |
|---|---|---|---|---|
| WI: | 100.000000 | Oil: | 77.000000 | 0.000000 |
| | | Gas: | 77.000000 | 0.000000 |
| Reversion Date: | None | Injection: | 0.000000 | 0.000000 |

Confidential Business Information

Exhibit 3 to 5/9/23 SDR

# Jore Federal 2-12H Cashflow with Actuals through 8/2019

Date: 9/16/2019
Time: 3:29 PM

Project: W:\SECI Well Information\IHS Energy\Projects\Reserves v9.4.mdb

## Oil Recovery Operations Only

Lease Name: Jore Federal (Oil Only) (2-12H)
County, ST: MCKENZIE, ND
Location: N151 W95 12 NW

Operator: Slawson Exploration Co., Inc.
Field Name: CLARKS CREEK

| Date | Well Count | Gross Production Oil (Bbl) | Gross Production Gas (Mcf) | Net Production Oil (Bbl) | Net Production Gas (Mcf) | Average Prices Oil ($/Bbl) | Average Prices Gas ($/Mcf) | Sales Total ($) |
|---|---|---|---|---|---|---|---|---|
| 12/2014 | 1 | 71,609 | 0 | 55,139 | 0 | 70.02 | 0.00 | 3,860,591 |
| 12/2015 | 1 | 38,509 | 0 | 29,652 | 0 | 37.97 | 0.00 | 1,125,736 |
| 12/2016 | 1 | 55,533 | 0 | 42,760 | 0 | 38.02 | 0.00 | 1,625,577 |
| 12/2017 | 1 | 22,691 | 0 | 17,472 | 0 | 45.40 | 0.00 | 793,173 |
| 12/2018 | 1 | 494 | 0 | 380 | 0 | 62.52 | 0.00 | 23,782 |
| 12/2019 | 1 | 41,934 | 0 | 32,289 | 0 | 55.55 | 0.00 | 1,793,678 |
| 12/2020 | 1 | 82,423 | 0 | 63,466 | 0 | 50.03 | 0.00 | 3,175,341 |
| 12/2021 | 1 | 47,015 | 0 | 36,202 | 0 | 46.32 | 0.00 | 1,676,819 |
| 12/2022 | 1 | 35,439 | 0 | 27,288 | 0 | 45.00 | 0.00 | 1,227,945 |
| 12/2023 | 1 | 29,217 | 0 | 22,497 | 0 | 44.80 | 0.00 | 1,007,858 |
| 12/2024 | 1 | 25,219 | 0 | 19,419 | 0 | 44.80 | 0.00 | 869,965 |
| 12/2025 | 1 | 22,387 | 0 | 17,238 | 0 | 44.80 | 0.00 | 772,277 |
| 12/2026 | 1 | 20,132 | 0 | 15,502 | 0 | 44.80 | 0.00 | 694,469 |
| 12/2027 | 1 | 18,119 | 0 | 13,951 | 0 | 44.80 | 0.00 | 625,022 |
| 12/2028 | 1 | 16,307 | 0 | 12,556 | 0 | 44.80 | 0.00 | 562,520 |
| Remainder: | | 121,187 | 0 | 93,314 | 0 | 44.80 | 0.00 | 4,180,478 |
| Grand Total: | | 648,215 | 0 | 499,125 | 0 | 48.11 | 0.00 | 24,015,230 |

| Date | Operating Expenses ($) | Taxes ($) | Operating Income ($) | Other Costs ($) | Periodic Cash Flow ($) | Cumulative Cash Flow ($) | 12% Cash Flow ($) |
|---|---|---|---|---|---|---|---|
| 12/2014 | 322,501 | 386,059 | 3,152,031 | 7,378,746 | -4,226,715 | -4,226,715 | -4,275,757 |
| 12/2015 | 168,120 | 112,574 | 845,042 | 0 | 845,042 | -3,381,673 | 775,807 |
| 12/2016 | 107,073 | 162,558 | 1,355,947 | 0 | 1,355,947 | -2,025,726 | 1,086,266 |
| 12/2017 | 263,637 | 79,317 | 450,218 | 0 | 450,218 | -1,575,508 | 343,281 |
| 12/2018 | 369,446 | 2,378 | -348,042 | 0 | -348,042 | -1,923,550 | -212,159 |
| 12/2019 | 796,951 | 179,368 | 817,360 | 0 | 817,360 | -1,106,190 | 439,910 |
| 12/2020 | 366,480 | 317,534 | 2,491,327 | 0 | 2,491,327 | 1,385,137 | 1,293,618 |
| 12/2021 | 242,554 | 167,682 | 1,266,583 | 0 | 1,266,583 | 2,651,720 | 583,525 |
| 12/2022 | 202,035 | 122,794 | 903,115 | 0 | 903,115 | 3,554,835 | 371,064 |
| 12/2023 | 180,258 | 100,786 | 726,814 | 0 | 726,814 | 4,281,649 | 266,433 |
| 12/2024 | 166,268 | 86,996 | 616,701 | 0 | 616,701 | 4,898,349 | 201,779 |
| 12/2025 | 156,356 | 77,228 | 538,693 | 0 | 538,693 | 5,437,043 | 157,338 |
| 12/2026 | 148,462 | 69,447 | 476,561 | 0 | 476,561 | 5,913,604 | 124,275 |
| 12/2027 | 141,415 | 62,502 | 421,105 | 0 | 421,105 | 6,334,708 | 98,050 |
| 12/2028 | 135,074 | 56,252 | 371,194 | 0 | 371,194 | 6,705,903 | 77,170 |
| Remainder: | 1,717,656 | 418,048 | 2,044,774 | 0 | 2,044,774 | 8,750,677 | 257,430 |
| Grand Total: | 5,484,285 | 2,401,523 | 16,129,423 | 7,378,746 | 8,750,677 | 8,750,677 | 1,588,031 |

**Discount Present Worth:**

| | |
|---|---|
| 0.00 % | 8,750,677 |
| 8.00 % | 3,062,985 |
| 10.00 % | 2,257,123 |
| 12.50 % | 1,438,475 |
| 15.00 % | 778,258 |
| 17.50 % | 237,558 |
| 20.00 % | -211,288 |
| 25.00 % | -908,559 |
| 30.00 % | -1,420,455 |
| 40.00 % | -2,112,466 |
| 50.00 % | -2,553,176 |

**Economic Dates:**

| | |
|---|---|
| Effective Date | 09/2014 |
| Calculated Limit | 07/2045 |
| Economic Life | 371 Months |
| | 30 Years 11 Months |

**Economics Information:**

| | |
|---|---|
| Net Payout Date: | 04/2020 |
| Rate of Return: | 18.77 % |
| Return on Investment: | 2.19 |
| Disc Return on Invest: | 1.22 |

**Economics Summary:**

| | Bbl Oil | Mcf Gas |
|---|---|---|
| Ultimate Gross | 648,215 | 0 |
| Historic Gross | 202,465 | 0 |
| Gross at Eff Date | 0 | 0 |
| Remaining Gross | 648,215 | 0 |
| Remaining Net | 499,125 | 0 |

Initial Division of Interest:

| | | | NRI | ORI |
|---|---|---|---|---|
| WI: | 100.000000 | Oil: | 77.000000 | 0.000000 |
| | | Gas: | 77.000000 | 0.000000 |
| Reversion Date: | None | Injection: | 0.000000 | 0.000000 |

Confidential Business Information

Exhibit 3 to 5/9/23 SDR

# *Jore Federal 2-12H Cashflow with Actuals through 8/2019*

Date: 9/16/2019
Time: 3:15 PM

Project: W:\SECI Well Information\IHS Energy\Projects\Reserves v9.4.mdb

## *Gas Recovery Operations Only*

Lease Name: Jore Federal (Gas Only) (2-12H)
County, ST: MCKENZIE, ND
Location: N151 W95 12 NW

Operator: Slawson Exploration Co., Inc.
Field Name: CLARKS CREEK

| Date | Well Count | Gross Production Oil (Bbl) | Gross Production Gas (Mcf) | Net Production Oil (Bbl) | Net Production Gas (Mcf) | Average Prices Oil ($/Bbl) | Average Prices Gas ($/Mcf) | Sales Total ($) |
|---|---|---|---|---|---|---|---|---|
| 12/2014 | 1 | 0 | 96,870 | 0 | 52,213 | 0.00 | 3.48 | 181,934 |
| 12/2015 | 1 | 0 | 51,653 | 0 | 27,841 | 0.00 | 1.65 | 45,922 |
| 12/2016 | 1 | 0 | 74,906 | 0 | 40,374 | 0.00 | 1.46 | 59,147 |
| 12/2017 | 1 | 0 | 30,090 | 0 | 16,219 | 0.00 | 2.15 | 34,927 |
| 12/2018 | 1 | 0 | 693 | 0 | 374 | 0.00 | 2.12 | 791 |
| 12/2019 | 1 | 0 | 60,739 | 0 | 32,739 | 0.00 | 1.69 | 55,305 |
| 12/2020 | 1 | 0 | 123,634 | 0 | 66,639 | 0.00 | 1.47 | 98,038 |
| 12/2021 | 1 | 0 | 70,523 | 0 | 38,012 | 0.00 | 1.27 | 48,337 |
| 12/2022 | 1 | 0 | 53,158 | 0 | 28,652 | 0.00 | 1.73 | 49,651 |
| 12/2023 | 1 | 0 | 43,825 | 0 | 23,622 | 0.00 | 1.73 | 40,934 |
| 12/2024 | 1 | 0 | 37,829 | 0 | 20,390 | 0.00 | 1.73 | 35,333 |
| 12/2025 | 1 | 0 | 33,581 | 0 | 18,100 | 0.00 | 1.73 | 31,366 |
| 12/2026 | 1 | 0 | 30,198 | 0 | 16,277 | 0.00 | 1.73 | 28,205 |
| 12/2027 | 1 | 0 | 27,178 | 0 | 14,649 | 0.00 | 1.73 | 25,385 |
| 12/2028 | 1 | 0 | 24,460 | 0 | 13,184 | 0.00 | 1.73 | 22,846 |
| Remainder: | | 0 | 181,781 | 0 | 97,980 | 0.00 | 1.73 | 169,787 |
| Grand Total: | | 0 | 941,119 | 0 | 507,263 | 0.00 | 1.83 | 927,906 |

| Date | Operating Expenses ($) | Taxes ($) | Operating Income ($) | Other Costs ($) | Periodic Cash Flow ($) | Cumulative Cash Flow ($) | 12% Cash Flow ($) |
|---|---|---|---|---|---|---|---|
| 12/2014 | 0 | 3,718 | 178,217 | 2,499,845 | -2,321,628 | -2,321,628 | -2,324,707 |
| 12/2015 | 0 | 1,982 | 43,940 | 0 | 43,940 | -2,277,689 | 40,677 |
| 12/2016 | 0 | 2,875 | 56,272 | 0 | 56,272 | -2,221,417 | 44,636 |
| 12/2017 | 0 | 1,155 | 33,772 | 0 | 33,772 | -2,187,645 | 25,199 |
| 12/2018 | 0 | 27 | 764 | 0 | 764 | -2,186,881 | 483 |
| 12/2019 | 0 | 2,331 | 52,974 | 0 | 52,974 | -2,133,907 | 29,680 |
| 12/2020 | 0 | 4,745 | 93,293 | 0 | 93,293 | -2,040,614 | 48,586 |
| 12/2021 | 0 | 2,706 | 45,631 | 0 | 45,631 | -1,994,984 | 21,085 |
| 12/2022 | 0 | 2,040 | 47,611 | 0 | 47,611 | -1,947,373 | 19,555 |
| 12/2023 | 0 | [illegible] | 39,252 | 0 | 39,252 | -1,908,122 | 14,386 |
| 12/2024 | 0 | [illegible] | 33,881 | 0 | 33,881 | -1,874,240 | 11,084 |
| 12/2025 | 0 | 1,289 | 30,077 | 0 | 30,077 | -1,844,163 | 8,783 |
| 12/2026 | 0 | 1,159 | 27,047 | 0 | 27,047 | -1,817,117 | 7,052 |
| 12/2027 | 0 | 1,043 | 24,342 | 0 | 24,342 | -1,792,775 | 5,667 |
| 12/2028 | 0 | 939 | 21,908 | 0 | 21,908 | -1,770,867 | 4,554 |
| Remainder: | 0 | 6,976 | 162,811 | 0 | 162,811 | -1,608,056 | 18,133 |
| Grand Total: | 0 | 36,117 | 891,789 | 2,499,845 | -1,608,056 | -1,608,056 | -2,025,147 |

**Discount Present Worth:**

| | |
|---|---|
| 0.00 % | -1,608,056 |
| 8.00 % | -1,945,015 |
| 10.00 % | -1,989,148 |
| 12.50 % | -2,033,118 |
| 15.00 % | -2,067,987 |
| 17.50 % | -2,096,189 |
| 20.00 % | -2,119,387 |
| 25.00 % | -2,155,115 |
| 30.00 % | -2,181,184 |
| 40.00 % | -2,216,388 |
| 50.00 % | -2,238,918 |

**Economic Dates:**

| | |
|---|---|
| Effective Date | 09/2014 |
| Calculated Limit | 07/2045 |
| Economic Life | 371 Months |
| | 30 Years 11 Months |

**Economics Information:**

| | |
|---|---|
| Net Payout Date: | n/a |
| Rate of Return: | n/a |
| Return on Investment: | 0.36 |
| Disc Return on Invest: | 0.19 |

**Economics Summary:**

| | Bbl Oil | Mcf Gas |
|---|---|---|
| Ultimate Gross | 0 | 941,119 |
| Historic Gross | 0 | 272,494 |
| Gross at Eff Date | 0 | 0 |
| Remaining Gross | 0 | 941,119 |
| Remaining Net | 0 | 507,263 |

Initial Division of Interest:

| | | | NRI | ORI |
|---|---|---|---|---|
| WI: | 100.000000 | Oil: | 77.000000 | 0.000000 |
| | | Gas: | 77.000000 | 0.000000 |
| Reversion Date: | None | Injection: | 0.000000 | 0.000000 |

Confidential Business Information

Exhibit 4 to 5/9/23 SDR

DAVIS GRAHAM & STUBBS

Kathleen C. Schroder
303 892 7354
Katie.Schroder@dgslaw.com

March 22, 2022

Via FedEx

Bureau of Land Management
Montana/Dakotas State Office
5001 Southgate Drive
Billings, MT 59101

Attn: Ms. Theresa M. Hanley, Acting State Director

**Re: Slawson Exploration Company, Inc. Request for State Director Review**
**North Dakota Field Office Determination on Royalty-Free Flaring**
**Jore (Federal) 2-12H**
**Lease No. 1420A042052**
**Agreement No. NDM 107646**

Dear Ms. Hanley,

On behalf of Slawson Exploration Company, Inc. ("Slawson"), we hereby request State Director review pursuant to 43 C.F.R. § 3165.3(b) of a North Dakota Field Office decision dated February 18, 2022, finding that gas flared from the Jore (Federal) 2-12H well ("Well") was avoidably lost and thus royalty bearing ("Decision," attached as Exhibit A). Because the Field Office erred by determining the flared gas was avoidably lost, the State Director must set aside the Decision.

We also request an extension of 14 days (until April 6, 2022) to submit additional data in support of this request for review as permitted by 43 C.F.R. § 3165.3(b).

## Background

The Decision relates to a sundry notice that Slawson submitted on September 27, 2019, requesting that the Bureau of Land Management (BLM) treat gas flared from the Well between September 2014 and December 2016 (the "Flaring Period") as unavoidably lost and thus royalty free.[1] *See* Exhibit A, Sundry Notice. The Well is located in the Clarks Creek field in Section 12 of Township 151 North, Range 95 West. *Id.* The Well produces from Communitization Agreement No. NDM 107646.

Production first occurred from the Well on September 4, 2014. Between the date of first production and August 28, 2019, the Well was not connected to a pipeline. In accordance with Section IV(B) of Notice to Lessees 4A and the U.S. Geological Survey (USGS) Conservation Division Manual, Slawson

[1] Slawson operated the Well during the Flaring Period. In August 2020, the BLM and Bureau of Indian Affairs approved a change of operator to White Butte Oil Operations, LLC a Slawson affiliate.

submitted an economic analysis with the sundry notice that demonstrated that the expenditures necessary to capture gas from the Well were not economically justified.

In the Decision, the Field Office determined that Slawson had not demonstrated that the flared gas was unavoidably lost. The Field Office based its decision on two findings. First, the Field Office found that Slawson incorrectly analyzed the economics of capturing gas only from the Well and not from wells throughout the field. The Field Office explained that the Conservation Division Manual "is clear in that the analysis must be conducted on a field wide basis to demonstrate that the collective production and capital expenditure of the fieldwide operations support the analysis and no one well, lease, or communitization agreement is unduly burdened." Exhibit A, Notification of Decision at 2.

Second, the Field Office found that Slawson did not re-evaluate its economic analysis to account for future developments and therefore did not accurately represent the field. Exhibit A, Notification of Decision at 2. The Field Office explained that "[d]ue to the rapid rate of development that occurred in the given field over the requested time frame, the economic analysis must be conducted at subsequent intervals from the initiation of production in the field otherwise the production that occurred at later dates is unfairly discounted." *Id.*

Slawson now requests that the State Director review and set aside the Decision.

**<u>Request for Review</u>**

Both of the Field Office's bases for the Decision are incorrect. First, Slawson correctly analyzed the economics of capturing gas only from the Well because Slawson did not operate other wells in the field during the Flaring Period. Second, and similarly, Slawson correctly did not re-evaluate its analysis to account for future developments during the Flaring Period because Slawson did not bring additional wells into production in the field until 2019.

## I. Slawson Correctly Analyzed the Economics of Capturing Gas Only from the Well.

Slawson correctly analyzed the economics of capturing gas only from the Well because Slawson and its affiliate White Butte Oil Operations, LLC (collectively, "Slawson") did not operate other wells in the field during the Flaring Period.[2] Simply put, Slawson had no other wells to include in its analysis.

Slawson's approach is consistent with analysis that BLM accepted from another operator to determine that flared gas was unavoidably lost. Particularly, BLM found that gas flared by QEP Energy Company was unavoidably lost based on QEP's analysis of wells it operates in Township 149 North, Range 95 West and not other operators' wells in this field. *See* Slawson <u>Exhibit B</u>, QEP Sundry Notice and Unavoidably Lost Determination, Attachment B (QEP Wells, Communitization Agreements). BLM did not require QEP to analyze the economics of capturing gas from wells it did not operate.

---

[2] Slawson is not certain how BLM defines a "field" for the purpose of the economic analysis. A "field" can be a field recognized by the North Dakota Industrial Commission or a geographic area (such as a township). The distinction is irrelevant here because, during the Flaring Period, Slawson only operated the Well within the Clarks Creek field and within T. 151 N., R. 95 W.

BLM must apply this same rule to Slawson. "[A] fundamental norm of administrative procedure requires an agency to treat like cases alike." *Statoil Gulf of Mexico LLC*, 178 IBLA 244, 258 (2009) (quoting *Westar Energy, Inc. v. Fed. Energy Regulatory Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007)). Therefore, BLM must hold Slawson's analysis to the same criteria and form as other analyses.

Furthermore, BLM cannot require Slawson to analyze the economics of a fictional situation in which BLM ordered Slawson and other operators to jointly capture gas. In the Decision, the Field Office stated that "[e]conomics of conserving gas must be on a field-wide basis, and **the Supervisor must consider the feasibility of a joint operation between all other lessees/operators in the field or area**." Exhibit A, Notification of Decision at 1 (emphasis added). To the extent this statement suggests that Slawson should have analyzed the economics of capturing gas from other operators' wells, this analysis is untimely, is infeasible, and ignores operational realities in the field.

First, to the extent the Field Office suggests that Slawson must analyze the economics of capturing other operators' gas because BLM "must consider the feasibility of a joint operation between all other lessees/operators in the field or area," this analysis is untimely. Even if BLM possesses the authority to require a joint operation between lessees,[3] BLM no longer can require a joint operation among operators to capture gas flared during the Flaring Period. The time to order joint operations has passed, and BLM cannot pretend it may retroactively require joint operations now. Accordingly, BLM cannot require Slawson to analyze the economics of a joint operation to capture flare gas during the Flaring Period.

Second, Slawson cannot conduct an accurate or meaningful analysis of the economics of capturing gas from wells in the field that Slawson does not operate. To prepare such an analysis, Slawson would need to speculate as to material components of the economic analysis, including other operators' development planning and costs, revenues, operating costs, and rate of return on capital expenditures. Such speculative assumptions would render a field-wide analysis entirely unreliable.

Finally, requiring Slawson to analyze the economics of capturing gas from wells that Slawson does not operate ignores the operational realities in the field. As early as 2015, Slawson unsuccessfully attempted to negotiate with both other operators and midstream companies to connect the Well to a gas sales line. *See, e.g.*, Exhibit C, Email from Matt Houston to Will Miller (Jan. 12, 2016) (forwarding term sheet from Crestwood Midstream Partners LP); Exhibit D, Email from Matt Houston to Will Miller (Sept. 19, 2016) (forwarding term sheet and emails between Crestwood Midstream Partners LP, PetroShale (US) Inc. and Slawson). In fact, Slawson did not connect the Well to sales until 2019. Requiring Slawson to analyze the economics of capturing gas from wells that Slawson does not operate ignores the fact that such arrangements were impossible during the Flaring Period.

For these reasons, Slawson appropriately analyzed the economics of capturing gas only from the Well. Therefore, the State Director must set aside the Decision.

---

[3] Slawson reserves the right to maintain that BLM lacks the authority to order joint operations.

**II. Slawson Cannot Analyze the Economics of Capture from Future Development because It Did Not Develop Additional Wells in the Field During the Flaring Period.**

In the Decision, the Field Office found Slawson's economic analysis deficient because Slawson did not analyze the economics of capture from future developments in the field. Particularly, the Field Office explained:

> "Future developments, such as extension of gathering facilities or the development of additional reserves, warrant a re-evaluation" of economic analysis. Due to the rapid rate of development that occurred in the given field over the requested time frame, the economic analysis must be conducted at subsequent intervals from the initiation of production in the field otherwise the production that occurred at later dates is unfairly discounted. The economic justification provided does not accurately represent the field since the development of additional reserves was not accounted for (see CDM 644.5.31).

Exhibit A, Notification of Decision at 2. The Field Office's position is incorrect because the Field Office misinterprets and misapplies the Conservation Division Manual.

In the Decision, the Field Office quotes language of the Conservation Division Manual out of context and, in doing so, misstates its provisions. Under the heading "Enforcement Provisions," the Conservation Division Manual states:

> In all cases, the Supervisor will determine whether a specific instance or occurrence is unnecessary, excessive., or unreasonable, to an extent that constitutes waste. The burden of proof rests with the lessee/operator .to justify that his practices are not wasteful. **If the Supervisor determines that the small volumes involved are not economically feasible to conserve or recover, and waste is not occurring, no further action need be taken unless future developments, such as extension of gathering facilities or the development of additional reserves, warrant a re-evaluation.**

Conservation Division Manual § 644.5.3.I (emphasis added).

The express language of this provision sets forth a two-step analysis process. This process first requires BLM to find that gas capture is not economically feasible. Then, this process requires that BLM need not take further action—unless future developments warrant a re-evaluation, including the extension of gathering facilities or the development of additional reserves.

With respect to the Well, the Field Office did not follow the first step of the process. The Field Office did not evaluate whether Slawson could economically capture any gas from the well. Accordingly, the Field Office has not satisfied the first step of this process. The State Director should set aside the Decision on this basis alone.

Further, the Field Office erred in the second step of this analysis. The Conservation Division Manual does not require analysis at intervals "unless future developments . . . warrant a re-evaluation." Here, no developments occurred to "warrant a re-evaluation." Slawson did not develop additional reserves within

Exhibit 4 to 5/9/23 SDR



the field during the Flaring Period[4]; Slawson only operated the Well within the field during the Flaring Period. Therefore, the Field Office erred by finding Slawson's analysis deficient for not re-evaluating based on predicted future development at different intervals during the Flaring Period. The State Director therefore must set aside the Decision.

## III. The State Director Must Correctly Analyze whether Slawson's Flared Gas was Unavoidably Lost.

Slawson requests that, after the State Director sets aside the Decision, the State Director evaluate Slawson's application for royalty-free treatment of gas flared from the Well during the Flaring Period.

### Request to Submit Supporting Data

Slawson is evaluating additional data in support of its request for review. As permitted by 43 C.F.R. § 3165.3(b), Slawson requests an extension of 14 days to submit additional data in support of its request for State Director review. Thus, Slawson requests until April 6, 2022 to submit additional information.

### Stay Pending Appeal

Slawson respectfully requests that the State Director stay the Decision pending review. Without a stay of the Decision, Slawson may be required to pay royalty on the gas that the Field Office determined was avoidably lost before the State Director issue a decision on Slawson's request for review. This harm to Slawson would be irreparable because, if the State Director later sets aside, remands, or modifies the Field Office's finding that flared gas was avoidably lost, then Slawson will be unable to recover the paid royalty because the Office of Natural Resources offers limited recoupment and refunds of royalty paid to Indian leases. *See* 30 C.F.R. §1218.53. The Interior Board of Land Appeals and the courts have recognized that the unrecoverable payment of money constitutes an irreparable harm. *E.g.*, *Marathon Oil Company*, 90 IBLA 236, 247 (1986) (unrecoverable payment of interest constitutes irreparable harm); *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 n.22 (2010) (Scalia, J., in chambers) ("If expenditures cannot be recouped, the resulting loss may be irreparable.").

---

[4] Slawson maintains that although the Conservation Division Manual requires an analysis of production that occurred after the Flaring Period, the analysis only must consider production from wells that were online during the Flaring Period. The Conservation Division Manual does not require an analysis of production from wells that came online after the Flaring Period. The Decision confirms this approach, stating, "Due to the rapid rate of development that occurred in the given field **over the requested time frame** the economic analysis must be conducted at subsequent intervals from the initiation of production in the field otherwise the production that occurred at later dates is unfairly discounted." Exhibit A, Notification of Decision at 2 (emphasis added). For example, the Conservation Division Manual does not require Slawson to evaluate the effect of new wells that came into production during 2019 and after on the economics of capturing gas flared during the Flaring Period. This future development was not foreseeable during the Flaring Period and therefore could not affect Slawson's decision as to whether to capture gas flared at that time.

By contrast, a stay will result in minimal to no injury to the Indian lessor. Even if the State Director ultimately determines that the gas is avoidably lost and royalty bearing, the Indian lessor will receive interest on the royalty to compensate for the lost time-value of money.

Finally, a stay is in the public interest. The public interest is not served by leaving the Decision in effect and therefore causing Slawson to pay royalty that ultimately may not be owed and that Slawson may be unable to recover.

## Oral Presentation

The regulation governing State Director review allows Slawson to request an oral presentation, *see* 43 C.F.R. § 3165.3(b). Slawson declines an oral presentation unless the State Director would find such a presentation useful to resolving this request for review.

## Conclusion

For the reasons set forth above, the Field Office erred in its determination that gas flared from the Well during the Flaring Period was avoidably lost and thus royalty bearing. The State Director therefore must set aside the Decision. Slawson further requests that the State Director evaluate Slawson's application for royalty-free treatment of gas flared from the Well during the Flaring Period and determine this gas was unavoidably lost and thus royalty free. Finally, Slawson requests until April 6, 2022 to submit additional date in support of this request.

If you have any questions about this request for review, please do not hesitate to contact me at (303) 892-7354 or katie.schroder@dgslaw.com.

Sincerely,

Kathleen C. Schroder
Davis Graham & Stubbs LLP

DAVIS
GRAHAM &
STUBBS

Kathleen C. Schroder
303 892 7354
Katie.Schroder@dgslaw.com

April 5, 2022

Via FedEx

Bureau of Land Management
Montana/Dakotas State Office
5001 Southgate Drive
Billings, MT 59101

Attn: Ms. Theresa M. Hanley, Acting State Director

**Re: Slawson Exploration Company, Inc. Request for State Director Review No. 922-22-10 Additional Data in Support of Request for Review**

Dear Ms. Hanley,

On March 22, 2022, Slawson Exploration Company, Inc. ("Slawson") requested State Director review of a North Dakota Field Office decision dated February 18, 2022, finding that gas flared from the Jore (Federal) 2-12H well ("Well") was avoidably lost and thus royalty bearing. In its request for review, Slawson also requested an extension of time to submit additional data in support of its request as permitted by 43 C.F.R. § 3165.3(b). By letter dated March 24, 2022, the State Director granted Slawson an extension of time until April 6, 2022 to submit additional data. Slawson now submits this additional data.[1]

In the Decision, the Field Office determined that Slawson incorrectly analyzed the economics of capturing gas only from the Well and that Slawson should have analyzed the economics of capturing gas from wells throughout the field. The Field Office explained that "analysis must be conducted on a field wide basis to demonstrate that the collective production and capital expenditure of the fieldwide operations support the analysis and no one well, lease, or communitization agreement is unduly burdened." Exhibit A, Notification of Decision at 2.

In its March 22, 2022 request for review, Slawson objected to the Field Office's position. Slawson asserted that BLM has not required other operators to analyze the economics of capturing gas from wells they did not operate. Slawson also maintained that BLM's suggestion that Slawson should have analyzed the economics of capturing gas from other operators' wells is untimely, is infeasible, and ignores operational realities in the field.

Slawson now provides additional information in support of its position that the Field Office's Decision is in error. First, Slawson explains that the information presented to the Field Office demonstrated that the Well cannot be connected to gas capture infrastructure economically, thus rendering field-wide

[1] Capitalized terms used herein have the same meaning as in Slawson's March 22, 2022 request for State Director review.

analysis unnecessary. Second, Slawson now provides a theoretical analysis of field-wide gas capture, which demonstrates that such capture is uneconomic. Based on this information and the information that Slawson presented in its March 22, 2022 request for review, the State Director should set aside the Decision and find that gas flared from the Well during the Flaring Period was unavoidably lost and thus royalty-free.

**I. The Well Cannot be Connected to Gas Capture Infrastructure Economically.**

To capture gas, a well must be physically connected to a gathering system. Then, a gathering system and/or pipeline must transport captured gas to a processing facility, where the gas is processed. An operator's economic analysis must account for the capital cost of constructing each of these components if it does not exist in the field.

With respect to the Well, Slawson has determined that the first component—the physical connection to a gathering system—is uneconomic. Because the Well was the only well on the pad during the Flaring Period, the quantity of production from the well pad did not justify the cost of connecting the Well to an existing gas capture system. Slawson made this demonstration in the economic analysis presented to the Field Office with the sundry notice for the Well. Therefore, Slawson may end its economic analysis here—Slawson need not analyze the cost of constructing further field-wide gas infrastructure to capture the gas.

Slawson based the cost of connecting the Well to existing gas capture infrastructure on actual estimates provided to Slawson. Particularly, Slawson received an Authorization for Expenditure (AFE) from a midstream company to connect the Well to existing processing facilities. *See* Slawson Exhibit A, Application for Flaring § (2); Slawson Exhibit E, Supplemental Data § (3)(b)(i)–(ii). From this AFE, Slawson isolated the cost to connect the Well to existing gas capture infrastructure and determined it is approximately $2.5 million. *See id.* As detailed in the economic analysis originally presented to the Field Office, connection of the Well to gathering and processing facilities at a cost of $2.5 million is not economic because payout will not occur for more than 371 months.[2] *See* Slawson Exhibit A, Application for Flaring.

Having determined that the cost of connecting the Well to capture infrastructure is uneconomic, Slawson need not evaluate the additional cost of constructing additional capture infrastructure or gas processing capacity. This additional cost would only make capture more expensive.

Moreover, Slawson need not evaluate the economics of field-wide capture and processing. Although in theory field-wide capture and processing could reduce per-well capture and processing costs, field-wide capture and processing would not reduce the cost of individual well connections. Thus, field-wide capture and processing would not reduce the $2.5 million cost to connect the Well to gas capture infrastructure.

---

[2] Consistent with this analysis, Slawson did not connect the Well to capture infrastructure until 2019, after Slawson had drilled additional wells on the pad. These additional wells made connection costs economic.

Therefore, Slawson correctly evaluated whether gas capture was economic by examining the costs to connect the Well to gas capture infrastructure. Slawson thus correctly determined the flared gas was unavoidably lost during the Flaring Period. The State Director must set aside the Decision and further find that gas flared during the Flaring Period was unavoidably lost.

**II. Field-Wide Capture is Uneconomic.**

Although Slawson maintains field-wide economic analysis is unnecessary, Slawson nonetheless prepared a theoretical economic analysis examining all flared volumes in the Clarks Creek-Bakken field during the Flaring Period to determine whether field-wide capture is economic.[3] *See* Slawson Exhibit E, Supplemental Data. Slawson performed this analysis to satisfy the alleged deficiency that the Field Office identified in the Decision. Because Slawson lacks the information necessary to prepare an actual economic analysis of field-wide capture,[4] however, Slawson made numerous assumptions, which are detailed in the attached analysis. *See id.*

The field-wide economic analysis demonstrates that field-wide capture is uneconomic, using either new field or old field criteria. Further, field-wide capture does not change the cost to connect the Well to a gas capture system. Therefore, connection of the Well to a gas capture system remains uneconomic during the Flaring Period.

**Conclusion**

For these reasons, Slawson appropriately analyzed the economics of capturing gas only from the Well in its analysis accompanying the sundry notice submitted to the Field Office. Therefore, the State Director must set aside the Decision and find that gas flared from the Well was unavoidably lost and thus royalty-free.

If you have any questions about this request for review, please do not hesitate to contact me at (303) 892-7354 or katie.schroder@dgslaw.com.

---

[3] BLM has not defined what constitutes a "field" for the purpose of the economic analysis. The North Dakota Industrial Commission has specifically defined the spacing unit containing the Well to fall within the Clarks Creek Field and, within that field, the Clarks Creek-Bakken Pool. The most recent redefinition of this field and specific rules governing the development of the field are contained within NDIC Order No. 30831 issued in Case No. 28373, which outlines that the field consists of portions of fourteen sections within four townships. Given the geographic constraints on this field, such as the presence of the undeveloped Blue Buttes American Indian Traditional Use Area to the west, and its location straddling the border of the Fort Berthold Indian Reservation, and given Slawson's lack of additional contiguous operated acreage, Slawson maintains that its economic analysis must examine the Clarks Creek Field as defined under North Dakota administrative law.

[4] Slawson detailed how it lacks the necessary information to perform an accurate or meaningful analysis on page 3 of its March 22, 2022 request for review.

Sincerely,

Kathleen C. Schroder
Davis Graham & Stubbs LLP

cc: rknell@blm.gov

Confidential Business Information - Exempt from Disclosure under FOIA

# Supplemental Data

## Request for State Director Review - Application for Flaring
## Slawson Exploration Company, Inc.
## Jore Federal 2-12H – API: 33-053-06052

(1) Field-Wide Model:

a. Slawson's original economic assessment only analyzed capture of gas from the Jore Federal 2-12H well because Slawson only has actual cost and pricing information related to wells that it operates.

b. Among BLM's reasons for finding that gas flared from the Jore Federal 2-12H well was avoidably lost was that "The capital investment for gas recovery operations cited at approximately 3 million dollars would have in fact justified gas capture had the economic analysis been conducted on a field wide basis further indicating the analysis was conducted on a single well." Slawson's original assessment only considered the cost of connecting the Jore Federal 2-12H well to an existing gas gathering system. It did not evaluate whether additional investment would have been needed to process the additional natural gas from the well. Slawson performed the analysis on that basis, as it had been provided with a cost estimate and terms from a midstream company to connect the well to existing facilities which presumably had sufficient capacity (or plans to add capacity) which were factored into the terms provided by the midstream company.

c. Those connection costs would not be reduced in examining the economics on a field-wide basis. Such a reduction would only occur when additional wells were added in the immediate vicinity (such as on the same surface location) as the Jore Federal 2-12H such that the connection costs could be considered in comparison to the production from multiple wells. The potential benefit of examining natural gas volumes from a larger area, such as an entire field would be if the combined additional volumes of natural gas that were available were sufficient to overcome the hurdle of additional capital expense investments in processing capacity. However, examining such a larger area, also imposes the higher costs of building a larger gathering system and tying-in numerous wells on the analysis.

d. Since the expenses for additional processing capacity were already assumed to be zero in the original economic assessment, and the economics of solely the gathering connection for the Jore Federal 2-12H were insufficient for requiring conservation and are unchanged when viewed on a field-wide basis, an analysis on a field-wide basis is redundant.

e. However, in response to BLM's reasoning in an effort to present the most comprehensive analysis possible, Slawson has prepared a theoretical economic analysis examining all flared volumes in the Clarks Creek-Bakken field during the Flaring Period. Slawson lacks the information necessary to prepare an actual economic analysis. Accordingly, Slawson made assumptions as described below.

f. The BLM has not defined what constitutes a "field" for the purpose of the economic analysis. The North Dakota Industrial Commission has specifically defined the spacing unit containing the Jore Federal 2-12H to fall within the "Clarks Creek Field" and the Clarks Creek-Bakken Pool within that field. The most recent redefinition of this Field and specific rules governing the development of the Field are contained within NDIC Order No. 30831 issued in Case No. 28373 (Exhibit 1) which outlines

Confidential Business Information

that the Field consists of portions of fourteen sections within four townships. Given the geographic constraints on this Field and area such as the presence of the undeveloped Blue Buttes American Indian Traditional Use Area to the west and its location straddling the border of the Fort Berthold Indian Reservation, and given Slawson's lack of additional contiguous operated acreage, Slawson maintains that this analysis must examine the Clarks Creek Field as defined under North Dakota administrative law.

g. Some wells within this field that had initial production which predated the Flaring Period and were connected to existing gas gathering facilities ("Preexisting Wells"). There are 23 of these Preexisting Wells within the field, see Exhibit 2. However, NDIC reports reflect that flaring was occurring from these wells, indicating that gathering and processing capacity available was insufficient for the volumes being produced. As such, in examining gas capture on a field-wide basis, the extraneous volumes of gas which were not gathered to the existing systems were assessed for the Preexisting Wells. The assessment examined the reported flared volumes as accessed from the North Dakota Industrial Commission for the Preexisting Wells during the Flaring Period.

h. Other wells within this field had initial production that occurred during the Flaring Period ("Contemporaneous Wells"). There are 16 of these Contemporaneous Wells withing the Clarks Creek-Bakken field, see Exhibit 2. For these wells, Slawson estimated the drilling and completion cost for oil recovery operations in addition to the connection cost of the wells to for gas recovery operations.

i. On this basis, an analysis of the forecast cashflows associated with both the oil recovery operations and gas recovery operations for all 40 wells in the field during the Flaring Period (Jore Federal 2-12H, 23 Preexisting Wells, and 16 Contemporaneous wells) is provided as Exhibit 3.

j. Since the payout status of the original investment for the Preexisting Wells is unknown, the criteria for requiring gas conservation under the USGS Conservation Division Manual – Guidelines for Evaluating Applications for Flaring ("Guidelines") are examined on both a "New field" basis and an "Old field" basis"

(2) Reserve Estimation Scenario:

a. **Assumptions:**

   i. Oil prices used actual received oil prices for the Jore Federal 2-12H well where available, months with no oil sales used WTI spot price from EIA data less a $7/Bbl deduction through 8/2019. For 9/2019 and onward used futures strip pricing as accessed from the Chicago Mercantile Exchange Data at 11:08 AM MDT on 9/16/2019 with the same $7/Bbl deduction.

   ii. Gas prices used EIA Henry Hub pricing for historical data and futures strip pricing as accessed from the Chicago Mercantile Exchange Data at 11:08 AM MDT on 9/16/2019.

   iii. An average Net Revenue Interest for the aggregated working interest owners of the wells was estimated at 77%.

   iv. Gas marketing and quality adjustments used 1,588 BTU/$ft^3$ per an analysis of gas from the Jore Federal 2-12H well performed 5/6/2019 by Astro-Chem Lab, Inc. (attached as Exhibit 4).

Confidential Business Information

v. To estimate the operators' gas revenue received, a model of the contractual arrangements that Slawson ultimately entered to connect the Jore Federal 2-12H well to a gas gathering line (subsequent to the Flaring Period) was used. This used an assumed $1.64/mcf deduction which includes a $1.15/mcf fixed fee and $0.49/mcf as a recent average of variable fees such as electricity, along with a 25% shrinkage factor accounting for the gathering company's percent of proceeds which was contractually arranged.

vi. Lifting costs used actual costs for historical periods on the Jore Federal 2-12H well and $6,500 plus $3.50/Bbl of oil produced as a model of the costs moving forward. All costs were assumed to be associated with the oil operation. The same $6,500 plus $3.50/Bbl of oil produced model is used for Preexisting Wells. However, a higher $8,000 plus $4.50/Bbl of oil model was used for the Contemporaneous Wells to reflect the higher lifting costs usually associated with newer wells.

b. **Estimated Economic Life of Field: 38 Years, 6 Months** (8/2011 to 02/2050). See Reserve Cashflow Scenarios from Combined Oil and Gas Recovery Operations and Decline Curves on Exhibit 5.

c. **Net Operating Income from Oil Recovery Operations.** See Column A of Exhibit 3 and Exhibit 6.

d. **Net Operating Income from Gas Recovery Operations.** See Column D of Exhibit 3 and Exhibit 7.

e. **Net Operating Income from Preexisting Well Oil and Gas Operations.** See Exhibit 8

(3) Estimated Capital Investments

a. **Oil Recovery Operations:**

i. For Preexisting Wells, no additional capital investment was assumed related to oil recovery operations as the wells already existed and only the flared gas volumes not being captured by existing infrastructure were considered.

ii. For Contemporaneous Wells, an estimate of the drilling and completion costs for each well is needed. Estimates based on the average cost of other wells operated by Slawson within the Williston Basin with similar lateral lengths which had had initial production within the Flaring Period have been used:

1. 3 of the 16 Contemporaneous Wells were drilled and completed on a 960-acre spacing unit with lateral lengths of approximately 7,500'.
2. Slawson placed nine wells with lateral lengths of approximately 7,500' online in the Williston Basin during the Flaring Period. The drilling and completion costs for these wells averaged $7,667,321. See Exhibit 9.
3. 13 of the 16 Contemporaneous Wells were drilled and completed on a 640-acre spacing unit with lateral lengths of approximately 4,900'.
4. Slawson placed four wells with lateral lengths of approximately 4,900' online in the Williston Basin during the Flaring Period. The drilling and completion costs for these wells averaged $5,790,499. See Exhibit 9.

iii. Thus the drilling and completion costs for oil recovery operations on the Contemporaneous Wells are estimated to total $98,278,450. This adds to the

Confidential Business Information

cost of drilling and completion for the Jore Federal 2-12H of $7,484,475 (updated from the original application to incorporate additional costs invoiced to the well).

b. **Gas Recovery Operations:**

i. The cost estimate for the gas recovery operations on the original analysis for the Jore Federal 2-12H was based on an AFE which had been provided by a midstream company to connect the Jore Federal 2-12H well specifically to that company's existing facilities for processing the gas. In the previous analysis the cost items which were specific to oil-gathering were removed to yield an estimate of what a gas-specific connection would have cost.

ii. That cost estimate included a connection length of 6,180' of line pipe and the facilities to connect the Jore Federal 2-12H well and without the components exclusive to oil-gathering components totaled $2,499,845, see Exhibit 10. This estimate can further be broken-down into $389,400 in facilities costs on the well location related to the gas connection and meter, $1,642,975 in costs related to constructing the gathering line and $467,470 in costs related to the general project which are not easily differentiated as related to a specific phase of the project.

iii. If those undifferentiated costs are allocated on a pro-rata basis between the well location costs and the gathering line construction costs, this yields an estimate for each well connection cost of $478,967 in location-specific costs and a cost for 6,180' of gathering line of $2,020,878.

iv. In analyzing volumes on a field-wide basis, the additional costs of connecting other wells which had flared volumes for the application timeframe to the gathering system would need to be considered. Not having a specific estimate for that construction prepared, those costs are estimated through extrapolation of the cost estimate that had been prepared for the Jore Federal 2-12H.

v. An example of a potential map of a gathering system to collect the excess flared volumes from the 23 Preexisting Wells and all gas volumes the 16 Contemporaneous Wells is provided on Exhibit 11. This estimates that 65,483' of line pipe would have been needed.

vi. Using the above estimates this would result in $18,679,713 of on-location costs associated with connecting the 39 wells and $21,413,132 of costs for the construction of gathering line. This is in addition to the original $2,499,845 estimate to connect the Jore Federal 2-12H well itself to the existing gathering and processing infrastructure. As noted earlier, this estimated cost for connecting the Jore Federal 2-12H well is not reduced through the consideration of additional costs necessary to connect other wells. This combines into a total field-wide cost estimate for gas recovery operations of $42,592,690.

vii. These estimates are still conservative as they assume no additional capital expenditure would have been necessary for the midstream company to process the additional natural gas from all 40 wells. While that assumption may have been appropriate for the original Jore Federal well analysis, there

Confidential Business Information

is a substantial likelihood that additional investments in processing capacity would have been needed for the additional volumes from the entire field. While the combined volumes available in a field may in some instances make additional processing investments viable, when they would not be for a smaller number of wells, for the purposes of this analysis Slawson is assuming zero additional investment in processing and examining only the economics of the gathering connections in a field-wide system.

(4) **PV12 Discounted Annual Cashflows.** See Columns B, C, E, and F of Exhibit 3 as well as Exhibits 5, 6, 7, and 8.

(5) **Payout Period for Oil and Gas Operations on PV12 Basis**
   a. Oil: 3 Years, 3 Months - 39 Months, 11/2017
   b. Gas: Never, in excess of 426 Months
   c. Combined: 6 Years, 1 Months – 73 Months, 09/2020

(6) **Criteria for requiring gas conservation in a New field**
   a. Combined payout exceeds oil payout by 87.2% (73 months/39 months minus 100%) which exceeds the 25% threshold from the Guidelines.
   b. Payout for gas-only operation does not occur so would be in excess of 426 months, clearly in exceeding the 5 year/60 month threshold from the Guidelines.
   c. The life of the field/lease is less than the longest payout period calculated since the gas-only operation is estimated never to payout.

(7) **Criteria for requiring gas conservation in an Old field**
   a. All net income from Preexisting Well operations would payout the estimated capital investment for gas facilities of $42,592,690 in 11 months. Even if all net income from both Preexisting Wells and Contemporaneous Wells were considered the gas facilities investment would payout in 8 months and still not meet the 6-month threshold from the Guidelines.
   b. Payout for gas-only operation does not occur but would be in excess of 426 months, clearly in exceeding the 5 year/60 month threshold from the Guidelines.
   c. The life of the field/lease is greater than 5 years.

(8) Based on the results in either (6) or (7) conservation was not required and the flaring from the Jore Federal 2-12H was unavoidable. In (6) none of the three criteria were met, while all three would have needed to be met for the flaring to be deemed avoidable. In (7) two of the three criteria were not met, while all three would have needed to be met for the flaring to be deemed avoidable.

A gas connection for the Jore Federal 2-12H was only economically justifiable with the addition of new wells in 2019 and beyond. It was not justified with the production from only the wells in the Clarks Creek field for the Flaring Period whether examined as a New field or an Old field.

Confidential Business Information

Exhibit 5 to 5/9/23 SDR

Exhibit 1

BEFORE THE INDUSTRIAL COMMISSION

OF THE STATE OF NORTH DAKOTA

CASE NO. 28373
(CONTINUED)
ORDER NO. 30831

IN THE MATTER OF A HEARING CALLED ON A MOTION OF THE COMMISSION TO CONSIDER THE APPLICATION OF EOG RESOURCES, INC. FOR AN ORDER AMENDING THE FIELD RULES FOR THE CLARKS CREEK-BAKKEN POOL TO ALTER THE SETBACK REQUIREMENT FOR THE WEST BOUNDARY OF AN EXISTING 1440-ACRE SPACING UNIT COMPRISED OF SECTIONS 13, 24, AND 25, LESS LOTS 1, 2, 3, AND 4 IN EACH SECTION, T.151N., R.95W., MCKENZIE COUNTY, ND, FROM 500 FEET TO 100 FEET, AND SUCH OTHER RELIEF AS IS APPROPRIATE.

Confidential Business Information

ORDER OF THE COMMISSION

THE COMMISSION FINDS:

(1) This cause originally came on for hearing at 9:00 a.m. on the 26th day of March, 2020. Counsel for EOG Resources, Inc. (EOG) submitted a request received March 23, 2020 to continue this case to the regularly scheduled hearing in April 2020. There were no objections, the hearing officer granted the request, and this case was scheduled for hearing on April 23, 2020.

(2) The record in this case was left open until May 1, 2020 for written comments due to temporary hearing procedures implemented as a result of the 2020 COVID-19 pandemic. No comments were received and the record was closed on May 1, 2020.

(3) The witnesses for EOG provided telephonic testimony in this matter pursuant to North Dakota Administrative Code (NDAC) Section 43-02-03-88.2. Telephonic Communication Affidavits were received on April 27, 2020; therefore, such testimony may be considered evidence.

(4) EOG made application to the Commission for an order amending the field rules for the Clarks Creek-Bakken Pool to alter the setback requirement for the west boundary of an existing standup 1440-acre spacing unit comprised of Sections 13, 24, and 25, less Lots 1, 2, 3, and 4 in each section, Township 151 North, Range 95 West, McKenzie County, North Dakota (Sections 13, 24, and 25), from 500 feet to 100 feet, and such other relief as is appropriate.

(5) Order No. 30734 entered in Case No. 28279, the most recent spacing order for the Clarks Creek-Bakken Pool, established proper spacing for the development of Zone I at up to eighteen horizontal wells per 640 acres, Zone II at up to twenty-four horizontal wells per 640 acres, Zone III at up to twenty-eight horizontal wells per 960 acres, Zone IV at up to thirty-two horizontal wells per 1280 acres, Zone V at up to forty horizontal wells per 1440 acres, Zone VI at up to two horizontal wells per 1920 acres, Zone VII at up to four horizontal wells per 1920 acres, Zone VIII at one horizontal well per 2560 acres, Zone IX at up to two horizontal wells per 2560 acres, and Zone X at up to sixty-four horizontal wells per 2560 acres.

(6) Sections 13, 24, and 25 less Lots 1 through 4 in each section are currently a standup 1440-acre spacing unit in Zone V in the Clarks Creek-Bakken Pool.

(7) Lots 5, 6, 7, and 8 and the E/2 of Sections 13 and 24 and the W/2 and W/2 E/2 of Sections 18 and 19, Township 151 North, Range 94 West, McKenzie County, North Dakota, are currently a standup lease-line 1920-acre spacing unit in Zone VI in the Clarks Creek-Bakken Pool.

(8) The E/2 of Section 25*, the E/2 of Section 36*, Township 151 North, Range 95 West, and the W/2 of Sections 30 and 31, Township 151 North, Range 94 West, McKenzie County, North Dakota, are currently a standup lease-line 1280-acre spacing unit in Zone XIII in the Antelope-Sanish Pool, which allows one lease-line horizontal well on a north-south orientation.

*Section 36 and Section 25 less Lots 1, 2, 3, and 4 are within the Clarks Creek Field.

(9) Lots 1 through 4 in Sections 13, 24, and 25 (aka the W/2 W/2) are designated as not administratively available for leasing under the Land and Resource Management Plan for the Dakota Prairie Grasslands Northern Region, that further designates the lands as American Indian Traditional Use Area.

(10) EOG proposes to batch drill and complete at approximately the same time two horizontal wells in the first bench in the Three Forks Formation 130 feet to 200 feet from the west boundary in the standup 1440-acre spacing unit described as Sections 13, 24, and 25 less Lots 1 through 4 in each section. Both horizontal wells will be drilled from the current well pad in the SW/4 NE/4 of Section 24, one to the north and one to the south. Utilization of horizontal drilling technology as proposed would result in the well being completed at a location or locations not in compliance with current applicable spacing orders for the Clarks Creek-Bakken Pool. The horizontal well design proposed may be preliminary and could be changed for various reasons which is permissible as long as the horizontal well design still justifies the spacing unit and is consistent with the evidence that justified the setback reduction.

(11) Current provisions in Zone V in the Clarks Creek-Bakken Pool provide that all portions of the well bore not isolated by cement of any horizontal well in the standup 1440-acre spacing unit described as Sections 13, 24, and 25 less Lots 1 through 4 in each section shall be no closer than 500 feet to the east or west boundaries.

(12) EOG testified its hydraulic fracture design results in induced fracture half-lengths from 100 feet to 200 feet depending on the size of the fracture stimulation.

Confidential Business Information

(13) The Commission believes a horizontal well located outside the Commission's 500-feet corridor lease-line horizontal well policy (250 feet on either side of the lease-line) will produce the vast majority of its reserves from within the underlying base spacing unit; this is supported by EOG's estimated induced fracture half-lengths. EOG is agreeable to a 250-feet setback requirement.

(14) There are seven horizontal wells completed in Zone V in the Clarks Creek-Bakken Pool in the standup 1440-acre spacing unit described as Sections 13, 24, and 25 less Lots 1 through 4 in each section.

(15) There were no objections to this application.

(16) In order to prevent waste and to protect correlative rights, the setback requirement for the west boundary of the existing standup 1440-acre spacing unit described as Sections 13, 24, and 25, less Lots 1, 2, 3, and 4 in each section should be established at 250 feet.

(17) If EOG's activities are successful, greater ultimate recovery of oil and gas from the pool will be achieved which will prevent waste and the drilling of unnecessary wells in a manner which will not have a detrimental effect on correlative rights.

Confidential Business Information

IT IS THEREFORE ORDERED:

(1) All portions of the well bore not isolated by cement of any horizontal well in Zone V in the Clarks Creek-Bakken Pool in the standup 1440-acre spacing unit described as Sections 13, 24, and 25, less Lots 1, 2, 3, and 4 in each section, Township 151 North, Range 95 West, McKenzie County, North Dakota, shall be no closer than 250 feet to the west boundary. Measurement inaccuracies in the directional survey equipment need not be considered.

(2) The Director is hereby authorized to exercise continuing jurisdiction in this matter to determine whether a horizontal well proposed or drilled in the 1440-acre spacing unit herein amended, has justified the amendment of such unit, to require amendments or modifications to the permit to drill for such horizontal well, and to deny a permit to drill in the event a well is proposed to be drilled in a manner inconsistent with the evidence that justified such spacing unit amendment.

(3) Provisions established herein for the Clarks Creek-Bakken Pool are for the exclusive purpose of drilling horizontal wells. Existing and future vertical and directional wells drilled within the area defined in paragraph (4) below shall not be subject to this order.

(4) The Clarks Creek Field is hereby defined as the following described tracts of land in McKenzie County, North Dakota:

TOWNSHIP 152 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTIONS 25 AND 36,

TOWNSHIP 152 NORTH, RANGE 94 WEST, 5TH PM
ALL OF SECTIONS 30 AND 31,

TOWNSHIP 151 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTIONS 1, 12 AND 36, AND ALL OF SECTIONS 13, 24 AND 25 LESS LOTS 1 THROUGH 4 IN EACH SECTION,

TOWNSHIP 151 NORTH, RANGE 94 WEST, 5TH PM
ALL OF SECTIONS 6, 7, 18 AND 19.

(5) The Clarks Creek-Bakken Pool is hereby defined as the following described tracts of land in McKenzie County, North Dakota:

ZONE I (18/640H)

TOWNSHIP 151 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTION 36.

ZONE II (24/640H)

TOWNSHIP 151 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTION 12.

ZONE III (28/960H-STANDUP)

TOWNSHIP 152 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTIONS 25 AND 36,

TOWNSHIP 151 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTION 1.

ZONE IV (32/1280H-STANDUP)

TOWNSHIP 152 NORTH, RANGE 94 WEST, 5TH PM
ALL OF SECTIONS 30 AND 31.

ZONE V (40/1440H-STANDUP)

TOWNSHIP 151 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTIONS 13, 24, AND 25 LESS LOTS 1 THROUGH 4 IN EACH SECTION.

ZONE VI (2/1920H-STANDUP-NORTH/SOUTH ORIENTATION-LEASE-LINE)

TOWNSHIP 151 NORTH, RANGE 95 WEST, 5TH PM
LOTS 5, 6, 7, AND 8 AND THE E/2 OF SECTIONS 13 AND 24,

TOWNSHIP 151 NORTH, RANGE 94 WEST, 5TH PM
THE W/2 AND W/2 E/2 OF SECTIONS 18 AND 19.

Confidential Business Information

ZONE VII (4/1920H-STANDUP)

TOWNSHIP 152 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTIONS 25 AND 36,

TOWNSHIP 151 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTION 1.

ZONE VIII (2560H-NORTH/SOUTH ORIENTATION-LEASE-LINE)

TOWNSHIP 152 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTIONS 25, 26*, 35* AND 36.
*Sections 26 and 35 are within the Hawkeye Field.

ZONE IX (2/2560H-NORTH/SOUTH ORIENTATION-LEASE-LINE)

TOWNSHIP 152 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTIONS 25 AND 36,

TOWNSHIP 152 NORTH, RANGE 94 WEST, 5TH PM
ALL OF SECTIONS 30 AND 31,

TOWNSHIP 151 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTIONS 1 AND 12,

TOWNSHIP 151 NORTH, RANGE 94 WEST, 5TH PM
ALL OF SECTIONS 6 AND 7.

ZONE X (64/2560H-STANDUP)

TOWNSHIP 151 NORTH, RANGE 94 WEST, 5TH PM
ALL OF SECTIONS 6, 7, 18 AND 19.

Confidential Business Information

(6) The Clarks Creek-Bakken Pool is hereby defined as that accumulation of oil and gas found in the interval from 50 feet above the top of the Bakken Formation to above the top of the Birdbear Formation within the limits of the field as set forth above.

(7) All portions of the well bore not isolated by cement of any horizontal well in the Clarks Creek-Bakken Pool shall adhere to the following requirements unless specifically provided for in the respective zone below unless granted an exception by the Commission after due notice and hearing:

(a) Measurement inaccuracies in the directional survey equipment need not be considered except when deemed necessary by the Director.

(b) The lateral, heel portion of the lateral, or toe portion of the lateral in horizontal well bores shall be no closer than 500 feet to the most nearly parallel spacing unit boundary.

(c) The Director is hereby authorized to reduce the setback from 500 feet to 200 feet for horizontal well bores where the angle of the heel portion of the lateral and the respective spacing unit boundary is less than 45° through the issuance of permit stipulations, whenever, in his opinion, the applicant has demonstrated that correlative rights will be protected.

(d) The heel portion of the lateral in horizontal well bores where the angle of such is greater than 45° from the respective most nearly perpendicular spacing unit boundary, shall be no closer than 150 feet to said boundary.

(e) The lateral or toe portion of the lateral in horizontal well bores where the angle of such is greater than 45° from the respective most nearly perpendicular spacing unit boundary, shall adhere to the following:

(i) For horizontal wells completed open hole, the total depth of the well bore shall be no closer than 150 feet to the boundary of the spacing unit;

(ii) For horizontal wells completed with the production liner or casing cemented in the lateral, the total depth of the well bore shall be no closer than 50 feet to the boundary of the spacing unit, unless the horizontal well is stimulated through the shoe at the toe of the lateral whereby the total depth of the well bore shall be no closer than 150 feet to the boundary of the spacing unit; and

(iii) For horizontal wells completed with the production liner or casing externally isolated in the lateral by the use of packers, the total depth of the well bore shall be no closer than 100 feet to the boundary of the spacing unit unless the horizontal well is stimulated through the shoe at the toe of the lateral whereby the total depth of the well bore shall be no closer than 150 feet to the boundary of the spacing unit.

(8) The Application for Permit to Drill (Form 1) for a horizontal well to be completed in the Clarks Creek-Bakken Pool shall include a well schematic which depicts the:

(a) Proposed production casing setting depth at the heel relative to the spacing unit boundary;

(b) Proposed completion style as open hole lateral, cemented liner or casing in the lateral, liner or casing externally isolated in the lateral by the use of packers, or other completion style; and

(c) Proposed toe of the lateral including the location of the deepest perforation, completion sleeve, and/or external isolation packer.

(9) The Completion Report (Form 6) for a horizontal well completed in the Clarks Creek-Bakken Pool shall include a well schematic which depicts the:

(a) Production casing setting depth at the heel relative to the spacing unit boundary;

Confidential Business Information

(b) Completion style as open hole lateral, cemented liner or casing in the lateral, liner or casing externally isolated in the lateral by the use of packers, or other completion style; and

(c) Toe of the lateral including the location of the deepest perforation, completion sleeve, and/or external isolation packer.

(10) The proper spacing for the development of Zone I in the Clarks Creek-Bakken Pool is hereby set at up to eighteen horizontal wells per 640-acre spacing unit.

(11) Spacing units hereafter created in Zone I in the Clarks Creek-Bakken Pool shall consist of a governmental section.

(12) Zone I in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

(13) The proper spacing for the development of Zone II in the Clarks Creek-Bakken Pool is hereby set at up to twenty-four horizontal wells per 640-acre spacing unit.

(14) Spacing units hereafter created in Zone II in the Clarks Creek-Bakken Pool shall consist of a governmental section.

(15) Fracture stimulation procedures shall be submitted for prior approval before completing any horizontal well with a fracture initiation point located in the N/2 of Section 12 in the 640-acre spacing unit in Zone II in the Clarks Creek-Bakken Pool described as Section 12, Township 151 North, Range 95 West, McKenzie County, North Dakota, other than the Jore Federal #11-12TFH (File No. 34373), Jore Federal #3-12H (File No. 34375), Jore Federal #9-12TFH (File No. 34395), and Jore Federal #5-12H (File No. 34392) wells. Such procedures shall indicate the location of the nearby fracture initiation points relative to the offending well bore in the original curve portion in the Jore Federal #4-12H well (File No. 34378), from 10,265 feet MD, approximately 38 feet from the north line and 2301 feet from the east line of Section 12 to 10,970 feet MD, approximately 460 feet from the north line and 1,937 feet from the east line of Section 12, Township 151 North, Range 95 West, McKenzie County, North Dakota, and contain sufficient detail, such as estimated induced fracture orientation and half-length, for the Director to determine that correlative rights will be protected. The Director may require additional tests and logs to ensure correlative rights are protected.

(16) Subsequent to the fracture stimulation for any horizontal well with a fracture initiation point located in the N/2 of Section 12 in the 640-acre spacing unit in Zone II in the Clarks Creek-Bakken Pool described as Section 12, Township 151 North, Range 95 West, McKenzie County, North Dakota, other than the Jore Federal #11-12TFH (File No. 34373), Jore Federal #3-12H (File No. 34375), Jore Federal #9-12TFH (File No. 34395), and Jore Federal #5-12H (File No. 34392) wells, a follow-up Sundry Notice (Form 4) shall be submitted verifying the location of the nearby fracture initiation points relative to the offending well bore in the original curve portion in the Jore Federal #4-12H well (File No. 34378), from 10,265 feet MD, approximately 38 feet from the north line and 2301 feet from the east line of Section 12 to 10,970 feet MD, approximately 460

Confidential Business Information

feet from the north line and 1,937 feet from the east line of Section 12, Township 151 North, Range 95 West, McKenzie County, North Dakota.

(17) Zone II in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

(18) The proper spacing for the development of Zone III in the Clarks Creek-Bakken Pool is hereby set at up to twenty-eight horizontal wells per standup 960-acre spacing unit.

(19) Section 25 and the N/2 of Section 36, Township 152 North, Range 95 West; and Section 1, Township 151 North, Range 95 West and the S/2 of Section 36, Township 152 North, Range 95 West, McKenzie County, North Dakota, are hereby designated standup 960-acre spacing units in Zone III in the Clarks Creek-Bakken Pool.

(20) Spacing units hereafter created in Zone III in the Clarks Creek-Bakken Pool shall be standup spacing units designated by the Commission.

(21) Fracture stimulation procedures shall be submitted for prior approval before completing any horizontal well with a fracture initiation point located in the SE/4 of Section 1 in the standup 960-acre spacing unit in Zone III in the Clarks Creek-Bakken Pool described as the S/2 of Section 36, Township 152 North, Range 95 West and Section 1, Township 151 North, Range 95 West, McKenzie County, North Dakota. Such procedures shall indicate the location of the nearby fracture initiation points relative to the offending well bore in the original curve portion in the Jore Federal #4-12H well (File No. 34378), from 10,265 feet MD, approximately 38 feet from the north line and 2301 feet from the east line of Section 12 to 10,970 feet MD, approximately 460 feet from the north line and 1,937 feet from the east line of Section 12, Township 151 North, Range 95 West, McKenzie County, North Dakota, and contain sufficient detail, such as estimated induced fracture orientation and half-length, for the Director to determine that correlative rights will be protected. The Director may require additional tests and logs to ensure correlative rights are protected.

(22) Subsequent to the fracture stimulation for any horizontal well with a fracture initiation point located in the SE/4 of Section 1 in the standup 960-acre spacing unit in Zone III in the Clarks Creek-Bakken Pool described as the S/2 of Section 36, Township 152 North, Range 95 West and Section 1, Township 151 North, Range 95 West, McKenzie County, North Dakota, a follow-up Sundry Notice (Form 4) shall be submitted verifying the location of the nearby fracture initiation points relative to the offending well bore in the original curve portion in the Jore Federal #4-12H well (File No. 34378), from 10,265 feet MD, approximately 38 feet from the north line and 2301 feet from the east line of Section 12 to 10,970 feet MD, approximately 460 feet from the north line and 1,937 feet from the east line of Section 12, Township 151 North, Range 95 West, McKenzie County, North Dakota.

(23) Zone III in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

(24) The proper spacing for the development of Zone IV in the Clarks Creek-Bakken Pool is hereby set at up to thirty-two horizontal wells per standup 1280-acre spacing unit.

Confidential Business Information

(25) Sections 30 and 31, Township 152 North, Range 94 West, McKenzie County, North Dakota, are hereby designated a standup 1280-acre spacing unit in Zone IV in the Clarks Creek-Bakken Pool.

(26) Spacing units hereafter created in Zone IV in the Clarks Creek-Bakken Pool shall be standup spacing units consisting of two adjacent governmental sections.

(27) Zone IV in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

(28) The proper spacing for the development of Zone V in the Clarks Creek-Bakken Pool is hereby set at up to forty horizontal wells per standup 1440-acre spacing unit.

(29) As an exception to paragraph (7) above, all portions of the well bore not isolated by cement of any horizontal well in Zone V in the Clarks Creek-Bakken Pool in the standup 1440-acre spacing unit described as Sections 13, 24, and 25, less Lots 1, 2, 3, and 4 in each section, Township 151 North, Range 95 West, McKenzie County, North Dakota, shall be no closer than 250 feet to the west boundary. Measurement inaccuracies in the directional survey equipment need not be considered.

(30) Sections 13, 24, and 25, less Lots 1, 2, 3, and 4 in each section, Township 151 North, Range 95 West, McKenzie County, North Dakota, are hereby designated a standup 1440-acre spacing unit in Zone V in the Clarks Creek-Bakken Pool.

(31) Spacing units hereafter created in Zone V in the Clarks Creek-Bakken Pool shall be standup spacing units designated by the Commission.

(32) Zone V in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

(33) The proper spacing for the development of Zone VI in the Clarks Creek-Bakken Pool is hereby set at up to two lease-line horizontal wells per standup 1920-acre spacing unit drilled on a north-south orientation.

(34) All portions of the well bore not isolated by cement of any horizontal well in Zone VI in the Clarks Creek-Bakken Pool shall be located approximately down the north-south axis and comply with paragraph (7) above.

(35) Lots 5, 6, 7, and 8 and the E/2 of Sections 13 and 24, Township 151 North, Range 95 West and the W/2 and the W/2 E/2 of Sections 18 and 19, Township 151 North, Range 94 West, McKenzie County, North Dakota, are hereby designated a standup 1920-acre spacing unit in Zone VI in the Clarks Creek-Bakken Pool.

(36) Spacing units hereafter created in Zone VI in the Clarks Creek-Bakken Pool shall be standup spacing units designated by the Commission.

(37) Zone VI in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

Confidential Business Information

(38) The proper spacing for the development of Zone VII in the Clarks Creek-Bakken Pool is hereby set at up to four horizontal wells per standup 1920-acre spacing unit.

(39) Sections 25 and 36, Township 152 North, Range 95 West and Section 1, Township 151 North, Range 95 West, McKenzie County, North Dakota, are hereby designated a standup 1920-acre spacing unit in Zone VII in the Clarks Creek-Bakken Pool.

(40) Spacing units hereafter created in Zone VII in the Clarks Creek-Bakken Pool shall be standup spacing units consisting of three adjacent governmental sections.

(41) Fracture stimulation procedures shall be submitted for prior approval before completing any horizontal well with a fracture initiation point located in the SE/4 of Section 1 in the standup 1920-acre spacing unit in Zone VII in the Clarks Creek-Bakken Pool described as Sections 25 and 36, Township 152 North, Range 95 West and Section 1, Township 151 North, Range 95 West, McKenzie County, North Dakota. Such procedures shall indicate the location of the nearby fracture initiation points relative to the offending well bore in the original curve portion in the Jore Federal #4-12H well (File No. 34378), from 10,265 feet MD, approximately 38 feet from the north line and 2301 feet from the east line of Section 12 to 10,970 feet MD, approximately 460 feet from the north line and 1,937 feet from the east line of Section 12, Township 151 North, Range 95 West, McKenzie County, North Dakota, and contain sufficient detail, such as estimated induced fracture orientation and half-length, for the Director to determine that correlative rights will be protected. The Director may require additional tests and logs to ensure correlative rights are protected.

(42) Subsequent to the fracture stimulation for any horizontal well with a fracture initiation point located in the SE/4 of Section 1 in the standup 1920-acre spacing unit in Zone VII in the Clarks Creek-Bakken Pool described as Sections 25 and 36, Township 152 North, Range 95 West and Section 1, Township 151 North, Range 95 West, McKenzie County, North Dakota, a follow-up Sundry Notice (Form 4) shall be submitted verifying the location of the nearby fracture initiation points relative to the offending well bore in the original curve portion in the Jore Federal #4-12H well (File No. 34378), from 10,265 feet MD, approximately 38 feet from the north line and 2301 feet from the east line of Section 12 to 10,970 feet MD, approximately 460 feet from the north line and 1,937 feet from the east line of Section 12, Township 151 North, Range 95 West, McKenzie County, North Dakota.

Confidential Business Information

(43) Zone VII in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

(44) The proper spacing for the development of Zone VIII in the Clarks Creek-Bakken Pool is hereby set at one lease-line horizontal well per 2560-acre spacing unit drilled on a north-south orientation.

(45) All portions of the well bore not isolated by cement of any horizontal well in Zone VIII in the Clarks Creek-Bakken Pool shall be located approximately down the north-south axis and comply with paragraph (7) above.

(46) Sections 25, 26*, 35*, and 36, Township 152 North, Range 95 West, McKenzie County, North Dakota, are hereby designated a 2560-acre spacing unit in Zone VIII in the Clarks Creek-Bakken Pool.

*Sections 26 and 35 are within the Hawkeye Field.

(47) One horizontal well shall be drilled and completed in the standup 960-acre spacing unit described as Section 25 and the N/2 of Section 36, Township 152 North, Range 95 West, McKenzie County, North Dakota, prior to completing any horizontal well in the lease-line 2560-acre spacing unit described as Sections 25, 26*, 35*, and 36, Township 152 North, Range 95 West, McKenzie County, North Dakota.

*Sections 26 and 35 are within the Hawkeye Field.

(48) Spacing units hereafter created in Zone VIII in the Clarks Creek-Bakken Pool shall consist of four adjacent governmental sections designated by the Commission.

(49) Zone VIII in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

(50) The proper spacing for the development of Zone IX in the Clarks Creek-Bakken Pool is hereby set at up to two lease-line horizontal wells per 2560-acre spacing unit drilled on a north-south orientation.

(51) All portions of the well bore not isolated by cement of any horizontal well in Zone IX in the Clarks Creek-Bakken Pool shall be located approximately down the north-south axis and comply with paragraph (7) above.

(52) Sections 25 and 36, Township 152 North, Range 95 West and Sections 30 and 31, Township 152 North, Range 94 West; and Sections 1 and 12, Township 151 North, Range 95 West and Sections 6 and 7, Township 151 North, Range 94 West, McKenzie County, North Dakota, are hereby designated 2560-acre spacing units in Zone IX in the Clarks Creek-Bakken Pool.

(53) One horizontal well shall be drilled and completed in the standup 960-acre spacing unit described as Section 25 and the N/2 of Section 36, Township 152 North, Range 95 West, McKenzie County, North Dakota, prior to completing any horizontal well in the lease-line 2560-acre spacing unit described as Sections 25 and 36, Township 152 North, Range 95 West and Sections 30 and 31, Township 152 North, Range 94 West, McKenzie County, North Dakota.

(54) Spacing units hereafter created in Zone IX in the Clarks Creek-Bakken Pool shall consist of four adjacent governmental sections designated by the Commission.

(55) Zone IX in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

(56) The proper spacing for the development of Zone X in the Clarks Creek-Bakken Pool is hereby set at up to sixty-four horizontal wells per standup 2560-acre spacing unit.

Confidential Business Information

(57) Sections 6, 7, 18, and 19, Township 151 North, Range 94 West, McKenzie County, North Dakota, are hereby designated a standup 2560-acre spacing unit in Zone X in the Clarks Creek-Bakken Pool.

(58) Spacing units hereafter created in Zone X in the Clarks Creek-Bakken Pool shall be standup spacing units consisting of four adjacent governmental sections.

(59) Zone X in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

(60) The operator of any horizontally drilled well in the Clarks Creek-Bakken Pool shall cause to be made a directional survey of the well bore. The directional survey contractor shall file a certified survey with the Commission within 30 days after completion of the well in accordance with NDAC Section 43-02-03-25. The survey shall be of sufficient quality to enable the Commission to determine the entire completion location of the well and its terminus.

(61) The Director is hereby authorized to exercise continuing jurisdiction to determine whether any well proposed or drilled upon any spacing unit herein established has justified the creation of such unit, to require amendments or modifications to the permit to drill for such well, and to deny a permit to drill in the event a well is proposed to be drilled in a manner inconsistent with the evidence that justified the spacing requirements in the Clarks Creek-Bakken Pool.

(62) The Commission shall have continuing jurisdiction in this matter and specifically reserves the authority, upon its own motion or the motion of any interested party, to: (1) review the spacing requirements for the Clarks Creek-Bakken Pool; (2) determine whether the separate zones of spacing established herein are warranted; and, (3) make such further amendments or modifications to the spacing requirements for the Clarks Creek-Bakken Pool as the Commission deems appropriate.

(63) No well shall be drilled or produced in the Clarks Creek-Bakken Pool, as defined herein, except in conformity with the regulations above without special order of the Commission after due notice and hearing.

(64) The following rules concerning the casing, tubing and equipping of wells shall apply to the subsequent drilling and operation of wells in the Clarks Creek-Bakken Pool:

(a) The surface casing shall consist of new or reconditioned pipe that has been previously tested to 1000 pounds per square inch. The casing shall be set and cemented at a point not less than 50 feet below the base of the Fox Hills Formation. Sufficient cement shall be used to fill the annular space outside the pipe to the surface of the ground, or the bottom of the cellar, and sufficient scratchers and centralizers shall be used to assure a good cement job. Cement shall be allowed to stand a minimum of 12 hours before drilling the plug or initiating tests. The quality of cement shall conform to the standards provided under NDAC Section 43-02-03-21. After cementing, the casing shall be tested by application of pump pressure of at least 1000 pounds per square inch. If, at the end of 30 minutes this pressure has dropped 100 pounds per square inch or more, the casing shall be repaired. Thereafter, the casing shall again be tested in the

Confidential Business Information

same manner. Further work shall not proceed until a satisfactory test has been obtained;

(b) The producing or oil string shall consist of new or reconditioned pipe that has been previously tested to 2000 pounds per square inch. Casing shall be set and cemented at a point not higher than the top of the producing formation, or at a point approved by the Director. Sufficient cement shall be used and applied in such a manner as to protect and isolate all formations containing oil and/or gas, protect the pipe through salt sections encountered, and isolate the Dakota-Lakota Series. The cement shall be allowed to stand a minimum of 15 hours before drilling the plug or initiating tests. The quality of cement shall conform to the standards provided under NDAC Section 43-02-03-21. After cementing, the casing shall be tested by application of pump pressure of at least 1500 pounds per square inch. If, at the end of 30 minutes this pressure has dropped 150 pounds per square inch or more, the casing shall be repaired. Thereafter, the casing shall again be tested in the same manner. Further work shall not proceed until a satisfactory test has been obtained;

(c) All well-head fittings and connections shall have a working pressure in excess of that to which they are expected to be subjected; and,

(d) All wells shall be equipped with tubing; a tubing packer must also be utilized in flowing wells unless a waiver is obtained from the Director after demonstrating the casing will not be subjected to excessive pressure or corrosion; all tubing shall be of sufficient internal diameter to allow the passage of a bottom hole pressure gauge for the purpose of obtaining bottom hole pressure measurements.

Confidential Business Information

(65) The gas-oil ratio of all wells not connected to a gas gathering system shall be measured annually during the month of May. The reservoir pressure shall be measured in any well completed in the Clarks Creek-Bakken Pool if deemed necessary by the Director. Drill stem test pressures are acceptable for determining reservoir pressure. Pressure measurements shall be made at or adjusted to a subsea datum of 8200 feet. All gas-oil ratio and reservoir pressure determinations shall be made by methods approved by the Director and reported to the Director within 15 days following the end of the month in which they are determined. The Director is authorized to waive these requirements if the necessity therefor can be demonstrated to his satisfaction. All additional gas-oil ratio and reservoir pressure determinations conducted on any well, but not specially required herein, shall be reported to the Director within 15 days following the end of the month in which they are determined.

(66) No salt water, drilling mud, crude oil, or waste oil shall be stored in pits in this field, except in an emergency, and approved by the Director.

(67) The first horizontal well completed in each Clarks Creek-Bakken Pool non-overlapping spacing unit shall be allowed to produce at a maximum efficient rate.

(68) All wells completed in the Clarks Creek-Bakken Pool that have received an exemption to North Dakota Century Code Section 38-08-06.4 shall be allowed to produce at a maximum efficient rate.

(69) All infill horizontal wells, including overlapping spacing units, completed in the Clarks Creek-Bakken Pool, shall be allowed to produce at a maximum efficient rate for a period of 90 days commencing on the first day oil is produced through well-head equipment into tanks from the ultimate producing interval after casing has been run; after that, such wells shall be allowed to continue to produce at a maximum efficient rate if the well or operator meets or exceeds the Commission approved gas capture goals. The gas capture percentage shall be calculated by summing monthly gas sold plus monthly gas used on lease plus monthly gas processed in a Commission approved beneficial manner, divided by the total monthly volume of associated gas produced by the operator. The operator is allowed to remove the initial 14 days of flowback gas in the total monthly volume calculation. The Commission will accept compliance with the gas capture goals by well, field, county, or statewide by operator. If such gas capture percentage is not attained at maximum efficient rate, the well(s) shall be restricted to 200 barrels of oil per day if at least 60% of the monthly volume of associated gas produced from the well is captured, otherwise oil production from such wells shall not exceed 100 barrels of oil per day.

The Commission will recognize the following as surplus gas being utilized in a beneficial manner:

(a) Equipped with an electrical generator that consumes surplus gas from the well;

(b) Equipped with a system that intakes the surplus gas and natural gas liquids volume from the well for beneficial consumption by means of compression to liquid for use as fuel, transport to a processing facility, production of petrochemicals or fertilizer, conversion to liquid fuels, separating and collecting the propane and heavier hydrocarbons; and

(c) Equipped with other value-added processes as approved by the Director which reduce the volume or intensity of the flare by more than 60%.

(70) If the flaring of gas produced with crude oil from the Clarks Creek-Bakken Pool is determined by the North Dakota Department of Environmental Quality as causing a violation of the North Dakota Air Pollution Control Rules (NDAC Article 33.1-15), production from the pool may be further restricted.

(71) This order shall cover all of the Clarks Creek-Bakken Pool, common source of supply of crude oil and/or natural gas as herein defined, and continues in full force and effect until further order of the Commission or until the last well in the pool is plugged and abandoned.

Dated this 12th day of June, 2020.

INDUSTRIAL COMMISSION
STATE OF NORTH DAKOTA

By the Director, on behalf of the Commission

/s/ Lynn D. Helms, Director

Confidential Business Information

Exhibit 5 to 5/9/23 SDR

Exhibit 2

**Wells in the Clarks Creek-Bakken Field During the Flaring Period**

**Application Well**
Jore Federal 2-12H

| Preexisting Well | API Number | Operator |
|---|---|---|
| CLARKS CREEK (101-1819H) | 3305303612 | EOG RESOURCES INC |
| CLARKS CREEK (11-0706H) | 3305303615 | EOG RESOURCES INC |
| CLARKS CREEK (12-0719H) | 3305303616 | EOG RESOURCES INC |
| CLARKS CREEK (13-1806H) | 3305303613 | EOG RESOURCES INC |
| CLARKS CREEK (14-1819H) | 3305303614 | EOG RESOURCES INC |
| CLARKS CREEK (16-0706H) | 3305303617 | EOG RESOURCES INC |
| HAWKEYE (01-2501H) | 3305304004 | EOG RESOURCES INC |
| HAWKEYE (02-2501H) | 3305304006 | EOG RESOURCES INC |
| HAWKEYE (100-2501H) | 3305304005 | EOG RESOURCES INC |
| HAWKEYE (102-2501H) | 3305304003 | EOG RESOURCES INC |
| RIVERVIEW (100-3031H) | 3305303931 | EOG RESOURCES INC |
| RIVERVIEW (3-3130H) | 3305303505 | EOG RESOURCES INC |
| RIVERVIEW (4-3031H) | 3305303932 | EOG RESOURCES INC |
| WEST CLARK (100-2413H) | 3305303447 | EOG RESOURCES INC |
| WEST CLARK (101-2425H) | 3305303446 | EOG RESOURCES INC |
| WEST CLARK (102-2413H) | 3305304142 | EOG RESOURCES INC |
| WEST CLARK (1-2413H) | 3305303449 | EOG RESOURCES INC |
| WEST CLARK (2-2425H) | 3305303448 | EOG RESOURCES INC |
| WEST CLARK (3-2413H) | 3305303445 | EOG RESOURCES INC |
| WEST CLARK (4-2425H) | 3305303444 | EOG RESOURCES INC |
| WEST CLARK (5-2425H) | 3305304141 | EOG RESOURCES INC |
| BULLET (12-36H) | 3305305493 | SHD OIL & GAS LLC |
| THUD (12-36H) | 3305305492 | SHD OIL & GAS LLC |

| Contemporaneous Well | API Number | Operator |
|---|---|---|
| WEST CLARK (103-0136H) | 3305306954 | EOG RESOURCES INC |
| WEST CLARK (104-0136H) | 3305306955 | EOG RESOURCES INC |
| WEST CLARK (117-0136H) | 3305307014 | EOG RESOURCES INC |
| AVALANCHE (36-14-MB2) | 3305306395 | SHD OIL & GAS LLC |
| AVALANCHE (36-15-TF1) | 3305306394 | SHD OIL & GAS LLC |
| AVALANCHE (36-16-MB2) | 3305306393 | SHD OIL & GAS LLC |
| AVALANCHE (36-17-TF2) | 3305306392 | SHD OIL & GAS LLC |
| BUCKY (13-36H) | 3305305409 | SHD OIL & GAS LLC |
| CANON (12-36H) | 3305305490 | SHD OIL & GAS LLC |
| HAMMER (12-36H) | 3305305491 | SHD OIL & GAS LLC |
| LUKE (13-36H) | 3305305412 | SHD OIL & GAS LLC |
| MAGNUM (36-11-TF2) | 3305306461 | SHD OIL & GAS LLC |
| MAGNUM (36-12-MB2) | 3305306462 | SHD OIL & GAS LLC |
| MAGNUM (36-13-TF2) | 3305306463 | SHD OIL & GAS LLC |
| MARC (13-36H) | 3305305411 | SHD OIL & GAS LLC |
| MATTIE (13-36H) | 3305305410 | SHD OIL & GAS LLC |

Confidential Business Information

Exhibit 5 to 5/9/23 SDR

Exhibit 3

| Clarks Creek-Bakken Field | Column A | Column B | Column C | Column D | Column E | Column F |
|---|---|---|---|---|---|---|
| | Oil Recovery Net Operating Income | Net Present Value of Oil Recovery Net Operating Income PV12 | Cumulative NPV12 | Gas Recovery Net Operating Income | Net Present Value of Gas Recovery Net Operating Income PV12 | Cumulative NPV12 |
| **Capital Expense** | $ (105,762,925) | $ (105,762,925) | $ (105,762,925) | $ (42,592,690) | $ (42,592,690) | $ (42,592,690) |
| 2014 | $ 31,683,123 | $ 31,007,428 | $ (74,755,497) | $ 1,406,009 | $ 1,374,344 | $ (41,218,346) |
| 2015 | $ 35,554,627 | $ 32,270,832 | $ (42,484,665) | $ 1,215,444 | $ 1,107,933 | $ (40,110,413) |
| 2016 | $ 32,514,622 | $ 26,126,260 | $ (16,358,405) | $ 3,593,501 | $ 2,861,203 | $ (37,249,210) |
| 2017 | $ 25,556,280 | $ 18,549,201 | $ 2,190,796 | $ 2,310,105 | $ 1,682,023 | $ (35,567,187) |
| 2018 | $ 23,910,858 | $ 15,486,615 | $ 17,677,411 | $ 1,500,562 | $ 967,692 | $ (34,599,495) |
| 2019 | $ 17,548,758 | $ 10,079,093 | $ 27,756,504 | $ 958,540 | $ 552,545 | $ (34,046,950) |
| 2020 | $ 15,488,120 | $ 7,999,679 | $ 35,756,183 | $ 834,666 | $ 431,451 | $ (33,615,499) |
| 2021 | $ 11,271,946 | $ 5,183,779 | $ 40,939,962 | $ 613,110 | $ 282,442 | $ (33,333,057) |
| 2022 | $ 9,139,471 | $ 3,752,340 | $ 44,692,302 | $ 615,697 | $ 252,678 | $ (33,080,379) |
| 2023 | $ 7,758,589 | $ 2,843,386 | $ 47,535,688 | $ 541,915 | $ 198,535 | $ (32,881,844) |
| 2024 | $ 6,639,959 | $ 2,172,726 | $ 49,708,414 | $ 483,526 | $ 158,149 | $ (32,723,695) |
| 2025 | $ 5,679,052 | $ 1,659,219 | $ 51,367,633 | $ 422,976 | $ 123,551 | $ (32,600,144) |
| 2026 | $ 4,819,931 | $ 1,257,467 | $ 52,625,100 | $ 378,486 | $ 98,684 | $ (32,501,460) |
| 2027 | $ 4,080,920 | $ 950,553 | $ 53,575,653 | $ 313,031 | $ 72,965 | $ (32,428,495) |
| 2028 | $ 3,437,215 | $ 714,949 | $ 54,290,602 | $ 271,616 | $ 56,457 | $ (32,372,038) |
| 2029 | $ 2,844,147 | $ 528,271 | $ 54,818,873 | $ 240,862 | $ 44,716 | $ (32,327,322) |
| 2030 | $ 2,322,318 | $ 385,179 | $ 55,204,052 | $ 208,743 | $ 34,612 | $ (32,292,710) |
| 2031 | $ 1,864,351 | $ 276,130 | $ 55,480,182 | $ 177,885 | $ 26,348 | $ (32,266,362) |
| 2032 | $ 1,494,029 | $ 197,605 | $ 55,677,787 | $ 138,569 | $ 18,309 | $ (32,248,053) |
| 2033 | $ 1,174,432 | $ 138,721 | $ 55,816,508 | $ 123,149 | $ 14,525 | $ (32,233,528) |
| 2034 | $ 883,321 | $ 93,199 | $ 55,909,707 | $ 109,163 | $ 11,496 | $ (32,222,032) |
| 2035 | $ 659,345 | $ 62,121 | $ 55,971,828 | $ 97,023 | $ 9,123 | $ (32,212,909) |
| 2036 | $ 479,227 | $ 40,325 | $ 56,012,153 | $ 85,941 | $ 7,216 | $ (32,205,693) |
| 2037 | $ 337,033 | $ 25,316 | $ 56,037,469 | $ 67,943 | $ 5,109 | $ (32,200,584) |
| 2038 | $ 256,436 | $ 17,200 | $ 56,054,669 | $ 52,584 | $ 3,520 | $ (32,197,064) |
| 2039 | $ 193,695 | $ 11,580 | $ 56,066,249 | $ 39,024 | $ 2,345 | $ (32,194,719) |
| 2040 | $ 151,867 | $ 8,106 | $ 56,074,355 | $ 22,387 | $ 1,205 | $ (32,193,514) |
| 2041 | $ 127,023 | $ 6,062 | $ 56,080,417 | $ 12,025 | $ 573 | $ (32,192,941) |
| 2042 | $ 90,921 | $ 3,877 | $ 56,084,294 | $ 10,823 | $ 460 | $ (32,192,481) |
| 2043 | $ 70,177 | $ 2,669 | $ 56,086,963 | $ 8,837 | $ 336 | $ (32,192,145) |
| 2044 | $ 48,258 | $ 1,641 | $ 56,088,604 | $ 7,876 | $ 267 | $ (32,191,878) |
| 2045 | $ 30,075 | $ 913 | $ 56,089,517 | $ 4,546 | $ 140 | $ (32,191,738) |
| 2046 | $ 20,027 | $ 543 | $ 56,090,060 | $ 715 | $ 19 | $ (32,191,719) |
| 2047 | $ 10,225 | $ 249 | $ 56,090,309 | $ 643 | $ 16 | $ (32,191,703) |
| 2048 | $ 1,402 | $ 32 | $ 56,090,341 | $ 579 | $ 12 | $ (32,191,691) |
| 2049 | $ (6,538) | $ (124) | $ 56,090,217 | $ 521 | $ 10 | $ (32,191,681) |
| 2050 | $ (1,805) | $ (32) | $ 56,090,185 | $ 82 | $ 1 | $ (32,191,680) |

Confidential Business Information

Exhibit 5 to 5/9/23 SDR

Exhibit 4

# ASTRO-CHEM LAB, INC.

4102 2nd Ave. W. Williston, North Dakota 58802-0972 P.O. Box 972
Phone: (701) 572-7355

## NATURAL GAS ANALYSIS

Sample Number: 19-01757 Date of Analysis: 5/6/2019
Company: Slawson Exploration Co.
City: Denver State: CO
Well Number: Jore Federal 2-12H
Sample Source: Treater
Date Received: 5/6/2019 Date Sampled: 5/6/2019
Temperature: Pressure: 22.0 PSI
Formation: Depth:
Location: Section: Twp: Rng: County: McKenzie
Distribution: Distribution List

| COMPONENT | MOLE % | GPM |
|---|---|---|
| Nitrogen | 1.56 | 0.000 |
| Methane | 57.98 | 0.000 |
| Carbon Dioxide | 0.44 | 0.000 |
| Ethane | 18.16 | 4.849 |
| $H_2S$ | 0.00 | 0.000 |
| Propane | 10.78 | 2.956 |
| Iso-Butane | 1.30 | 0.424 |
| N-Butane | 4.57 | 1.435 |
| Iso-Pentane | 0.68 | 0.247 |
| N-Pentane | 1.37 | 0.493 |
| Hexanes + | 3.16 | 1.384 |
| Oxygen/Argon | 0.00 | 0.000 |
| Total | 100.00 | 11.788 |

Calculated Specific Gravity 0.9644 (Air = 1.0000)
Calculated Gross BTU/ft³ 1588 (Saturated) 1616 (Dry) at 14.73 psi and 60°F

Remarks: Sampled by M. Fick (ACL)

Analyzed By: C. Jungels

Confidential Business Information

# Clarks Creek Field - Oil and Gas Recovery Estimates

Date: 3/31/2022
Time: 10:05 AM

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

# Evaluation Based on "Flaring Period" from 9/2014 to 12/2016

Summary Lease Report

| Date | Well Count | Gross Production Oil (Bbl) | Gross Production Gas (Mcf) | Net Production Oil (Bbl) | Net Production Gas (Mcf) | Average Prices Oil ($/Bbl) | Average Prices Gas ($/Mcf) | Sales Total ($) |
|---|---|---|---|---|---|---|---|---|
| 12/2014 | 37 | 809,775 | 552,734 | 623,527 | 319,204 | 63.64 | 4.48 | 41,109,851 |
| 12/2015 | 37 | 1,641,943 | 937,229 | 1,264,296 | 541,250 | 39.39 | 2.32 | 51,055,132 |
| 12/2016 | 39 | 1,666,954 | 2,462,095 | 1,283,555 | 1,421,860 | 36.73 | 2.60 | 50,835,682 |
| 12/2017 | 40 | 1,064,852 | 1,310,892 | 819,936 | 757,040 | 45.04 | 3.12 | 39,297,686 |
| 12/2018 | 40 | 760,704 | 790,798 | 585,742 | 456,686 | 57.95 | 3.36 | 35,477,187 |
| 12/2019 | 39 | 662,093 | 655,926 | 509,811 | 378,797 | 52.29 | 2.60 | 27,641,577 |
| 12/2020 | 39 | 613,982 | 608,969 | 472,766 | 351,679 | 49.63 | 2.44 | 24,323,646 |
| 12/2021 | 39 | 513,601 | 481,984 | 395,473 | 278,346 | 46.31 | 2.27 | 18,947,682 |
| 12/2022 | 36 | 443,609 | 399,053 | 341,579 | 230,453 | 44.99 | 2.74 | 16,001,157 |
| 12/2023 | 36 | 395,175 | 351,232 | 304,284 | 202,837 | 44.80 | 2.74 | 14,188,302 |
| 12/2024 | 36 | 354,177 | 313,389 | 272,716 | 180,982 | 44.80 | 2.74 | 12,714,100 |
| 12/2025 | 35 | 315,964 | 274,144 | 243,292 | 158,318 | 44.80 | 2.74 | 11,333,746 |
| 12/2026 | 35 | 283,886 | 245,309 | 218,592 | 141,666 | 44.80 | 2.74 | 10,181,489 |
| 12/2027 | 33 | 249,311 | 202,885 | 191,969 | 117,166 | 44.80 | 2.74 | 8,921,603 |
| 12/2028 | 31 | 219,842 | 176,043 | 169,279 | 101,665 | 44.80 | 2.74 | 7,862,537 |
| Remainder: | | 1,192,185 | 913,815 | 917,982 | 527,728 | 44.80 | 2.74 | 42,573,095 |
| Grand Total: | | 11,188,052 | 10,676,498 | 8,614,800 | 6,165,678 | 45.87 | 2.81 | 412,464,472 |

| Date | Operating Expenses ($) | Taxes ($) | Operating Income ($) | Other Costs ($) | Periodic Cash Flow ($) | Cumulative Cash Flow ($) | 12% Cash Flow ($) |
|---|---|---|---|---|---|---|---|
| 12/2014 | 4,029,881 | 3,990,839 | 33,089,131 | 148,355,615 | -115,266,484 | -115,266,484 | -115,973,843 |
| 12/2015 | 9,266,408 | 5,018,652 | 36,770,071 | 0 | 36,770,071 | -78,496,412 | 33,378,765 |
| 12/2016 | 9,912,227 | 4,815,331 | 36,108,123 | 0 | 36,108,123 | -42,388,289 | 28,987,464 |
| 12/2017 | 7,684,032 | 3,747,269 | 27,866,385 | 0 | 27,866,385 | -14,521,904 | 20,231,224 |
| 12/2018 | 6,638,840 | 3,426,927 | 25,411,420 | 0 | 25,411,420 | 10,889,516 | 16,454,307 |
| 12/2019 | 6,441,702 | 2,692,577 | 18,507,299 | 0 | 18,507,299 | 29,396,815 | 10,631,638 |
| 12/2020 | 5,629,427 | 2,371,434 | 16,322,786 | 0 | 16,322,786 | 45,719,601 | 8,431,130 |
| 12/2021 | 5,211,333 | 1,851,294 | 11,885,056 | 0 | 11,885,056 | 57,604,657 | 5,466,221 |
| 12/2022 | 4,692,675 | 1,553,313 | 9,755,168 | 0 | 9,755,168 | 67,359,826 | 4,005,018 |
| 12/2023 | 4,510,162 | 1,377,637 | 8,300,503 | 0 | 8,300,503 | 75,660,329 | 3,041,921 |
| 12/2024 | 4,355,961 | 1,234,655 | 7,123,484 | 0 | 7,123,484 | 82,783,813 | 2,330,876 |
| 12/2025 | 4,130,496 | 1,101,222 | 6,102,028 | 0 | 6,102,028 | 88,885,841 | 1,782,770 |
| 12/2026 | 3,993,694 | 989,378 | 5,198,416 | 0 | 5,198,416 | 94,084,258 | 1,356,151 |
| 12/2027 | 3,659,287 | 868,365 | 4,393,950 | 0 | 4,393,950 | 98,478,208 | 1,023,519 |
| 12/2028 | 3,388,099 | 765,607 | 3,708,831 | 0 | 3,708,831 | 102,187,039 | 771,407 |
| Remainder: | 23,963,073 | 4,150,134 | 14,459,887 | 0 | 14,459,887 | 116,646,926 | 1,979,938 |
| Grand Total: | 107,507,298 | 39,954,633 | 265,002,541 | 148,355,615 | 116,646,926 | 116,646,926 | 23,898,504 |

**Discount Present Worth:**

| | |
|---|---|
| 0.00 % | 116,646,926 |
| 8.00 % | 45,456,360 |
| 10.00 % | 33,912,975 |
| 12.50 % | 21,598,966 |
| 15.00 % | 11,141,497 |
| 17.50 % | 2,149,911 |
| 20.00 % | -5,665,051 |
| 25.00 % | -18,587,649 |
| 30.00 % | -28,843,018 |
| 40.00 % | -44,115,714 |
| 50.00 % | -54,970,387 |

**Economic Dates:**

| | |
|---|---|
| Effective Date | 09/2014 |
| Calculated Limit | 02/2050 |
| Economic Life | 426 Months |
| | 35 Years 6 Months |

**Economics Information:**

| | |
|---|---|
| Net Payout Date: | 07/2018 |
| Rate of Return: | 18.15 % |
| Return on Investment: | 1.79 |
| Disc Return on Invest: | 1.16 |

**Economics Summary:**

| | Bbl Oil | Mcf Gas |
|---|---|---|
| Ultimate Gross | 16,686,833 | 14,993,573 |
| Historic Gross | 9,645,264 | 8,317,218 |
| Gross at Eff Date | 5,498,781 | 4,317,075 |
| Remaining Gross | 11,188,052 | 10,676,498 |
| Remaining Net | 8,614,800 | 6,165,678 |

Confidential Business Information

Exhibit 5 to 5/9/23 SDR

Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:06 AM

Lease Name: Jore Federal (Oil and Gas Recovery) (2-12H)
County, ST: MCKENZIE, ND Econ
Location: N151 W95 12 NW

Operator: Slawson Exploration Co., Inc.
Field Name: CLARKS CREEK



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: CLARKS CREEK (Flared Gas) (101-1819H)
County, ST: MCKENZIE, ND
Location: N151 W94 18 NE NW

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK

## CLARKS CREEK (Flared Gas) 101-1819H - EOG RESOURCES INC



Exhibit 5 to 5/9/23 SDR

Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: CLARKS CREEK (Flared Gas) (11-0706H)
County, ST: MCKENZIE, ND
Location: N151 W94 7 SE SE

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK

## CLARKS CREEK (Flared Gas) 11-0706H - EOG RESOURCES INC



Exhibit 5

## ***Rate/Time Graph***

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: CLARKS CREEK (Flared Gas) (12-0719H)
County, ST: MCKENZIE, ND
Location: N151 W94 7 SE SE

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK



Exhibit 5 to 5/9/23 SDR

Exhibit 5

## Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: CLARKS CREEK (Flared Gas) (13-1806H)
County, ST: MCKENZIE, ND
Location: N151 W94 18 NE NW

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: CLARKS CREEK (Flared Gas) (14-1819H)
County, ST: MCKENZIE, ND
Location: N151 W94 18 NE NW

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK



Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: CLARKS CREEK (Flared Gas) (16-0706H)
County, ST: MCKENZIE, ND
Location: N151 W94 7 SE SE

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK

## CLARKS CREEK (Flared Gas) 16-0706H - EOG RESOURCES INC



Exhibit 5 to 5/9/23 SDR

Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: HAWKEYE (Flared Gas) (01-2501H)
County, ST: MCKENZIE, ND
Location: N152 W95 25 NW

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK

## HAWKEYE (Flared Gas) 01-2501H - EOG RESOURCES INC



Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: HAWKEYE (Flared Gas) (02-2501H)
County, ST: MCKENZIE, ND
Location: N152 W95 25 NE

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK




Confidential Business Information

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: HAWKEYE (Flared Gas) (100-2501H)
County, ST: MCKENZIE, ND
Location: N152 W95 25 NE

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK



## Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: HAWKEYE (Flared Gas) (102-2501H)
County, ST: MCKENZIE, ND
Location: N152 W95 25 NW

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK

### HAWKEYE (Flared Gas) 102-2501H - EOG RESOURCES INC



Exhibit 5 to 5/9/23 SDR

Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: RIVERVIEW (Flared Gas) (100-3031H)
County, ST: MCKENZIE, ND
Location: N152 W94 30 NW NW

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK



Exhibit 5 to 5/9/23 SDR

Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: RIVERVIEW (Flared Gas) (3-3130H)
County, ST: MCKENZIE, ND
Location: N152 W94 31 SE

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: RIVERVIEW (Flared Gas) (4-3031H)
County, ST: MCKENZIE, ND
Location: N152 W94 30 NW NW

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK



## Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: WEST CLARK (Flared Gas) (100-2413H)
County, ST: MCKENZIE, ND
Location: N151 W95 24 SW NE

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: WEST CLARK (Flared Gas) (101-2425H)
County, ST: MCKENZIE, ND
Location: N151 W95 24 NE

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK

## WEST CLARK (Flared Gas) 101-2425H - EOG RESOURCES INC



Exhibit 5

## *Rate/Time Graph*

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: WEST CLARK (Flared Gas) (102-2413H)
County, ST: MCKENZIE, ND
Location: N151 W95 24 NE

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK



Exhibit 5 to 5/9/23 SDR

Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: WEST CLARK (Flared Gas) (1-2413H)
County, ST: MCKENZIE, ND
Location: N151 W95 24 NE

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: WEST CLARK (Flared Gas) (2-2425H)
County, ST: MCKENZIE, ND
Location: N151 W95 24 NE

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK



Exhibit 5 to 5/9/23 SDR

Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: WEST CLARK (Flared Gas) (3-2413H)
County, ST: MCKENZIE, ND
Location: N151 W95 24 NE

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: WEST CLARK (Flared Gas) (4-2425H)
County, ST: MCKENZIE, ND
Location: N151 W95 24 SW NE

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK



Exhibit 5 to 5/9/23 SDR

Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: WEST CLARK (Flared Gas) (5-2425H)
County, ST: MCKENZIE, ND
Location: N151 W95 24 NE

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK

## WEST CLARK (Flared Gas) 5-2425H - EOG RESOURCES INC



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: BULLET (Flared Gas) (12-36H)
County, ST: MCKENZIE, ND
Location: N151 W95 36 NW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK



Exhibit 5 to 5/9/23 SDR

Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:07 AM

Lease Name: THUD (Flared Gas) (12-36H)
County, ST: MCKENZIE, ND
Location: N151 W95 36 NW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK

## THUD (Flared Gas) 12-36H - SHD OIL & GAS LLC



Exhibit 5 to 5/9/23 SDR

Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:10 AM

Lease Name: WEST CLARK (103-0136H)
County, ST: MCKENZIE, ND
Location: N151 W95 1 SW

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:10 AM

Lease Name: WEST CLARK (104-0136H)
County, ST: MCKENZIE, ND
Location: N151 W95 1 SW

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:10 AM

Lease Name: WEST CLARK (117-0136H)
County, ST: MCKENZIE, ND
Location: N151 W95 1 SW

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK



Exhibit 5 to 5/9/23 SDR

Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:10 AM

Lease Name: AVALANCHE (36-14-MB2)
County, ST: MCKENZIE, ND
Location: N151 W95 36 SW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK

## AVALANCHE 36-14-MB2 - SHD OIL & GAS LLC




Confidential Business Information

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:10 AM

Lease Name: AVALANCHE (36-15-TF1)
County, ST: MCKENZIE, ND
Location: N151 W95 36 SW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK

## AVALANCHE 36-15-TF1 - SHD OIL & GAS LLC



Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:10 AM

Lease Name: AVALANCHE (36-16-MB2)
County, ST: MCKENZIE, ND
Location: N151 W95 36 SW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK



Exhibit 5 to 5/9/23 SDR

Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:10 AM

Lease Name: AVALANCHE (36-17-TF2)
County, ST: MCKENZIE, ND
Location: N151 W95 36 SW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK




Confidential Business Information

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:10 AM

Lease Name: BUCKY (13-36H)
County, ST: MCKENZIE, ND
Location: N151 W95 36 SW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:10 AM

Lease Name: CANON (12-36H)
County, ST: MCKENZIE, ND
Location: N151 W95 36 NW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK

## CANON 12-36H - SHD OIL & GAS LLC



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:10 AM

Lease Name: HAMMER (12-36H)
County, ST: MCKENZIE, ND
Location: N151 W95 36 NW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK

## HAMMER 12-36H - SHD OIL & GAS LLC



Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:11 AM

Lease Name: LUKE (13-36H)
County, ST: MCKENZIE, ND
Location: N151 W95 36 SW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK

## LUKE 13-36H - SHD OIL & GAS LLC



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:11 AM

Lease Name: MAGNUM (36-11-TF2)
County, ST: MCKENZIE, ND
Location: N151 W95 36 NW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK



Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:11 AM

Lease Name: MAGNUM (36-12-MB2)
County, ST: MCKENZIE, ND
Location: N151 W95 36 NW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK

## MAGNUM 36-12-MB2 - SHD OIL & GAS LLC



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:11 AM

Lease Name: MAGNUM (36-13-TF2)
County, ST: MCKENZIE, ND
Location: N151 W95 36 NW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK

## MAGNUM 36-13-TF2 - SHD OIL & GAS LLC




Confidential Business Information

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:11 AM

Lease Name: MARC (13-36H)
County, ST: MCKENZIE, ND
Location: N151 W95 36 SW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 3/31/2022
Time: 10:11 AM

Lease Name: MATTIE (13-36H)
County, ST: MCKENZIE, ND
Location: N151 W95 36 SW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK



Exhibit 5 to 5/9/23 SDR
Exhibit 6

# Clarks Creek Field - Oil Recovery Estimates

Date: 3/31/2022
Time: 10:23 AM

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

# Evaluation Based on "Flaring Period" from 9/2014 to 12/2016

Summary Lease Report

| Date | Well Count | Gross Production Oil (Bbl) | Gross Production Gas (Mcf) | Net Production Oil (Bbl) | Net Production Gas (Mcf) | Average Prices Oil ($/Bbl) | Average Prices Gas ($/Mcf) | Sales Total ($) |
|---|---|---|---|---|---|---|---|---|
| 12/2014 | 37 | 809,775 | 0 | 623,527 | 0 | 63.64 | 0.00 | 39,681,115 |
| 12/2015 | 37 | 1,641,943 | 0 | 1,264,296 | 0 | 39.39 | 0.00 | 49,801,151 |
| 12/2016 | 39 | 1,666,954 | 0 | 1,283,555 | 0 | 36.73 | 0.00 | 47,140,944 |
| 12/2017 | 40 | 1,064,852 | 0 | 819,936 | 0 | 45.04 | 0.00 | 36,933,680 |
| 12/2018 | 40 | 760,704 | 0 | 585,742 | 0 | 57.95 | 0.00 | 33,944,109 |
| 12/2019 | 39 | 662,093 | 0 | 509,811 | 0 | 52.29 | 0.00 | 26,656,067 |
| 12/2020 | 39 | 613,982 | 0 | 472,766 | 0 | 49.63 | 0.00 | 23,463,941 |
| 12/2021 | 39 | 513,601 | 0 | 395,473 | 0 | 46.31 | 0.00 | 18,314,754 |
| 12/2022 | 36 | 443,609 | 0 | 341,579 | 0 | 44.99 | 0.00 | 15,369,052 |
| 12/2023 | 36 | 395,175 | 0 | 304,284 | 0 | 44.80 | 0.00 | 13,631,945 |
| 12/2024 | 36 | 354,177 | 0 | 272,716 | 0 | 44.80 | 0.00 | 12,217,688 |
| 12/2025 | 35 | 315,964 | 0 | 243,292 | 0 | 44.80 | 0.00 | 10,899,498 |
| 12/2026 | 35 | 283,886 | 0 | 218,592 | 0 | 44.80 | 0.00 | 9,792,916 |
| 12/2027 | 33 | 249,311 | 0 | 191,969 | 0 | 44.80 | 0.00 | 8,600,230 |
| 12/2028 | 31 | 219,842 | 0 | 169,279 | 0 | 44.80 | 0.00 | 7,583,682 |
| Remainder: | | 1,192,185 | 0 | 917,982 | 0 | 44.80 | 0.00 | 41,125,600 |
| Grand Total: | | 11,188,052 | 0 | 8,614,800 | 0 | 45.87 | 0.00 | 395,156,372 |

| Date | Operating Expenses ($) | Taxes ($) | Operating Income ($) | Other Costs ($) | Periodic Cash Flow ($) | Cumulative Cash Flow ($) | 12% Cash Flow ($) |
|---|---|---|---|---|---|---|---|
| 12/2014 | 4,029,881 | 3,968,112 | 31,683,123 | 105,762,925 | -74,079,802 | -74,079,802 | -74,755,497 |
| 12/2015 | 9,266,408 | 4,980,115 | 35,554,627 | 0 | 35,554,627 | -38,525,175 | 32,270,832 |
| 12/2016 | 9,912,227 | 4,714,094 | 32,514,622 | 0 | 32,514,622 | -6,010,553 | 26,126,260 |
| 12/2017 | 7,684,032 | 3,693,368 | 25,556,280 | 0 | 25,556,280 | 19,545,727 | 18,549,201 |
| 12/2018 | 6,638,840 | 3,394,411 | 23,910,858 | 0 | 23,910,858 | 43,456,585 | 15,486,615 |
| 12/2019 | 6,441,702 | 2,665,607 | 17,548,758 | 0 | 17,548,758 | 61,005,343 | 10,079,093 |
| 12/2020 | 5,629,427 | 2,346,394 | 15,488,120 | 0 | 15,488,120 | 76,493,464 | 7,999,679 |
| 12/2021 | 5,211,333 | 1,831,475 | 11,271,946 | 0 | 11,271,946 | 87,765,410 | 5,183,779 |
| 12/2022 | 4,692,675 | 1,536,905 | 9,139,471 | 0 | 9,139,471 | 96,904,881 | 3,752,340 |
| 12/2023 | 4,510,162 | 1,363,195 | 7,758,589 | 0 | 7,758,589 | 104,663,470 | 2,843,386 |
| 12/2024 | 4,355,961 | 1,221,769 | 6,639,959 | 0 | 6,639,959 | 111,303,428 | 2,172,726 |
| 12/2025 | 4,130,496 | 1,089,950 | 5,679,052 | 0 | 5,679,052 | 116,982,480 | 1,659,219 |
| 12/2026 | 3,993,694 | 979,292 | 4,819,931 | 0 | 4,819,931 | 121,802,411 | 1,257,467 |
| 12/2027 | 3,659,287 | 860,023 | 4,080,920 | 0 | 4,080,920 | 125,883,331 | 950,553 |
| 12/2028 | 3,388,099 | 758,368 | 3,437,215 | 0 | 3,437,215 | 129,320,545 | 714,949 |
| Remainder: | 23,963,073 | 4,112,560 | 13,049,967 | 0 | 13,049,967 | 142,370,512 | 1,799,581 |
| Grand Total: | 107,507,298 | 39,515,637 | 248,133,437 | 105,762,925 | 142,370,512 | 142,370,512 | 56,090,185 |

**Discount Present Worth:**

| | |
|---|---|
| 0.00 % | 142,370,512 |
| 8.00 % | 76,189,086 |
| 10.00 % | 65,429,565 |
| 12.50 % | 53,945,091 |
| 15.00 % | 44,187,692 |
| 17.50 % | 35,795,614 |
| 20.00 % | 28,500,463 |
| 25.00 % | 16,436,252 |
| 30.00 % | 6,862,360 |
| 40.00 % | -7,392,813 |
| 50.00 % | -17,521,752 |

**Economic Dates:**

| | |
|---|---|
| Effective Date | 09/2014 |
| Calculated Limit | 02/2050 |
| Economic Life | 426 Months |
| | 35 Years 6 Months |

**Economics Information:**

| | |
|---|---|
| Net Payout Date: | 03/2017 |
| Rate of Return: | 34.35 % |
| Return on Investment: | 2.35 |
| Disc Return on Invest: | 1.53 |

**Economics Summary:**

| | Bbl Oil | Mcf Gas |
|---|---|---|
| Ultimate Gross | 16,686,833 | 0 |
| Historic Gross | 9,645,264 | 0 |
| Gross at Eff Date | 5,498,781 | 0 |
| Remaining Gross | 11,188,052 | 0 |
| Remaining Net | 8,614,800 | 0 |

Confidential Business Information

# *Clarks Creek Field - Gas Recovery Estimates*

Date: 3/31/2022
Time: 11:02 AM

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

## *Evaluation Based on "Flaring Period" from 9/2014 to 12/2016*

Summary Lease Report

| Date | Well Count | Gross Production Oil (Bbl) | Gross Production Gas (Mcf) | Net Production Oil (Bbl) | Net Production Gas (Mcf) | Average Prices Oil ($/Bbl) | Average Prices Gas ($/Mcf) | Sales Total ($) |
|---|---|---|---|---|---|---|---|---|
| 12/2014 | 37 | 0 | 552,734 | 0 | 319,204 | 0.00 | 4.48 | 1,428,736 |
| 12/2015 | 37 | 0 | 937,229 | 0 | 541,250 | 0.00 | 2.32 | 1,253,981 |
| 12/2016 | 39 | 0 | 2,462,095 | 0 | 1,421,860 | 0.00 | 2.60 | 3,694,738 |
| 12/2017 | 40 | 0 | 1,310,892 | 0 | 757,040 | 0.00 | 3.12 | 2,364,006 |
| 12/2018 | 40 | 0 | 790,798 | 0 | 456,686 | 0.00 | 3.36 | 1,533,078 |
| 12/2019 | 39 | 0 | 655,926 | 0 | 378,797 | 0.00 | 2.60 | 985,511 |
| 12/2020 | 39 | 0 | 608,969 | 0 | 351,679 | 0.00 | 2.44 | 859,705 |
| 12/2021 | 39 | 0 | 481,984 | 0 | 278,346 | 0.00 | 2.27 | 632,928 |
| 12/2022 | 36 | 0 | 399,053 | 0 | 230,453 | 0.00 | 2.74 | 632,105 |
| 12/2023 | 36 | 0 | 351,232 | 0 | 202,837 | 0.00 | 2.74 | 556,357 |
| 12/2024 | 36 | 0 | 313,389 | 0 | 180,982 | 0.00 | 2.74 | 496,412 |
| 12/2025 | 35 | 0 | 274,144 | 0 | 158,318 | 0.00 | 2.74 | 434,248 |
| 12/2026 | 35 | 0 | 245,309 | 0 | 141,666 | 0.00 | 2.74 | 388,572 |
| 12/2027 | 33 | 0 | 202,885 | 0 | 117,166 | 0.00 | 2.74 | 321,373 |
| 12/2028 | 31 | 0 | 176,043 | 0 | 101,665 | 0.00 | 2.74 | 278,855 |
| Remainder: | | 0 | 913,815 | 0 | 527,728 | 0.00 | 2.74 | 1,447,495 |
| Grand Total: | | 0 | 10,676,498 | 0 | 6,165,678 | 0.00 | 2.81 | 17,308,100 |

| Date | Operating Expenses ($) | Taxes ($) | Operating Income ($) | Other Costs ($) | Periodic Cash Flow ($) | Cumulative Cash Flow ($) | 12% Cash Flow ($) |
|---|---|---|---|---|---|---|---|
| 12/2014 | 0 | 22,727 | 1,406,009 | 42,592,690 | -41,186,681 | -41,186,681 | -41,218,346 |
| 12/2015 | 0 | 38,537 | 1,215,444 | 0 | 1,215,444 | -39,971,237 | 1,107,933 |
| 12/2016 | 0 | 101,236 | 3,593,501 | 0 | 3,593,501 | -36,377,736 | 2,861,203 |
| 12/2017 | 0 | 53,901 | 2,310,105 | 0 | 2,310,105 | -34,067,631 | 1,682,023 |
| 12/2018 | 0 | 32,516 | 1,500,562 | 0 | 1,500,562 | -32,567,069 | 967,692 |
| 12/2019 | 0 | 26,970 | 958,540 | 0 | 958,540 | -31,608,528 | 552,545 |
| 12/2020 | 0 | 25,040 | 834,666 | 0 | 834,666 | -30,773,863 | 431,451 |
| 12/2021 | 0 | 19,818 | 613,110 | 0 | 613,110 | -30,160,753 | 282,442 |
| 12/2022 | 0 | 16,408 | 615,697 | 0 | 615,697 | -29,545,055 | 252,678 |
| 12/2023 | 0 | 14,442 | 541,915 | 0 | 541,915 | -29,003,141 | 198,535 |
| 12/2024 | 0 | 12,886 | 483,526 | 0 | 483,526 | -28,519,615 | 158,149 |
| 12/2025 | 0 | 11,272 | 422,976 | 0 | 422,976 | -28,096,639 | 123,551 |
| 12/2026 | 0 | 10,087 | 378,486 | 0 | 378,486 | -27,718,153 | 98,684 |
| 12/2027 | 0 | 8,342 | 313,031 | 0 | 313,031 | -27,405,123 | 72,965 |
| 12/2028 | 0 | 7,239 | 271,616 | 0 | 271,616 | -27,133,507 | 56,457 |
| Remainder: | 0 | 37,574 | 1,409,921 | 0 | 1,409,921 | -25,723,586 | 180,357 |
| Grand Total: | 0 | 438,996 | 16,869,104 | 42,592,690 | -25,723,586 | -25,723,586 | -32,191,681 |

Confidential Business Information

**Discount Present Worth:**

| | |
|---|---|
| 0.00 % | -25,723,586 |
| 8.00 % | -30,732,726 |
| 10.00 % | -31,516,590 |
| 12.50 % | -32,346,125 |
| 15.00 % | -33,046,196 |
| 17.50 % | -33,645,703 |
| 20.00 % | -34,165,514 |
| 25.00 % | -35,023,902 |
| 30.00 % | -35,705,378 |
| 40.00 % | -36,722,901 |
| 50.00 % | -37,448,635 |

**Economic Dates:**

| | |
|---|---|
| Effective Date | 09/2014 |
| Calculated Limit | 02/2050 |
| Economic Life | 426 Months |
| | 35 Years 6 Months |

**Economics Information:**

| | |
|---|---|
| Net Payout Date: | n/a |
| Rate of Return: | n/a |
| Return on Investment: | 0.40 |
| Disc Return on Invest: | 0.24 |

**Economics Summary:**

| | Bbl Oil | Mcf Gas |
|---|---|---|
| Ultimate Gross | 0 | 14,993,573 |
| Historic Gross | 0 | 8,317,218 |
| Gross at Eff Date | 0 | 4,317,075 |
| Remaining Gross | 0 | 10,676,498 |
| Remaining Net | 0 | 6,165,678 |

Exhibit 5 to 5/9/23 SDR
Exhibit 8

# Clarks Creek Field - Oil and Gas - Preexisting Wells Only

Date: 3/31/2022
Time: 10:49 AM

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

# Evaluation Based on "Flaring Period" from 9/2014 to 12/2016

Summary Lease Report

| Date | Well Count | Gross Production Oil (Bbl) | Gross Production Gas (Mcf) | Net Production Oil (Bbl) | Net Production Gas (Mcf) | Average Prices Oil ($/Bbl) | Average Prices Gas ($/Mcf) | Sales Total ($) |
|---|---|---|---|---|---|---|---|---|
| 12/2014 | 23 | 628,367 | 336,948 | 483,843 | 194,587 | 64.41 | 4.51 | 32,039,221 |
| 12/2015 | 23 | 1,159,165 | 247,753 | 892,557 | 143,077 | 39.96 | 2.83 | 36,068,507 |
| 12/2016 | 23 | 680,240 | 93,162 | 523,785 | 53,801 | 35.28 | 2.15 | 18,596,412 |
| 12/2017 | 23 | 599,330 | 99,972 | 461,484 | 57,734 | 45.05 | 3.11 | 20,969,586 |
| 12/2018 | 23 | 481,549 | 83,132 | 370,793 | 48,009 | 57.93 | 3.37 | 21,642,149 |
| 12/2019 | 23 | 411,963 | 71,897 | 317,211 | 41,520 | 52.08 | 2.59 | 16,628,533 |
| 12/2020 | 23 | 363,071 | 63,657 | 279,565 | 36,762 | 49.56 | 2.43 | 13,943,564 |
| 12/2021 | 23 | 324,856 | 57,060 | 250,139 | 32,952 | 46.31 | 2.27 | 11,658,537 |
| 12/2022 | 23 | 292,128 | 51,337 | 224,939 | 29,647 | 44.99 | 2.74 | 10,202,051 |
| 12/2023 | 23 | 262,907 | 46,202 | 202,438 | 26,682 | 44.80 | 2.74 | 9,142,428 |
| 12/2024 | 23 | 236,616 | 41,582 | 182,195 | 24,014 | 44.80 | 2.74 | 8,228,186 |
| 12/2025 | 23 | 212,955 | 37,424 | 163,975 | 21,612 | 44.80 | 2.74 | 7,405,367 |
| 12/2026 | 23 | 191,659 | 33,682 | 147,578 | 19,451 | 44.80 | 2.74 | 6,664,830 |
| 12/2027 | 23 | 172,493 | 30,313 | 132,820 | 17,506 | 44.80 | 2.74 | 5,998,347 |
| 12/2028 | 22 | 153,384 | 26,798 | 118,106 | 15,476 | 44.80 | 2.74 | 5,333,596 |
| Remainder: | | 862,570 | 148,129 | 664,179 | 85,545 | 44.80 | 2.74 | 29,989,852 |
| Grand Total: | | 7,033,255 | 1,469,050 | 5,415,606 | 848,376 | 46.50 | 3.14 | 254,511,168 |

| Date | Operating Expenses ($) | Taxes ($) | Operating Income ($) | Other Costs ($) | Periodic Cash Flow ($) | Cumulative Cash Flow ($) | 12% Cash Flow ($) |
|---|---|---|---|---|---|---|---|
| 12/2014 | 2,797,285 | 3,130,077 | 26,111,860 | 42,592,690 | -16,480,830 | -16,480,830 | -17,018,845 |
| 12/2015 | 5,851,078 | 3,576,587 | 26,640,842 | 0 | 26,640,842 | 10,160,012 | 24,294,817 |
| 12/2016 | 4,174,840 | 1,851,930 | 12,569,642 | 0 | 12,569,642 | 22,729,654 | 10,101,622 |
| 12/2017 | 3,891,656 | 2,083,128 | 14,994,803 | 0 | 14,994,803 | 37,724,457 | 10,856,370 |
| 12/2018 | 3,479,421 | 2,151,443 | 16,011,284 | 0 | 16,011,284 | 53,735,741 | 10,354,329 |
| 12/2019 | 3,235,870 | 1,655,068 | 11,737,595 | 0 | 11,737,595 | 65,473,336 | 6,760,069 |
| 12/2020 | 3,064,749 | 1,388,033 | 9,490,782 | 0 | 9,490,782 | 74,964,118 | 4,895,035 |
| 12/2021 | 2,930,997 | 1,160,713 | 7,566,828 | 0 | 7,566,828 | 82,530,946 | 3,478,328 |
| 12/2022 | 2,816,449 | 1,014,184 | 6,371,418 | 0 | 6,371,418 | 88,902,364 | 2,615,238 |
| 12/2023 | 2,714,175 | 908,824 | 5,519,430 | 0 | 5,519,430 | 94,421,794 | 2,022,475 |
| 12/2024 | 2,622,157 | 817,942 | 4,788,087 | 0 | 4,788,087 | 99,209,880 | 1,566,586 |
| 12/2025 | 2,539,342 | 736,147 | 4,129,878 | 0 | 4,129,878 | 103,339,758 | 1,206,527 |
| 12/2026 | 2,464,807 | 662,533 | 3,537,490 | 0 | 3,537,490 | 106,877,248 | 922,801 |
| 12/2027 | 2,397,727 | 596,279 | 3,004,341 | 0 | 3,004,341 | 109,881,589 | 699,814 |
| 12/2028 | 2,259,345 | 530,217 | 2,544,034 | 0 | 2,544,034 | 112,425,623 | 529,125 |
| Remainder: | 17,403,495 | 2,981,612 | 9,604,745 | 0 | 9,604,745 | 122,030,368 | 1,327,273 |
| Grand Total: | 64,643,392 | 25,244,717 | 164,623,058 | 42,592,690 | 122,030,368 | 122,030,368 | 64,611,565 |

**Discount Present Worth:**

| | |
|---|---|
| 0.00 % | 122,030,368 |
| 8.00 % | 77,733,794 |
| 10.00 % | 70,685,951 |
| 12.50 % | 63,222,377 |
| 15.00 % | 56,933,084 |
| 17.50 % | 51,564,611 |
| 20.00 % | 46,930,115 |
| 25.00 % | 39,334,861 |
| 30.00 % | 33,370,560 |
| 40.00 % | 24,593,480 |
| 50.00 % | 18,426,939 |

**Economic Dates:**

| | |
|---|---|
| Effective Date | 09/2014 |
| Calculated Limit | 02/2050 |
| Economic Life | 426 Months |
| | 35 Years 6 Months |

**Economics Information:**

| | |
|---|---|
| Net Payout Date: | 07/2015 |
| Rate of Return: | >100 % |
| Return on Investment: | 3.87 |
| Disc Return on Invest: | 2.52 |

**Economics Summary:**

| | Bbl Oil | Mcf Gas |
|---|---|---|
| Ultimate Gross | 12,532,036 | 5,786,125 |
| Historic Gross | 7,957,550 | 4,993,958 |
| Gross at Eff Date | 5,498,781 | 4,317,075 |
| Remaining Gross | 7,033,255 | 1,469,050 |
| Remaining Net | 5,415,606 | 848,376 |

Confidential Business Information

Exhibit 9

**Drilling and Completion Costs for Slawson Operated Wells**
**with Comparable Lateral Lengths to Contemproaneous Wells**

| Well with ~7,500' Lateral Length | First Sales Date | Actual Drilling and Completion Cost |
|---|---|---|
| Bootleg #5-14-15TFH | 9/5/2014 | $ 8,900,598 |
| Ironbank #5-14-13TFH | 12/5/2014 | $ 7,970,762 |
| Bootleg #8-14-15TF2H | 2/5/2015 | $ 6,969,758 |
| Pike Federal #1 SLH | 2/6/2015 | $ 7,576,635 |
| Ironbank #4-14-13TFH | 2/7/2015 | $ 7,237,550 |
| Ironbank #6-14-13TFH | 2/26/2015 | $ 7,849,480 |
| Ironbank #7-14-13TFH | 2/26/2015 | $ 8,072,315 |
| Bootleg #7-14-15TFH | 4/10/2015 | $ 7,289,789 |
| Bootleg #6-14-15TFH | 4/11/2015 | $ 7,139,005 |
| | **Average** | **$ 7,667,321** |

| Well with ~4,900' Lateral Length | First Sales Date | Actual Drilling and Completion Cost |
|---|---|---|
| Jore Federal #2-12H | 9/4/2014 | $ 7,484,475 |
| Revolver #7-35TFH | 10/26/2014 | $ 5,860,104 |
| Phoenix #2-18H | 3/22/2015 | $ 4,777,136 |
| Phoenix #1 SLH | 3/24/2015 | $ 5,040,281 |
| | **Average** | **$ 5,790,499** |

Confidential Business Information

Exhibit 5 to 5/9/23 SDR

Exhibit 9

# AUTHORITY FOR EXPENDITURE

SLAWSON exploration company, inc.

**WELL:** BOOTLEG 5-14-15TFH **OPERATOR:** SLAWSON EXPLORATION CO, INC **AFE#:** 05494

**LOCATION:** NENW Section 14-154N-99W **COUNTY/STATE:** WILLIAMS/NORTH DAKOTA **CREATED:** February 26, 2014

**PURPOSE:** Drill and complete a Three Forks single lateral horizontal well on 960 acre spacing **ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 4, 702 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 382, 290 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 123, 940 |
| 105 | DRILLING SUPERVISION $ | 59, 200 | 59, 200 | 64, 011 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 17, 000 |
| 120 | WATER | 20, 000 | 20, 000 | 35, 026 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 258, 618 |
| 160 | DAYWORK 32 DAYS @ $21,000/DAY | 672, 000 | 672, 000 | 812, 475 |
| 175 | CREW LODGING & PER DIEM | 52, 800 | 52, 800 | 52, 857 |
| 180 | RIG FUEL AND BOILER $ | 217, 600 | 217, 600 | 138, 438 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 400, 000 | 400, 000 | 248, 568 |
| 200 | DRILL BITS | 65, 000 | 65, 000 | 67, 408 |
| 210 | SUBSURFACE RENTAL EQUIPMENT $ | 160, 000 | 160, 000 | 337, 104 |
| 215 | DIRECTIONAL DRILLING SERVICES $ | 330, 000 | 330, 000 | 383, 561 |
| 230 | SURFACE EQUIPMENT RENTALS $ | 208, 000 | 208, 000 | 270, 226 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 30, 694 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 45, 223 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 37, 462 |
| 320 | MUD LOGGING SERVICES | 22, 000 | 22, 000 | 20, 672 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 22, 000 | 22, 000 | 20, 672 |
| 350 | FREIGHT & TRUCKING | 128, 000 | 192, 000 | 52, 642 |
| 360 | CONTRACT LABOR | 120, 000 | 180, 000 | 180, 102 |
| 370 | ADMINISTRATIVE OVERHEAD | 24, 000 | 27, 500 | 18, 733 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 40, 105 |
| 385 | COMMUNICATIONS | 24, 000 | 24, 000 | 665 |
| 390 | MISCELLANEOUS | | | 101 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 117, 846 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 6, 958 |
| 430 | COMPL. RIG 7 DAYS @ $20,000/DAY W | | 140, 000 | 32, 191 |
| 435 | COILED TUBING SERVICES | | 262, 500 | 251, 833 |
| 440 | COMPLETION TOOL RENTALS | | 35, 000 | 50, 139 |
| 450 | CASED HOLE LOGS & PERFORATING | | 375, 000 | 302, 998 |
| 455 | WATER FOR STIMULATION | | 450, 000 | 176, 883 |
| 460 | FORMATION STIMULATION | | 2, 812, 500 | 2, 793, 520 |
| 470 | COMPLETION SUPERVISION | | 24, 500 | 68, 119 |
| 490 | SALES TAX ON EQUIPMENT 5% | 24, 615 | 109, 380 | 53, 484 |
| | TOTAL INTANGIBLES | $3, 167, 215 | $7, 549, 980 | $7, 497, 266 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 60, 567 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 372, 521 |
| 700 | LINER 7,500' OF 4-1/2" 13.5# P- | | 150, 000 | 121, 142 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 2, 504 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 9, 324 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 74, 227 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 400, 000 | 42, 721 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 95, 869 |
| 820 | PUMPING UNIT | | 200, 000 | 166, 043 |
| 830 | PRIME MOVER ELECTRICITY + MO | | 50, 000 | 30, 056 |
| 840 | SUCKER RODS | | 40, 000 | 42, 033 |
| 850 | SUBSURFACE PUMP | | 7, 600 | 7, 356 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 90, 648 |
| 880 | COMBUSTOR | | 50, 000 | 11, 925 |
| 890 | OIL STOCK TANKS | | 50, 000 | 70, 079 |
| 900 | SEPARATORS | | | 8, 885 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 53, 398 |
| 930 | LABOR & TRUCKING | | 75, 000 | 124, 458 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 19, 576 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 695, 315 | $1, 403, 332 |
| | TOTAL WELL COSTS | $3, 659, 515 | $9, 245, 295 | $8, 900, 598 |

Confidential Business Information





3/30/22

Exhibit 5 to 5/9/23 SDR

Exhibit 9

# AUTHORITY FOR EXPENDITURE

SLAWSON exploration company, inc.

**WELL:** IRONBANK 5-14-13TFH **OPERATOR:** SLAWSON EXPLORATION CO, INC **AFE#:** 05496

**LOCATION:** NENW Section 14-154N-99W **COUNTY/STATE:** WILLIAMS/NORTH DAKOTA **CREATED:** February 26, 2014

**PURPOSE:** Drill and complete a Three Forks single lateral horizontal well on 960 acre spacing **ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 4, 286 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 404, 336 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 118, 453 |
| 105 | DRILLING SUPERVISION $ | 59, 200 | 59, 200 | 49, 718 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 19, 278 |
| 120 | WATER | 20, 000 | 20, 000 | 35, 713 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 155, 762 |
| 160 | DAYWORK 32 DAYS @ $21,000/DAY | 672, 000 | 672, 000 | 692, 900 |
| 175 | CREW LODGING & PER DIEM | 52, 800 | 52, 800 | 44, 293 |
| 180 | RIG FUEL AND BOILER $ | 217, 600 | 217, 600 | 191, 684 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 400, 000 | 400, 000 | 209, 805 |
| 200 | DRILL BITS | 65, 000 | 65, 000 | 107, 381 |
| 210 | SUBSURFACE RENTAL EQUIPMENT $ | 160, 000 | 160, 000 | 293, 433 |
| 215 | DIRECTIONAL DRILLING SERVICES $ | 330, 000 | 330, 000 | 391, 713 |
| 230 | SURFACE EQUIPMENT RENTALS $ | 208, 000 | 208, 000 | 216, 148 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 30, 181 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 58, 512 |
| 320 | MUD LOGGING SERVICES | 22, 000 | 22, 000 | 16, 662 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 22, 000 | 22, 000 | 16, 662 |
| 350 | FREIGHT & TRUCKING | 128, 000 | 192, 000 | 54, 452 |
| 360 | CONTRACT LABOR | 120, 000 | 180, 000 | 155, 890 |
| 370 | ADMINISTRATIVE OVERHEAD | 24, 000 | 27, 500 | 15, 185 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 41, 593 |
| 385 | COMMUNICATIONS | 24, 000 | 24, 000 | 8, 089 |
| 390 | MISCELLANEOUS | | | 117 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 61, 889 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 1, 631 |
| 430 | COMPL. RIG 7 DAYS @ $20,000/DAY W | | 140, 000 | 61, 154 |
| 435 | COILED TUBING SERVICES | | 262, 500 | |
| 440 | COMPLETION TOOL RENTALS | | 35, 000 | 91, 404 |
| 450 | CASED HOLE LOGS & PERFORATING | | 375, 000 | 264, 095 |
| 455 | WATER FOR STIMULATION | | 450, 000 | 622, 954 |
| 460 | FORMATION STIMULATION | | 2, 812, 500 | 1, 914, 855 |
| 470 | COMPLETION SUPERVISION | | 24, 500 | 68, 300 |
| 490 | SALES TAX ON EQUIPMENT 5% | 24, 615 | 109, 380 | 60, 480 |
| | TOTAL INTANGIBLES | $3, 167, 215 | $7, 549, 980 | $6, 479, 008 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 65, 195 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 384, 014 |
| 700 | LINER 7,500' OF 4-1/2" 13.5# P- | | 150, 000 | 157, 296 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 3, 005 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 9, 250 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 68, 714 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 400, 000 | 115, 273 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 86, 729 |
| 820 | PUMPING UNIT | | 200, 000 | 164, 529 |
| 830 | PRIME MOVER ELECTRICITY + MO | | 50, 000 | 31, 166 |
| 840 | SUCKER RODS | | 40, 000 | 29, 639 |
| 850 | SUBSURFACE PUMP | | 7, 600 | 4, 699 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 99, 370 |
| 880 | COMBUSTOR | | 50, 000 | |
| 890 | OIL STOCK TANKS | | 50, 000 | 70, 079 |
| 900 | SEPARATORS | | | 8, 885 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 54, 775 |
| 930 | LABOR & TRUCKING | | 75, 000 | 121, 133 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 18, 003 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 695, 315 | $1, 491, 754 |
| | TOTAL WELL COSTS | $3, 659, 515 | $9, 245, 295 | $7, 970, 762 |

Confidential Business Information



CAR 000152

3/30/22

# AUTHORITY FOR EXPENDITURE

SLAWSON exploration company, inc.

**WELL:** BOOTLEG 8-14-15TF2H
**OPERATOR:** SLAWSON EXPLORATION CO, INC
**AFE#:** 05578

**LOCATION:** NESW Section 14-154N-99W
**COUNTY/STATE:** WILLIAMS/NORTH DAKOTA
**CREATED:** May 14, 2014

**PURPOSE:** Drill and complete a 2nd Bench Three Forks single lateral horizontal well on 960 acre spacing
**ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 2, 385 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 293, 291 |
| 095 | HEALTH/SAFETY/ENVIRONMENT | | | 302 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 104, 328 |
| 105 | DRILLING SUPERVISION $ | 59, 200 | 59, 200 | 46, 061 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 20, 510 |
| 120 | WATER | 20, 000 | 20, 000 | 59, 600 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 120, 553 |
| 160 | DAYWORK 32 DAYS @ $21,000/DAY | 672, 000 | 672, 000 | 627, 582 |
| 175 | CREW LODGING & PER DIEM | 52, 800 | 52, 800 | 40, 840 |
| 180 | RIG FUEL AND BOILER $ | 217, 600 | 217, 600 | 159, 751 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 400, 000 | 400, 000 | 276, 783 |
| 200 | DRILL BITS | 65, 000 | 65, 000 | 102, 363 |
| 210 | SUBSURFACE RENTAL EQUIPMENT $ | 160, 000 | 160, 000 | 186, 789 |
| 215 | DIRECTIONAL DRILLING SERVICES $ | 330, 000 | 330, 000 | 314, 432 |
| 230 | SURFACE EQUIPMENT RENTALS $ | 208, 000 | 208, 000 | 210, 072 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 23, 396 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 50, 892 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 41, 221 |
| 320 | MUD LOGGING SERVICES | 22, 000 | 22, 000 | 15, 703 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 22, 000 | 22, 000 | 15, 703 |
| 350 | FREIGHT & TRUCKING | 128, 000 | 192, 000 | 40, 186 |
| 360 | CONTRACT LABOR | 120, 000 | 180, 000 | 131, 417 |
| 370 | ADMINISTRATIVE OVERHEAD | 24, 000 | 27, 500 | 13, 035 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 40, 532 |
| 385 | COMMUNICATIONS | 24, 000 | 24, 000 | 6, 229 |
| 390 | MISCELLANEOUS | | | 119 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 68, 634 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 12, 550 |
| 425 | WIRELINE SERVICES | | | 12, 435 |
| 430 | COMPL. RIG 7 DAYS @ $20,000/DAY W | | 140, 000 | 9, 886 |
| 435 | COILED TUBING SERVICES | | 262, 500 | 221, 810 |
| 440 | COMPLETION TOOL RENTALS | | 35, 000 | 63, 700 |
| 450 | CASED HOLE LOGS & PERFORATING | | 375, 000 | 228, 052 |
| 455 | WATER FOR STIMULATION | | 450, 000 | 343, 377 |
| 460 | FORMATION STIMULATION | | 2, 812, 500 | 1, 621, 709 |
| 470 | COMPLETION SUPERVISION | | 24, 500 | 36, 460 |
| 490 | SALES TAX ON EQUIPMENT 5% | 24, 615 | 109, 380 | 55, 967 |
| | TOTAL INTANGIBLES | $3, 167, 215 | $7, 549, 980 | $5, 618, 655 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 59, 419 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 380, 587 |
| 700 | LINER 7,500' OF 4-1/2" 13.5# P- | | 150, 000 | 111, 075 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 2, 659 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 9, 050 |
| 740 | PRODUCTION OR LINER INCL. HGR. | | | 10, 800 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 69, 998 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 400, 000 | 64, 433 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 99, 037 |
| 820 | PUMPING UNIT | | 200, 000 | 168, 760 |
| 830 | PRIME MOVER ELECTRICITY + MO | | 50, 000 | 31, 166 |
| 840 | SUCKER RODS | | 40, 000 | 28, 614 |
| 850 | SUBSURFACE PUMP | | 7, 600 | 6, 341 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 52, 668 |
| 880 | COMBUSTOR | | 50, 000 | 7, 950 |
| 890 | OIL STOCK TANKS | | 50, 000 | 58, 500 |
| 900 | SEPARATORS | | | 6, 885 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 54, 500 |
| 930 | LABOR & TRUCKING | | 75, 000 | 119, 920 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 8, 741 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 695, 315 | $1, 351, 103 |
| | TOTAL WELL COSTS | $3, 659, 515 | $9, 245, 295 | $6, 969, 758 |

Confidential Business Information



3/30/22

# AUTHORITY FOR EXPENDITURE

SLAWSON exploration company, inc.

**WELL:** PIKE FEDERAL 1 SLH | **OPERATOR:** SLAWSON EXPLORATION CO, INC | **AFE#:** 05665

**LOCATION:** SESE Section 4-151N-92W | **COUNTY/STATE:** MOUNTRAIL/NORTH DAKOTA | **CREATED:** July 30, 2014

**PURPOSE:** Drill and complete a Bakken single lateral horizontal well on 2560 acre spacing | **ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 26, 080 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 274, 241 |
| 095 | HEALTH/SAFETY/ENVIRONMENT | | | 25 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 68, 554 |
| 105 | DRILLING SUPERVISION | 68, 800 | 68, 800 | 62, 186 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 27, 018 |
| 120 | WATER | 20, 000 | 20, 000 | 35, 395 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 231, 455 |
| 150 | FOOTAGE __,___FT @ $__.__/FT | | | |
| 160 | DAYWORK 38 DAYS @ $21,000/DAY | 798, 000 | 798, 000 | 625, 678 |
| 175 | CREW LODGING & PER DIEM | 62, 700 | 62, 700 | 4, 800 |
| 180 | RIG FUEL AND BOILER | 282, 625 | 282, 625 | 61, 124 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 475, 000 | 475, 000 | 310, 599 |
| 200 | DRILL BITS | 75, 000 | 75, 000 | 83, 795 |
| 210 | SUBSURFACE RENTAL EQUIPMENT | 190, 000 | 190, 000 | 187, 657 |
| 215 | DIRECTIONAL DRILLING SERVICES | 448, 000 | 448, 000 | 347, 251 |
| 230 | SURFACE EQUIPMENT RENTALS | 266, 000 | 266, 000 | 288, 880 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 24, 219 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 57, 132 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 79, 946 |
| 320 | MUD LOGGING SERVICES | 28, 000 | 28, 000 | 24, 175 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 28, 000 | 28, 000 | 24, 175 |
| 350 | FREIGHT & TRUCKING | 171, 000 | 213, 750 | 74, 898 |
| 360 | CONTRACT LABOR | 152, 000 | 228, 000 | 186, 385 |
| 365 | FISHING SERVICES | | | 5, 640 |
| 370 | ADMINISTRATIVE OVERHEAD | 28, 500 | 33, 500 | 19, 956 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 27, 275 |
| 385 | COMMUNICATIONS | 28, 500 | 28, 500 | 109 |
| 390 | MISCELLANEOUS | | | 18 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 64, 991 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 53, 849 |
| 430 | COMPL RIG 10 DAYS @ $20,000/DAY | | 200, 000 | 98, 843 |
| 440 | COMPLETION TOOL RENTALS | | 50, 000 | 105, 126 |
| 450 | CASED HOLE LOGS & PERFORATING | | 300, 000 | 121, 406 |
| 455 | WATER FOR STIMULATION | | 300, 000 | 489, 303 |
| 460 | FORMATION STIMULATION | | 1, 950, 000 | 1, 733, 982 |
| 470 | COMPLETION SUPERVISION | | 35, 000 | 45, 851 |
| 490 | SALES TAX ON EQUIPMENT | 24, 615 | 117, 750 | 62, 436 |
| | TOTAL INTANGIBLES | $3, 764, 740 | $6, 887, 625 | $5, 934, 453 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 49, 088 |
| 630 | INTERMEDIATE __,___' OF __ _/_" | | | 14, 433 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 315, 928 |
| 700 | LINER 10,000' OF 4-1/2" 13.5# P- | | 200, 000 | 109, 973 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 3, 385 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 9, 625 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 38, 485 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 515, 000 | 254, 786 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 101, 995 |
| 820 | PUMPING UNIT | | 200, 000 | 171, 780 |
| 830 | PRIME MOVER | | 50, 000 | 32, 604 |
| 840 | SUCKER RODS | | 40, 000 | 24, 228 |
| 850 | SUBSURFACE PUMP | | 10, 000 | 14, 139 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 159, 102 |
| 880 | COMBUSTOR | | 50, 000 | 23, 354 |
| 890 | OIL STOCK TANKS | | 50, 000 | 64, 728 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 45, 900 |
| 930 | LABOR & TRUCKING | | 75, 000 | 155, 864 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 5, 438 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | 47, 347 |
| | TOTAL TANGIBLES | $492, 300 | $1, 862, 715 | $1, 642, 182 |
| | TOTAL WELL COSTS | $4, 257, 040 | $8, 750, 340 | $7, 576, 635 |

Confidential Business Information





3/30/22

Exhibit 5 to 5/9/23 SDR
Exhibit 9

# AUTHORITY FOR EXPENDITURE

SLAWSON exploration company, inc.

**WELL:** IRONBANK 4-14-13TFH
**OPERATOR:** SLAWSON EXPLORATION CO, INC
**AFE#:** 05495

**LOCATION:** NENW Section 14-154N-99W
**COUNTY/STATE:** WILLIAMS/NORTH DAKOTA
**CREATED:** February 26, 2014

**PURPOSE:** Drill and complete a Three Forks single lateral horizontal well on 960 acre spacing
**ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 4, 400 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 314, 589 |
| 095 | HEALTH/SAFETY/ENVIRONMENT | | | 13 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 118, 931 |
| 105 | DRILLING SUPERVISION $ | 59, 200 | 59, 200 | 55, 446 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 33, 864 |
| 120 | WATER | 20, 000 | 20, 000 | 61, 474 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 167, 713 |
| 160 | DAYWORK 32 DAYS @ $21,000/DAY | 672, 000 | 672, 000 | 579, 600 |
| 175 | CREW LODGING & PER DIEM | 52, 800 | 52, 800 | 44, 310 |
| 180 | RIG FUEL AND BOILER $ | 217, 600 | 217, 600 | 127, 835 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 400, 000 | 400, 000 | 192, 656 |
| 200 | DRILL BITS | 65, 000 | 65, 000 | 81, 561 |
| 210 | SUBSURFACE RENTAL EQUIPMENT $ | 160, 000 | 160, 000 | 196, 353 |
| 215 | DIRECTIONAL DRILLING SERVICES $ | 330, 000 | 330, 000 | 283, 517 |
| 230 | SURFACE EQUIPMENT RENTALS $ | 208, 000 | 208, 000 | 240, 665 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 30, 219 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 66, 263 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 38, 073 |
| 320 | MUD LOGGING SERVICES | 22, 000 | 22, 000 | 15, 980 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 22, 000 | 22, 000 | 15, 980 |
| 350 | FREIGHT & TRUCKING | 128, 000 | 192, 000 | 58, 948 |
| 360 | CONTRACT LABOR | 120, 000 | 180, 000 | 191, 875 |
| 365 | FISHING SERVICES | | | 4, 163 |
| 370 | ADMINISTRATIVE OVERHEAD | 24, 000 | 27, 500 | 14, 872 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 40, 847 |
| 385 | COMMUNICATIONS | 24, 000 | 24, 000 | 7, 007 |
| 390 | MISCELLANEOUS | | | 117 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 76, 581 |
| 430 | COMPL. RIG 7 DAYS @ $20,000/DAY W | | 140, 000 | 110, 246 |
| 435 | COILED TUBING SERVICES | | 262, 500 | 126, 400 |
| 440 | COMPLETION TOOL RENTALS | | 35, 000 | 98, 745 |
| 450 | CASED HOLE LOGS & PERFORATING | | 375, 000 | 230, 711 |
| 455 | WATER FOR STIMULATION | | 450, 000 | 345, 389 |
| 460 | FORMATION STIMULATION | | 2, 812, 500 | 1, 743, 325 |
| 470 | COMPLETION SUPERVISION | | 24, 500 | 39, 660 |
| 490 | SALES TAX ON EQUIPMENT 5% | 24, 615 | 109, 380 | 58, 733 |
| | TOTAL INTANGIBLES | $3, 167, 215 | $7, 549, 980 | $5, 817, 061 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 60, 029 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 383, 467 |
| 700 | LINER 7,500' OF 4-1/2" 13.5# P- | | 150, 000 | 113, 686 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 3, 454 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 8, 795 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 66, 856 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 400, 000 | 70, 874 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 98, 160 |
| 820 | PUMPING UNIT | | 200, 000 | 164, 529 |
| 830 | PRIME MOVER ELECTRICITY + MO | | 50, 000 | 31, 166 |
| 840 | SUCKER RODS | | 40, 000 | 29, 688 |
| 850 | SUBSURFACE PUMP | | 7, 600 | 31, 331 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 90, 053 |
| 880 | COMBUSTOR | | 50, 000 | |
| 890 | OIL STOCK TANKS | | 50, 000 | 70, 079 |
| 900 | SEPARATORS | | | 8, 885 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 54, 775 |
| 930 | LABOR & TRUCKING | | 75, 000 | 116, 659 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 18, 003 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 695, 315 | $1, 420, 489 |
| | TOTAL WELL COSTS | $3, 659, 515 | $9, 245, 295 | $7, 237, 550 |

Confidential Business Information



3/30/22

Exhibit 5 to 5/9/23 SDR

Exhibit 9

# AUTHORITY FOR EXPENDITURE

SLAWSON exploration company, inc.

**WELL:** IRONBANK 6-14-13TFH **OPERATOR:** SLAWSON EXPLORATION CO, INC **AFE#:** 05539

**LOCATION:** NESW Section 14-154N-99W **COUNTY/STATE:** WILLIAMS/NORTH DAKOTA **CREATED:** March 28, 2014

**PURPOSE:** Drill and complete a Three Forks single lateral horizontal well on 960 acre spacing **ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 2, 279 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 387, 572 |
| 095 | HEALTH/SAFETY/ENVIRONMENT | | | 10 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 111, 240 |
| 105 | DRILLING SUPERVISION $ | 59, 200 | 59, 200 | 86, 396 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 21, 060 |
| 120 | WATER | 20, 000 | 20, 000 | 81, 159 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 225, 147 |
| 160 | DAYWORK 32 DAYS @ $21,000/DAY | 672, 000 | 672, 000 | 652, 117 |
| 175 | CREW LODGING & PER DIEM | 52, 800 | 52, 800 | 60, 602 |
| 180 | RIG FUEL AND BOILER $ | 217, 600 | 217, 600 | 188, 111 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 400, 000 | 400, 000 | 246, 470 |
| 200 | DRILL BITS | 65, 000 | 65, 000 | 119, 334 |
| 210 | SUBSURFACE RENTAL EQUIPMENT $ | 160, 000 | 160, 000 | 297, 639 |
| 215 | DIRECTIONAL DRILLING SERVICES $ | 330, 000 | 330, 000 | 399, 805 |
| 230 | SURFACE EQUIPMENT RENTALS $ | 208, 000 | 208, 000 | 348, 515 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 32, 766 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 67, 097 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 43, 805 |
| 320 | MUD LOGGING SERVICES | 22, 000 | 22, 000 | 22, 133 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 22, 000 | 22, 000 | 17, 035 |
| 350 | FREIGHT & TRUCKING | 128, 000 | 192, 000 | 111, 528 |
| 360 | CONTRACT LABOR | 120, 000 | 180, 000 | 223, 601 |
| 370 | ADMINISTRATIVE OVERHEAD | 24, 000 | 27, 500 | 14, 781 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 42, 213 |
| 385 | COMMUNICATIONS | 24, 000 | 24, 000 | 13, 096 |
| 390 | MISCELLANEOUS | | | 1, 369 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 70, 277 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 2, 502 |
| 430 | COMPL. RIG 7 DAYS @ $20,000/DAY W | | 140, 000 | 66, 108 |
| 435 | COILED TUBING SERVICES | | 262, 500 | |
| 440 | COMPLETION TOOL RENTALS | | 35, 000 | 70, 376 |
| 450 | CASED HOLE LOGS & PERFORATING | | 375, 000 | 173, 384 |
| 455 | WATER FOR STIMULATION | | 450, 000 | 479, 598 |
| 460 | FORMATION STIMULATION | | 2, 812, 500 | 1, 708, 673 |
| 470 | COMPLETION SUPERVISION | | 24, 500 | 37, 142 |
| 490 | SALES TAX ON EQUIPMENT 5% | 24, 615 | 109, 380 | 62, 422 |
| | TOTAL INTANGIBLES | $3, 167, 215 | $7, 549, 980 | $6, 487, 362 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 64, 786 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 386, 798 |
| 700 | LINER 7,500' OF 4-1/2" 13.5# P- | | 150, 000 | 125, 245 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 2, 625 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 9, 250 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 64, 285 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 400, 000 | 65, 267 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 74, 381 |
| 820 | PUMPING UNIT | | 200, 000 | 115, 430 |
| 830 | PRIME MOVER ELECTRICITY + MO | | 50, 000 | 31, 935 |
| 840 | SUCKER RODS | | 40, 000 | 29, 618 |
| 850 | SUBSURFACE PUMP | | 7, 600 | 6, 448 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 85, 664 |
| 880 | COMBUSTOR | | 50, 000 | 11, 925 |
| 890 | OIL STOCK TANKS | | 50, 000 | 65, 650 |
| 900 | SEPARATORS | | | 8, 885 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 54, 113 |
| 930 | LABOR & TRUCKING | | 75, 000 | 147, 289 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 12, 524 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 695, 315 | $1, 362, 118 |
| | TOTAL WELL COSTS | $3, 659, 515 | $9, 245, 295 | $7, 849, 480 |

Confidential Business Information

Exhibit 5 to 5/9/23 SDR

Exhibit 9

# AUTHORITY FOR EXPENDITURE

SLAWSON exploration company, inc.

**WELL:** IRONBANK 7-14-13TFH **OPERATOR:** SLAWSON EXPLORATION CO, INC **AFE#:** 05540

**LOCATION:** NESW Section 14-154N-99W **COUNTY/STATE:** WILLIAMS/NORTH DAKOTA **CREATED:** March 28, 2014

**PURPOSE:** Drill and complete a Three Forks single lateral horizontal well on 960 acre spacing **ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 2, 279 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 268, 289 |
| 095 | HEALTH/SAFETY/ENVIRONMENT | | | 10 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 111, 240 |
| 105 | DRILLING SUPERVISION $ | 59, 200 | 59, 200 | 49, 698 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 23, 805 |
| 120 | WATER | 20, 000 | 20, 000 | 35, 232 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 209, 353 |
| 160 | DAYWORK 32 DAYS @ $21,000/DAY | 672, 000 | 672, 000 | 649, 225 |
| 175 | CREW LODGING & PER DIEM | 52, 800 | 52, 800 | 41, 780 |
| 180 | RIG FUEL AND BOILER $ | 217, 600 | 217, 600 | 230, 614 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 400, 000 | 400, 000 | 202, 276 |
| 200 | DRILL BITS | 65, 000 | 65, 000 | 51, 213 |
| 210 | SUBSURFACE RENTAL EQUIPMENT $ | 160, 000 | 160, 000 | 335, 421 |
| 215 | DIRECTIONAL DRILLING SERVICES $ | 330, 000 | 330, 000 | 328, 159 |
| 230 | SURFACE EQUIPMENT RENTALS $ | 208, 000 | 208, 000 | 230, 103 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 26, 782 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 98, 577 |
| 320 | MUD LOGGING SERVICES | 22, 000 | 22, 000 | 19, 293 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 22, 000 | 22, 000 | 19, 293 |
| 350 | FREIGHT & TRUCKING | 128, 000 | 192, 000 | 51, 651 |
| 360 | CONTRACT LABOR | 120, 000 | 180, 000 | 114, 656 |
| 370 | ADMINISTRATIVE OVERHEAD | 24, 000 | 27, 500 | 15, 406 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 42, 374 |
| 385 | COMMUNICATIONS | 24, 000 | 24, 000 | 2, 739 |
| 390 | MISCELLANEOUS | | | 55 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 71, 647 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 2, 502 |
| 430 | COMPL. RIG 7 DAYS @ $20,000/DAY W | | 140, 000 | 75, 999 |
| 435 | COILED TUBING SERVICES | | 262, 500 | |
| 440 | COMPLETION TOOL RENTALS | | 35, 000 | 61, 278 |
| 450 | CASED HOLE LOGS & PERFORATING | | 375, 000 | 228, 334 |
| 455 | WATER FOR STIMULATION | | 450, 000 | 895, 043 |
| 460 | FORMATION STIMULATION | | 2, 812, 500 | 2, 077, 508 |
| 470 | COMPLETION SUPERVISION | | 24, 500 | 77, 443 |
| 490 | SALES TAX ON EQUIPMENT 5% | 24, 615 | 109, 380 | 63, 037 |
| | TOTAL INTANGIBLES | $3, 167, 215 | $7, 549, 980 | $6, 712, 314 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 64, 626 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 389, 951 |
| 700 | LINER 7,500' OF 4-1/2" 13.5# P- | | 150, 000 | 126, 161 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 2, 685 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 9, 250 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 69, 299 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 400, 000 | 61, 323 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 70, 607 |
| 820 | PUMPING UNIT | | 200, 000 | 115, 430 |
| 830 | PRIME MOVER ELECTRICITY + MO | | 50, 000 | 31, 935 |
| 840 | SUCKER RODS | | 40, 000 | 30, 102 |
| 850 | SUBSURFACE PUMP | | 7, 600 | 6, 447 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 85, 424 |
| 880 | COMBUSTOR | | 50, 000 | 11, 925 |
| 890 | OIL STOCK TANKS | | 50, 000 | 65, 650 |
| 900 | SEPARATORS | | | 8, 885 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 54, 113 |
| 930 | LABOR & TRUCKING | | 75, 000 | 143, 664 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 12, 524 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 695, 315 | $1, 360, 001 |
| | TOTAL WELL COSTS | $3, 659, 515 | $9, 245, 295 | $8, 072, 315 |

Confidential Business Information

# AUTHORITY FOR EXPENDITURE

slawson exploration company, inc.

**WELL:** BOOTLEG 7-14-15TFH **OPERATOR:** SLAWSON EXPLORATION CO, INC **AFE#:** 05538
**LOCATION:** NESW Section 14-154N-99W **COUNTY/STATE:** WILLIAMS/NORTH DAKOTA **CREATED:** May 14, 2014
**PURPOSE:** Drill and complete a Three Forks single lateral horizontal well on 960 acre spacing **ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 3, 436 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 227, 622 |
| 095 | HEALTH/SAFETY/ENVIRONMENT | | | 600 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 107, 129 |
| 105 | DRILLING SUPERVISION $ | 59, 200 | 59, 200 | 55, 901 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 20, 510 |
| 120 | WATER | 20, 000 | 20, 000 | 77, 998 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 114, 767 |
| 160 | DAYWORK 32 DAYS @ $21,000/DAY | 672, 000 | 672, 000 | 672, 500 |
| 175 | CREW LODGING & PER DIEM | 52, 800 | 52, 800 | 50, 301 |
| 180 | RIG FUEL AND BOILER $ | 217, 600 | 217, 600 | 260, 784 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 400, 000 | 400, 000 | 192, 867 |
| 200 | DRILL BITS | 65, 000 | 65, 000 | 112, 392 |
| 210 | SUBSURFACE RENTAL EQUIPMENT $ | 160, 000 | 160, 000 | 204, 902 |
| 215 | DIRECTIONAL DRILLING SERVICES $ | 330, 000 | 330, 000 | 347, 948 |
| 230 | SURFACE EQUIPMENT RENTALS $ | 208, 000 | 208, 000 | 291, 875 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 27, 733 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 44, 446 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 34, 083 |
| 320 | MUD LOGGING SERVICES | 22, 000 | 22, 000 | 17, 980 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 22, 000 | 22, 000 | 17, 980 |
| 350 | FREIGHT & TRUCKING | 128, 000 | 192, 000 | 48, 850 |
| 360 | CONTRACT LABOR | 120, 000 | 180, 000 | 178, 946 |
| 370 | ADMINISTRATIVE OVERHEAD | 24, 000 | 27, 500 | 13, 111 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 39, 067 |
| 385 | COMMUNICATIONS | 24, 000 | 24, 000 | 7, 342 |
| 390 | MISCELLANEOUS | | | 119 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 59, 752 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 330 |
| 425 | WIRELINE SERVICES | | | 12, 463 |
| 430 | COMPL. RIG 7 DAYS @ $20,000/DAY W | | 140, 000 | 14, 169 |
| 435 | COILED TUBING SERVICES | | 262, 500 | 128, 458 |
| 440 | COMPLETION TOOL RENTALS | | 35, 000 | 53, 558 |
| 450 | CASED HOLE LOGS & PERFORATING | | 375, 000 | 238, 966 |
| 455 | WATER FOR STIMULATION | | 450, 000 | 362, 607 |
| 460 | FORMATION STIMULATION | | 2, 812, 500 | 1, 653, 471 |
| 470 | COMPLETION SUPERVISION | | 24, 500 | 48, 799 |
| 490 | SALES TAX ON EQUIPMENT 5% | 24, 615 | 109, 380 | 60, 964 |
| | TOTAL INTANGIBLES | $3, 167, 215 | $7, 549, 980 | $5, 804, 726 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 59, 666 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 378, 751 |
| 700 | LINER 7,500' OF 4-1/2" 13.5# P- | | 150, 000 | 113, 699 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 2, 524 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 8, 574 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 70, 353 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 400, 000 | 60, 749 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 108, 488 |
| 820 | PUMPING UNIT | | 200, 000 | 159, 868 |
| 830 | PRIME MOVER ELECTRICITY + MO | | 50, 000 | 31, 166 |
| 840 | SUCKER RODS | | 40, 000 | 28, 685 |
| 850 | SUBSURFACE PUMP | | 7, 600 | 76, 658 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 119, 235 |
| 880 | COMBUSTOR | | 50, 000 | 7, 950 |
| 890 | OIL STOCK TANKS | | 50, 000 | 58, 500 |
| 900 | SEPARATORS | | | 6, 885 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 54, 500 |
| 930 | LABOR & TRUCKING | | 75, 000 | 128, 074 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 10, 738 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 695, 315 | $1, 485, 063 |
| | TOTAL WELL COSTS | $3, 659, 515 | $9, 245, 295 | $7, 289, 789 |

Confidential Business Information



3/30/22

# AUTHORITY FOR EXPENDITURE

Slawson exploration company, inc.

**WELL:** BOOTLEG 6-14-15TFH **OPERATOR:** SLAWSON EXPLORATION CO, INC **AFE#:** 05537

**LOCATION:** NESW Section 14-154N-99W **COUNTY/STATE:** WILLIAMS/NORTH DAKOTA **CREATED:** May 14, 2014

**PURPOSE:** Drill and complete a Three Forks single lateral horizontal well on 960 acre spacing **ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 3, 119 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 239, 295 |
| 095 | HEALTH/SAFETY/ENVIRONMENT | | | 600 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 107, 129 |
| 105 | DRILLING SUPERVISION $ | 59, 200 | 59, 200 | 56, 117 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 20, 510 |
| 120 | WATER | 20, 000 | 20, 000 | 71, 013 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 122, 387 |
| 160 | DAYWORK 32 DAYS @ $21,000/DAY | 672, 000 | 672, 000 | 679, 900 |
| 175 | CREW LODGING & PER DIEM | 52, 800 | 52, 800 | 45, 488 |
| 180 | RIG FUEL AND BOILER $ | 217, 600 | 217, 600 | 153, 712 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 400, 000 | 400, 000 | 238, 589 |
| 200 | DRILL BITS | 65, 000 | 65, 000 | 118, 623 |
| 210 | SUBSURFACE RENTAL EQUIPMENT $ | 160, 000 | 160, 000 | 210, 060 |
| 215 | DIRECTIONAL DRILLING SERVICES $ | 330, 000 | 330, 000 | 382, 223 |
| 230 | SURFACE EQUIPMENT RENTALS $ | 208, 000 | 208, 000 | 224, 261 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 25, 258 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 45, 593 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 41, 830 |
| 320 | MUD LOGGING SERVICES | 22, 000 | 22, 000 | 19, 772 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 22, 000 | 22, 000 | 19, 772 |
| 350 | FREIGHT & TRUCKING | 128, 000 | 192, 000 | 72, 352 |
| 360 | CONTRACT LABOR | 120, 000 | 180, 000 | 169, 744 |
| 370 | ADMINISTRATIVE OVERHEAD | 24, 000 | 27, 500 | 12, 295 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 40, 666 |
| 385 | COMMUNICATIONS | 24, 000 | 24, 000 | 7, 049 |
| 390 | MISCELLANEOUS | | | 1, 797 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 70, 205 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 8, 075 |
| 425 | WIRELINE SERVICES | | | 12, 435 |
| 430 | COMPL. RIG 7 DAYS @ $20,000/DAY W | | 140, 000 | 13, 872 |
| 435 | COILED TUBING SERVICES | | 262, 500 | 160, 048 |
| 440 | COMPLETION TOOL RENTALS | | 35, 000 | 57, 342 |
| 450 | CASED HOLE LOGS & PERFORATING | | 375, 000 | 231, 380 |
| 455 | WATER FOR STIMULATION | | 450, 000 | 267, 841 |
| 460 | FORMATION STIMULATION | | 2, 812, 500 | 1, 638, 204 |
| 470 | COMPLETION SUPERVISION | | 24, 500 | 35, 034 |
| 480 | SALES TAX ON EQUIPMENT 5% | 24, 615 | 109, 380 | 61, 537 |
| | TOTAL INTANGIBLES | $3, 167, 215 | $7, 549, 980 | $5, 685, 127 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 60, 543 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 379, 370 |
| 700 | LINER 7,500' OF 4-1/2" 13.5# P- | | 150, 000 | 113, 055 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 3, 244 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 6, 324 |
| 740 | PRODUCTION OR LINER INCL. HGR. | | | 10, 800 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 70, 273 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 400, 000 | 45, 552 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 98, 340 |
| 820 | PUMPING UNIT | | 200, 000 | 161, 805 |
| 830 | PRIME MOVER ELECTRICITY + MO | | 50, 000 | 31, 166 |
| 840 | SUCKER RODS | | 40, 000 | 28, 611 |
| 850 | SUBSURFACE PUMP | | 7, 600 | 51, 920 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 122, 820 |
| 880 | COMBUSTOR | | 50, 000 | 7, 950 |
| 890 | OIL STOCK TANKS | | 50, 000 | 58, 500 |
| 900 | SEPARATORS | | | 6, 885 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 54, 500 |
| 930 | LABOR & TRUCKING | | 75, 000 | 131, 482 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 10, 738 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 695, 315 | $1, 453, 878 |
| | TOTAL WELL COSTS | $3, 659, 515 | $9, 245, 295 | $7, 139, 005 |

Confidential Business Information




3/30/22

Exhibit 5 to 5/9/23 SDR

Exhibit 9

# AUTHORITY FOR EXPENDITURE

SLAWSON exploration company, inc.

| | | | | | |
|---|---|---|---|---|---|
| **WELL:** | JORE FEDERAL 2-12H (WBOO) | **OPERATOR:** | WHITE BUTTE OIL OPERATIONS LLC | **AFE#:** | 05600 |
| **LOCATION:** | NWNW Section 12-151N-95W | **COUNTY/STATE:** | MCKENZIE/NORTH DAKOTA | **CREATED:** | June 23, 2014 |
| **PURPOSE:** | Drill and complete a Bakken single lateral horizontal well on 640 acre spacing | | | **ACCT DATE:** | 3/2022 |

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 171, 044- |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 405, 877 |
| 095 | HEALTH/SAFETY/ENVIRONMENT | | | 94 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 222, 255 |
| 105 | DRILLING SUPERVISION | 46, 400 | 46, 400 | 52, 955 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 17, 898 |
| 120 | WATER | 20, 000 | 20, 000 | 93, 988 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 50, 713 |
| 150 | FOOTAGE __,___FT @ $__.__/FT | | | 23, 758 |
| 160 | DAYWORK 24 DAYS @ $21,000/DAY | 504, 000 | 504, 000 | 693, 520 |
| 175 | CREW LODGING & PER DIEM | 39, 600 | 39, 600 | |
| 180 | RIG FUEL AND BOILER | 163, 200 | 163, 200 | 172, 507 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 300, 000 | 300, 000 | 369, 593 |
| 200 | DRILL BITS | 50, 000 | 50, 000 | 89, 157 |
| 210 | SUBSURFACE RENTAL EQUIPMENT | 120, 000 | 120, 000 | 159, 420 |
| 215 | DIRECTIONAL DRILLING SERVICES | 210, 000 | 210, 000 | 218, 717 |
| 230 | SURFACE EQUIPMENT RENTALS | 156, 000 | 156, 000 | 373, 690 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 28, 745 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 59, 085 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 68, 976 |
| 320 | MUD LOGGING SERVICES $ | 14, 000 | 14, 000 | 22, 717 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES $ | 14, 000 | 14, 000 | 22, 717 |
| 350 | FREIGHT & TRUCKING $ | 96, 000 | 144, 000 | 176, 129 |
| 360 | CONTRACT LABOR $ | 90, 000 | 135, 000 | 193, 088 |
| 370 | ADMINISTRATIVE OVERHEAD $ | 18, 000 | 21, 500 | 26, 457 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 34, 330 |
| 385 | COMMUNICATIONS | 18, 000 | 18, 000 | 31 |
| 390 | MISCELLANEOUS | | | 13 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 58, 663 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 9, 400 |
| 425 | WIRELINE SERVICES | | | 10, 242 |
| 430 | COMPL. RIG 7 DAYS @ $20,000/DAY W | | 140, 000 | 38, 047 |
| 435 | COILED TUBING SERVICES | | 175, 000 | 18, 554 |
| 440 | COMPLETION TOOL RENTALS | | 35, 000 | 105, 480 |
| 450 | CASED HOLE LOGS & PERFORATING | | 250, 000 | 198, 608 |
| 455 | WATER FOR STIMULATION | | 300, 000 | 226, 147 |
| 4[illegible]0 | FORMATION STIMULATION | | 1, 875, 000 | 1, 869, 934 |
| 4[illegible]0 | COMPLETION SUPERVISION | | 24, 500 | 34, 304 |
| 4[illegible]0 | SALES TAX ON EQUIPMENT | 24, 615 | 106, 880 | 52, 854 |
| | TOTAL INTANGIBLES | $2, 501, 815 | $5, 551, 080 | $6, 027, 619 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 52, 148 |
| 630 | INTERMEDIATE __,___' OF __ _/_" | | | 15, 221 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 329, 037 |
| 700 | LINER 5,000' OF 4-1/2" 13.5# P- | | 100, 000 | 58, 677 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 66, 431 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 400, 000 | 62, 126 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 103, 499 |
| 820 | PUMPING UNIT | | 200, 000 | 24, 689 |
| 830 | PRIME MOVER ELECTRICITY + MOTO | | 50, 000 | 21, 322 |
| 840 | SUCKER RODS | | 40, 000 | 1, 180 |
| 850 | SUBSURFACE PUMP | | 7, 600 | |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 342, 612 |
| 880 | COMBUSTOR | | 50, 000 | 23, 850 |
| 890 | OIL STOCK TANKS | | 50, 000 | 80, 962 |
| 900 | SEPARATORS | | | 4, 646 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 111, 636 |
| 930 | LABOR & TRUCKING | | 75, 000 | 147, 060 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 11, 760 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 645, 315 | $1, 456, 856 |
| | TOTAL WELL COSTS | $2, 994, 115 | $7, 196, 395 | $7, 484, 475 |

Confidential Business Information

# AUTHORITY FOR EXPENDITURE

SLAWSON exploration company, inc.

**WELL:** REVOLVER 7-35TFH **OPERATOR:** SLAWSON EXPLORATION CO, INC **AFE#:** 05664

**LOCATION:** SWSE Section 35-151N-92W **COUNTY/STATE:** MOUNTRAIL/NORTH DAKOTA **CREATED:** July 30, 2014

**PURPOSE:** Drill and complete a Three Forks single lateral horizontal well on 640 acre spacing **ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 8, 350 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 290, 416 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 132, 074 |
| 105 | DRILLING SUPERVISION | 46, 400 | 46, 400 | 65, 031 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 23, 422 |
| 120 | WATER | 20, 000 | 20, 000 | 33, 705 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 277, 290 |
| 160 | DAYWORK 24 DAYS @ $21,000/DAY | 504, 000 | 504, 000 | 486, 832 |
| 175 | CREW LODGING & PER DIEM | 39, 600 | 39, 600 | 4, 620 |
| 180 | RIG FUEL AND BOILER | 163, 200 | 163, 200 | 246, 611 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 300, 000 | 300, 000 | 301, 346 |
| 200 | DRILL BITS | 50, 000 | 50, 000 | 69, 160 |
| 210 | SUBSURFACE RENTAL EQUIPMENT | 120, 000 | 120, 000 | 193, 139 |
| 215 | DIRECTIONAL DRILLING SERVICES | 210, 000 | 210, 000 | 269, 217 |
| 230 | SURFACE EQUIPMENT RENTALS | 156, 000 | 156, 000 | 196, 082 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 49, 993 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 62, 382 |
| 320 | MUD LOGGING SERVICES | 14, 000 | 14, 000 | 14, 149 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | 4, 500 |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 14, 000 | 14, 000 | 14, 149 |
| 350 | FREIGHT & TRUCKING | 96, 000 | 144, 000 | 72, 508 |
| 360 | CONTRACT LABOR | 90, 000 | 135, 000 | 109, 605 |
| 370 | ADMINISTRATIVE OVERHEAD | 18, 000 | 22, 000 | 10, 421 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 24, 148 |
| 385 | COMMUNICATIONS | 18, 000 | 18, 000 | 49 |
| 390 | MISCELLANEOUS | | | 475 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 36, 925 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 6, 000 |
| 430 | COMPL. RIG 8 DAYS @ $20,000/DAY | | 160, 000 | 19, 787 |
| 440 | COMPLETION TOOL RENTALS | | 40, 000 | 51, 295 |
| 450 | CASED HOLE LOGS & PERFORATING | | 200, 000 | 25, 913 |
| 455 | WATER FOR STIMULATION | | 200, 000 | 197, 883 |
| 460 | FORMATION STIMULATION | | 1, 200, 000 | 1, 079, 001 |
| 470 | COMPLETION SUPERVISION | | 28, 000 | 12, 068 |
| 490 | SALES TAX ON EQUIPMENT | 24, 615 | 105, 675 | 58, 254 |
| | TOTAL INTANGIBLES | $2, 501, 815 | $4, 578, 875 | $4, 446, 800 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 44, 674 |
| 630 | INTERMEDIATE __,___' OF __ _/_" | | | 14, 646 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 315, 482 |
| 700 | LINER 5,000' OF 4-1/2" 13.5# P- | | 100, 000 | 70, 301 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 2, 125 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 9, 610 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 60, 743 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 375, 000 | 287, 107 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 68, 728 |
| 820 | PUMPING UNIT | | 200, 000 | 165, 623 |
| 830 | PRIME MOVER | | 50, 000 | 31, 166 |
| 840 | SUCKER RODS | | 40, 000 | 31, 502 |
| 850 | SUBSURFACE PUMP | | 8, 500 | 22, 015 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 66, 937 |
| 880 | COMBUSTOR | | 50, 000 | 23, 850 |
| 890 | OIL STOCK TANKS | | 50, 000 | 32, 500 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 45, 900 |
| 930 | LABOR & TRUCKING | | 75, 000 | 114, 515 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 5, 880 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 621, 215 | $1, 413, 304 |
| | TOTAL WELL COSTS | $2, 994, 115 | $6, 200, 090 | $5, 860, 104 |

Confidential Business Information




3/30/22

Exhibit 5 to 5/9/23 SDR

Exhibit 9

# AUTHORITY FOR EXPENDITURE

slawson exploration company, inc.

**WELL:** PHOENIX 2-18H
**OPERATOR:** SLAWSON EXPLORATION CO, INC
**AFE#:** 05689

**LOCATION:** SWSW Section 18-152N-91W
**COUNTY/STATE:** MOUNTRAIL/NORTH DAKOTA
**CREATED:** August 19, 2014

**PURPOSE:** Drill and complete a Bakken single lateral horizontal well on 640 acre spacing
**ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 18, 831 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 237, 153 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 65, 215 |
| 105 | DRILLING SUPERVISION | 46, 400 | 46, 400 | 26, 219 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 17, 000 |
| 120 | WATER | 20, 000 | 20, 000 | 8, 548 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 41, 397 |
| 160 | DAYWORK 24 DAYS @ $21,000/DAY | 504, 000 | 504, 000 | 396, 931 |
| 175 | CREW LODGING & PER DIEM | 39, 600 | 39, 600 | 6, 035 |
| 180 | RIG FUEL AND BOILER | 163, 200 | 163, 200 | 142, 504 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 300, 000 | 300, 000 | 250, 427 |
| 200 | DRILL BITS | 50, 000 | 50, 000 | 86, 953 |
| 210 | SUBSURFACE RENTAL EQUIPMENT | 120, 000 | 120, 000 | 146, 337 |
| 215 | DIRECTIONAL DRILLING SERVICES | 210, 000 | 210, 000 | 285, 539 |
| 230 | SURFACE EQUIPMENT RENTALS | 156, 000 | 156, 000 | 160, 514 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 34, 065 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 64, 015 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 54, 990 |
| 320 | MUD LOGGING SERVICES | 14, 000 | 14, 000 | 11, 529 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 14, 000 | 14, 000 | 11, 529 |
| 350 | FREIGHT & TRUCKING | 96, 000 | 144, 000 | 65, 190 |
| 360 | CONTRACT LABOR | 90, 000 | 135, 000 | 161, 442 |
| 370 | ADMINISTRATIVE OVERHEAD | 18, 000 | 22, 000 | 9, 233 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 20, 388 |
| 385 | COMMUNICATIONS | 18, 000 | 18, 000 | 10, 981 |
| 390 | MISCELLANEOUS | | | |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 62, 925 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 4, 915 |
| 430 | COMPL. RIG 8 DAYS @ $20,000/DAY | | 160, 000 | 13, 625 |
| 440 | COMPLETION TOOL RENTALS | | 40, 000 | 43, 937 |
| 450 | CASED HOLE LOGS & PERFORATING | | 200, 000 | 19, 333 |
| 455 | WATER FOR STIMULATION | | 200, 000 | 309, 897 |
| 460 | FORMATION STIMULATION | | 1, 200, 000 | 624, 911 |
| 470 | COMPLETION SUPERVISION | | 28, 000 | 13, 164 |
| 490 | SALES TAX ON EQUIPMENT | 24, 615 | 105, 675 | 61, 710 |
| | TOTAL INTANGIBLES | $2, 501, 815 | $4, 578, 875 | $3, 487, 402 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 50, 793 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 331, 789 |
| 700 | LINER 5,000' OF 4-1/2" 13.5# P- | | 100, 000 | 66, 588 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 3, 425 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 10, 000 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 44, 399 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 375, 000 | 186, 197 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 65, 769 |
| 820 | PUMPING UNIT | | 200, 000 | 115, 555 |
| 830 | PRIME MOVER | | 50, 000 | 33, 864 |
| 840 | SUCKER RODS | | 40, 000 | 26, 457 |
| 850 | SUBSURFACE PUMP | | 8, 500 | 8, 195 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 91, 321 |
| 880 | COMBUSTOR | | 50, 000 | 12, 150 |
| 890 | OIL STOCK TANKS | | 50, 000 | 64, 116 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 77, 482 |
| 930 | LABOR & TRUCKING | | 75, 000 | 94, 919 |
| 940 | MISC. LEASE EQUIPMENT | | | 135- |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 5, 600 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | 1, 250 |
| | TOTAL TANGIBLES | $492, 300 | $1, 621, 215 | $1, 289, 734 |
| | TOTAL WELL COSTS | $2, 994, 115 | $6, 200, 090 | $4, 777, 136 |

Confidential Business Information

Exhibit 5 to 5/9/23 SDR
Exhibit 9

# AUTHORITY FOR EXPENDITURE

SLAWSON exploration company, inc.

**WELL:** PHOENIX 1 SLH **OPERATOR:** SLAWSON EXPLORATION CO, INC **AFE#:** 05691

**LOCATION:** SWSW Section 18-152N-91W **COUNTY/STATE:** MOUNTRAIL/NORTH DAKOTA **CREATED:** August 19, 2014

**PURPOSE:** Drill and complete a Bakken single lateral horizontal well on 1280 acre spacing **ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 4, 544 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 215, 764 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 66, 573 |
| 105 | DRILLING SUPERVISION | 46, 400 | 46, 400 | 46, 138 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 17, 000 |
| 120 | WATER | 20, 000 | 20, 000 | 42, 361 |
| | DRILLING CONTRACT | | | |
| 130 | TURNKEY CONTRACT | | | 473 |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 85, 363 |
| 160 | DAYWORK 24 DAYS @ $21,000/DAY | 504, 000 | 504, 000 | 363, 285 |
| 175 | CREW LODGING & PER DIEM | 39, 600 | 39, 600 | 6, 318 |
| 180 | RIG FUEL AND BOILER | 163, 200 | 163, 200 | 102, 301 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 300, 000 | 300, 000 | 211, 479 |
| 200 | DRILL BITS | 50, 000 | 50, 000 | 67, 115 |
| 210 | SUBSURFACE RENTAL EQUIPMENT | 120, 000 | 120, 000 | 143, 342 |
| 215 | DIRECTIONAL DRILLING SERVICES | 210, 000 | 210, 000 | 298, 044 |
| 230 | SURFACE EQUIPMENT RENTALS | 156, 000 | 156, 000 | 231, 720 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 37, 565 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 67, 236 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 60, 973 |
| 320 | MUD LOGGING SERVICES | 14, 000 | 14, 000 | 19, 963 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 14, 000 | 14, 000 | 13, 562 |
| 350 | FREIGHT & TRUCKING | 96, 000 | 144, 000 | 75, 720 |
| 360 | CONTRACT LABOR | 90, 000 | 135, 000 | 255, 107 |
| 370 | ADMINISTRATIVE OVERHEAD | 18, 000 | 22, 000 | 9, 305 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 20, 388 |
| 385 | COMMUNICATIONS | 18, 000 | 18, 000 | 2, 086 |
| 390 | MISCELLANEOUS | | | 73 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 70, 077 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 5, 070 |
| 430 | COMPL. RIG 8 DAYS @ $20,000/DAY | | 160, 000 | 18, 095 |
| 435 | COILED TUBING SERVICES | | | 100, 713 |
| 440 | COMPLETION TOOL RENTALS | | 40, 000 | 54, 607 |
| 450 | CASED HOLE LOGS & PERFORATING | | 200, 000 | 18, 500 |
| 455 | WATER FOR STIMULATION | | 200, 000 | 239, 617 |
| 460 | FORMATION STIMULATION | | 1, 200, 000 | 707, 395 |
| 470 | COMPLETION SUPERVISION | | 28, 000 | 22, 924 |
| 490 | SALES TAX ON EQUIPMENT | 24, 615 | 105, 675 | 61, 382 |
| | TOTAL INTANGIBLES | $2, 501, 815 | $4, 578, 875 | $3, 762, 178 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 50, 197 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 343, 997 |
| 700 | LINER 5,000' OF 4-1/2" 13.5# P- | | 100, 000 | 74, 986 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 3, 425 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 5, 755 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 44, 802 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 375, 000 | 160, 820 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 62, 129 |
| 820 | PUMPING UNIT | | 200, 000 | 115, 987 |
| 830 | PRIME MOVER | | 50, 000 | 33, 659 |
| 840 | SUCKER RODS | | 40, 000 | 26, 407 |
| 850 | SUBSURFACE PUMP | | 8, 500 | 8, 053 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 89, 656 |
| 880 | COMBUSTOR | | 50, 000 | 12, 150 |
| 890 | OIL STOCK TANKS | | 50, 000 | 65, 316 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 77, 482 |
| 930 | LABOR & TRUCKING | | 75, 000 | 96, 567 |
| 940 | MISC. LEASE EQUIPMENT | | | 135- |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 5, 600 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | 1, 250 |
| | TOTAL TANGIBLES | $492, 300 | $1, 621, 215 | $1, 278, 103 |
| | TOTAL WELL COSTS | $2, 994, 115 | $6, 200, 090 | $5, 040, 281 |

Confidential Business Information



3/30/22

Exhibit 5 to 5/9/23 SDR

Exhibit 10

## Crestwood Midstream Partners LP/Arrow Pipeline LLC
## Authorization for Expenditure
## Well Connect Project Estimate

Arrow Midstream Holdings, LLC
Arrow Pipeline, LLC

| | | | |
|---|---|---|---|
| **Project Name** | Slawson Jore | **Project #** | |
| **Project Manager** | Kyle Smith | **AFE Amount** | $2,942,171 |
| **Producer** | Slawson | **AFE Type** | Full Scope |

| WBS | Description of Expenditure | Quantity | Full Scope - Original | Supplemental | Total Budget | Shared Cost/Well |
|---|---|---|---|---|---|---|
| 501 | Project Management Labor | 1 | $ 15,000 | $ - | $ 15,000 | $ 1,363.64 |
| 502 | Operations & Maintenance Internal Labor | 1 | $ 25,000 | $ - | $ 25,000 | $ 2,272.73 |
| 503 | Company Expenses (Pcard Expenses) | 0 | $ - | $ - | $ - | $ - |
| **510** | **Contract Engineering, Land Survey, Consulting Services** | | $ - | $ - | $ - | $ - |
| 511 | Outside Engineering | 1 | $ 5,000 | $ - | $ 5,000 | $ 454.55 |
| 512 | Land Survey | 6,180 | $ 162,080 | $ - | $ 162,080 | $ 14,734.55 |
| 516 | Geotechnical Drilling and Testing | | $ - | $ - | $ - | $ - |
| **520** | **Environmental, Health, and Safety** | | $ - | $ - | $ - | $ - |
| 521 | Natural Resources Permitting | 6,180 | $ 15,450 | $ - | $ 15,450 | $ 1,404.55 |
| 522 | Cultural Resources Permitting | | $ - | $ - | $ - | $ - |
| 524 | PSM / RMP / PHA | | $ - | $ - | $ - | $ - |
| 525 | Air Compliance | | $ - | $ - | $ - | $ - |
| 527 | Environmental Inspection | | $ - | $ - | $ - | $ - |
| **530** | **Land and ROW Acquisition and Leases** | | $ - | $ - | $ - | $ - |
| 531 | ROW Agent Fees | 6,180 | $ 47,310 | $ - | $ 47,310 | $ 4,300.91 |
| 532 | Land Acquisition Fees | 6,180 | $ 92,700 | $ - | $ 92,700 | $ 8,427.27 |
| 536 | Government and Public Affairs | 1 | $ 16,440 | $ - | $ 16,440 | $ 1,494.55 |
| **540** | **Contract Construction Management** | | $ - | $ - | $ - | $ - |
| 541 | Contract Inspection Services | 60 | $ 150,000 | $ - | $ 150,000 | $ 13,636.36 |
| 543 | Commissioning / Start-up Support | 1 | $ 5,000 | $ - | $ 5,000 | $ 454.55 |
| 544 | Radiographic Inspection | 50 | $ 125,000 | $ - | $ 125,000 | $ 11,363.64 |
| 545 | Lab Services | | $ - | $ - | $ - | $ - |
| 546 | Testing Services | | $ - | $ - | $ - | $ - |
| **550** | **Construction** | | $ - | $ - | $ - | $ - |
| 551 | General / Mechanical Construction | 100 | $ 85,000 | $ - | $ 85,000 | $ 7,727.27 |
| 552 | Pipeline Construction (including Hot Taps & Pig L/R) | 5,780 | $ 725,800 | $ - | $ 725,800 | $ 65,981.82 |
| 553 | Electrical / Instrumentation Construction | 3 | $ 111,900 | $ - | $ 111,900 | $ 10,172.73 |
| 554 | Site Civil / Structural Construction | 3 | $ 40,500 | $ - | $ 40,500 | $ 3,681.82 |
| 555 | HDD / Boring Construction | 400 | $ 72,000 | $ - | $ 72,000 | $ 6,545.45 |
| **560** | **Materials and Equipment** | | $ - | $ - | $ - | $ - |
| 561 | Foundations | | $ - | $ - | $ - | $ - |
| 565 | Line Pipe | 6,180 | $ 166,556 | $ - | $ 166,556 | $ 15,141.45 |
| 566 | Pipe Bends, Fittings, Bolts & Flanges | 1 | $ 41,639 | $ - | $ 41,639 | $ 3,785.36 |
| 567 | Valves & Valve Actuators | 1 | $ 93,000 | $ - | $ 93,000 | $ 8,454.55 |
| 568 | Packaged Piping Assembly or Skid | 2 | $ 90,000 | $ - | $ 90,000 | $ 8,181.82 |
| 572 | Pumps & Drivers | 1 | $ 60,000 | $ - | $ 60,000 | $ 5,454.55 |
| 573 | Electric Motors, Engines, Turbines, Generators | | $ - | $ - | $ - | $ - |
| 575 | Storage Vessels and Tanks | | $ - | $ - | $ - | $ - |
| 576 | Measurement (2 Oil LACT; 1 Gas Meter Skid) | 3 | $ 487,326 | $ - | $ 487,326 | $ 44,302.36 |
| 578 | Cathodic Protection | | $ - | $ - | $ - | $ - |
| 579 | Electrical | 3 | $ 42,000 | $ - | $ 42,000 | $ 3,818.18 |
| 580 | Instrumentation & Controls | | $ - | $ - | $ - | $ - |
| 581 | SCADA / Comm / IT Equipment | | $ - | $ - | $ - | $ - |
| 582 | Heat Tracing, Insulation & Fireproofing | | $ - | $ - | $ - | $ - |
| 583 | Protective Coatings | | $ - | $ - | $ - | $ - |
| **590** | **Other and Miscellaneous** | | $ - | $ - | $ - | $ - |
| 599 | Contingency (10%) | | $ 267,470 | $ - | $ 267,470 | $ 24,315.46 |
| **X** | **TOTAL PROJECT ESTIMATE** | | **$ 2,942,171** | **$ -** | **$ 2,942,171** | **$ 267,470.10** |
| XX | Estimated Adder For Winter Construction | | $ 394,560 | $ - | $ 394,560 | $ 35,869.09 |

**Notes:**

| | |
|---|---|
| Line 576 | LACT building (5,000 BPD capacity) is based on a Coriolis Meter for oil flow measurement and includes a charge pump, booster pump, and all associated piping in a skid-mounted, fully enclosed and heated building |
| Line 576 | Meter Building includes 3" Daniel Orifice meter run with a Total Flow computer for gas flow measurement |
| Line X | Represents the total multi-well pad pipeline connection costs that are shared equally with each individual well connection on the respective pad. |
| Line XX | Construction based on normal rates for construction in the summer. Operator will be invoiced for Winter Construction adder in the event construction occurs during the winter months. The commencement of construction shall be at the sole discretion of Crestwood. |

| LACT Prices | | Gas/Water Meter Prices | |
|---|---|---|---|
| $ 221,163 | 5000 BPD | $ 84,443 | 3" Gas/2" Water |
| $ 401,620 | 5000/2500 BPD | $ 99,449 | 2" & 3" Gas/2" Water |
| $ 390,400 | 2500/2500 BPD | $ 57,560 | 2" Water Only |
| $ 357,264 | 1000/1000 BPD | $ 45,000 | 3" Dual Gas Only |

Confidential Business Information

Exhibit 5 to 5/9/23 SDR

Exhibit 11

## Clarks Creek Bakken Field – Wells Producing 9/2014 to 12/2016




Bottom-Hole Location of Preexisting Wells

Bottom-Hole Location of Contemporaneous Wells

Example Gathering system to gather Flared volumes from Wells
Estimate of 65,483' of Line-Pipe

CAR 000165

Exhibit 6 to 5/9/23 SDR

United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Montana/Dakotas State Office
5001 Southgate Drive
Billings, Montana 59101
http://www.blm.gov/montana-dakotas

SDR-922-22-10
3165.3 (MT9220.RK)

April 20, 2022

CERTIFIED MAIL RETURN RECEIPT REQUESTED
7020 3160 0000 0327 6216

Kathleen C. Schroder )
Davis Graham & Stubbs )
Attorney for Slawson Exploration Company, Inc. )
1550 17th Street, Suite 500 ) SDR No. 922-22-10
Denver, Colorado 80202 )

Dear Ms. Schroder,

**DECISION AFFIRMED**

On March 23, 2022, the Bureau of Land Management (BLM) Montana-Dakotas State Office (MT-DK) received your petition via FedEx, dated March 22, 2022 (Enclosure 1) and request for State Director Review (SDR). Slawson Exploration Company, Inc (Slawson) requested an extension of time to provide additional supporting documentation. Slawson also requested an administrative review of the Decision on one (1) Flaring Sundry, made by the BLM North Dakota Field Office (NDFO) on February 18, 2022, received by Slawson on February 24, 2022. The SDR request was filed timely in accordance with 43 CFR § 3165.3(b). The SDR was assigned number SDR-922-22-10.

The BLM acknowledged Slawson's requests via letter dated March 24, 2022. Slawson declined the opportunity for an oral presentation and relied on their written submission.

**BACKGROUND - SUMMARY OF RELEVANT HISTORICAL EVENTS**

The Decision on Flaring Sundry submitted by Slawson in connection with flaring of oil-well gas dealt with one (1) well,

Jore (Federal) 2-12H

located in North Dakota, where the well was not connected to a pipeline. The reported flaring occurred between September 2014 and December 2016.

The NDFO issued the Decision, which determined that in accordance with Notice to Lessees and Operators of Onshore Federal and Indian Oil and Gas Leases: Royalty or Compensation for Oil and Gas Loss, Notice to Lessees 4A (NTL-4A), II. A & C (2) and III. A and Conservation Division Manual (CDM) 644.5, flaring reported by Slawson was an avoidable loss.

## APPLICABLE LAW

The Federal mineral leasing statutes share a common purpose of promoting the development of Federal oil and gas resources for the financial benefit of the public. The Mineral Leasing Act (MLA), as amended, states that all leases "shall be subject to the condition that the lessee will, in conducting his explorations and mining operations, use all reasonable precautions to prevent waste of oil or gas developed in the land . . ." (30 U.S.C. 225). The MLA further provides that "[e]ach lease shall contain . . . a provision that such rules . . . for the prevention of undue waste as may be prescribed by [the Secretary] shall be observed . . .." The Federal Oil and Gas Management Act of 1982 (FOGRMA) establishes royalty liability for "oil or gas lost or wasted . . . when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order or citation issued under [the mineral leasing laws]." (30 U.S.C. 1756). In the Federal Land Policy Act of 1976 (FLPMA), as amended, Congress declared "that it is the policy of the United States that . . . the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals . . . (43 U.S.C. 1701).

Notice to Lessees (NTL)-4A II. A & C and III. A, provide as follows:

II. <u>DEFINITIONS</u>

As used in this Notice, certain terms are defined as follows:

> A. "Avoidably lost" production shall mean the venting or flaring of produced gas without the prior authorization, approval, ratification, or acceptance of the Supervisor and the loss of produced oil or gas when the Supervisor determines that such loss occurred as a result of (1) negligence on the part of the lessee or operator, or (2) the failure of the lessee or operator to take all reasonable measures to prevent and/or to control the loss, or (3) the failure of the lessee or operator to comply fully with the applicable lease terms and regulations, appropriate provisions of the approved operating plan, or the prior written orders of the Supervisor, or (4) any combination of the foregoing.
>
> C. "Unavoidably lost" production shall mean … (2) that oil or gas which is lost because of line failures, equipment malfunctions, blowouts, fires, or otherwise except where the Supervisor determines that said loss resulted from the negligence or the failure of the lessee or operator to take all reasonable measures to prevent and/or control the loss.

Exhibit 6 to 5/9/23 SDR



III. AUTHORIZED VENTING AND FLARING OF GAS

Lessees or operators are hereby authorized to vent or flare gas on a short-term basis without incurring a royalty obligation in the following circumstances:

A. Emergencies,
B. Well-purging and evaluations tests,
C. Initial production tests, or
D. Routine or Special well tests.

IV. OTHER VENTING OR FLARING

Oil well gas. Except as provided in II.C and III above, oil well gas may not be vented or flared unless approved in writing by the Supervisor.

**DISCUSSION:**

**I. Slawson contends that the well cannot be connected to gas capture infrastructure economically.**

Slawson contends that the gas flared should be royalty-free because it was uneconomic to hook the well up to infrastructure.

**BLM Response:**

As mentioned above, NTL-4A Section II(A) states that:

"Avoidably lost" production shall mean the venting or flaring of produced gas without the prior authorization, approval, ratification, or acceptance of the Supervisor and the loss of produced oil or gas when the Supervisor determines that such loss occurred as a result of (1) negligence on the part of the lessee or operator, or (2) the failure of the lessee or operator to take all reasonable measures to prevent and/or to control the loss, or (3) the failure of the lessee or operator to comply fully with the applicable lease terms and regulations appropriate provisions of the approved operating plan, or the prior written orders of the Supervisor, or (4) any combination of the foregoing.

NTL-4A also outlines what should be submitted to the field office for consideration of royalty free flaring. Section 4(B) of NTL-4A states,

> [t]he Supervisor may approve an application for the venting or flaring of oil well gas if justified . . . .by the submittal of (1) an evaluation report supported by engineering, geologic, and economic data which demonstrates to the satisfaction of the Supervisor that the expenditures necessary to market or beneficially use such gas are not economically justified and that conservation of the gas, if required, would lead to premature abandonment of recoverable oil reserves and

Exhibit 6 to 5/9/23 SDR



> ultimately to a greater loss of equivalent energy than would be recovered if the venting or flaring were permitted to continue . . . (NTL-4A, VI (B), pg. 4).

CDM part 644.5.3(I) states "The burden of proof rests with the lessee/operator to justify that his practices are not wasteful." This is also stated in Petro-Hunt, 197 IBLA 100 at 114, "BLM is obligated to reach a decision that has a rational basis and is supported by the record. In some cases, a lessee's failure to provide adequate information and analysis constitutes, in itself, a rational basis for denying its request for royalty-free flaring."

The CDM part 644, Chapter 5, part F indicates that "economics of conserving gas must be on a field-wide basis, and the Supervisor must consider the feasibility of a joint operation between all other lessees/operators in the field or area." Further, it goes on to state

> When it is justified by the lessee/operator, temporary flaring of gas production not exceeding one year may be allowed while evaluating reserves, awaiting pipeline construction, negotiating sales contracts, or awaiting plan construction, provided total monthly per-well gas flared does not exceed 10 MMCF. The fact that a lessee/operator is not financially able to properly dispose of all production from the leasehold is not automatic justification for allowing loss of nonrenewable resources.

Slawson flared gas for approximately twenty-seven (27) months between September 2014 and December 2016. Slawson did submit economics at the time of sundry for NDFO to consider, however their submission was on one well as opposed to field-wide. NDFO's notification of decision outlines the reasons Slawson's economic justification was inadequate. These reasons include, but are not limited to, providing economics on a single well versus on a field wide basis, and re-evaluating economics as the field develops.

**II. Next, Slawson contends that field-wide capture is uneconomic.**

Slawson prepared a theoretical field-wide economic analysis to indicate that gas capture on a field-wide basis would be uneconomic.

**BLM Response**

Slawson contends it would be uneconomical to hook up a well to infrastructure, therefore additional analysis on a field-wide basis is not warranted. However, based on CDM part 644, Chapter 5, part F, a field-wide analysis is precisely what is needed to determine whether gas should be royalty free. Slawson prepared a field-wide economic analysis to correct a deficiency noted in the NDFO decision. They also contend that this additional evidence shows that it would have been uneconomical at the time of flaring. However, Slawson's submittal asserts that it would uneconomical based on capacity constraints. Slawson should have submitted these economics based on the lack of pipeline and as a result limits the scope of this review.

At SDR, the State Office must review the Field Office's decision based on the relevant facts, information and evidence presented to the FO at the time of their decision. While untimely to the

NDFO's decision, Slawson attempted to correct a deficiency by providing additional information during the SDR. Consideration of this additional information, while untimely, would not render a different decision because the economic justification submitted was incorrectly analyzed based on the facts of this case.

**Conclusion:**

After considering the record, to include the Statement of Reasons provided by Slawson, I affirm the NDFO decision dated February 18, 2022, for the above referenced wells.

**Appeal Rights:**

This Decision may be appealed to the Interior Board of Land Appeals, Office of the Secretary, in accordance with the regulations contained in 43 C.F.R. § 3165.4 and Form 1842-1 (Enclosure 2). If an appeal is taken, a Notice of Appeal must be filed in this office at the above address within 30 days from receipt of this Decision. A copy of the Notice of Appeal and of any statement of reasons, written arguments, or briefs must also be served on the Office of the Solicitor at the address shown on Form 1842-1. It is also requested that a copy of any statement of reasons, written arguments, or briefs be sent to this office. The appellant has the burden of showing that the Decision appealed from is in error.

If you wish to file a Petition for a Stay of this Decision, pursuant to 43 C.F.R. § 4.21, the Petition must accompany your Notice of Appeal. A Petition for a Stay is required to show sufficient justification based on the standards listed below. Copies of the Notice of Appeal and Petition for a Stay must also be submitted to each party named in the Decision and to the Interior Board of Land Appeals and to the appropriate Office of the Solicitor (see 43 C.F.R. § 4.413) at the same time the original documents are filed with this office. If you request a stay, you have the burden of proof to demonstrate that a stay should be granted.

**Standards for Obtaining a Stay**

Except as otherwise provided by law or other pertinent regulation, a petition for a stay of a Decision pending appeal shall show sufficient justification based on the following standards:

(1) The relative harm to the parties if the stay is granted or denied;
(2) The likelihood of the appellant's success on the merits;
(3) The likelihood of immediate and irreparable harm if the stay is not granted; and
(4) Whether the public interest favors granting the stay.

Sincerely,

Theresa M. Hanley

Theresa M. Hanley
Acting State Director
BLM Montana/Dakotas

2 Enclosures:
1- Slawson SDR Request letter (6 pp)
2- Form 1842-1 (2 pp)

cc (w/ encl.):
Field Manager, North Dakota Field Office
District Manager, Eastern Montana/Dakotas

Exhibit 6 to 5/9/23 SDR

DAVIS
GRAHAM &
STUBBS

Kathleen C. Schroder
303 892 7354
Katie.Schroder@dgslaw.com

Received
Bureau of Land Management
MAR 23 2022
Montana State Office
Billings, Montana

March 22, 2022

Via FedEx

Bureau of Land Management
Montana/Dakotas State Office
5001 Southgate Drive
Billings, MT 59101

Attn: Ms. Theresa M. Hanley, Acting State Director

**Re: Slawson Exploration Company, Inc. Request for State Director Review**
**North Dakota Field Office Determination on Royalty-Free Flaring**
**Jore (Federal) 2-12H**
**Lease No. 1420A042052**
**Agreement No. NDM 107646**

Dear Ms. Hanley,

On behalf of Slawson Exploration Company, Inc. ("Slawson"), we hereby request State Director review pursuant to 43 C.F.R. § 3165.3(b) of a North Dakota Field Office decision dated February 18, 2022, finding that gas flared from the Jore (Federal) 2-12H well ("Well") was avoidably lost and thus royalty bearing ("Decision," attached as Exhibit A). Because the Field Office erred by determining the flared gas was avoidably lost, the State Director must set aside the Decision.

We also request an extension of 14 days (until April 6, 2022) to submit additional data in support of this request for review as permitted by 43 C.F.R. § 3165.3(b).

## Background

The Decision relates to a sundry notice that Slawson submitted on September 27, 2019, requesting that the Bureau of Land Management (BLM) treat gas flared from the Well between September 2014 and December 2016 (the "Flaring Period") as unavoidably lost and thus royalty free.[1] *See* Exhibit A, Sundry Notice. The Well is located in the Clarks Creek field in Section 12 of Township 151 North, Range 95 West. *Id.* The Well produces from Communitization Agreement No. NDM 107646.

Production first occurred from the Well on September 4, 2014. Between the date of first production and August 28, 2019, the Well was not connected to a pipeline. In accordance with Section IV(B) of Notice to Lessees 4A and the U.S. Geological Survey (USGS) Conservation Division Manual, Slawson

[1] Slawson operated the Well during the Flaring Period. In August 2020, the BLM and Bureau of Indian Affairs approved a change of operator to White Butte Oil Operations, LLC a Slawson affiliate.

submitted an economic analysis with the sundry notice that demonstrated that the expenditures necessary to capture gas from the Well were not economically justified.

In the Decision, the Field Office determined that Slawson had not demonstrated that the flared gas was unavoidably lost. The Field Office based its decision on two findings. First, the Field Office found that Slawson incorrectly analyzed the economics of capturing gas only from the Well and not from wells throughout the field. The Field Office explained that the Conservation Division Manual "is clear in that the analysis must be conducted on a field wide basis to demonstrate that the collective production and capital expenditure of the fieldwide operations support the analysis and no one well, lease, or communitization agreement is unduly burdened." Exhibit A, Notification of Decision at 2.

Second, the Field Office found that Slawson did not re-evaluate its economic analysis to account for future developments and therefore did not accurately represent the field. Exhibit A, Notification of Decision at 2. The Field Office explained that "[d]ue to the rapid rate of development that occurred in the given field over the requested time frame, the economic analysis must be conducted at subsequent intervals from the initiation of production in the field otherwise the production that occurred at later dates is unfairly discounted." *Id.*

Slawson now requests that the State Director review and set aside the Decision.

**Request for Review**

Both of the Field Office's bases for the Decision are incorrect. First, Slawson correctly analyzed the economics of capturing gas only from the Well because Slawson did not operate other wells in the field during the Flaring Period. Second, and similarly, Slawson correctly did not re-evaluate its analysis to account for future developments during the Flaring Period because Slawson did not bring additional wells into production in the field until 2019.

## I. Slawson Correctly Analyzed the Economics of Capturing Gas Only from the Well.

Slawson correctly analyzed the economics of capturing gas only from the Well because Slawson and its affiliate White Butte Oil Operations, LLC (collectively, "Slawson") did not operate other wells in the field during the Flaring Period.[2] Simply put, Slawson had no other wells to include in its analysis.

Slawson's approach is consistent with analysis that BLM accepted from another operator to determine that flared gas was unavoidably lost. Particularly, BLM found that gas flared by QEP Energy Company was unavoidably lost based on QEP's analysis of wells it operates in Township 149 North, Range 95 West and not other operators' wells in this field. *See* Slawson Exhibit B, QEP Sundry Notice and Unavoidably Lost Determination, Attachment B (QEP Wells, Communitization Agreements). BLM did not require QEP to analyze the economics of capturing gas from wells it did not operate.

---

[2] Slawson is not certain how BLM defines a "field" for the purpose of the economic analysis. A "field" can be a field recognized by the North Dakota Industrial Commission or a geographic area (such as a township). The distinction is irrelevant here because, during the Flaring Period, Slawson only operated the Well within the Clarks Creek field and within T. 151 N., R. 95 W.

BLM must apply this same rule to Slawson. "[A] fundamental norm of administrative procedure requires an agency to treat like cases alike." *Statoil Gulf of Mexico LLC*, 178 IBLA 244, 258 (2009) (quoting *Westar Energy, Inc. v. Fed. Energy Regulatory Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007)). Therefore, BLM must hold Slawson's analysis to the same criteria and form as other analyses.

Furthermore, BLM cannot require Slawson to analyze the economics of a fictional situation in which BLM ordered Slawson and other operators to jointly capture gas. In the Decision, the Field Office stated that "[e]conomics of conserving gas must be on a field-wide basis, and **the Supervisor must consider the feasibility of a joint operation between all other lessees/operators in the field or area.**" Exhibit A, Notification of Decision at 1 (emphasis added). To the extent this statement suggests that Slawson should have analyzed the economics of capturing gas from other operators' wells, this analysis is untimely, is infeasible, and ignores operational realities in the field.

First, to the extent the Field Office suggests that Slawson must analyze the economics of capturing other operators' gas because BLM "must consider the feasibility of a joint operation between all other lessees/operators in the field or area," this analysis is untimely. Even if BLM possesses the authority to require a joint operation between lessees,[3] BLM no longer can require a joint operation among operators to capture gas flared during the Flaring Period. The time to order joint operations has passed, and BLM cannot pretend it may retroactively require joint operations now. Accordingly, BLM cannot require Slawson to analyze the economics of a joint operation to capture flare gas during the Flaring Period.

Second, Slawson cannot conduct an accurate or meaningful analysis of the economics of capturing gas from wells in the field that Slawson does not operate. To prepare such an analysis, Slawson would need to speculate as to material components of the economic analysis, including other operators' development planning and costs, revenues, operating costs, and rate of return on capital expenditures. Such speculative assumptions would render a field-wide analysis entirely unreliable.

Finally, requiring Slawson to analyze the economics of capturing gas from wells that Slawson does not operate ignores the operational realities in the field. As early as 2015, Slawson unsuccessfully attempted to negotiate with both other operators and midstream companies to connect the Well to a gas sales line. *See, e.g.*, Exhibit C, Email from Matt Houston to Will Miller (Jan. 12, 2016) (forwarding term sheet from Crestwood Midstream Partners LP); Exhibit D, Email from Matt Houston to Will Miller (Sept. 19, 2016) (forwarding term sheet and emails between Crestwood Midstream Partners LP, PetroShale (US) Inc. and Slawson). In fact, Slawson did not connect the Well to sales until 2019. Requiring Slawson to analyze the economics of capturing gas from wells that Slawson does not operate ignores the fact that such arrangements were impossible during the Flaring Period.

For these reasons, Slawson appropriately analyzed the economics of capturing gas only from the Well. Therefore, the State Director must set aside the Decision.

---

[3] Slawson reserves the right to maintain that BLM lacks the authority to order joint operations.

Exhibit 6 to 5/9/23 SDR



**II. Slawson Cannot Analyze the Economics of Capture from Future Development because It Did Not Develop Additional Wells in the Field During the Flaring Period.**

In the Decision, the Field Office found Slawson's economic analysis deficient because Slawson did not analyze the economics of capture from future developments in the field. Particularly, the Field Office explained:

> "Future developments, such as extension of gathering facilities or the development of additional reserves, warrant a re-evaluation" of economic analysis. Due to the rapid rate of development that occurred in the given field over the requested time frame, the economic analysis must be conducted at subsequent intervals from the initiation of production in the field otherwise the production that occurred at later dates is unfairly discounted. The economic justification provided does not accurately represent the field since the development of additional reserves was not accounted for (see CDM 644.5.31).

Exhibit A, Notification of Decision at 2. The Field Office's position is incorrect because the Field Office misinterprets and misapplies the Conservation Division Manual.

In the Decision, the Field Office quotes language of the Conservation Division Manual out of context and, in doing so, misstates its provisions. Under the heading "Enforcement Provisions," the Conservation Division Manual states:

> In all cases, the Supervisor will determine whether a specific instance or occurrence is unnecessary, excessive., or unreasonable, to an extent that constitutes waste. The burden of proof rests with the lessee/operator .to justify that his practices are not wasteful. **If the Supervisor determines that the small volumes involved are not economically feasible to conserve or recover, and waste is not occurring, no further action need be taken unless future developments, such as extension of gathering facilities or the development of additional reserves, warrant a re-evaluation.**

Conservation Division Manual § 644.5.3.I (emphasis added).

The express language of this provision sets forth a two-step analysis process. This process first requires BLM to find that gas capture is not economically feasible. Then, this process requires that BLM need not take further action—unless future developments warrant a re-evaluation, including the extension of gathering facilities or the development of additional reserves.

With respect to the Well, the Field Office did not follow the first step of the process. The Field Office did not evaluate whether Slawson could economically capture any gas from the well. Accordingly, the Field Office has not satisfied the first step of this process. The State Director should set aside the Decision on this basis alone.

Further, the Field Office erred in the second step of this analysis. The Conservation Division Manual does not require analysis at intervals "unless future developments . . . warrant a re-evaluation." Here, no developments occurred to "warrant a re-evaluation." Slawson did not develop additional reserves within

the field during the Flaring Period[4]; Slawson only operated the Well within the field during the Flaring Period. Therefore, the Field Office erred by finding Slawson's analysis deficient for not re-evaluating based on predicted future development at different intervals during the Flaring Period. The State Director therefore must set aside the Decision.

## III. The State Director Must Correctly Analyze whether Slawson's Flared Gas was Unavoidably Lost.

Slawson requests that, after the State Director sets aside the Decision, the State Director evaluate Slawson's application for royalty-free treatment of gas flared from the Well during the Flaring Period.

**Request to Submit Supporting Data**

Slawson is evaluating additional data in support of its request for review. As permitted by 43 C.F.R. § 3165.3(b), Slawson requests an extension of 14 days to submit additional data in support of its request for State Director review. Thus, Slawson requests until April 6, 2022 to submit additional information.

**Stay Pending Appeal**

Slawson respectfully requests that the State Director stay the Decision pending review. Without a stay of the Decision, Slawson may be required to pay royalty on the gas that the Field Office determined was avoidably lost before the State Director issue a decision on Slawson's request for review. This harm to Slawson would be irreparable because, if the State Director later sets aside, remands, or modifies the Field Office's finding that flared gas was avoidably lost, then Slawson will be unable to recover the paid royalty because the Office of Natural Resources offers limited recoupment and refunds of royalty paid to Indian leases. *See* 30 C.F.R. §1218.53. The Interior Board of Land Appeals and the courts have recognized that the unrecoverable payment of money constitutes an irreparable harm. *E.g.*, *Marathon Oil Company*, 90 IBLA 236, 247 (1986) (unrecoverable payment of interest constitutes irreparable harm); *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 n.22 (2010) (Scalia, J., in chambers) ("If expenditures cannot be recouped, the resulting loss may be irreparable.").

---

[4] Slawson maintains that although the Conservation Division Manual requires an analysis of production that occurred after the Flaring Period, the analysis only must consider production from wells that were online during the Flaring Period. The Conservation Division Manual does not require an analysis of production from wells that came online after the Flaring Period. The Decision confirms this approach, stating, "Due to the rapid rate of development that occurred in the given field **over the requested time frame** the economic analysis must be conducted at subsequent intervals from the initiation of production in the field otherwise the production that occurred at later dates is unfairly discounted." Exhibit A, Notification of Decision at 2 (emphasis added). For example, the Conservation Division Manual does not require Slawson to evaluate the effect of new wells that came into production during 2019 and after on the economics of capturing gas flared during the Flaring Period. This future development was not foreseeable during the Flaring Period and therefore could not affect Slawson's decision as to whether to capture gas flared at that time.

Exhibit 6 to 5/9/23 SDR



By contrast, a stay will result in minimal to no injury to the Indian lessor. Even if the State Director ultimately determines that the gas is avoidably lost and royalty bearing, the Indian lessor will receive interest on the royalty to compensate for the lost time-value of money.

Finally, a stay is in the public interest. The public interest is not served by leaving the Decision in effect and therefore causing Slawson to pay royalty that ultimately may not be owed and that Slawson may be unable to recover.

**Oral Presentation**

The regulation governing State Director review allows Slawson to request an oral presentation, *see* 43 C.F.R. § 3165.3(b). Slawson declines an oral presentation unless the State Director would find such a presentation useful to resolving this request for review.

**Conclusion**

For the reasons set forth above, the Field Office erred in its determination that gas flared from the Well during the Flaring Period was avoidably lost and thus royalty bearing. The State Director therefore must set aside the Decision. Slawson further requests that the State Director evaluate Slawson's application for royalty-free treatment of gas flared from the Well during the Flaring Period and determine this gas was unavoidably lost and thus royalty free. Finally, Slawson requests until April 6, 2022 to submit additional date in support of this request.

If you have any questions about this request for review, please do not hesitate to contact me at (303) 892-7354 or katie.schroder@dgslaw.com.

Sincerely,

Kathleen C. Schroder
Davis Graham & Stubbs LLP

Exhibit 6 to 5/9/23 SDR

Form 1842-1
(September 2020)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

## INFORMATION ON TAKING APPEALS TO THE INTERIOR BOARD OF LAND APPEALS

DO NOT APPEAL UNLESS
1. This decision is adverse to you,
AND
2. You believe it is incorrect

IF YOU APPEAL, THE FOLLOWING PROCEDURES MUST BE FOLLOWED

| | |
|---|---|
| **1. NOTICE OF APPEAL**.................................. | A person who wishes to appeal to the Interior Board of Land Appeals must file in the office of the officer who made the decision (not the Interior Board of Land Appeals) a notice that they wish to appeal. A person served with the decision being appealed must transmit the *Notice of Appeal* in time for it to be filed in the office where it is required to be filed within 30 days after the date of service. If a decision is published in the FEDERAL REGISTER, a person not served with the decision must transmit a *Notice of Appeal* in time for it to be filed within 30 days after the date of publication (43 CFR 4.41 I and 4.413). |
| **2. WHERE TO FILE** NOTICE OF APPEAL......... | Montana State Office, Bureau of Land Management<br>5001 Southgate Drive<br>Billings, Montana 59101-4669 |
| WITH COPY TO SOLICITOR........................ | Field Solicitor, U.S. Department of the Interior<br>2021 4th Avenue North, Suite 112<br>Billings, Montana 59101 |
| **3. STATEMENT OF REASONS** | Within 30 days after filing the *Notice of Appeal,* file a complete statement of the reasons why you are appealing. This must be filed with the United States Department of the Interior, Office of Hearings and Appeals, Interior Board of Land Appeals, 801 N. Quincy Street, MS 300-QC, Arlington, Virginia 22203. If you fully stated your reasons for appealing when filing the *Notice of Appeal,* no additional statement is necessary (43 CFR 4.412 and 4.413). |
| WITH COPY TO SOLICITOR......................... | Field Solicitor, U.S. Department of the Interior<br>2021 4th Avenue North, Suite 112<br>Billings, Montana 59101 |
| **4. SERVICE OF DOCUMENTS** | A party that files any document under 43 CFR Subpart 4, must serve a copy of it concurrently on the appropriate official of the Office of the Solicitor under 43 CFR 4.413(c) and 4.413(d). For a notice of appeal and statement of reasons, a copy must be served on each person named in the decision under appeal and for all other documents, a copy must be served on each party to the appeal (including intervenors). Service on a person or party known to be represented by counsel or other designated representative must be made on the representative. Service must be made at the last address of record of the person or party (if unrepresented) or the representative, unless the person, party or representative has notified the serving party of a subsequent change of address. |
| **5. METHOD OF SERVICE....** | If the document being served is a notice of appeal, service may be made by (a) Personal delivery; (b) Registered or certified mail, return receipt requested; (c) Delivery service, delivery receipt requested, if the last address of record is not a post office box; or (d) Electronic means such as electronic mail or facsimile, if the person to be served has previously consented to that means in writing. All other documents may be served by (a) Personal delivery; (b) Mail; (c) Delivery service, if the last address of record is not a post office box; or (d) Electronic means, such as electronic mail or facsimile, if the person to be served has previously consented to that means in writing. |
| **6. REQUEST FOR STAY..............** | Except where program-specific regulations place this decision in full force and effect or provide for an automatic stay, the decision becomes effective upon the expiration of the time allowed for filing an appeal unless a petition for a stay is timely filed together with a Notice of Appeal (43 CFR 4.21). If you wish to file a petition for a stay of the effectiveness of this decision during the time that your appeal is being reviewed by the Interior Board of Land Appeals, the petition for a stay must accompany your Notice of Appeal (43 CFR 4.21 or 43 CFR 2801.10 or 43 CFR 2881.10). A petition for a stay is required to show sufficient justification based on the standards listed below. Copies of the Notice of Appeal and Petition for a Stay must also be submitted to each party named in this decision and to the Interior Board of Land Appeals and to the appropriate Office of the Solicitor (43 CFR 4.413) at the same time the original documents are filed with this office. If you request a stay, you have the burden of proof to demonstrate that a stay should be granted.<br>Standards for Obtaining a Stay. Except as otherwise provided by law or other pertinent regulations, a petition for a stay of a decision pending appeal shall show sufficient justification based on the following standards: (1) the relative harm to the parties if the stay is granted or denied, (2) the likelihood of the appellant's success on the merits, (3) the likelihood of immediate and irreparable harm if the stay is not granted, and (4) whether the public interest favors granting the stay. |

Unless these procedures are followed, your appeal will be subject to dismissal (43 CFR 4.402). Be certain that **all** communications are identified by serial number of the case being appealed.

**NOTE:** A document is not filed until it is actually received in the proper office (43 CFR 4.401(a)). See 43 CFR Part 4, Subpart B for general rules relating to procedures and practice involving appeals.

(Continued on page 2)

Exhibit 6 to 5/9/23 SDR

**43 CFR SUBPART 1821-GENERAL INFORMATION**

Sec. 1821.10 Where are BLM offices located? (a) In addition to the Headquarters Office in Grand Junction, CO and seven national level support and service centers, BLM operates 12 State Offices each having several subsidiary offices called Field Offices. The addresses of the State Offices can be found in the most recent edition of 43 CFR 1821.10. The State Office geographical areas of jurisdiction are as follows:

STATE OFFICES AND AREAS OF JURISDICTION:

Alaska State Office ---------- Alaska
Arizona State Office ------------ Arizona
California State Office --------- California
Colorado State Office --------- Colorado
Eastern States Office ----------- Arkansas, Iowa, Louisiana, Minnesota, Missouri and, all States east of the Mississippi River
Idaho State Office -------------- Idaho
Montana State Office --------- Montana, North Dakota, and South Dakota
Nevada State Office------------- Nevada
New Mexico State Office ------ New Mexico, Kansas, Oklahoma, and Texas
Oregon State Office ------------ Oregon and Washington
Utah State Office --------------- Utah
Wyoming State Office --------- Wyoming and Nebraska

(b) A list of the names, addresses, and geographical areas of jurisdiction of all Field Offices of the Bureau of Land Management can be obtained at the above addresses or any office of the Bureau of Land Management, including the Headquarters Office, Bureau of Land Management, 760 Horizon Drive, Grand Junction, CO 81506.

(Form 1842-1, September 2020)

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**OFFICE OF HEARINGS AND APPEALS**
**BOARD OF LAND APPEALS**

| | | |
|---|---|---|
| Slawson Exploration Company, Inc. | ) ) ) ) ) | IBLA No. 2022-187 |

---

## SLAWSON EXPLORATION COMPANY, INC.'S STATEMENT OF REASONS

---

Slawson Exploration Company, Inc. ("Slawson") appeals a decision of the Bureau of Land Management (BLM) Montana/Dakotas State Office finding that gas flared from one natural gas well was royalty bearing. *See* Exhibit 1, Decision of Montana/Dakotas State Office, SDR No. 922-22-10 (Apr. 10, 2022) ("Decision"). Slawson had prepared two different analyses, each using a different methodology, to demonstrate that the flared gas could not be economically captured and therefore that BLM should deem the flared gas to be royalty free. BLM improperly rejected both analyses. Slawson respectfully requests that the Board reverse BLM's decision and grant Slawson's request for royalty-free flaring.

## LEGAL BACKGROUND

This appeal turns on the application of Notice to Lessees and Operators of Onshore Federal and Indian Oil and Gas Leases 4A, 44 Fed. Reg. 76,600 (Dec. 27, 1979) ( "NTL 4A"). NTL 4A outlines whether and when vented and flared gas that was produced from federal and Indian oil and gas leases is avoidably or unavoidably lost and thus royalty bearing or royalty free, respectively.[1] Under the Department's regulations, and consistent with the Mineral Leasing Act,

[1] In *Hess Corporation*, 197 IBLA 299 (2021), the Board correctly observed that NTL 4A "does not completely reflect BLM's practice and regulations that have been in place since the late 1980s." *Id.* at 304.

as amended, and the Federal Oil and Gas Royalty Management Act of 1982, a lessee is not liable for royalties on gas that is "unavoidably lost." 30 U.S.C. §§ 225, 187, 1756; *accord* 30 C.F.R. §§ 1202.150(b)(1) and (c), 1202.555(a)(1) (2016); *XTO Energy, Inc.*, 193 IBLA 101, 103 (2018) ("Applicable Departmental regulations specify that 'avoidably lost' gas is subject to royalties and that 'unavoidably lost' gas is royalty-free.").

In its definitions, NTL 4A deems certain types of gas losses "unavoidably lost" and thus royalty free. NTL 4A § II(C). NTL 4A also authorizes and makes royalty free the short-term venting or flaring of gas in certain defined circumstances. *Id.* §§ II(C) and III.

Relevant to this appeal, NTL 4A allows BLM to approve venting or flaring of associated gas from oil wells upon submittal of:

> [A]n evaluation report supported engineering, geologic, and economic data which demonstrates to the satisfaction of the Supervisor that the expenditures necessary to market or beneficially use such gas are not economically justified and that conservation of the gas, if required, would lead to the premature abandonment of recoverable oil reserves and ultimately to a greater loss of equivalent energy than would be recovered if the venting or flaring were permitted to continue[.][2]

NTL 4A § IV(B). NTL 4A then provides additional direction on the information that an application for royalty-free treatment of vented or flared gas must contain, stating:

> Applications . . . shall include all appropriate engineering, geologic, and economic data in support of the applicant's determination that conservation of the gas is not viable from an economic standpoint and, if approval is not granted to continue the venting or flaring of the gas, that it will result in the premature abandonment of oil production and/or the curtailment of lease development. The information provided shall include the applicant's estimates of the volumes of oil and gas that would be produced to the economic limit if the application to vent or flare were approved and the volumes of the oil and gas that would be produced if the applicant was required to market or beneficially use the gas. When evaluating the feasibility of requiring conservation of the gas, the total leasehold production, including both oil and gas, as well as the economics of a field wide plan shall be considered by the Supervisor

---

[2] NTL 4A also allows BLM to approve venting or flaring of associated gas from oil wells upon submittal of "an action plan that will eliminate venting or flaring or the gas within 1 year from the date of application." NTL 4A § IV(B).

> in determining whether the lease can be operated successfully if it is required that the gas be conserved.

NTL 4A § IV(C). Operators apply for royalty-free treatment of vented or flared gas by submitting a sundry notice to BLM. *See Hess Corporation*, 197 IBLA 299, 306 (2021).

The Geological Survey's Conservation Division Manual provides additional guidance on implementing NTL 4A and, particularly, guidance on evaluating applications for royalty-free venting and flaring. *See* Exhibit 2, U.S. Department of the Interior, Geological Survey, Conservation Division Manual § 644.5.3F (Rel. No. 68 June 23, 1980). The Conservation Division Manual sets forth criteria for requiring gas conservation. For new fields, the Conservation Division Manual advises that gas conservation should be required when: (1) the combined payout exceeds the payout of the oil operation by less than 25%, but not beyond five years; (2) payout from the gas-only operation is less than five years; and (3) the estimated life of the field/lease is greater than the longest pay out period calculated. *Id.* § 644.5.3F, Ex. 2 at 1. For old fields, the Conservation Division Manual advises that gas conservation should be required when: (1) the combination of all net income from the existing oil operation and gas operation will provide a payout of capital investment for gas facilities within six months; (2) payout from the gas operation is less than five years; and (3) the estimated life of the field is greater than five years. *Id.* § 644.5.3F, Ex. 2 at 1–2.

BLM applied NTL 4A and the Conservation Division Manual when evaluating a sundry notice, accompanied by engineering, geologic, and economic data, that Slawson submitted requesting that BLM treat gas flared from the Jore (Federal) 2-12H well (the "Jore Well") as royalty free.

## FACTUAL BACKGROUND

### I. Flaring from the Jore (Federal) 2-12H Well

The Jore Well is an oil well producing from communitized Indian leases and fee leases in McKenzie County, North Dakota, in the Clark's Creek Field.[3] *See* Exhibit 3, Sundry Notice, Electronic Submission No. 485517 (submitted Sept. 27, 2019 and decided Feb. 18, 2022) ("Sundry Notice"). The Jore Well first produced on September 4, 2014. *See* Exhibit 4, Slawson Request for State Director Review at 1 (Mar. 22, 2022).

The Jore Well was the only well located on the well pad until 2019, when Slawson completed additional wells. Exhibit 5, W. Miller Decl. ¶ 4. Similarly, the Jore Well was the only well producing from the communitized area. *Id.* ¶ 5. Until 2019, the Jore Well was Slawson's only well in the Clark's Creek Field. *Id.* ¶ 6.

When Slawson drilled the Jore Well, no comprehensive field-wide gas capture system gathered production from all wells in the Clark's Creek Field.[4] Exhibit 5, W. Miller Decl. ¶ 7. Although gathering lines captured natural gas from some wells within the Clark's Creek Field, these lines lacked excess capacity; as a result, wells connected to these lines routinely were forced to flare natural gas. *See* Exhibit 6, Additional Data in Support of Request for State Director Review No. 922-22-10, Ex. A, Supplemental Data § (1)(g), § (1)(h), Ex. 8 (total of gross gas production for 2014, 2015, and 2016). Slawson had evaluated the possibility of connecting the Jore Well to this existing infrastructure but capacity constraints prevented Slawson from doing so. Exhibit 5, W. Miller Decl. ¶ 8.

---

[3] The Clark's Creek Field is an oil field recognized by the North Dakota Industrial Commission.

[4] Of the 40 wells in the Clark's Creek Field, 17 wells including the Jore Well were not connected to gas capture infrastructure at the time that the Jore Well came online. *See* Exhibit 6, Additional Data in Support of Request for State Director Review No. 922-22-10 (Apr. 5, 2022), Ex. A, Supplemental Data § (1)(d).

Slawson also considered an offer to connect the Jore Well to a proposed extension of an existing Arrow Pipeline LLC system that Slawson understands would have gathered production from the Jore Well, other wells within the Clark's Creek Field, and wells within neighboring fields and transported it to a central delivery point. Exhibit 7, Map of Arrow Pipeline LLC Proposed Northern Extension. Crestwood Midstream Partners LP/Arrow Pipeline LLC ("Arrow") quoted Slawson $2,499,845 to participate in this system.[5] *See* Exhibit 3, Sundry Notice, Authorization for Expenditure from Arrow. The volume of gas produced from the Jore Well, however, did not justify the proposed cost of connecting the Jore Well to this gathering system.

Because the volume of gas produced from the Jore Well did not justify the cost of connecting to the proposed system, Slawson flared gas from the Jore Well. In 2019, Slawson began production of three additional wells on the same pad as the Jore Well. Exhibit 5, W. Miller Decl. ¶ 10; Exhibit 6, Additional Data in Support of Request for State Director Review No. 922-22-10, at 2 n.2 (Apr. 5, 2022). The addition of these wells and the production from them warranted the cost of connecting the wells, including the Jore Well, to a gathering line. *Id.*

## II. Slawson's Sundry Notice Requesting Royalty-Free Flaring from the Jore Well

Consistent with NTL 4A, Slawson submitted a sundry notice to BLM requesting royalty-free flaring from the Jore Well between September 2014 through December 2016 (the "Flaring Period").[6] *See* Exhibit 3, Sundry Notice; NTL 4A § IV(B). The sundry notice included a detailed analysis demonstrating that capturing gas from the Jore Well was not economic. *Id.*

---

[5] The Authorization for Expenditure is for $2,942,171; however, Slawson has excluded oil-specific items such as Lease Automatic Custody Transfers (LACTs) from this figure. *See* Exhibit 6, Additional Data in Support of Request for State Director Review No. 922-22-10, Ex. A, Ex. 10, Authorization for Expenditure from Crestwood Midstream Partners LP/Arrow Pipeline LLC.

[6] The total volume flared from Jore Well during the Flaring Period was 223,349 Mcf. *See* Exhibit 8, Notification of Decision.

This analysis included engineering, geologic, and economic data showing that Slawson could not economically capture gas produced from the Jore Well. Consistent with the Conservation Division Manual, Slawson estimated the life of the lease (30 years and 11 months) and the annual net operating income from oil recovery operations, *see* Exhibit 3, Sundry Notice, Application for Flaring pg. 1 § (1)(b) and (c) and pg. 2; estimated capital investment and annual net operating income from gas recovery operations, *see id.* pg. 1 § (2); and calculated the present value of operating net income for both oil and gas operations, *see id.* pgs. 1–2. To estimate the capital investment, Slawson relied on the real, actual cost of $2.5 million that Arrow quoted Slawson to include the Jore Well in Arrow's proposed expansion of its gathering system. *See id.* pg. 1 § (2).

On February 18, 2022, the BLM North Dakota Field Office denied Slawson's request to deem the flared gas to be royalty-free. *See* Exhibit 3, Sundry Notice; Exhibit 8, Notification of Decision. The Field Office determined that Slawson's economic analysis was inadequate to justify its request for royalty-free flaring, for two reasons.

First, the Field Office determined that Slawson's economic analysis considered the economics of capturing gas from a single well, rather than on a field-wide basis. Exhibit 8, Notification of Decision at 1. The Field Office explained that "[e]conomics of conserving gas must be on a field-wide basis" and, further, that "the Supervisor must consider the feasibility of a joint operation between all other lessees/operators in the field or area." *Id.* The Field Office concluded that "[t]he capital investment for gas recovery operations cited at approximately 3 million dollars would have in fact justified gas capture had the economic analysis been conducted on a field wide basis further indicating the analysis was conducted on a single well." *Id.*

Second, the Field Office found that Slawson's economic analysis failed to account for the development of additional reserves. Exhibit 8, Notification of Decision at 2. The Field Office reasoned that "'[f]uture developments, such as extension of gathering facilities or the development of additional reserves, warrant a re-evaluation' of economic analysis." *Id.* (quoting Conservation Division Manual § 644.5.3I). Accordingly, the Field Office denied Slawson's request for royalty-free flaring.

**III. Slawson's Request for State Director Review of the Field Office's Decision**

Slawson sought State Director review of the Field Office's decision on the Sundry Notice in accordance with 43 C.F.R. § 3165.3(b). *See* Exhibit 4, Slawson Request for State Director Review (Mar. 22, 2022). Slawson contended the Field Office erred for multiple reasons, including that the Field Office incorrectly rejected Slawson's economic analysis. Slawson argued that it had demonstrated that gas capture was uneconomic based on real, actual costs of including the Jore Well in a proposed area-wide gathering system. *See* Exhibit 6, Additional Data in Support of Request for State Director Review No. 922-22-10, at 2–3. Furthermore, to remedy the Field Office's perceived deficiency, Slawson provided a theoretical field-wide economic analysis for the State Director's consideration. *See id.* Ex. A, Supplemental Data. This theoretical field-wide economic analysis demonstrated that the criteria for requiring gas conservation were not met. *See id.* Ex. A, Supplemental Data §§ (6) and (7).

On April 20, 2022, the Acting State Director for BLM's Montana/Dakotas State Office affirmed the Field Office's decision. Exhibit 1, Decision. The Acting State Director first upheld the Field Office's determination that Slawson's initial justification was inadequate because it "provide[ed] economics on a single well versus on a field wide basis" and did not "re-evaluat[e] economics as the field develops." *See id.* at 4. Further, the Acting State Director rejected the

theoretical field-wide analysis that Slawson had prepared, explaining that it was based on capacity constraints rather than the lack of pipeline. *Id.* Accordingly, the Acting State Director upheld the Field Office's determination that gas flared from the Jore Well was avoidably lost and thus royalty-bearing.

Slawson initiated this appeal by filing a Notice of Appeal of the Decision in accordance with 43 C.F.R. § 4.411. The Board should reverse the Decision and grant Slawson's request for royalty-free flaring from the Jore Well during the Flaring Period.

**STANDARD OF REVIEW**

"A BLM decision made in the exercise of its discretionary authority must have a rational basis that is stated in the decision and supported by facts of record demonstrating that the decision is not arbitrary, capricious, or an abuse of discretion." *Valid Energy, Inc.*, 192 IBLA 7, 14 (2017). This Board will set aside or reverse a BLM decision when an appellant can demonstrate, "by a preponderance of the evidence, that BLM committed a material error in its factual analysis or that its decision is not supported by a record showing it gave due consideration to all relevant factors and acted on the basis of a rational connection between the facts found and the choice made." *Id.* Here, Slawson has met that burden.

**ARGUMENT**

The Board should reverse the Decision and grant Slawson's request for royalty-free flaring from the Jore Well during the Flaring Period. Under two different methods of analysis, Slawson demonstrated that capture of gas flared from the Jore Well was not economically justified.

BLM erroneously rejected Slawson's analyses. First, BLM improperly rejected the analysis that Slawson attached to its sundry notice demonstrating that including the Jore Well in a area-wide gathering system was not economically justified. Second, BLM incorrectly rejected

Slawson's theoretical field-wide analysis, which demonstrated that capture was uneconomic based on lack of pipeline. Given BLM's errors, the Board must reverse the Decision and grant Slawson's request for royalty-free flaring from the Jore Well during the Flaring Period.

## I. BLM Incorrectly Rejected Slawson's Economic Analysis Based on Including the Jore Well in a Proposed Gathering System.

BLM erroneously rejected the analysis attached to Slawson's sundry notice, which considered the economics of including the Jore Well to a proposed gathering system. First, BLM incorrectly found that Slawson should have evaluated the economics of gathering on a field-wide basis. Second, BLM improperly found Slawson's analysis to be inadequate after incorrectly finding that Slawson did not re-evaluate the economics of gas capture over the Flaring Period to account for future development. Contrary to BLM's findings, however, Slawson properly demonstrated that capture of gas from the Jore Well during the Flaring Period was not economically justified. Therefore, the Board should reverse the Decision and grant Slawson's request for royalty-free flaring from the Jore Well during the Flaring Period.

### A. Slawson Properly Evaluated the Cost of Including the Jore Well in a Proposed Gathering System.

In the Decision, BLM found that Slawson improperly evaluated the economics of connecting a single well to a gathering system. *See* Exhibit 1, Decision at 4 (stating that Slawson analyzed the economics of gas capture "on a single well"). BLM reasoned that Slawson should have evaluated the economics of gathering on a field-wide basis.

The economic analysis attached to Slawson's Sundry Notice presumed a $2.5 million capital investment to include the Jore Well in a proposed area-wide gathering system. Slawson based this figure on an Authorization for Expenditure that Slawson received from Arrow.

In the Decision, however, BLM misunderstood the $2.5 million cost. BLM assumed that this estimated cost was an expenditure necessary to connect the Jore Well, by itself, to an existing

gathering line.[7] It is not. Rather, this amount reflects the share of costs allocated to the Jore Well if it was included in a larger gathering system that Arrow proposed to construct and that Slawson understands would have gathered natural gas produced from other wells in the Clark's Creek Field and neighboring fields, as well as the Jore Well. *See* Exhibit 7, Map of Arrow Pipeline LLC Proposed Northern Extension.

A close look at the Authorization for Expenditure submitted by Arrow confirms that the cost is for a narrow scope of services, rather than the cost to connect the Jore Well to existing gas capture infrastructure. Of the estimated $2.5 million, approximately $389,000 are associated with facilities sited on the well location (such as the gas connection and meter), $1.6 million relate to constructing 6,180 feet of gathering line (to link the Jore Well to the proposed field-wide gathering system, *see* Exhibit 7, Map of Arrow Pipeline LLC Proposed Northern Extension), and approximately $467,000 are general project costs. *See* Exhibit 3, Sundry Notice, Authorization for Expenditure from Crestwood Midstream Partners LP/Arrow Pipeline LLC; Exhibit 6, Additional Data in Support of Request for State Director Review No. 922-22-10, Ex. A, Supplemental Data § (3)(b)(ii). Thus, the estimate reflects Slawson's share of costs had the Jore Well been included in an area-wide gathering system.

---

[7] The Field Office erroneously pointed to the steep connection cost as evidence that Slawson should have analyzed field-wide capture, stating that "[t]he capital investment for gas recovery operations cited at approximately 3 million dollars would have in fact justified gas capture had the economic analysis been conducted on a field wide basis further indicating the analysis was conducted on a single well." *See* Exhibit 8, Notification of Decision at 1. Moreover, Slawson attempted to negotiate with other operators to connect the Jore Well to a gathering line, without success. *See, e.g.*, Exhibit 4, Request for State Director Review, Ex. C (Email from Matt Houston to Will Miller (Jan. 12, 2016) (forwarding term sheet from Crestwood Midstream Partners LP)) and Ex. D (Email from Matt Houston to Will Miller (Sept. 19, 2016) (forwarding term sheet and emails between Crestwood Midstream Partners LP, PetroShale (US) Inc. and Slawson)).

Because Slawson's analysis considered the economics of conserving gas on an area-wide basis, the analysis is consistent with NTL 4A and the Conservation Division Manual. Neither document provides any specific direction as to how operators must conduct a field- or area-wide economic analysis. Rather, NTL 4A merely directs that BLM "consider[ ]" "the economics of a field wide plan," together with other factors. *See* NTL 4A § VI(C). Similarly, the Conservation Division Manual contains an equally vague statement that "economics of conserving gas must be on a field-wide basis, and the Supervisor must consider the feasibility of a joint operation between all other lessees/operations in the field or area." Conservation Division Manual § 644.5.3F. Although the Conservation Division Manual's Guidelines for Evaluating Applications for Flaring set forth specific criteria for evaluating whether to require gas conservation, *id.* § 644.5.3F, Ex. 2, pg. 1 § (5), they also lack direction as to how to analyze the economics of field- or area-wide capture. *See id.* § 644.5.3F, Ex. 2. Accordingly, NTL 4A and the Conservation Division Manual afford Slawson broad flexibility as to how it may analyze the economics of field- or area-wide capture.

Furthermore, NTL 4A and the Conservation Division Manual do not support BLM's position that a theoretical analysis of the economics of field-wide capture is necessary to justify a request for royalty-free flaring under NTL 4A. If BLM's position is correct, the Conservation Division Manual would have specified that economic analyses always include certain data, such as production volumes and estimated capital investments, such as drilling costs, for all wells in the field or area. The Conservation Division Manual, however, does not require any such information. In fact, the Conservation Division Manual only calls for analysis of an initial capital investment, such as drilling costs, "where appropriate" and makes no reference to such investments for all

wells in a field or area. Conservation Division Manual § 644.5.3F, Ex. 2, pg. 1 § (1). BLM cannot read requirements into NTL 4A and the Conservation Division Manual where they do not exist.

Given the flexibility provided by NTL 4A and the Conservation Division Manual, Slawson has demonstrated that connecting the Jore Well to an area-wide gathering system was not economically justified. This Board has recognized that the determination of whether gas capture was not economically justified is a fact-specific determination driven by the information that the lessee presents to BLM. Particularly, the Board has stated that "the question of whether it would have been economically feasible to avoid flaring is 'a question of fact that must be answered on a case-by-case analysis of data presented by the lessee.'" *Petro-Hunt L.L.C.*, 197 IBLA 100, 113 (2021) (quoting *Maxus Exploration Co.*, 122 IBLA 190, 198 n.1 (1993)). In the absence of specific guidance in NTL 4A and the Conservation Division Manual as to how a lessee must demonstrate that gas capture would be uneconomic, the lessee has flexibility to rely on available information for this demonstration. *See generally Rife Oil Properties, Inc.*, 131 IBLA 357, 374 (1994) ("On an evidentiary question such as this, the relevant inquiry is whether the record supports a finding on the preponderance of the evidence that it would have been economic to market gas from the well."); *Ladd Petroleum Corp.*, 107 IBLA 5, 9 (1989) (explaining that NTL-4A, as interpreted by the Department, "allow[s] the lessee an opportunity to show the gas vented or flared . . . was not economically recoverable").

For these reasons, Slawson properly relied on real and actual estimated costs to include the Jore Well in a proposed gathering system to demonstrate that gas capture was not economic and therefore that flaring should be royalty free.

B. Slawson Need Not Re-evaluate Its Economic Analysis Throughout the Flaring Period.

In the Decision, the Acting State Director affirmed the Field Office's finding that Slawson's economic analysis was inadequate because Slawson did not "re-evaluat[e] economics as the field develops." Exhibit 1, Decision at 4. BLM erred in rejecting Slawson's economic analysis on this basis.

*1. BLM Misinterprets the Conservation Division Manual.*

BLM's requirement that Slawson re-evaluate the economics of the Clark's Creek Field during the Flaring Period rests of its erroneous interpretation of the Conservation Division Manual. The Field Office set forth its interpretation in the Notification of Decision on Slawson's sundry notice. The Field Office explained that the Conservation Division Manual requires the economic analysis be conducted at periodic intervals:

> "Future developments, such as extension of gathering facilities or the development of additional reserves, warrant a re-evaluation" of economic analysis. Due to the rapid rate of development that occurred in the given field over the requested time frame, the economic analysis must be conducted at subsequent intervals from the initiation of production in the field otherwise the production that occurred at later dates is unfairly discounted. The economic justification provided does not accurately represent the field since the development of additional reserves was not accounted for (see CDM 644.5.31).

Exhibit 8, Notification of Decision at 2.

This interpretation quotes language of the Conservation Division Manual out of context and, in doing so, misstates its provisions. The quoted language does not appear in the provisions governing applications for venting or flaring in section 644.5.3F of the Conservation Division Manual. Rather, this language is found under the heading "Enforcement Provisions" in section 644.5.3I. The relevant provision states:

> In all cases, the Supervisor will determine whether a specific instance or occurrence is unnecessary, excessive., or unreasonable, to an extent that constitutes waste. The burden of proof rests with the lessee/operator .to justify that his practices are not

> wasteful. **If the Supervisor determines that the small volumes involved are not economically feasible to conserve or recover, and waste is not occurring, no further action need be taken unless future developments, such as extension of gathering facilities or the development of additional reserves, warrant a re-evaluation.**

Conservation Division Manual § 644.5.3.I (emphasis added).

The express language of this provision sets forth a two-step analysis process. This process first requires BLM to find that gas capture is not economically feasible. Then, this process requires that BLM need not take further action—unless future developments warrant a re-evaluation, including the extension of gathering facilities or the development of additional reserves.

Here, BLM has not followed this process. BLM has not evaluated whether Slawson could economically capture any gas from the Jore Well. Accordingly, BLM has not satisfied the first step of this process. Accordingly, BLM cannot dismiss Slawson's economic analysis on this basis.

2. *Circumstances Do Not Warrant Re-evaluation During the Flaring Period.*

Slawson maintains that BLM misinterprets the Conservation Division Manual and cannot require Slawson to re-evaluate the economics of the Clark's Creek Field during the Flaring Period. Alternatively, Slawson argues that it need not re-evaluate its economic analysis because the circumstances do not warrant such re-evaluation during the Flaring Period, for two reasons.[8]

---

[8] Slawson maintains that to the extent the Conservation Division Manual requires an analysis of production that occurred after the Flaring Period, the analysis only must consider production from wells that were online during the Flaring Period. The Conservation Division Manual does not require an analysis of production from wells that came online after the Flaring Period. The Field Office's rationale confirms this approach, stating, "Due to the rapid rate of development that occurred in the given field **over the requested time frame** the economic analysis must be conducted at subsequent intervals from the initiation of production in the field otherwise the production that occurred at later dates is unfairly discounted." Exhibit 8, Notification of Decision at 2 (emphasis added). For example, the Conservation Division Manual does not require Slawson to evaluate the effect of new wells that came into production during 2019 and after on the economics of capturing gas flared during the Flaring Period. This future development was not foreseeable during the Flaring Period and therefore could not affect Slawson's decision as to whether to capture gas flared at that time.

First, and most significant, no developments occurred during the Flaring Period that would make the $2.5 million capital expenditure economic. *See* Conservation Division Manual § 644.5.3.I ("no further action be taken unless future developments . . . warrant a re-evaluation"). Such an expenditure could become economic if Slawson added new wells on the same pad as the Jore Well. Slawson, however, did not complete any additional wells on this pad until 2019. Exhibit 5, W. Miller Decl. ¶ 6. Similarly, nearby gathering lines continued to operate without excess capacity during the Flaring Period. *See id.* ¶ 8. Because no developments occurred during the Flaring Period that would cause the significant capital expenditure to be economic, Slawson need not re-evaluate its economic analysis.

Second, and more generally, BLM has no basis to assume that significant reserves were developed during the 28-month Flaring Period that necessitate re-evaluation of Slawson's economic analysis. The Flaring Period is relatively short and consistent with the length of another analysis period that BLM has approved in McKenzie County, North Dakota. *See* Exhibit 9, Sundry Notice, Electronic Submission No. 537310 (submitted Nov. 13, 2020 and approved March 15, 2021), Attachment D. Particularly, BLM has accepted an economic analysis that accounted for increased well densities in the Grail Field in McKenzie County, North Dakota, in three-year intervals. *See id.* Slawson's 28-month Flaring Period is shorter than BLM's approved three-year evaluation window. BLM therefore has no basis to require Slawson to re-evaluate the economics of the Clark's Creek Field during the Flaring Period.

Because circumstances do not warrant Slawson's re-evaluation of its economic analysis during the Flaring Period, BLM incorrectly rejected Slawson's economic analysis. The Board therefore should reverse the Decision and grant Slawson's request for royalty-free flaring from the Jore Well during the Flaring Period.

## II. BLM Improperly Rejected Slawson's Theoretical Field-Wide Analysis.

Although Slawson maintains that a theoretical field-wide economic analysis is unnecessary because Slawson can otherwise demonstrate that capture of gas flared from the Jore Well was not economically justified, Slawson nonetheless prepared a theoretical field-wide economic analysis to rectify the deficiency the Field Office alleged.[9] *See* Exhibit 8, Notification of Decision at 1–2; Exhibit 6, Additional Data in Support of Request for State Director Review No. 922-22-10, Ex. A, Supplemental Data. In the Decision, however, the Acting State Director rejected this analysis after finding that "Slawson's submittal asserts that [gas capture] would [be] uneconomical based on capacity constraints." Exhibit 1, Decision at 4. The Acting State Director reasoned that "Slawson should have submitted these economics based on the lack of pipeline and as a result limits the scope of this review." *Id.*

The Acting State Director findings are simply incorrect. Slawson did not analyze whether gas capture would be uneconomic based on capacity constraints. Rather, because flaring from the Jore Well is caused by the lack of a gathering line to it,[10] Slawson analyzed the economics of constructing a gas gathering line to capture all gas from 17 wells in the Clark's Creek Field that were not connected to a gathering line, including the Jore Well. *See* Exhibit 6, Additional Data in Support of Request for State Director Review No. 922-22-10, Ex. A, Supplemental Data § (3)(b)(iv) and Ex. 11. Additionally, Slawson included in this analysis the costs to capture excess

[9] BLM has not defined what constitutes a "field" for the purpose of analysis under NTL 4A. Slawson's theoretical analysis examined capture within a field as defined in North Dakota administrative law. *See* Exhibit 6, Additional Data in Support of Request for State Director Review No. 922-22-10 at 3 n. 3.

[10] The reason that Slawson could not connect the Jore Well to a gathering line is that existing gathering lines within the Clark's Creek Field were at capacity. Exhibit 5, W. Miller Decl. ¶ 8. That reason, however, does not somehow transform Slawson's analysis from being based on lack of pipeline to being based on capacity constraints.

flared volumes from 23 wells in the Clark's Creek Field that were already connected to a gathering line.[11] *See id.* Presumably, a larger gathering system accommodating a greater volume of gas would reduce the share of costs borne by the Jore Well. Slawson estimated that the cost to construct such a field-wide gathering system would be $42,592,690 and evaluated the payout period of Clark Creek's Field in accordance with the Conservation Division Manual. *See id.* Ex. A, Supplemental Data §§ 3(b)(vi), (5)–(7) and Ex. 3. Slawson therefore based its economics on the lack of a field-wide gathering system, rather than capacity constraints.

Slawson also did not analyze whether capacity constraints would require expanded processing capacity at nearby gas plants. Once Slawson determined that the construction of a gas gathering system was not economically justified, Slawson did not analyze the additional cost of expanding processing capacity to accommodate the additional production. The additional cost of expanding processing capacity would only make gas capture from the Jore Well more uneconomic. Therefore, BLM has no basis to conclude that Slawson based its economic analysis based on capacity constraints.

This Board will set aside or reverse a BLM decision upon a showing that "BLM committed a material error in its factual analysis." *Valid Energy, Inc.*, 192 IBLA 7, 14 (2017). Because BLM incorrectly concluded that Slawson based its economic analysis on capacity constraints, the Board must reverse BLM's decision.

---

[11] During the Flaring Period, the 23 wells that were connected to a gathering system that lacked excess capacity flared 677,863 Mcf of natural gas. *See* Exhibit 6, Additional Data in Support of Request for State Director Review No. 922-22-10, Ex. A, Supplemental Data § (1)(g), § (1)(h), Ex. 8 (total of gross gas production for 2014, 2015, and 2016).

## CONCLUSION

BLM improperly rejected both of Slawson's economic analyses, which demonstrate that gas flared from the Jore Well could not be economically captured. Given BLM's errors, the Board must reverse the Decision and grant Slawson's request for royalty-free flaring from the Jore Well.

Respectfully submitted,

DAVIS GRAHAM & STUBBS LLP

Kathleen C. Schroder
1550 17th St., Suite 500
Denver, CO 80202
Telephone: (303) 892-9400
Facsimile: (303) 893-1379
Email: katie.schroder@dgslaw.com

Attorneys for Slawson Exploration Company, Inc.

Dated June 17, 2022

Exhibit 7 to 5/9/23 SDR

# CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2022, a true and correct copy of the foregoing **SLAWSON EXPLORATION COMPANY, INC.'S STATEMENT OF REASONS** was served on the following parties in accordance with the applicable rules and orders of this Board:

***Via electronic mail***

U.S. Department of the Interior
Office of Hearings and Appeals
Interior Board of Land Appeals
801 N. Quincy Street, Suite 300
Arlington, Virginia 22203

U.S. Department of the Interior
Field Solicitor
2021 4th Avenue North, Suite 112
Billings, Montana 59101
lisa.bruno@sol.doi.gov

***Via FedEx***

U.S. Department of the Interior
Bureau of Land Management
Montana State Office
5001 Southgate Drive
Billings, Montana 59101-4669

[signature]

Exhibit 8 to 5/9/23 SDR

United States Department of the Interior
Office of Hearings and Appeals
Interior Board of Land Appeals
801 N. Quincy Street, Suite 300
Arlington, VA 22203

(703) 235-3750 ibla@oha.doi.gov

October 7, 2022

| | | |
|---|---|---|
| IBLA 2022-187 | ) | SDR No. 922-22-10 |
| | ) | |
| SLAWSON EXPLORATION COMPANY, INC. | ) | Venting and Flaring |
| | ) | |
| | ) | Motion to Set Aside and Remand Granted |

ORDER*

Slawson Exploration Company, Inc. appealed an April 20, 2022, decision issued by the Acting State Director of the Montana/Dakotas State Office, Bureau of Land Management (BLM). BLM now asks the Board to set aside and remand its decision "to allow it an opportunity to consider additional information."[1] BLM did not indicate whether Slawson opposes the motion, but we discern no prejudice to Slawson from granting it, and we therefore grant it without waiting for Slawson to respond.[2]

Accordingly, we set aside BLM's April 20, 2022, decision and remand the matter to BLM for appropriate action.

SILVIA IDZIOREK Digitally signed by SILVIA IDZIOREK Date: 2022.10.07 11:19:18 -04'00'
Silvia Riechel Idziorek
Acting Deputy Chief Administrative Judge

I concur:

STEVEN LECHNER Digitally signed by STEVEN LECHNER Date: 2022.10.07 11:59:40 -04'00'
Steven J. Lechner
Acting Chief Administrative Judge

* This Order is binding on the parties but does not constitute Board precedent.
[1] BLM's Motion for Set Aside and Remand (filed Oct. 5, 2022).
[2] *See* 43 C.F.R. 4.407(b) (2021) (providing 15 days after service to respond to a motion).

Exhibit 9 to 5/9/23 SDR

United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Montana/Dakotas State Office
5001 Southgate Drive
Billings, Montana 59101
http://www.blm.gov/montana-dakotas

SDR-922-22-10
3165.3 (MT9220.RK)

October 18, 2022

**CERTIFIED MAIL RETURN RECEIPT REQUESTED**
**7020 3160 0000 0327 7206**

Kathleen C. Schroder
Davis Graham & Stubbs
Attorney for Slawson Exploration Company, Inc.
1550 17th Street, Suite 500
Denver, Colorado 80202

Dear Ms. Schroder,

**DECISION SET ASIDE AND REMANDED**

On March 23, 2022, the Bureau of Land Management (BLM) Montana-Dakotas State Office received your petition for State Director Review (SDR), challenging the North Dakota Field Office's (NDFO) decision dated February 18, 2022. The SDR was timely and assigned number SDR-922-22-10. The BLM State Office issued the SDR decision on April 20, 2022, which affirmed the NDFO's determination that Slawson's flaring was avoidable and as such, royalties were due (the Decision). The Decision dealt with one sundry located on Indian minerals.

Slawson appealed the Decision to the Interior Board of Land Appeals (IBLA) on May 19, 2022. The IBLA docketed this case as IBLA 2022-187. On October 5, 2022, BLM requested a voluntary remand of the Decision to the Montana-Dakotas State Office to consider additional information. Thereafter, on October 7, 2022, the IBLA granted BLM's motion and set aside and remanded the Decision. The Montana-Dakotas State Office is now remanding the Decision to the NDFO for it to consider Slawson's sundry request pertaining to flaring.

Sincerely,

SONYA GERMANN
Digitally signed by SONYA GERMANN
Date: 2022.10.18 11:55:01 -06'00'

Sonya I. Germann
State Director

cc:
Field Manager, North Dakota Field Office
District Manager, Eastern Montana/Dakotas

Exhibit 10 to 5/9/23 SDR

**Schroder, Katie**

| | |
|---|---|
| **From:** | Matt Houston <IMCEAEX-_O=SLAWSON_OU=SLAWSON_CN=RECIPIENTS_CN=MHOUSTON@namprd13.prod.outlook.com> |
| **Sent:** | Tuesday, January 12, 2016 1:41 PM |
| **To:** | William Miller |
| **Subject:** | FW: Arrow Gathering Term Sheet |
| **Attachments:** | Slawson Term Sheet.docx |

They originally proposed the terms outlined above

Best Regards,

Matt Houston
Operations Manager
Slawson Exploration Company, Inc.

1675 Broadway, Ste. 1600, Denver, Co. 80202
Direct: 720-897-8759, Cell: 512-944-5528
mhouston@slawsoncompanies.com,

---

**From:** Korbi Hart
**Sent:** Friday, January 08, 2016 3:18 PM
**To:** Matt Houston
**Subject:** FW: Arrow Gathering Term Sheet

Korbi D. Hart
Inland Crude
1675 Broadway Suite 1600
Denver, CO 80202-4675
khart@inlandcrude.com
720-961-4053 office
505-860-5846 mobile

---

**From:** Flint, Fred [mailto:Fred.Flint@crestwoodlp.com]
**Sent:** Friday, December 04, 2015 8:58 AM
**To:** Korbi Hart
**Subject:** Arrow Gathering Term Sheet

Good Morning Korbi,

Attached, please find a Term Sheet detailing the general terms that Arrow proposes to perform gathering services for Slawson's Jore and Panzer pads.

If Slawson is able to add more acreage to the dedication, we may be able to do better on some of the fees. Please call to discuss at your convenience.

Thanks,

**Fred A. Flint**
Senior Director, Commercial

**Crestwood Equity Partners LP**
**Crestwood Midstream Partners LP**
700 Louisiana Street, Suite 2550
Houston, TX 77002
**P**: (713) 380-3035 **C**: (281) 739-0304
**F**: (832) 519-2250
Fred.Flint@crestwoodlp.com
www.crestwoodlp.com

This email message, and any attachments, provided by Crestwood and its affiliates, may contain information that is proprietary, legally privileged, confidential, or exempt from disclosure, and is intended exclusively for the individual or entity to which it is addressed. If you are not the intended recipient, any dissemination, distribution, retention, or copying of this email message and any attachments is strictly prohibited. If you have received this email message in error please notify the sender immediately by telephone or return email and delete this email message from your computer.


152N\95W
152N\94W
152N\93W
151N\95W
151N\94W
151N\93W
150N\95W
150N\94W
CLARKS CREEK
Legend
Jore Federal 2-12H Surface Location
Arrow CDP
Arrow Midstream Systems Pipelines
Arrow Midstream Systems Proposed Northern Extension
Clarks Creek Oil Field
Lake Sakakawea
SLAWSON
exploration company, inc.
Arrow Midstream System
Theoretical Northern Extension
Author: Shannon Towaley
Scale: 1:117,682
Date: June 16, 2022
Arrow Unbuilt Northern Extension Area.mxd
Legend
Planned 6,180' Route From Arrow Jore AFE
Arrow Midstream System Proposed Northern Extension
JORE FEDERAL 2-12H

Exhibit 12 to 5/9/23 SDR

**Crestwood Midstream Partners LP/Arrow Pipeline LLC**
**Authorization for Expenditure**
**Well Connect Project Estimate**

| | | | |
|---|---|---|---|
| **Project Name** | Slawson Jore | **Project #** | |
| **Project Manager** | Kyle Smith | **AFE Amount** | $2,942,171 |
| **Producer** | Slawson | **AFE Type** | Full Scope |

| WBS | Description of Expenditure | Quantity | Full Scope - Original | Supplemental | Total Budget | Shared Cost/Well |
|---|---|---|---|---|---|---|
| 501 | Project Management Labor | 1 | $ 15,000 | $ - | $ 15,000 | $ 1,363.64 |
| 502 | Operations & Maintenance Internal Labor | 1 | $ 25,000 | $ - | $ 25,000 | $ 2,272.73 |
| 503 | Company Expenses (Pcard Expenses) | 0 | $ - | $ - | $ - | $ - |
| **510** | **Contract Engineering, Land Survey, Consulting Services** | | $ - | $ - | $ - | $ - |
| 511 | Outside Engineering | 1 | $ 5,000 | $ - | $ 5,000 | $ 454.55 |
| 512 | Land Survey | 6,180 | $ 162,080 | $ - | $ 162,080 | $ 14,734.55 |
| 516 | Geotechnical Drilling and Testing | | $ - | $ - | $ - | $ - |
| **520** | **Environmental, Health, and Safety** | | $ - | $ - | $ - | $ - |
| 521 | Natural Resources Permitting | 6,180 | $ 15,450 | $ - | $ 15,450 | $ 1,404.55 |
| 522 | Cultural Resources Permitting | | $ - | $ - | $ - | $ - |
| 524 | PSM / RMP / PHA | | $ - | $ - | $ - | $ - |
| 525 | Air Compliance | | $ - | $ - | $ - | $ - |
| 527 | Environmental Inspection | | $ - | $ - | $ - | $ - |
| **530** | **Land and ROW Acquisition and Leases** | | $ - | $ - | $ - | $ - |
| 531 | ROW Agent Fees | 6,180 | $ 47,310 | $ - | $ 47,310 | $ 4,300.91 |
| 532 | Land Acquisition Fees | 6,180 | $ 92,700 | $ - | $ 92,700 | $ 8,427.27 |
| 536 | Government and Public Affairs | 1 | $ 16,440 | $ - | $ 16,440 | $ 1,494.55 |
| **540** | **Contract Construction Management** | | $ - | $ - | $ - | $ - |
| 541 | Contract Inspection Services | 60 | $ 150,000 | $ - | $ 150,000 | $ 13,636.36 |
| 543 | Commissioning / Start-up Support | 1 | $ 5,000 | $ - | $ 5,000 | $ 454.55 |
| 544 | Radiographic Inspection | 50 | $ 125,000 | $ - | $ 125,000 | $ 11,363.64 |
| 545 | Lab Services | | $ - | $ - | $ - | $ - |
| 546 | Testing Services | | $ - | $ - | $ - | $ - |
| **550** | **Construction** | | $ - | $ - | $ - | $ - |
| 551 | General / Mechanical Construction | 100 | $ 85,000 | $ - | $ 85,000 | $ 7,727.27 |
| 552 | Pipeline Construction (including Hot Taps & Pig L/R) | 5,780 | $ 725,800 | $ - | $ 725,800 | $ 65,981.82 |
| 553 | Electrical / Instrumentation Construction | 3 | $ 111,900 | $ - | $ 111,900 | $ 10,172.73 |
| 554 | Site Civil / Structural Construction | 3 | $ 40,500 | $ - | $ 40,500 | $ 3,681.82 |
| 555 | HDD / Boring Construction | 400 | $ 72,000 | $ - | $ 72,000 | $ 6,545.45 |
| **560** | **Materials and Equipment** | | $ - | $ - | $ - | $ - |
| 561 | Foundations | | $ - | $ - | $ - | $ - |
| 565 | Line Pipe | 6,180 | $ 166,556 | $ - | $ 166,556 | $ 15,141.45 |
| 566 | Pipe Bends, Fittings, Bolts & Flanges | 1 | $ 41,639 | $ - | $ 41,639 | $ 3,785.36 |
| 567 | Valves & Valve Actuators | 1 | $ 93,000 | $ - | $ 93,000 | $ 8,454.55 |
| 568 | Packaged Piping Assembly or Skid | 2 | $ 90,000 | $ - | $ 90,000 | $ 8,181.82 |
| 572 | Pumps & Drivers | 1 | $ 60,000 | $ - | $ 60,000 | $ 5,454.55 |
| 573 | Electric Motors, Engines, Turbines, Generators | | $ - | $ - | $ - | $ - |
| 575 | Storage Vessels and Tanks | | $ - | $ - | $ - | $ - |
| 576 | Measurement (2 Oil LACT; 1 Gas Meter Skid) | 3 | $ 487,326 | $ - | $ 487,326 | $ 44,302.36 |
| 578 | Cathodic Protection | | $ - | $ - | $ - | $ - |
| 579 | Electrical | 3 | $ 42,000 | $ - | $ 42,000 | $ 3,818.18 |
| 580 | Instrumentation & Controls | | $ - | $ - | $ - | $ - |
| 581 | SCADA / Comm / IT Equipment | | $ - | $ - | $ - | $ - |
| 582 | Heat Tracing, Insulation & Fireproofing | | $ - | $ - | $ - | $ - |
| 583 | Protective Coatings | | $ - | $ - | $ - | $ - |
| **590** | **Other and Miscellaneous** | | $ - | $ - | $ - | $ - |
| 599 | Contingency (10%) | | $ 267,470 | $ - | $ 267,470 | $ 24,315.46 |
| **X** | **TOTAL PROJECT ESTIMATE** | | **$ 2,942,171** | **$ -** | **$ 2,942,171** | **$ 267,470.10** |
| XX | Estimated Adder For Winter Construction | | $ 394,560 | $ - | $ 394,560 | $ 35,869.09 |

**Notes:**

| | |
|---|---|
| Line 576 | LACT building (5,000 BPD capacity) is based on a Coriolis Meter for oil flow measurement and includes a charge pump, booster pump, and all associated piping in a skid-mounted, fully enclosed and heated building |
| Line 576 | Meter Building includes 3" Daniel Orifice meter run with a Total Flow computer for gas flow measurement |
| Line X | Represents the total multi-well pad pipeline connection costs that are shared equally with each individual well connection on the respective pad. |
| Line XX | Construction based on normal rates for construction in the summer. Operator will be invoiced for Winter Construction adder in the event construction occurs during the winter months. The commencement of construction shall be at the sole discretion of Crestwood. |

| LACT Prices | | Gas/Water Meter Prices | |
|---|---|---|---|
| $ 221,163 | 5000 BPD | $ 84,443 | 3" Gas/2" Water |
| $ 401,620 | 5000/2500 BPD | $ 99,449 | 2" & 3" Gas/2" Water |
| $ 390,400 | 2500/2500 BPD | $ 57,560 | 2" Water Only |
| $ 357,264 | 1000/1000 BPD | $ 45,000 | 3" Dual Gas Only |

Confidential Business Information

# Clarks Creek Field – Contemporaneous Wells Only

**Request for State Director Review - Application for Flaring**
**Slawson Exploration Company, Inc.**
**Jore Federal 2-12H – API: 33-053-06052**

**(1) Field-Wide Model:**

a. The BLM's North Dakota Field Office's most recent rejection of the request for royalty free flaring on remand from the State Director, under the heading of "Meaningful Analysis", faulted the field-wide analysis that Slawson had previously presented for State Director Review because it considered "redundant infrastructure" from considering flared volumes from what Slawson had labelled as "Preexisting Wells" in the Supplemental Data compiled for the prior State Director Review.

b. They indicated that this analysis, which included an updated economic reserve estimate for the wells from the timeframe in the field, thus presented the analysis as one of a "capacity constraint" rather than one due to "lack of a pipeline connection".

c. Slawson has repeatedly made and continues to make the argument that the lack of a pipeline is inextricably linked to the capacity constraints within the field and thus it was appropriate to assume that an additional theoretical pipeline system laid to the area might wish to gather volumes from existing wells which were flared despite their connection to an existing pipeline system with insufficient capacity so long as only the volumes of gas which were flared during that time-period were considered in boosting the theoretical revenues associated with gas recovery operations **and** drilling and completion costs for the preexisting wells were **not** considered in that portion of the economic analysis.

d. Notwithstanding the discussion in (c) above, a similar economic analysis can also be performed under the criteria for requiring gas conservation under the USGS Conservation Division Manual – Guidelines for Evaluating Applications for Flaring ("Guidelines") for only the "Contemporaneous Wells" from the Supplemental Data presented at the previous State Director Review.

e. Many of the assumptions from the prior Supplemental Data field-wide analysis remain the same in this scenario, but some of those that remain most pertinent to the analysis of Contemporaneous Wells only are restated here.

f. The BLM has not defined what constitutes a "field" for the purpose of the economic analysis. The North Dakota Industrial Commission has specifically defined the spacing unit containing the Jore Federal 2-12H to fall within the "Clarks Creek Field" and the Clarks Creek-Bakken Pool within that field. The most recent redefinition of this Field and specific rules governing the development of the Field are contained within NDIC Order No. 30831 issued in Case No. 28373 (Exhibit 1) which outlines that the Field consists of portions of fourteen sections within four townships. Given the geographic constraints on this Field and area such as the presence of the undeveloped Blue Buttes American Indian Traditional Use Area to the west and its location straddling the border of the Fort Berthold Indian Reservation, and given Slawson's lack of additional contiguous operated acreage, Slawson maintains that this analysis must examine the Clarks Creek Field as defined under North Dakota administrative law.

Confidential Business Information

g. Wells within this field had initial production that occurred during the Flaring Period ("Contemporaneous Wells"). There are 16 of these Contemporaneous Wells within the Clarks Creek-Bakken field, see Exhibit 2. For these wells, Slawson estimated the drilling and completion cost for oil recovery operations in addition to the connection cost of the wells to for gas recovery operations.

h. On this basis, an analysis of the forecast cashflows associated with both the oil recovery operations and gas recovery operations for these 17 wells in the field during the Flaring Period (Jore Federal 2-12H and the 16 Contemporaneous wells) is provided as Exhibit 3.

i. Since this is a hypothetical which requires that analysis only includes new wells, the criteria for requiring gas conservation under the USGS Conservation Division Manual – Guidelines for Evaluating Applications for Flaring ("Guidelines") are examined on both a "New field" basis—the previous analysis having already examined a scenario that reviewed this as an "Old field" which considered the oil revenue from the Preexisting well.

(2) Reserve Estimation Scenario:

a. **Assumptions:**

i. Oil prices used actual received oil prices for the Jore Federal 2-12H well where available, months with no oil sales used WTI spot price from EIA data less a $7/Bbl deduction through 8/2019. For 9/2019 and onward used futures strip pricing as accessed from the Chicago Mercantile Exchange Data at 11:08 AM MDT on 9/16/2019 with the same $7/Bbl deduction.

ii. Gas prices used EIA Henry Hub pricing for historical data and futures strip pricing as accessed from the Chicago Mercantile Exchange Data at 11:08 AM MDT on 9/16/2019.

iii. An average Net Revenue Interest for the aggregated working interest owners of the wells was estimated at 77%.

iv. Gas marketing and quality adjustments used 1,588 BTU/$ft^3$ per an analysis of gas from the Jore Federal 2-12H well performed 5/6/2019 by Astro-Chem Lab, Inc. (attached as Exhibit 4).

v. To estimate the operators' gas revenue received, a model of the contractual arrangements that Slawson ultimately entered to connect the Jore Federal 2-12H well to a gas gathering line (subsequent to the Flaring Period) was used. This used an assumed $1.64/mcf deduction which includes a $1.15/mcf fixed fee and $0.49/mcf as a recent average of variable fees such as electricity, along with a 25% shrinkage factor accounting for the gathering company's percent of proceeds which was contractually arranged.

vi. Lifting costs used actual costs for historical periods on the Jore Federal 2-12H well and $6,500 plus $3.50/Bbl of oil produced as a model of the costs moving forward. All costs were assumed to be associated with the oil operation. The same $6,500 plus $3.50/Bbl of oil produced model is used for Preexisting Wells. However, a higher $8,000 plus $4.50/Bbl of oil model was used for the Contemporaneous Wells to reflect the higher lifting costs usually associated with newer wells.

Confidential Business Information

b. **Estimated Economic Life of Field: 30 Years, 11 Months** (9/2014 to 7/2045). See Reserve Cashflow Scenarios from Combined Oil and Gas Recovery Operations and Decline Curves on Exhibit 5.

c. **Net Operating Income from Oil Recovery Operations.** See Column A of Exhibit 3 and Exhibit 6.

d. **Net Operating Income from Gas Recovery Operations.** See Column D of Exhibit 3 and Exhibit 7.

(3) Estimated Capital Investments

a. **Oil Recovery Operations:**

i. For Contemporaneous Wells, an estimate of the drilling and completion costs for each well is needed. Estimates based on the average cost of other wells operated by Slawson within the Williston Basin with similar lateral lengths which had had initial production within the Flaring Period have been used:

1. 3 of the 16 Contemporaneous Wells were drilled and completed on a 960-acre spacing unit with lateral lengths of approximately 7,500'.
2. Slawson placed nine wells with lateral lengths of approximately 7,500' online in the Williston Basin during the Flaring Period. The drilling and completion costs for these wells averaged $7,667,321. See Exhibit 8.
3. 13 of the 16 Contemporaneous Wells were drilled and completed on a 640-acre spacing unit with lateral lengths of approximately 4,900'.
4. Slawson placed four wells with lateral lengths of approximately 4,900' online in the Williston Basin during the Flaring Period. The drilling and completion costs for these wells averaged $5,790,499. See Exhibit 8.

ii. Thus the drilling and completion costs for oil recovery operations on the Contemporaneous Wells are estimated to total $98,278,450. This adds to the cost of drilling and completion for the Jore Federal 2-12H of $7,484,475 (updated from the original application to incorporate additional costs invoiced to the well).

Confidential Business Information

b. **Gas Recovery Operations:**

i. The cost estimate for the gas recovery operations on the original analysis for the Jore Federal 2-12H was based on an AFE which had been provided by a midstream company to connect the Jore Federal 2-12H well specifically to that company's existing facilities for processing the gas. In the previous analysis the cost items which were specific to oil-gathering were removed to yield an estimate of what a gas-specific connection would have cost.

ii. That cost estimate included a connection length of 6,180' of line pipe and the facilities to connect the Jore Federal 2-12H well and without the components exclusive to oil-gathering components totaled $2,499,845, see Exhibit . This estimate can further be broken-down into $389,400 in facilities costs on the well location related to the gas connection and meter, $1,642,975 in costs related to constructing the gathering line and $467,470 in costs related to

the general project which are not easily differentiated as related to a specific phase of the project.

iii. If those undifferentiated costs are allocated on a pro-rata basis between the well location costs and the gathering line construction costs, this yields an estimate for each well connection cost of $478,967 in location-specific costs and a cost for 6,180' of gathering line of $2,020,878.

iv. In analyzing volumes on a field-wide basis, the additional costs of connecting other wells which had flared volumes for the application timeframe to the gathering system would need to be considered. Not having a specific estimate for that construction prepared, those costs are estimated through extrapolation of the cost estimate that had been prepared for the Jore Federal 2-12H.

v. An example of a potential map of a gathering system to gas volumes the 16 Contemporaneous Wells in addition to the Jore Federal 2-12H is provided on Exhibit 10. This estimates that 65,483' of line pipe would have been needed.

vi. Using the above estimates this would result in $7,663,472 of on-location costs associated with connecting the 16 contemporaneous wells and $8,463,816 of costs for the construction of gathering line. This is in addition to the original $2,499,845 estimate to connect the Jore Federal 2-12H well itself to the existing gathering and processing infrastructure. As noted earlier, this estimated cost for connecting the Jore Federal 2-12H well is not reduced through the consideration of additional costs necessary to connect other wells. This combines into a total field-wide cost estimate for gas recovery operations of $18,627,133.

vii. These estimates are still conservative as they assume no additional capital expenditure would have been necessary for the midstream company to process the additional natural gas from the 17 wells. While that assumption may have been appropriate for the original Jore Federal well analysis, there is a substantial likelihood that additional investments in processing capacity would have been needed for the additional volumes from the entire field. While the combined volumes available in a field may in some instances make additional processing investments viable, when they would not be for a smaller number of wells, for the purposes of this analysis Slawson is assuming zero additional investment in processing and examining only the economics of the gathering connections in a field-wide system.

(4) **PV12 Discounted Annual Cashflows.** See Columns B, C, E, and F of Exhibit 3 as well as Exhibits 5, 6, and 7.

(5) **Payout Period for Oil and Gas Operations on PV12 Basis**

a. Oil: Never, in excess of 371 Months
b. Gas: Never, in excess of 371 Months
c. Combined: Never, in excess of 371 Months

(6) **Criteria for requiring gas conservation in a New field**

a. The combined payout does not occur so would be in excess of 371 months, clearly exceeding the 5 year/60month threshold from the Guidelines.
b. Payout for gas-only operation does not occur so would be in excess of 371 months, clearly in exceeding the 5 year/60 month threshold from the Guidelines.

Confidential Business Information

c. The life of the field/lease is less than the longest payout period calculated since none of the payouts is forecast to occur.

(7) Based on the results in (6) conservation was not required and the flaring from the Jore Federal 2-12H was unavoidable. All three of the criteria were not met, while all three would have needed to be met for the flaring to be deemed avoidable.

A gas connection for the Jore Federal 2-12H was only economically justifiable with the addition of new wells in 2019 and beyond. It was not justified with the production from only the Contemporaneous wells in the Clarks Creek field and associated infrastructure for the Flaring Period.

Confidential Business Information

BEFORE THE INDUSTRIAL COMMISSION

OF THE STATE OF NORTH DAKOTA

CASE NO. 28373
(CONTINUED)
ORDER NO. 30831

IN THE MATTER OF A HEARING CALLED ON A MOTION OF THE COMMISSION TO CONSIDER THE APPLICATION OF EOG RESOURCES, INC. FOR AN ORDER AMENDING THE FIELD RULES FOR THE CLARKS CREEK-BAKKEN POOL TO ALTER THE SETBACK REQUIREMENT FOR THE WEST BOUNDARY OF AN EXISTING 1440-ACRE SPACING UNIT COMPRISED OF SECTIONS 13, 24, AND 25, LESS LOTS 1, 2, 3, AND 4 IN EACH SECTION, T.151N., R.95W., MCKENZIE COUNTY, ND, FROM 500 FEET TO 100 FEET, AND SUCH OTHER RELIEF AS IS APPROPRIATE.

Confidential Business Information

ORDER OF THE COMMISSION

THE COMMISSION FINDS:

(1) This cause originally came on for hearing at 9:00 a.m. on the 26th day of March, 2020. Counsel for EOG Resources, Inc. (EOG) submitted a request received March 23, 2020 to continue this case to the regularly scheduled hearing in April 2020. There were no objections, the hearing officer granted the request, and this case was scheduled for hearing on April 23, 2020.

(2) The record in this case was left open until May 1, 2020 for written comments due to temporary hearing procedures implemented as a result of the 2020 COVID-19 pandemic. No comments were received and the record was closed on May 1, 2020.

(3) The witnesses for EOG provided telephonic testimony in this matter pursuant to North Dakota Administrative Code (NDAC) Section 43-02-03-88.2. Telephonic Communication Affidavits were received on April 27, 2020; therefore, such testimony may be considered evidence.

(4) EOG made application to the Commission for an order amending the field rules for the Clarks Creek-Bakken Pool to alter the setback requirement for the west boundary of an existing standup 1440-acre spacing unit comprised of Sections 13, 24, and 25, less Lots 1, 2, 3, and 4 in each section, Township 151 North, Range 95 West, McKenzie County, North Dakota (Sections 13, 24, and 25), from 500 feet to 100 feet, and such other relief as is appropriate.

(5) Order No. 30734 entered in Case No. 28279, the most recent spacing order for the Clarks Creek-Bakken Pool, established proper spacing for the development of Zone I at up to eighteen horizontal wells per 640 acres, Zone II at up to twenty-four horizontal wells per 640 acres, Zone III at up to twenty-eight horizontal wells per 960 acres, Zone IV at up to thirty-two horizontal wells per 1280 acres, Zone V at up to forty horizontal wells per 1440 acres, Zone VI at up to two horizontal wells per 1920 acres, Zone VII at up to four horizontal wells per 1920 acres, Zone VIII at one horizontal well per 2560 acres, Zone IX at up to two horizontal wells per 2560 acres, and Zone X at up to sixty-four horizontal wells per 2560 acres.

(6) Sections 13, 24, and 25 less Lots 1 through 4 in each section are currently a standup 1440-acre spacing unit in Zone V in the Clarks Creek-Bakken Pool.

(7) Lots 5, 6, 7, and 8 and the E/2 of Sections 13 and 24 and the W/2 and W/2 E/2 of Sections 18 and 19, Township 151 North, Range 94 West, McKenzie County, North Dakota, are currently a standup lease-line 1920-acre spacing unit in Zone VI in the Clarks Creek-Bakken Pool.

(8) The E/2 of Section 25*, the E/2 of Section 36*, Township 151 North, Range 95 West, and the W/2 of Sections 30 and 31, Township 151 North, Range 94 West, McKenzie County, North Dakota, are currently a standup lease-line 1280-acre spacing unit in Zone XIII in the Antelope-Sanish Pool, which allows one lease-line horizontal well on a north-south orientation.

*Section 36 and Section 25 less Lots 1, 2, 3, and 4 are within the Clarks Creek Field.

(9) Lots 1 through 4 in Sections 13, 24, and 25 (aka the W/2 W/2) are designated as not administratively available for leasing under the Land and Resource Management Plan for the Dakota Prairie Grasslands Northern Region, that further designates the lands as American Indian Traditional Use Area.

(10) EOG proposes to batch drill and complete at approximately the same time two horizontal wells in the first bench in the Three Forks Formation 130 feet to 200 feet from the west boundary in the standup 1440-acre spacing unit described as Sections 13, 24, and 25 less Lots 1 through 4 in each section. Both horizontal wells will be drilled from the current well pad in the SW/4 NE/4 of Section 24, one to the north and one to the south. Utilization of horizontal drilling technology as proposed would result in the well being completed at a location or locations not in compliance with current applicable spacing orders for the Clarks Creek-Bakken Pool. The horizontal well design proposed may be preliminary and could be changed for various reasons which is permissible as long as the horizontal well design still justifies the spacing unit and is consistent with the evidence that justified the setback reduction.

(11) Current provisions in Zone V in the Clarks Creek-Bakken Pool provide that all portions of the well bore not isolated by cement of any horizontal well in the standup 1440-acre spacing unit described as Sections 13, 24, and 25 less Lots 1 through 4 in each section shall be no closer than 500 feet to the east or west boundaries.

(12) EOG testified its hydraulic fracture design results in induced fracture half-lengths from 100 feet to 200 feet depending on the size of the fracture stimulation.

Confidential Business Information

(13) The Commission believes a horizontal well located outside the Commission's 500-feet corridor lease-line horizontal well policy (250 feet on either side of the lease-line) will produce the vast majority of its reserves from within the underlying base spacing unit; this is supported by EOG's estimated induced fracture half-lengths. EOG is agreeable to a 250-feet setback requirement.

(14) There are seven horizontal wells completed in Zone V in the Clarks Creek-Bakken Pool in the standup 1440-acre spacing unit described as Sections 13, 24, and 25 less Lots 1 through 4 in each section.

(15) There were no objections to this application.

(16) In order to prevent waste and to protect correlative rights, the setback requirement for the west boundary of the existing standup 1440-acre spacing unit described as Sections 13, 24, and 25, less Lots 1, 2, 3, and 4 in each section should be established at 250 feet.

(17) If EOG's activities are successful, greater ultimate recovery of oil and gas from the pool will be achieved which will prevent waste and the drilling of unnecessary wells in a manner which will not have a detrimental effect on correlative rights.

IT IS THEREFORE ORDERED:

(1) All portions of the well bore not isolated by cement of any horizontal well in Zone V in the Clarks Creek-Bakken Pool in the standup 1440-acre spacing unit described as Sections 13, 24, and 25, less Lots 1, 2, 3, and 4 in each section, Township 151 North, Range 95 West, McKenzie County, North Dakota, shall be no closer than 250 feet to the west boundary. Measurement inaccuracies in the directional survey equipment need not be considered.

(2) The Director is hereby authorized to exercise continuing jurisdiction in this matter to determine whether a horizontal well proposed or drilled in the 1440-acre spacing unit herein amended, has justified the amendment of such unit, to require amendments or modifications to the permit to drill for such horizontal well, and to deny a permit to drill in the event a well is proposed to be drilled in a manner inconsistent with the evidence that justified such spacing unit amendment.

(3) Provisions established herein for the Clarks Creek-Bakken Pool are for the exclusive purpose of drilling horizontal wells. Existing and future vertical and directional wells drilled within the area defined in paragraph (4) below shall not be subject to this order.

(4) The Clarks Creek Field is hereby defined as the following described tracts of land in McKenzie County, North Dakota:

TOWNSHIP 152 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTIONS 25 AND 36,

TOWNSHIP 152 NORTH, RANGE 94 WEST, 5TH PM
ALL OF SECTIONS 30 AND 31,

Confidential Business Information

TOWNSHIP 151 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTIONS 1, 12 AND 36, AND ALL OF SECTIONS 13, 24 AND 25 LESS LOTS 1 THROUGH 4 IN EACH SECTION,

TOWNSHIP 151 NORTH, RANGE 94 WEST, 5TH PM
ALL OF SECTIONS 6, 7, 18 AND 19.

(5) The Clarks Creek-Bakken Pool is hereby defined as the following described tracts of land in McKenzie County, North Dakota:

ZONE I (18/640H)

TOWNSHIP 151 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTION 36.

ZONE II (24/640H)

TOWNSHIP 151 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTION 12.

ZONE III (28/960H-STANDUP)

TOWNSHIP 152 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTIONS 25 AND 36,

TOWNSHIP 151 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTION 1.

ZONE IV (32/1280H-STANDUP)

TOWNSHIP 152 NORTH, RANGE 94 WEST, 5TH PM
ALL OF SECTIONS 30 AND 31.

ZONE V (40/1440H-STANDUP)

TOWNSHIP 151 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTIONS 13, 24, AND 25 LESS LOTS 1 THROUGH 4 IN EACH SECTION.

ZONE VI (2/1920H-STANDUP-NORTH/SOUTH ORIENTATION-LEASE-LINE)

TOWNSHIP 151 NORTH, RANGE 95 WEST, 5TH PM
LOTS 5, 6, 7, AND 8 AND THE E/2 OF SECTIONS 13 AND 24,

TOWNSHIP 151 NORTH, RANGE 94 WEST, 5TH PM
THE W/2 AND W/2 E/2 OF SECTIONS 18 AND 19.

Confidential Business Information

ZONE VII (4/1920H-STANDUP)

TOWNSHIP 152 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTIONS 25 AND 36,

TOWNSHIP 151 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTION 1.

ZONE VIII (2560H-NORTH/SOUTH ORIENTATION-LEASE-LINE)

TOWNSHIP 152 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTIONS 25, 26*, 35* AND 36.
*Sections 26 and 35 are within the Hawkeye Field.

ZONE IX (2/2560H-NORTH/SOUTH ORIENTATION-LEASE-LINE)

TOWNSHIP 152 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTIONS 25 AND 36,

TOWNSHIP 152 NORTH, RANGE 94 WEST, 5TH PM
ALL OF SECTIONS 30 AND 31,

TOWNSHIP 151 NORTH, RANGE 95 WEST, 5TH PM
ALL OF SECTIONS 1 AND 12,

TOWNSHIP 151 NORTH, RANGE 94 WEST, 5TH PM
ALL OF SECTIONS 6 AND 7.

ZONE X (64/2560H-STANDUP)

TOWNSHIP 151 NORTH, RANGE 94 WEST, 5TH PM
ALL OF SECTIONS 6, 7, 18 AND 19.

Confidential Business Information

(6) The Clarks Creek-Bakken Pool is hereby defined as that accumulation of oil and gas found in the interval from 50 feet above the top of the Bakken Formation to above the top of the Birdbear Formation within the limits of the field as set forth above.

(7) All portions of the well bore not isolated by cement of any horizontal well in the Clarks Creek-Bakken Pool shall adhere to the following requirements unless specifically provided for in the respective zone below unless granted an exception by the Commission after due notice and hearing:

(a) Measurement inaccuracies in the directional survey equipment need not be considered except when deemed necessary by the Director.

(b) The lateral, heel portion of the lateral, or toe portion of the lateral in horizontal well bores shall be no closer than 500 feet to the most nearly parallel spacing unit boundary.

(c) The Director is hereby authorized to reduce the setback from 500 feet to 200 feet for horizontal well bores where the angle of the heel portion of the lateral and the respective spacing unit boundary is less than 45° through the issuance of permit stipulations, whenever, in his opinion, the applicant has demonstrated that correlative rights will be protected.

(d) The heel portion of the lateral in horizontal well bores where the angle of such is greater than 45° from the respective most nearly perpendicular spacing unit boundary, shall be no closer than 150 feet to said boundary.

(e) The lateral or toe portion of the lateral in horizontal well bores where the angle of such is greater than 45° from the respective most nearly perpendicular spacing unit boundary, shall adhere to the following:

(i) For horizontal wells completed open hole, the total depth of the well bore shall be no closer than 150 feet to the boundary of the spacing unit;

(ii) For horizontal wells completed with the production liner or casing cemented in the lateral, the total depth of the well bore shall be no closer than 50 feet to the boundary of the spacing unit, unless the horizontal well is stimulated through the shoe at the toe of the lateral whereby the total depth of the well bore shall be no closer than 150 feet to the boundary of the spacing unit; and

(iii) For horizontal wells completed with the production liner or casing externally isolated in the lateral by the use of packers, the total depth of the well bore shall be no closer than 100 feet to the boundary of the spacing unit unless the horizontal well is stimulated through the shoe at the toe of the lateral whereby the total depth of the well bore shall be no closer than 150 feet to the boundary of the spacing unit.

(8) The Application for Permit to Drill (Form 1) for a horizontal well to be completed in the Clarks Creek-Bakken Pool shall include a well schematic which depicts the:

(a) Proposed production casing setting depth at the heel relative to the spacing unit boundary;

(b) Proposed completion style as open hole lateral, cemented liner or casing in the lateral, liner or casing externally isolated in the lateral by the use of packers, or other completion style; and

(c) Proposed toe of the lateral including the location of the deepest perforation, completion sleeve, and/or external isolation packer.

(9) The Completion Report (Form 6) for a horizontal well completed in the Clarks Creek-Bakken Pool shall include a well schematic which depicts the:

(a) Production casing setting depth at the heel relative to the spacing unit boundary;

Confidential Business Information

(b) Completion style as open hole lateral, cemented liner or casing in the lateral, liner or casing externally isolated in the lateral by the use of packers, or other completion style; and

(c) Toe of the lateral including the location of the deepest perforation, completion sleeve, and/or external isolation packer.

(10) The proper spacing for the development of Zone I in the Clarks Creek-Bakken Pool is hereby set at up to eighteen horizontal wells per 640-acre spacing unit.

(11) Spacing units hereafter created in Zone I in the Clarks Creek-Bakken Pool shall consist of a governmental section.

(12) Zone I in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

(13) The proper spacing for the development of Zone II in the Clarks Creek-Bakken Pool is hereby set at up to twenty-four horizontal wells per 640-acre spacing unit.

(14) Spacing units hereafter created in Zone II in the Clarks Creek-Bakken Pool shall consist of a governmental section.

(15) Fracture stimulation procedures shall be submitted for prior approval before completing any horizontal well with a fracture initiation point located in the N/2 of Section 12 in the 640-acre spacing unit in Zone II in the Clarks Creek-Bakken Pool described as Section 12, Township 151 North, Range 95 West, McKenzie County, North Dakota, other than the Jore Federal #11-12TFH (File No. 34373), Jore Federal #3-12H (File No. 34375), Jore Federal #9-12TFH (File No. 34395), and Jore Federal #5-12H (File No. 34392) wells. Such procedures shall indicate the location of the nearby fracture initiation points relative to the offending well bore in the original curve portion in the Jore Federal #4-12H well (File No. 34378), from 10,265 feet MD, approximately 38 feet from the north line and 2301 feet from the east line of Section 12 to 10,970 feet MD, approximately 460 feet from the north line and 1,937 feet from the east line of Section 12, Township 151 North, Range 95 West, McKenzie County, North Dakota, and contain sufficient detail, such as estimated induced fracture orientation and half-length, for the Director to determine that correlative rights will be protected. The Director may require additional tests and logs to ensure correlative rights are protected.

(16) Subsequent to the fracture stimulation for any horizontal well with a fracture initiation point located in the N/2 of Section 12 in the 640-acre spacing unit in Zone II in the Clarks Creek-Bakken Pool described as Section 12, Township 151 North, Range 95 West, McKenzie County, North Dakota, other than the Jore Federal #11-12TFH (File No. 34373), Jore Federal #3-12H (File No. 34375), Jore Federal #9-12TFH (File No. 34395), and Jore Federal #5-12H (File No. 34392) wells, a follow-up Sundry Notice (Form 4) shall be submitted verifying the location of the nearby fracture initiation points relative to the offending well bore in the original curve portion in the Jore Federal #4-12H well (File No. 34378), from 10,265 feet MD, approximately 38 feet from the north line and 2301 feet from the east line of Section 12 to 10,970 feet MD, approximately 460

Confidential Business Information

feet from the north line and 1,937 feet from the east line of Section 12, Township 151 North, Range 95 West, McKenzie County, North Dakota.

(17) Zone II in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

(18) The proper spacing for the development of Zone III in the Clarks Creek-Bakken Pool is hereby set at up to twenty-eight horizontal wells per standup 960-acre spacing unit.

(19) Section 25 and the N/2 of Section 36, Township 152 North, Range 95 West; and Section 1, Township 151 North, Range 95 West and the S/2 of Section 36, Township 152 North, Range 95 West, McKenzie County, North Dakota, are hereby designated standup 960-acre spacing units in Zone III in the Clarks Creek-Bakken Pool.

(20) Spacing units hereafter created in Zone III in the Clarks Creek-Bakken Pool shall be standup spacing units designated by the Commission.

(21) Fracture stimulation procedures shall be submitted for prior approval before completing any horizontal well with a fracture initiation point located in the SE/4 of Section 1 in the standup 960-acre spacing unit in Zone III in the Clarks Creek-Bakken Pool described as the S/2 of Section 36, Township 152 North, Range 95 West and Section 1, Township 151 North, Range 95 West, McKenzie County, North Dakota. Such procedures shall indicate the location of the nearby fracture initiation points relative to the offending well bore in the original curve portion in the Jore Federal #4-12H well (File No. 34378), from 10,265 feet MD, approximately 38 feet from the north line and 2301 feet from the east line of Section 12 to 10,970 feet MD, approximately 460 feet from the north line and 1,937 feet from the east line of Section 12, Township 151 North, Range 95 West, McKenzie County, North Dakota, and contain sufficient detail, such as estimated induced fracture orientation and half-length, for the Director to determine that correlative rights will be protected. The Director may require additional tests and logs to ensure correlative rights are protected.

(22) Subsequent to the fracture stimulation for any horizontal well with a fracture initiation point located in the SE/4 of Section 1 in the standup 960-acre spacing unit in Zone III in the Clarks Creek-Bakken Pool described as the S/2 of Section 36, Township 152 North, Range 95 West and Section 1, Township 151 North, Range 95 West, McKenzie County, North Dakota, a follow-up Sundry Notice (Form 4) shall be submitted verifying the location of the nearby fracture initiation points relative to the offending well bore in the original curve portion in the Jore Federal #4-12H well (File No. 34378), from 10,265 feet MD, approximately 38 feet from the north line and 2301 feet from the east line of Section 12 to 10,970 feet MD, approximately 460 feet from the north line and 1,937 feet from the east line of Section 12, Township 151 North, Range 95 West, McKenzie County, North Dakota.

(23) Zone III in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

(24) The proper spacing for the development of Zone IV in the Clarks Creek-Bakken Pool is hereby set at up to thirty-two horizontal wells per standup 1280-acre spacing unit.

Confidential Business Information

(25) Sections 30 and 31, Township 152 North, Range 94 West, McKenzie County, North Dakota, are hereby designated a standup 1280-acre spacing unit in Zone IV in the Clarks Creek-Bakken Pool.

(26) Spacing units hereafter created in Zone IV in the Clarks Creek-Bakken Pool shall be standup spacing units consisting of two adjacent governmental sections.

(27) Zone IV in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

(28) The proper spacing for the development of Zone V in the Clarks Creek-Bakken Pool is hereby set at up to forty horizontal wells per standup 1440-acre spacing unit.

(29) As an exception to paragraph (7) above, all portions of the well bore not isolated by cement of any horizontal well in Zone V in the Clarks Creek-Bakken Pool in the standup 1440-acre spacing unit described as Sections 13, 24, and 25, less Lots 1, 2, 3, and 4 in each section, Township 151 North, Range 95 West, McKenzie County, North Dakota, shall be no closer than 250 feet to the west boundary. Measurement inaccuracies in the directional survey equipment need not be considered.

(30) Sections 13, 24, and 25, less Lots 1, 2, 3, and 4 in each section, Township 151 North, Range 95 West, McKenzie County, North Dakota, are hereby designated a standup 1440-acre spacing unit in Zone V in the Clarks Creek-Bakken Pool.

(31) Spacing units hereafter created in Zone V in the Clarks Creek-Bakken Pool shall be standup spacing units designated by the Commission.

(32) Zone V in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

(33) The proper spacing for the development of Zone VI in the Clarks Creek-Bakken Pool is hereby set at up to two lease-line horizontal wells per standup 1920-acre spacing unit drilled on a north-south orientation.

(34) All portions of the well bore not isolated by cement of any horizontal well in Zone VI in the Clarks Creek-Bakken Pool shall be located approximately down the north-south axis and comply with paragraph (7) above.

(35) Lots 5, 6, 7, and 8 and the E/2 of Sections 13 and 24, Township 151 North, Range 95 West and the W/2 and the W/2 E/2 of Sections 18 and 19, Township 151 North, Range 94 West, McKenzie County, North Dakota, are hereby designated a standup 1920-acre spacing unit in Zone VI in the Clarks Creek-Bakken Pool.

(36) Spacing units hereafter created in Zone VI in the Clarks Creek-Bakken Pool shall be standup spacing units designated by the Commission.

(37) Zone VI in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

Confidential Business Information

(38) The proper spacing for the development of Zone VII in the Clarks Creek-Bakken Pool is hereby set at up to four horizontal wells per standup 1920-acre spacing unit.

(39) Sections 25 and 36, Township 152 North, Range 95 West and Section 1, Township 151 North, Range 95 West, McKenzie County, North Dakota, are hereby designated a standup 1920-acre spacing unit in Zone VII in the Clarks Creek-Bakken Pool.

(40) Spacing units hereafter created in Zone VII in the Clarks Creek-Bakken Pool shall be standup spacing units consisting of three adjacent governmental sections.

(41) Fracture stimulation procedures shall be submitted for prior approval before completing any horizontal well with a fracture initiation point located in the SE/4 of Section 1 in the standup 1920-acre spacing unit in Zone VII in the Clarks Creek-Bakken Pool described as Sections 25 and 36, Township 152 North, Range 95 West and Section 1, Township 151 North, Range 95 West, McKenzie County, North Dakota. Such procedures shall indicate the location of the nearby fracture initiation points relative to the offending well bore in the original curve portion in the Jore Federal #4-12H well (File No. 34378), from 10,265 feet MD, approximately 38 feet from the north line and 2301 feet from the east line of Section 12 to 10,970 feet MD, approximately 460 feet from the north line and 1,937 feet from the east line of Section 12, Township 151 North, Range 95 West, McKenzie County, North Dakota, and contain sufficient detail, such as estimated induced fracture orientation and half-length, for the Director to determine that correlative rights will be protected. The Director may require additional tests and logs to ensure correlative rights are protected.

(42) Subsequent to the fracture stimulation for any horizontal well with a fracture initiation point located in the SE/4 of Section 1 in the standup 1920-acre spacing unit in Zone VII in the Clarks Creek-Bakken Pool described as Sections 25 and 36, Township 152 North, Range 95 West and Section 1, Township 151 North, Range 95 West, McKenzie County, North Dakota, a follow-up Sundry Notice (Form 4) shall be submitted verifying the location of the nearby fracture initiation points relative to the offending well bore in the original curve portion in the Jore Federal #4-12H well (File No. 34378), from 10,265 feet MD, approximately 38 feet from the north line and 2301 feet from the east line of Section 12 to 10,970 feet MD, approximately 460 feet from the north line and 1,937 feet from the east line of Section 12, Township 151 North, Range 95 West, McKenzie County, North Dakota.

Confidential Business Information

(43) Zone VII in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

(44) The proper spacing for the development of Zone VIII in the Clarks Creek-Bakken Pool is hereby set at one lease-line horizontal well per 2560-acre spacing unit drilled on a north-south orientation.

(45) All portions of the well bore not isolated by cement of any horizontal well in Zone VIII in the Clarks Creek-Bakken Pool shall be located approximately down the north-south axis and comply with paragraph (7) above.

(46) Sections 25, 26*, 35*, and 36, Township 152 North, Range 95 West, McKenzie County, North Dakota, are hereby designated a 2560-acre spacing unit in Zone VIII in the Clarks Creek-Bakken Pool.

*Sections 26 and 35 are within the Hawkeye Field.

(47) One horizontal well shall be drilled and completed in the standup 960-acre spacing unit described as Section 25 and the N/2 of Section 36, Township 152 North, Range 95 West, McKenzie County, North Dakota, prior to completing any horizontal well in the lease-line 2560-acre spacing unit described as Sections 25, 26*, 35*, and 36, Township 152 North, Range 95 West, McKenzie County, North Dakota.

*Sections 26 and 35 are within the Hawkeye Field.

(48) Spacing units hereafter created in Zone VIII in the Clarks Creek-Bakken Pool shall consist of four adjacent governmental sections designated by the Commission.

(49) Zone VIII in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

(50) The proper spacing for the development of Zone IX in the Clarks Creek-Bakken Pool is hereby set at up to two lease-line horizontal wells per 2560-acre spacing unit drilled on a north-south orientation.

(51) All portions of the well bore not isolated by cement of any horizontal well in Zone IX in the Clarks Creek-Bakken Pool shall be located approximately down the north-south axis and comply with paragraph (7) above.

(52) Sections 25 and 36, Township 152 North, Range 95 West and Sections 30 and 31, Township 152 North, Range 94 West; and Sections 1 and 12, Township 151 North, Range 95 West and Sections 6 and 7, Township 151 North, Range 94 West, McKenzie County, North Dakota, are hereby designated 2560-acre spacing units in Zone IX in the Clarks Creek-Bakken Pool.

(53) One horizontal well shall be drilled and completed in the standup 960-acre spacing unit described as Section 25 and the N/2 of Section 36, Township 152 North, Range 95 West, McKenzie County, North Dakota, prior to completing any horizontal well in the lease-line 2560-acre spacing unit described as Sections 25 and 36, Township 152 North, Range 95 West and Sections 30 and 31, Township 152 North, Range 94 West, McKenzie County, North Dakota.

(54) Spacing units hereafter created in Zone IX in the Clarks Creek-Bakken Pool shall consist of four adjacent governmental sections designated by the Commission.

(55) Zone IX in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

(56) The proper spacing for the development of Zone X in the Clarks Creek-Bakken Pool is hereby set at up to sixty-four horizontal wells per standup 2560-acre spacing unit.

Confidential Business Information

(57) Sections 6, 7, 18, and 19, Township 151 North, Range 94 West, McKenzie County, North Dakota, are hereby designated a standup 2560-acre spacing unit in Zone X in the Clarks Creek-Bakken Pool.

(58) Spacing units hereafter created in Zone X in the Clarks Creek-Bakken Pool shall be standup spacing units consisting of four adjacent governmental sections.

(59) Zone X in the Clarks Creek-Bakken Pool shall not be extended except by further order of the Commission after due notice and hearing.

(60) The operator of any horizontally drilled well in the Clarks Creek-Bakken Pool shall cause to be made a directional survey of the well bore. The directional survey contractor shall file a certified survey with the Commission within 30 days after completion of the well in accordance with NDAC Section 43-02-03-25. The survey shall be of sufficient quality to enable the Commission to determine the entire completion location of the well and its terminus.

(61) The Director is hereby authorized to exercise continuing jurisdiction to determine whether any well proposed or drilled upon any spacing unit herein established has justified the creation of such unit, to require amendments or modifications to the permit to drill for such well, and to deny a permit to drill in the event a well is proposed to be drilled in a manner inconsistent with the evidence that justified the spacing requirements in the Clarks Creek-Bakken Pool.

(62) The Commission shall have continuing jurisdiction in this matter and specifically reserves the authority, upon its own motion or the motion of any interested party, to: (1) review the spacing requirements for the Clarks Creek-Bakken Pool; (2) determine whether the separate zones of spacing established herein are warranted; and, (3) make such further amendments or modifications to the spacing requirements for the Clarks Creek-Bakken Pool as the Commission deems appropriate.

(63) No well shall be drilled or produced in the Clarks Creek-Bakken Pool, as defined herein, except in conformity with the regulations above without special order of the Commission after due notice and hearing.

(64) The following rules concerning the casing, tubing and equipping of wells shall apply to the subsequent drilling and operation of wells in the Clarks Creek-Bakken Pool:

(a) The surface casing shall consist of new or reconditioned pipe that has been previously tested to 1000 pounds per square inch. The casing shall be set and cemented at a point not less than 50 feet below the base of the Fox Hills Formation. Sufficient cement shall be used to fill the annular space outside the pipe to the surface of the ground, or the bottom of the cellar, and sufficient scratchers and centralizers shall be used to assure a good cement job. Cement shall be allowed to stand a minimum of 12 hours before drilling the plug or initiating tests. The quality of cement shall conform to the standards provided under NDAC Section 43-02-03-21. After cementing, the casing shall be tested by application of pump pressure of at least 1000 pounds per square inch. If, at the end of 30 minutes this pressure has dropped 100 pounds per square inch or more, the casing shall be repaired. Thereafter, the casing shall again be tested in the

Confidential Business Information

same manner. Further work shall not proceed until a satisfactory test has been obtained;

(b) The producing or oil string shall consist of new or reconditioned pipe that has been previously tested to 2000 pounds per square inch. Casing shall be set and cemented at a point not higher than the top of the producing formation, or at a point approved by the Director. Sufficient cement shall be used and applied in such a manner as to protect and isolate all formations containing oil and/or gas, protect the pipe through salt sections encountered, and isolate the Dakota-Lakota Series. The cement shall be allowed to stand a minimum of 15 hours before drilling the plug or initiating tests. The quality of cement shall conform to the standards provided under NDAC Section 43-02-03-21. After cementing, the casing shall be tested by application of pump pressure of at least 1500 pounds per square inch. If, at the end of 30 minutes this pressure has dropped 150 pounds per square inch or more, the casing shall be repaired. Thereafter, the casing shall again be tested in the same manner. Further work shall not proceed until a satisfactory test has been obtained;

(c) All well-head fittings and connections shall have a working pressure in excess of that to which they are expected to be subjected; and,

(d) All wells shall be equipped with tubing; a tubing packer must also be utilized in flowing wells unless a waiver is obtained from the Director after demonstrating the casing will not be subjected to excessive pressure or corrosion; all tubing shall be of sufficient internal diameter to allow the passage of a bottom hole pressure gauge for the purpose of obtaining bottom hole pressure measurements.

(65) The gas-oil ratio of all wells not connected to a gas gathering system shall be measured annually during the month of May. The reservoir pressure shall be measured in any well completed in the Clarks Creek-Bakken Pool if deemed necessary by the Director. Drill stem test pressures are acceptable for determining reservoir pressure. Pressure measurements shall be made at or adjusted to a subsea datum of 8200 feet. All gas-oil ratio and reservoir pressure determinations shall be made by methods approved by the Director and reported to the Director within 15 days following the end of the month in which they are determined. The Director is authorized to waive these requirements if the necessity therefor can be demonstrated to his satisfaction. All additional gas-oil ratio and reservoir pressure determinations conducted on any well, but not specially required herein, shall be reported to the Director within 15 days following the end of the month in which they are determined.

(66) No salt water, drilling mud, crude oil, or waste oil shall be stored in pits in this field, except in an emergency, and approved by the Director.

(67) The first horizontal well completed in each Clarks Creek-Bakken Pool non-overlapping spacing unit shall be allowed to produce at a maximum efficient rate.

(68) All wells completed in the Clarks Creek-Bakken Pool that have received an exemption to North Dakota Century Code Section 38-08-06.4 shall be allowed to produce at a maximum efficient rate.

Confidential Business Information

(69) All infill horizontal wells, including overlapping spacing units, completed in the Clarks Creek-Bakken Pool, shall be allowed to produce at a maximum efficient rate for a period of 90 days commencing on the first day oil is produced through well-head equipment into tanks from the ultimate producing interval after casing has been run; after that, such wells shall be allowed to continue to produce at a maximum efficient rate if the well or operator meets or exceeds the Commission approved gas capture goals. The gas capture percentage shall be calculated by summing monthly gas sold plus monthly gas used on lease plus monthly gas processed in a Commission approved beneficial manner, divided by the total monthly volume of associated gas produced by the operator. The operator is allowed to remove the initial 14 days of flowback gas in the total monthly volume calculation. The Commission will accept compliance with the gas capture goals by well, field, county, or statewide by operator. If such gas capture percentage is not attained at maximum efficient rate, the well(s) shall be restricted to 200 barrels of oil per day if at least 60% of the monthly volume of associated gas produced from the well is captured, otherwise oil production from such wells shall not exceed 100 barrels of oil per day.

The Commission will recognize the following as surplus gas being utilized in a beneficial manner:

(a) Equipped with an electrical generator that consumes surplus gas from the well;

(b) Equipped with a system that intakes the surplus gas and natural gas liquids volume from the well for beneficial consumption by means of compression to liquid for use as fuel, transport to a processing facility, production of petrochemicals or fertilizer, conversion to liquid fuels, separating and collecting the propane and heavier hydrocarbons; and

(c) Equipped with other value-added processes as approved by the Director which reduce the volume or intensity of the flare by more than 60%.

(70) If the flaring of gas produced with crude oil from the Clarks Creek-Bakken Pool is determined by the North Dakota Department of Environmental Quality as causing a violation of the North Dakota Air Pollution Control Rules (NDAC Article 33.1-15), production from the pool may be further restricted.

(71) This order shall cover all of the Clarks Creek-Bakken Pool, common source of supply of crude oil and/or natural gas as herein defined, and continues in full force and effect until further order of the Commission or until the last well in the pool is plugged and abandoned.

Confidential Business Information

Dated this 12th day of June, 2020.

INDUSTRIAL COMMISSION
STATE OF NORTH DAKOTA

By the Director, on behalf of the Commission

/s/ Lynn D. Helms, Director

Exhibit 13 to 5/9/23 SDR

Exhibit 2

**Wells in the Clarks Creek-Bakken Field**
**Placed on Production During the Flaring Period**

**Application Well**
Jore Federal 2-12H

| Contemporaneous Well | API Number | Operator |
|---|---|---|
| WEST CLARK (103-0136H) | 3305306954 | EOG RESOURCES INC |
| WEST CLARK (104-0136H) | 3305306955 | EOG RESOURCES INC |
| WEST CLARK (117-0136H) | 3305307014 | EOG RESOURCES INC |
| AVALANCHE (36-14-MB2) | 3305306395 | SHD OIL & GAS LLC |
| AVALANCHE (36-15-TF1) | 3305306394 | SHD OIL & GAS LLC |
| AVALANCHE (36-16-MB2) | 3305306393 | SHD OIL & GAS LLC |
| AVALANCHE (36-17-TF2) | 3305306392 | SHD OIL & GAS LLC |
| BUCKY (13-36H) | 3305305409 | SHD OIL & GAS LLC |
| CANON (12-36H) | 3305305490 | SHD OIL & GAS LLC |
| HAMMER (12-36H) | 3305305491 | SHD OIL & GAS LLC |
| LUKE (13-36H) | 3305305412 | SHD OIL & GAS LLC |
| MAGNUM (36-11-TF2) | 3305306461 | SHD OIL & GAS LLC |
| MAGNUM (36-12-MB2) | 3305306462 | SHD OIL & GAS LLC |
| MAGNUM (36-13-TF2) | 3305306463 | SHD OIL & GAS LLC |
| MARC (13-36H) | 3305305411 | SHD OIL & GAS LLC |
| MATTIE (13-36H) | 3305305410 | SHD OIL & GAS LLC |

Confidential Business Information

Exhibit 13 to 5/9/23 SDR

Exhibit 3

| Clarks Creek-Bakken Field Contemporaneous Wells Only | Column A | Column B | Column C | Column D | Column E | Column F |
|---|---|---|---|---|---|---|
| | Oil Recovery Net Operating Income | Net Present Value of Oil Recovery Net Operating Income PV12 | Cumulative NPV12 | Gas Recovery Net Operating Income | Net Present Value of Gas Recovery Net Operating Income PV12 | Cumulative NPV12 |
| **Capital Expense** | $ (105,762,925) | $ (105,762,925) | $ (105,762,925) | $ (18,627,133) | $ (18,627,133) | $ (18,627,133) |
| 2014 | $ 6,434,407 | $ 6,278,854 | $ (99,484,071) | $ 542,865 | $ 529,073 | $ (18,098,060) |
| 2015 | $ 9,308,109 | $ 8,342,465 | $ (91,141,606) | $ 821,120 | $ 741,483 | $ (17,356,577) |
| 2016 | $ 20,056,569 | $ 16,115,138 | $ (75,026,468) | $ 3,481,912 | $ 2,770,704 | $ (14,585,873) |
| 2017 | $ 10,736,780 | $ 7,819,842 | $ (67,206,626) | $ 2,134,803 | $ 1,555,011 | $ (13,030,862) |
| 2018 | $ 8,058,052 | $ 5,234,291 | $ (61,972,335) | $ 1,342,084 | $ 865,687 | $ (12,165,175) |
| 2019 | $ 5,915,626 | $ 3,379,351 | $ (58,592,984) | $ 854,077 | $ 492,218 | $ (11,672,957) |
| 2020 | $ 6,084,127 | $ 3,149,413 | $ (55,443,571) | $ 747,877 | $ 386,681 | $ (11,286,276) |
| 2021 | $ 3,777,644 | $ 1,738,830 | $ (53,704,741) | $ 540,584 | $ 249,062 | $ (11,037,214) |
| 2022 | $ 2,847,261 | $ 1,169,598 | $ (52,535,143) | $ 536,489 | $ 220,181 | $ (10,817,033) |
| 2023 | $ 2,310,445 | $ 847,024 | $ (51,688,119) | $ 470,629 | $ 172,422 | $ (10,644,611) |
| 2024 | $ 1,916,029 | $ 627,124 | $ (51,060,995) | $ 419,369 | $ 137,166 | $ (10,507,445) |
| 2025 | $ 1,606,915 | $ 469,554 | $ (50,591,441) | $ 365,235 | $ 106,689 | $ (10,400,756) |
| 2026 | $ 1,334,408 | $ 348,216 | $ (50,243,225) | $ 326,518 | $ 85,134 | $ (10,315,622) |
| 2027 | $ 1,123,349 | $ 261,627 | $ (49,981,598) | $ 266,260 | $ 62,077 | $ (10,253,545) |
| 2028 | $ 934,527 | $ 194,419 | $ (49,787,179) | $ 230,270 | $ 47,863 | $ (10,205,682) |
| 2029 | $ 761,894 | $ 141,523 | $ (49,645,656) | $ 203,715 | $ 37,822 | $ (10,167,860) |
| 2030 | $ 619,891 | $ 102,806 | $ (49,542,850) | $ 175,311 | $ 29,072 | $ (10,138,788) |
| 2031 | $ 503,766 | $ 74,586 | $ (49,468,264) | $ 147,796 | $ 21,896 | $ (10,116,892) |
| 2032 | $ 427,748 | $ 56,547 | $ (49,411,717) | $ 112,524 | $ 14,868 | $ (10,102,024) |
| 2033 | $ 348,920 | $ 41,195 | $ (49,370,522) | $ 100,691 | $ 11,876 | $ (10,090,148) |
| 2034 | $ 277,428 | $ 29,253 | $ (49,341,269) | $ 90,622 | $ 9,543 | $ (10,080,605) |
| 2035 | $ 213,085 | $ 20,069 | $ (49,321,200) | $ 81,560 | $ 7,668 | $ (10,072,937) |
| 2036 | $ 155,177 | $ 13,057 | $ (49,308,143) | $ 73,404 | $ 6,162 | $ (10,066,775) |
| 2037 | $ 112,706 | $ 8,456 | $ (49,299,687) | $ 57,981 | $ 4,361 | $ (10,062,414) |
| 2038 | $ 79,027 | $ 5,307 | $ (49,294,380) | $ 46,707 | $ 3,126 | $ (10,059,288) |
| 2039 | $ 52,362 | $ 3,130 | $ (49,291,250) | $ 35,103 | $ 2,110 | $ (10,057,178) |
| 2040 | $ 41,947 | $ 2,235 | $ (49,289,015) | $ 19,217 | $ 1,036 | $ (10,056,142) |
| 2041 | $ 36,179 | $ 1,727 | $ (49,287,288) | $ 9,593 | $ 457 | $ (10,055,685) |
| 2042 | $ 24,761 | $ 1,056 | $ (49,286,232) | $ 8,634 | $ 367 | $ (10,055,318) |
| 2043 | $ 14,485 | $ 553 | $ (49,285,679) | $ 7,770 | $ 295 | $ (10,055,023) |
| 2044 | $ 5,237 | $ 180 | $ (49,285,499) | $ 6,993 | $ 237 | $ (10,054,786) |
| 2045 | $ (845) | $ (26) | $ (49,285,525) | $ 3,752 | $ 116 | $ (10,054,670) |

Confidential Business Information

Exhibit 13 to 5/9/23 SDR

Exhibit 4

# ASTRO-CHEM LAB, INC.

4102 2nd Ave. W. Williston, North Dakota 58802-0972 P.O. Box 972
Phone: (701) 572-7355

## NATURAL GAS ANALYSIS

Sample Number: 19-01757 Date of Analysis: 5/6/2019
Company: Slawson Exploration Co.
City: Denver State: CO
Well Number: Jore Federal 2-12H
Sample Source: Treater
Date Received: 5/6/2019 Date Sampled: 5/6/2019
Temperature: Pressure: 22.0 PSI
Formation: Depth:
Location: Section: Twp: Rng: County: McKenzie
Distribution: Distribution List

| COMPONENT | MOLE % | GPM |
|---|---|---|
| Nitrogen | 1.56 | 0.000 |
| Methane | 57.98 | 0.000 |
| Carbon Dioxide | 0.44 | 0.000 |
| Ethane | 18.16 | 4.849 |
| $H_2S$ | 0.00 | 0.000 |
| Propane | 10.78 | 2.956 |
| Iso-Butane | 1.30 | 0.424 |
| N-Butane | 4.57 | 1.435 |
| Iso-Pentane | 0.68 | 0.247 |
| N-Pentane | 1.37 | 0.493 |
| Hexanes + | 3.16 | 1.384 |
| Oxygen/Argon | 0.00 | 0.000 |
| Total | 100.00 | 11.788 |

Calculated Specific Gravity 0.9644 (Air = 1.0000)
Calculated Gross BTU/ft³ 1588 (Saturated) 1616 (Dry) at 14.73 psi and 60°F

Remarks: Sampled by M. Fick (ACL)

Analyzed By: C. Jungels

Confidential Business Information

Exhibit 13 to 5/9/23 SDR

Exhibit 5

# Clarks Creek Field - Oil and Gas Recovery Estimates

Date: 5/2/2023
Time: 5:09 PM

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

# Contemporaneous Wells Only

Summary Lease Report

| Date | Well Count | Gross Production Oil (Bbl) | Gross Production Gas (Mcf) | Net Production Oil (Bbl) | Net Production Gas (Mcf) | Average Prices Oil ($/Bbl) | Average Prices Gas ($/Mcf) | Sales Total ($) |
|---|---|---|---|---|---|---|---|---|
| 12/2014 | 14 | 181,408 | 215,786 | 139,684 | 124,616 | 60.99 | 4.43 | 9,070,631 |
| 12/2015 | 14 | 482,778 | 689,476 | 371,739 | 398,172 | 38.03 | 2.13 | 14,986,625 |
| 12/2016 | 16 | 986,714 | 2,368,933 | 759,770 | 1,368,059 | 37.72 | 2.62 | 32,239,269 |
| 12/2017 | 17 | 465,522 | 1,210,920 | 358,452 | 699,306 | 45.04 | 3.12 | 18,328,100 |
| 12/2018 | 17 | 279,155 | 707,666 | 214,949 | 408,677 | 57.99 | 3.36 | 13,835,038 |
| 12/2019 | 16 | 250,130 | 584,029 | 192,600 | 337,277 | 52.62 | 2.60 | 11,013,045 |
| 12/2020 | 16 | 250,911 | 545,312 | 193,202 | 314,917 | 49.74 | 2.45 | 10,380,082 |
| 12/2021 | 16 | 188,745 | 424,924 | 145,333 | 245,394 | 46.31 | 2.27 | 7,289,145 |
| 12/2022 | 13 | 151,481 | 347,716 | 116,640 | 200,806 | 45.00 | 2.74 | 5,799,106 |
| 12/2023 | 13 | 132,268 | 305,030 | 101,846 | 176,155 | 44.80 | 2.74 | 5,045,874 |
| 12/2024 | 13 | 117,561 | 271,806 | 90,522 | 156,968 | 44.80 | 2.74 | 4,485,914 |
| 12/2025 | 12 | 103,009 | 236,720 | 79,317 | 136,706 | 44.80 | 2.74 | 3,928,379 |
| 12/2026 | 12 | 92,226 | 211,627 | 71,014 | 122,215 | 44.80 | 2.74 | 3,516,658 |
| 12/2027 | 10 | 76,818 | 172,572 | 59,150 | 99,660 | 44.80 | 2.74 | 2,923,255 |
| 12/2028 | 9 | 66,458 | 149,245 | 51,173 | 86,189 | 44.80 | 2.74 | 2,528,941 |
| Remainder: | | 329,615 | 765,686 | 253,803 | 442,183 | 44.80 | 2.74 | 12,583,243 |
| Grand Total: | | 4,154,797 | 9,207,449 | 3,199,194 | 5,317,302 | 44.80 | 2.75 | 157,953,305 |

| Date | Operating Expenses ($) | Taxes ($) | Operating Income ($) | Other Costs ($) | Periodic Cash Flow ($) | Cumulative Cash Flow ($) | 12% Cash Flow ($) |
|---|---|---|---|---|---|---|---|
| 12/2014 | 1,232,597 | 860,762 | 6,977,272 | 124,390,058 | -117,412,786 | -117,412,786 | -117,582,131 |
| 12/2015 | 3,415,331 | 1,442,065 | 10,129,229 | 0 | 10,129,229 | -107,283,557 | 9,083,948 |
| 12/2016 | 5,737,387 | 2,963,401 | 23,538,481 | 0 | 23,538,481 | -83,745,076 | 18,885,842 |
| 12/2017 | 3,792,376 | 1,664,141 | 12,871,582 | 0 | 12,871,582 | -70,873,493 | 9,374,853 |
| 12/2018 | 3,159,419 | 1,275,483 | 9,400,136 | 0 | 9,400,136 | -61,473,358 | 6,099,978 |
| 12/2019 | 3,205,832 | 1,037,509 | 6,769,703 | 0 | 6,769,703 | -54,703,654 | 3,871,569 |
| 12/2020 | 2,564,677 | 983,400 | 6,832,004 | 0 | 6,832,004 | -47,871,650 | 3,536,095 |
| 12/2021 | 2,280,336 | 690,581 | 4,318,228 | 0 | 4,318,228 | -43,553,422 | 1,987,892 |
| 12/2022 | 1,876,226 | 539,129 | 3,383,750 | 0 | 3,383,750 | -40,169,672 | 1,389,779 |
| 12/2023 | 1,795,987 | 468,812 | 2,781,074 | 0 | 2,781,074 | -37,388,598 | 1,019,446 |
| 12/2024 | 1,733,803 | 416,713 | 2,335,398 | 0 | 2,335,398 | -35,053,200 | 764,290 |
| 12/2025 | 1,591,155 | 365,075 | 1,972,150 | 0 | 1,972,150 | -33,081,050 | 576,243 |
| 12/2026 | 1,528,886 | 326,845 | 1,660,926 | 0 | 1,660,926 | -31,420,124 | 433,350 |
| 12/2027 | 1,261,560 | 272,086 | 1,389,609 | 0 | 1,389,609 | -30,030,514 | 323,705 |
| 12/2028 | 1,128,754 | 235,390 | 1,164,797 | 0 | 1,164,797 | -28,865,718 | 242,282 |
| Remainder: | 6,559,579 | 1,168,522 | 4,855,142 | 0 | 4,855,142 | -24,010,575 | 652,665 |
| Grand Total: | 42,863,905 | 14,709,917 | 100,379,483 | 124,390,058 | -24,010,575 | -24,010,575 | -59,340,194 |

**Discount Present Worth:**

| | |
|---|---|
| 0.00 % | -24,010,575 |
| 8.00 % | -50,904,567 |
| 10.00 % | -55,400,109 |
| 12.50 % | -60,250,544 |
| 15.00 % | -64,418,721 |
| 17.50 % | -68,041,834 |
| 20.00 % | -71,222,299 |
| 25.00 % | -76,549,643 |
| 30.00 % | -80,840,711 |
| 40.00 % | -87,336,326 |
| 50.00 % | -92,024,459 |

**Economic Dates:**

| | |
|---|---|
| Effective Date | 09/2014 |
| Calculated Limit | 07/2045 |
| Economic Life | 371 Months |
| | 30 Years 11 Months |

**Economics Information:**

| | |
|---|---|
| Net Payout Date: | n/a |
| Rate of Return: | n/a |
| Return on Investment: | 0.81 |
| Disc Return on Invest: | 0.52 |

**Economics Summary:**

| | Bbl Oil | Mcf Gas |
|---|---|---|
| Ultimate Gross | 4,154,797 | 9,207,449 |
| Historic Gross | 1,687,714 | 3,323,260 |
| Gross at Eff Date | 0 | 0 |
| Remaining Gross | 4,154,797 | 9,207,449 |
| Remaining Net | 3,199,194 | 5,317,302 |

Confidential Business Information

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 5/2/2023
Time: 4:03 PM

Lease Name: Jore Federal (Oil and Gas Recovery) (2-12H)
County, ST: MCKENZIE, ND Econ
Location: N151 W95 12 NW

Operator: Slawson Exploration Co., Inc.
Field Name: CLARKS CREEK



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 5/2/2023
Time: 4:02 PM

Lease Name: WEST CLARK (103-0136H)
County, ST: MCKENZIE, ND
Location: N151 W95 1 SW

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 5/2/2023
Time: 4:02 PM

Lease Name: WEST CLARK (104-0136H)
County, ST: MCKENZIE, ND
Location: N151 W95 1 SW

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK



Exhibit 13 to 5/9/23 SDR

Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 5/2/2023
Time: 4:02 PM

Lease Name: WEST CLARK (117-0136H)
County, ST: MCKENZIE, ND
Location: N151 W95 1 SW

Operator: EOG RESOURCES INC
Field Name: CLARKS CREEK




Confidential Business Information

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 5/2/2023
Time: 4:02 PM

Lease Name: AVALANCHE (36-14-MB2)
County, ST: MCKENZIE, ND
Location: N151 W95 36 SW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK

## AVALANCHE 36-14-MB2 - SHD OIL & GAS LLC



Exhibit 13 to 5/9/23 SDR

Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 5/2/2023
Time: 4:03 PM

Lease Name: AVALANCHE (36-15-TF1)
County, ST: MCKENZIE, ND
Location: N151 W95 36 SW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 5/2/2023
Time: 4:03 PM

Lease Name: AVALANCHE (36-16-MB2)
County, ST: MCKENZIE, ND
Location: N151 W95 36 SW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK

## AVALANCHE 36-16-MB2 - SHD OIL & GAS LLC




Confidential Business Information

## Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 5/2/2023
Time: 4:03 PM

Lease Name: AVALANCHE (36-17-TF2)
County, ST: MCKENZIE, ND
Location: N151 W95 36 SW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 5/2/2023
Time: 4:03 PM

Lease Name: BUCKY (13-36H)
County, ST: MCKENZIE, ND
Location: N151 W95 36 SW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK

## BUCKY 13-36H - SHD OIL & GAS LLC



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 5/2/2023
Time: 4:03 PM

Lease Name: CANON (12-36H)
County, ST: MCKENZIE, ND
Location: N151 W95 36 NW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK

## CANON 12-36H - SHD OIL & GAS LLC



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 5/2/2023
Time: 4:03 PM

Lease Name: HAMMER (12-36H)
County, ST: MCKENZIE, ND
Location: N151 W95 36 NW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK

## HAMMER 12-36H - SHD OIL & GAS LLC



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 5/2/2023
Time: 4:03 PM

Lease Name: LUKE (13-36H)
County, ST: MCKENZIE, ND
Location: N151 W95 36 SW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK

## LUKE 13-36H - SHD OIL & GAS LLC



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 5/2/2023
Time: 4:03 PM

Lease Name: MAGNUM (36-11-TF2)
County, ST: MCKENZIE, ND
Location: N151 W95 36 NW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK



# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 5/2/2023
Time: 4:03 PM

Lease Name: MAGNUM (36-12-MB2)
County, ST: MCKENZIE, ND
Location: N151 W95 36 NW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK



# *Rate/Time Graph*

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 5/2/2023
Time: 4:03 PM

Lease Name: MAGNUM (36-13-TF2)
County, ST: MCKENZIE, ND
Location: N151 W95 36 NW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK

## MAGNUM 36-13-TF2 - SHD OIL & GAS LLC



Exhibit 13 to 5/9/23 SDR

Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 5/2/2023
Time: 4:03 PM

Lease Name: MARC (13-36H)
County, ST: MCKENZIE, ND
Location: N151 W95 36 SW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK

## MARC 13-36H - SHD OIL & GAS LLC



Exhibit 13 to 5/9/23 SDR

Exhibit 5

# Rate/Time Graph

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

Date: 5/2/2023
Time: 4:03 PM

Lease Name: MATTIE (13-36H)
County, ST: MCKENZIE, ND
Location: N151 W95 36 SW

Operator: SHD OIL & GAS LLC
Field Name: CLARKS CREEK



Exhibit 13 to 5/9/23 SDR
Exhibit 6

# Clarks Creek Field - Oil Recovery Estimates

Date: 5/2/2023
Time: 4:08 PM

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

# Contemporaneous Wells Only

Summary Lease Report

| Date | Well Count | Gross Production Oil (Bbl) | Gross Production Gas (Mcf) | Net Production Oil (Bbl) | Net Production Gas (Mcf) | Average Prices Oil ($/Bbl) | Average Prices Gas ($/Mcf) | Sales Total ($) |
|---|---|---|---|---|---|---|---|---|
| 12/2014 | 14 | 181,408 | 0 | 139,684 | 0 | 60.99 | 0.00 | 8,518,893 |
| 12/2015 | 14 | 482,778 | 0 | 371,739 | 0 | 38.03 | 0.00 | 14,137,155 |
| 12/2016 | 16 | 986,714 | 0 | 759,770 | 0 | 37.72 | 0.00 | 28,659,952 |
| 12/2017 | 17 | 465,522 | 0 | 358,452 | 0 | 45.04 | 0.00 | 16,143,507 |
| 12/2018 | 17 | 279,155 | 0 | 214,949 | 0 | 57.99 | 0.00 | 12,463,856 |
| 12/2019 | 16 | 250,130 | 0 | 192,600 | 0 | 52.62 | 0.00 | 10,134,953 |
| 12/2020 | 16 | 250,911 | 0 | 193,202 | 0 | 49.74 | 0.00 | 9,609,783 |
| 12/2021 | 16 | 188,745 | 0 | 145,333 | 0 | 46.31 | 0.00 | 6,731,088 |
| 12/2022 | 13 | 151,481 | 0 | 116,640 | 0 | 45.00 | 0.00 | 5,248,319 |
| 12/2023 | 13 | 132,268 | 0 | 101,846 | 0 | 44.80 | 0.00 | 4,562,702 |
| 12/2024 | 13 | 117,561 | 0 | 90,522 | 0 | 44.80 | 0.00 | 4,055,369 |
| 12/2025 | 12 | 103,009 | 0 | 79,317 | 0 | 44.80 | 0.00 | 3,553,411 |
| 12/2026 | 12 | 92,226 | 0 | 71,014 | 0 | 44.80 | 0.00 | 3,181,438 |
| 12/2027 | 10 | 76,818 | 0 | 59,150 | 0 | 44.80 | 0.00 | 2,649,899 |
| 12/2028 | 9 | 66,458 | 0 | 51,173 | 0 | 44.80 | 0.00 | 2,292,534 |
| Remainder: | | 329,615 | 0 | 253,803 | 0 | 44.80 | 0.00 | 11,370,387 |
| Grand Total: | | 4,154,797 | 0 | 3,199,194 | 0 | 44.80 | 0.00 | 143,313,247 |

| Date | Operating Expenses ($) | Taxes ($) | Operating Income ($) | Other Costs ($) | Periodic Cash Flow ($) | Cumulative Cash Flow ($) | 12% Cash Flow ($) |
|---|---|---|---|---|---|---|---|
| 12/2014 | 1,232,597 | 851,889 | 6,434,407 | 105,762,925 | -99,328,518 | -99,328,518 | -99,484,071 |
| 12/2015 | 3,415,331 | 1,413,716 | 9,308,109 | 0 | 9,308,109 | -90,020,409 | 8,342,465 |
| 12/2016 | 5,737,387 | 2,865,995 | 20,056,569 | 0 | 20,056,569 | -69,963,840 | 16,115,138 |
| 12/2017 | 3,792,376 | 1,614,351 | 10,736,780 | 0 | 10,736,780 | -59,227,060 | 7,819,842 |
| 12/2018 | 3,159,419 | 1,246,386 | 8,058,052 | 0 | 8,058,052 | -51,169,008 | 5,234,291 |
| 12/2019 | 3,205,832 | 1,013,495 | 5,915,626 | 0 | 5,915,626 | -45,253,382 | 3,379,351 |
| 12/2020 | 2,564,677 | 960,978 | 6,084,127 | 0 | 6,084,127 | -39,169,255 | 3,149,413 |
| 12/2021 | 2,280,336 | 673,109 | 3,777,644 | 0 | 3,777,644 | -35,391,611 | 1,738,830 |
| 12/2022 | 1,876,226 | 524,832 | 2,847,261 | 0 | 2,847,261 | -32,544,350 | 1,169,598 |
| 12/2023 | 1,795,987 | 456,270 | 2,310,445 | 0 | 2,310,445 | -30,233,905 | 847,024 |
| 12/2024 | 1,733,803 | 405,537 | 1,916,029 | 0 | 1,916,029 | -28,317,876 | 627,124 |
| 12/2025 | 1,591,155 | 355,341 | 1,606,915 | 0 | 1,606,915 | -26,710,961 | 469,554 |
| 12/2026 | 1,528,886 | 318,144 | 1,334,408 | 0 | 1,334,408 | -25,376,553 | 348,216 |
| 12/2027 | 1,261,560 | 264,990 | 1,123,349 | 0 | 1,123,349 | -24,253,204 | 261,627 |
| 12/2028 | 1,128,754 | 229,253 | 934,527 | 0 | 934,527 | -23,318,678 | 194,419 |
| Remainder: | 6,559,579 | 1,137,039 | 3,673,770 | 0 | 3,673,770 | -19,644,908 | 501,653 |
| Grand Total: | 42,863,905 | 14,331,325 | 86,118,017 | 105,762,925 | -19,644,908 | -19,644,908 | -49,285,525 |

**Discount Present Worth:**

| | |
|---|---|
| 0.00 % | -19,644,908 |
| 8.00 % | -42,143,359 |
| 10.00 % | -45,944,802 |
| 12.50 % | -50,058,546 |
| 15.00 % | -53,603,245 |
| 17.50 % | -56,691,163 |
| 20.00 % | -59,406,654 |
| 25.00 % | -63,964,424 |
| 30.00 % | -67,643,224 |
| 40.00 % | -73,223,366 |
| 50.00 % | -77,258,617 |

**Economic Dates:**

| | |
|---|---|
| Effective Date | 09/2014 |
| Calculated Limit | 07/2045 |
| Economic Life | 371 Months |
| | 30 Years 11 Months |

**Economics Information:**

| | |
|---|---|
| Net Payout Date: | n/a |
| Rate of Return: | n/a |
| Return on Investment: | 0.81 |
| Disc Return on Invest: | 0.53 |

**Economics Summary:**

| | Bbl Oil | Mcf Gas |
|---|---|---|
| Ultimate Gross | 4,154,797 | 0 |
| Historic Gross | 1,687,714 | 0 |
| Gross at Eff Date | 0 | 0 |
| Remaining Gross | 4,154,797 | 0 |
| Remaining Net | 3,199,194 | 0 |

Confidential Business Information

Exhibit 13 to 5/9/23 SDR
Exhibit 7

# Clarks Creek Field - Gas Recovery Estimates

Date: 5/2/2023
Time: 4:44 PM

Project: W:\SECI Well Information\IHS Energy\Projects\Clarks Creek Field Model v9.4.mdb

## Contemporaneous Wells Only

Summary Lease Report

| Date | Well Count | Gross Production Oil (Bbl) | Gross Production Gas (Mcf) | Net Production Oil (Bbl) | Net Production Gas (Mcf) | Average Prices Oil ($/Bbl) | Average Prices Gas ($/Mcf) | Sales Total ($) |
|---|---|---|---|---|---|---|---|---|
| 12/2014 | 14 | 0 | 215,786 | 0 | 124,616 | 0.00 | 4.43 | 551,738 |
| 12/2015 | 14 | 0 | 689,476 | 0 | 398,172 | 0.00 | 2.13 | 849,470 |
| 12/2016 | 16 | 0 | 2,368,933 | 0 | 1,368,059 | 0.00 | 2.62 | 3,579,318 |
| 12/2017 | 17 | 0 | 1,210,920 | 0 | 699,306 | 0.00 | 3.12 | 2,184,593 |
| 12/2018 | 17 | 0 | 707,666 | 0 | 408,677 | 0.00 | 3.36 | 1,371,181 |
| 12/2019 | 16 | 0 | 584,029 | 0 | 337,277 | 0.00 | 2.60 | 878,092 |
| 12/2020 | 16 | 0 | 545,312 | 0 | 314,917 | 0.00 | 2.45 | 770,299 |
| 12/2021 | 16 | 0 | 424,924 | 0 | 245,394 | 0.00 | 2.27 | 558,056 |
| 12/2022 | 13 | 0 | 347,716 | 0 | 200,806 | 0.00 | 2.74 | 550,787 |
| 12/2023 | 13 | 0 | 305,030 | 0 | 176,155 | 0.00 | 2.74 | 483,171 |
| 12/2024 | 13 | 0 | 271,806 | 0 | 156,968 | 0.00 | 2.74 | 430,545 |
| 12/2025 | 12 | 0 | 236,720 | 0 | 136,706 | 0.00 | 2.74 | 374,968 |
| 12/2026 | 12 | 0 | 211,627 | 0 | 122,215 | 0.00 | 2.74 | 335,220 |
| 12/2027 | 10 | 0 | 172,572 | 0 | 99,660 | 0.00 | 2.74 | 273,356 |
| 12/2028 | 9 | 0 | 149,245 | 0 | 86,189 | 0.00 | 2.74 | 236,407 |
| Remainder: | | 0 | 765,686 | 0 | 442,183 | 0.00 | 2.74 | 1,212,856 |
| Grand Total: | | 0 | 9,207,449 | 0 | 5,317,302 | 0.00 | 2.75 | 14,640,058 |

| Date | Operating Expenses ($) | Taxes ($) | Operating Income ($) | Other Costs ($) | Periodic Cash Flow ($) | Cumulative Cash Flow ($) | 12% Cash Flow ($) |
|---|---|---|---|---|---|---|---|
| 12/2014 | 0 | 8,873 | 542,865 | 18,627,133 | -18,084,268 | -18,084,268 | -18,098,060 |
| 12/2015 | 0 | 28,350 | 821,120 | 0 | 821,120 | -17,263,148 | 741,483 |
| 12/2016 | 0 | 97,406 | 3,481,912 | 0 | 3,481,912 | -13,781,236 | 2,770,704 |
| 12/2017 | 0 | 49,791 | 2,134,803 | 0 | 2,134,803 | -11,646,433 | 1,555,011 |
| 12/2018 | 0 | 29,098 | 1,342,084 | 0 | 1,342,084 | -10,304,350 | 865,687 |
| 12/2019 | 0 | 24,014 | 854,077 | 0 | 854,077 | -9,450,272 | 492,218 |
| 12/2020 | 0 | 22,422 | 747,877 | 0 | 747,877 | -8,702,395 | 386,681 |
| 12/2021 | 0 | 17,472 | 540,584 | 0 | 540,584 | -8,161,811 | 249,062 |
| 12/2022 | 0 | 14,297 | 536,489 | 0 | 536,489 | -7,625,321 | 220,181 |
| 12/2023 | 0 | 12,542 | 470,629 | 0 | 470,629 | -7,154,692 | 172,422 |
| 12/2024 | 0 | 11,176 | 419,369 | 0 | 419,369 | -6,735,323 | 137,166 |
| 12/2025 | 0 | 9,733 | 365,235 | 0 | 365,235 | -6,370,089 | 106,689 |
| 12/2026 | 0 | 8,702 | 326,518 | 0 | 326,518 | -6,043,570 | 85,134 |
| 12/2027 | 0 | 7,096 | 266,260 | 0 | 266,260 | -5,777,310 | 62,077 |
| 12/2028 | 0 | 6,137 | 230,270 | 0 | 230,270 | -5,547,040 | 47,863 |
| Remainder: | 0 | 31,483 | 1,181,373 | 0 | 1,181,373 | -4,365,667 | 151,012 |
| Grand Total: | 0 | 378,592 | 14,261,466 | 18,627,133 | -4,365,667 | -4,365,667 | -10,054,669 |

Confidential Business Information

**Discount Present Worth:**

| | |
|---|---|
| 0.00 % | -4,365,667 |
| 8.00 % | -8,761,208 |
| 10.00 % | -9,455,307 |
| 12.50 % | -10,191,998 |
| 15.00 % | -10,815,476 |
| 17.50 % | -11,350,671 |
| 20.00 % | -11,815,646 |
| 25.00 % | -12,585,219 |
| 30.00 % | -13,197,486 |
| 40.00 % | -14,112,960 |
| 50.00 % | -14,765,842 |

**Economic Dates:**

| | |
|---|---|
| Effective Date | 09/2014 |
| Calculated Limit | 07/2045 |
| Economic Life | 371 Months |
| | 30 Years 11 Months |

**Economics Information:**

| | |
|---|---|
| Net Payout Date: | n/a |
| Rate of Return: | n/a |
| Return on Investment: | 0.77 |
| Disc Return on Invest: | 0.46 |

**Economics Summary:**

| | Bbl Oil | Mcf Gas |
|---|---|---|
| Ultimate Gross | 0 | 9,207,449 |
| Historic Gross | 0 | 3,323,260 |
| Gross at Eff Date | 0 | 0 |
| Remaining Gross | 0 | 9,207,449 |
| Remaining Net | 0 | 5,317,302 |

**Drilling and Completion Costs for Slawson Operated Wells with Comparable Lateral Lengths to Contemproaneous Wells**

| Well with ~7,500' Lateral Length | First Sales Date | Actual Drilling and Completion Cost |
|---|---|---|
| Bootleg #5-14-15TFH | 9/5/2014 | $ 8,900,598 |
| Ironbank #5-14-13TFH | 12/5/2014 | $ 7,970,762 |
| Bootleg #8-14-15TF2H | 2/5/2015 | $ 6,969,758 |
| Pike Federal #1 SLH | 2/6/2015 | $ 7,576,635 |
| Ironbank #4-14-13TFH | 2/7/2015 | $ 7,237,550 |
| Ironbank #6-14-13TFH | 2/26/2015 | $ 7,849,480 |
| Ironbank #7-14-13TFH | 2/26/2015 | $ 8,072,315 |
| Bootleg #7-14-15TFH | 4/10/2015 | $ 7,289,789 |
| Bootleg #6-14-15TFH | 4/11/2015 | $ 7,139,005 |
| | **Average** | **$ 7,667,321** |

| Well with ~4,900' Lateral Length | First Sales Date | Actual Drilling and Completion Cost |
|---|---|---|
| Jore Federal #2-12H | 9/4/2014 | $ 7,484,475 |
| Revolver #7-35TFH | 10/26/2014 | $ 5,860,104 |
| Phoenix #2-18H | 3/22/2015 | $ 4,777,136 |
| Phoenix #1 SLH | 3/24/2015 | $ 5,040,281 |
| | **Average** | **$ 5,790,499** |

Confidential Business Information

Exhibit 13 to 5/9/23 SDR

Exhibit 8

# AUTHORITY FOR EXPENDITURE

SLAWSON exploration company, inc.

**WELL:** BOOTLEG 5-14-15TFH | **OPERATOR:** SLAWSON EXPLORATION CO, INC | **AFE#:** 05494

**LOCATION:** NENW Section 14-154N-99W | **COUNTY/STATE:** WILLIAMS/NORTH DAKOTA | **CREATED:** February 26, 2014

**PURPOSE:** Drill and complete a Three Forks single lateral horizontal well on 960 acre spacing | **ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 4, 702 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 382, 290 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 123, 940 |
| 105 | DRILLING SUPERVISION $ | 59, 200 | 59, 200 | 64, 011 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 17, 000 |
| 120 | WATER | 20, 000 | 20, 000 | 35, 026 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 258, 618 |
| 160 | DAYWORK 32 DAYS @ $21,000/DAY | 672, 000 | 672, 000 | 812, 475 |
| 175 | CREW LODGING & PER DIEM | 52, 800 | 52, 800 | 52, 857 |
| 180 | RIG FUEL AND BOILER $ | 217, 600 | 217, 600 | 138, 438 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 400, 000 | 400, 000 | 248, 568 |
| 200 | DRILL BITS | 65, 000 | 65, 000 | 67, 408 |
| 210 | SUBSURFACE RENTAL EQUIPMENT $ | 160, 000 | 160, 000 | 337, 104 |
| 215 | DIRECTIONAL DRILLING SERVICES $ | 330, 000 | 330, 000 | 383, 561 |
| 230 | SURFACE EQUIPMENT RENTALS $ | 208, 000 | 208, 000 | 270, 226 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 30, 694 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 45, 223 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 37, 462 |
| 320 | MUD LOGGING SERVICES | 22, 000 | 22, 000 | 20, 672 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 22, 000 | 22, 000 | 20, 672 |
| 350 | FREIGHT & TRUCKING | 128, 000 | 192, 000 | 52, 642 |
| 360 | CONTRACT LABOR | 120, 000 | 180, 000 | 180, 102 |
| 370 | ADMINISTRATIVE OVERHEAD | 24, 000 | 27, 500 | 18, 733 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 40, 105 |
| 385 | COMMUNICATIONS | 24, 000 | 24, 000 | 665 |
| 390 | MISCELLANEOUS | | | 101 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 117, 846 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 6, 958 |
| 430 | COMPL. RIG 7 DAYS @ $20,000/DAY W | | 140, 000 | 32, 191 |
| 435 | COILED TUBING SERVICES | | 262, 500 | 251, 833 |
| 440 | COMPLETION TOOL RENTALS | | 35, 000 | 50, 139 |
| 450 | CASED HOLE LOGS & PERFORATING | | 375, 000 | 302, 998 |
| 455 | WATER FOR STIMULATION | | 450, 000 | 176, 883 |
| 460 | FORMATION STIMULATION | | 2, 812, 500 | 2, 793, 520 |
| 470 | COMPLETION SUPERVISION | | 24, 500 | 68, 119 |
| 490 | SALES TAX ON EQUIPMENT 5% | 24, 615 | 109, 380 | 53, 484 |
| | TOTAL INTANGIBLES | $3, 167, 215 | $7, 549, 980 | $7, 497, 266 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 60, 567 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 372, 521 |
| 700 | LINER 7,500' OF 4-1/2" 13.5# P- | | 150, 000 | 121, 142 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 2, 504 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 9, 324 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 74, 227 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 400, 000 | 42, 721 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 95, 869 |
| 820 | PUMPING UNIT | | 200, 000 | 166, 043 |
| 830 | PRIME MOVER ELECTRICITY + MO | | 50, 000 | 30, 056 |
| 840 | SUCKER RODS | | 40, 000 | 42, 033 |
| 850 | SUBSURFACE PUMP | | 7, 600 | 7, 356 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 90, 648 |
| 880 | COMBUSTOR | | 50, 000 | 11, 925 |
| 890 | OIL STOCK TANKS | | 50, 000 | 70, 079 |
| 900 | SEPARATORS | | | 8, 885 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 53, 398 |
| 930 | LABOR & TRUCKING | | 75, 000 | 124, 458 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 19, 576 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 695, 315 | $1, 403, 332 |
| | TOTAL WELL COSTS | $3, 659, 515 | $9, 245, 295 | $8, 900, 598 |

Confidential Business Information



CAR 000248

3/30/22

# AUTHORITY FOR EXPENDITURE

Slawson exploration company, inc.

**WELL:** IRONBANK 5-14-13TFH **OPERATOR:** SLAWSON EXPLORATION CO, INC **AFE#:** 05496

**LOCATION:** NENW Section 14-154N-99W **COUNTY/STATE:** WILLIAMS/NORTH DAKOTA **CREATED:** February 26, 2014

**PURPOSE:** Drill and complete a Three Forks single lateral horizontal well on 960 acre spacing **ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 4, 286 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 404, 336 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 118, 453 |
| 105 | DRILLING SUPERVISION $ | 59, 200 | 59, 200 | 49, 718 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 19, 278 |
| 120 | WATER | 20, 000 | 20, 000 | 35, 713 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 155, 762 |
| 160 | DAYWORK 32 DAYS @ $21,000/DAY | 672, 000 | 672, 000 | 692, 900 |
| 175 | CREW LODGING & PER DIEM | 52, 800 | 52, 800 | 44, 293 |
| 180 | RIG FUEL AND BOILER $ | 217, 600 | 217, 600 | 191, 684 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 400, 000 | 400, 000 | 209, 805 |
| 200 | DRILL BITS | 65, 000 | 65, 000 | 107, 381 |
| 210 | SUBSURFACE RENTAL EQUIPMENT $ | 160, 000 | 160, 000 | 293, 433 |
| 215 | DIRECTIONAL DRILLING SERVICES $ | 330, 000 | 330, 000 | 391, 713 |
| 230 | SURFACE EQUIPMENT RENTALS $ | 208, 000 | 208, 000 | 216, 148 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 30, 181 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 58, 512 |
| 320 | MUD LOGGING SERVICES | 22, 000 | 22, 000 | 16, 662 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 22, 000 | 22, 000 | 16, 662 |
| 350 | FREIGHT & TRUCKING | 128, 000 | 192, 000 | 54, 452 |
| 360 | CONTRACT LABOR | 120, 000 | 180, 000 | 155, 890 |
| 370 | ADMINISTRATIVE OVERHEAD | 24, 000 | 27, 500 | 15, 185 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 41, 593 |
| 385 | COMMUNICATIONS | 24, 000 | 24, 000 | 8, 089 |
| 390 | MISCELLANEOUS | | | 117 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 61, 889 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 1, 631 |
| 430 | COMPL. RIG 7 DAYS @ $20,000/DAY W | | 140, 000 | 61, 154 |
| 435 | COILED TUBING SERVICES | | 262, 500 | |
| 440 | COMPLETION TOOL RENTALS | | 35, 000 | 91, 404 |
| 450 | CASED HOLE LOGS & PERFORATING | | 375, 000 | 264, 095 |
| 455 | WATER FOR STIMULATION | | 450, 000 | 622, 954 |
| 460 | FORMATION STIMULATION | | 2, 812, 500 | 1, 914, 855 |
| 470 | COMPLETION SUPERVISION | | 24, 500 | 68, 300 |
| 490 | SALES TAX ON EQUIPMENT 5% | 24, 615 | 109, 380 | 60, 480 |
| | TOTAL INTANGIBLES | $3, 167, 215 | $7, 549, 980 | $6, 479, 008 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 65, 195 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 384, 014 |
| 700 | LINER 7,500' OF 4-1/2" 13.5# P- | | 150, 000 | 157, 296 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 3, 005 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 9, 250 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 68, 714 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 400, 000 | 115, 273 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 86, 729 |
| 820 | PUMPING UNIT | | 200, 000 | 164, 529 |
| 830 | PRIME MOVER ELECTRICITY + MO | | 50, 000 | 31, 166 |
| 840 | SUCKER RODS | | 40, 000 | 29, 639 |
| 850 | SUBSURFACE PUMP | | 7, 600 | 4, 699 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 99, 370 |
| 880 | COMBUSTOR | | 50, 000 | |
| 890 | OIL STOCK TANKS | | 50, 000 | 70, 079 |
| 900 | SEPARATORS | | | 8, 885 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 54, 775 |
| 930 | LABOR & TRUCKING | | 75, 000 | 121, 133 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 18, 003 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 695, 315 | $1, 491, 754 |
| | TOTAL WELL COSTS | $3, 659, 515 | $9, 245, 295 | $7, 970, 762 |

Confidential Business Information

Exhibit 13 to 5/9/23 SDR
Exhibit 8

# AUTHORITY FOR EXPENDITURE

slawson exploration company, inc.

**WELL:** BOOTLEG 8-14-15TF2H
**OPERATOR:** SLAWSON EXPLORATION CO, INC
**AFE#:** 05578
**LOCATION:** NESW Section 14-154N-99W
**COUNTY/STATE:** WILLIAMS/NORTH DAKOTA
**CREATED:** May 14, 2014
**PURPOSE:** Drill and complete a 2nd Bench Three Forks single lateral horizontal well on 960 acre spacing
**ACCT DATE:** 3/2022

| INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|
| 080 SURVEYS AND PERMITS | 25, 000 | 25, 000 | 2, 385 |
| 090 DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 293, 291 |
| 095 HEALTH/SAFETY/ENVIRONMENT | | | 302 |
| 100 LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 104, 328 |
| 105 DRILLING SUPERVISION $ | 59, 200 | 59, 200 | 46, 061 |
| 110 CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 20, 510 |
| 120 WATER | 20, 000 | 20, 000 | 59, 600 |
| DRILLING CONTRACT | | | |
| 140 MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 120, 553 |
| 160 DAYWORK 32 DAYS @ $21,000/DAY | 672, 000 | 672, 000 | 627, 582 |
| 175 CREW LODGING & PER DIEM | 52, 800 | 52, 800 | 40, 840 |
| 180 RIG FUEL AND BOILER $ | 217, 600 | 217, 600 | 159, 751 |
| 190 DRILLING MUD,ADDITIVES,SALT MUD FUE | 400, 000 | 400, 000 | 276, 783 |
| 200 DRILL BITS | 65, 000 | 65, 000 | 102, 363 |
| 210 SUBSURFACE RENTAL EQUIPMENT $ | 160, 000 | 160, 000 | 186, 789 |
| 215 DIRECTIONAL DRILLING SERVICES $ | 330, 000 | 330, 000 | 314, 432 |
| 230 SURFACE EQUIPMENT RENTALS $ | 208, 000 | 208, 000 | 210, 072 |
| 260 SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 23, 396 |
| 270 INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 50, 892 |
| 280 PRODUCTION CEMENT & CEMENTING | | | 41, 221 |
| 320 MUD LOGGING SERVICES | 22, 000 | 22, 000 | 15, 703 |
| 330 OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 GEOLOGICAL & ENGINEERING SERVICES | 22, 000 | 22, 000 | 15, 703 |
| 350 FREIGHT & TRUCKING | 128, 000 | 192, 000 | 40, 186 |
| 360 CONTRACT LABOR | 120, 000 | 180, 000 | 131, 417 |
| 370 ADMINISTRATIVE OVERHEAD | 24, 000 | 27, 500 | 13, 035 |
| 380 INSURANCE | 20, 000 | 20, 000 | 40, 532 |
| 385 COMMUNICATIONS | 24, 000 | 24, 000 | 6, 229 |
| 390 MISCELLANEOUS | | | 119 |
| 410 CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 68, 634 |
| 420 CEMENT SQUEEZE & MISC PUMP | | | 12, 550 |
| 425 WIRELINE SERVICES | | | 12, 435 |
| 430 COMPL. RIG 7 DAYS @ $20,000/DAY W | | 140, 000 | 9, 886 |
| 435 COILED TUBING SERVICES | | 262, 500 | 221, 810 |
| 440 COMPLETION TOOL RENTALS | | 35, 000 | 63, 700 |
| 450 CASED HOLE LOGS & PERFORATING | | 375, 000 | 228, 052 |
| 455 WATER FOR STIMULATION | | 450, 000 | 343, 377 |
| 460 FORMATION STIMULATION | | 2, 812, 500 | 1, 621, 709 |
| 470 COMPLETION SUPERVISION | | 24, 500 | 36, 460 |
| 490 SALES TAX ON EQUIPMENT 5% | 24, 615 | 109, 380 | 55, 967 |
| TOTAL INTANGIBLES | $3, 167, 215 | $7, 549, 980 | $5, 618, 655 |

| TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|
| CASING | | | |
| 610 SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 59, 419 |
| 640 INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 380, 587 |
| 700 LINER 7,500' OF 4-1/2" 13.5# P- | | 150, 000 | 111, 075 |
| FLOAT EQUIPMENT | | | |
| 720 SURFACE CASING | 2, 500 | 2, 500 | 2, 659 |
| 730 INTERMEDIATE CASING | 12, 000 | 12, 000 | 9, 050 |
| 740 PRODUCTION OR LINER INCL. HGR. | | | 10, 800 |
| TUBING | | | |
| 770 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 69, 998 |
| 790 PACKERS, CASING PACKERS, & ANCHORS | | 400, 000 | 64, 433 |
| 800 CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 99, 037 |
| 820 PUMPING UNIT | | 200, 000 | 168, 760 |
| 830 PRIME MOVER ELECTRICITY + MO | | 50, 000 | 31, 166 |
| 840 SUCKER RODS | | 40, 000 | 28, 614 |
| 850 SUBSURFACE PUMP | | 7, 600 | 6, 341 |
| 860 SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 52, 668 |
| 880 COMBUSTOR | | 50, 000 | 7, 950 |
| 890 OIL STOCK TANKS | | 50, 000 | 58, 500 |
| 900 SEPARATORS | | | 6, 885 |
| 910 HEATER TREATER OR GUN BBL. | | 48, 000 | 54, 500 |
| 930 LABOR & TRUCKING | | 75, 000 | 119, 920 |
| 960 WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 8, 741 |
| 980 PIPELINE CONNECTIONS | | 10, 000 | |
| TOTAL TANGIBLES | $492, 300 | $1, 695, 315 | $1, 351, 103 |
| TOTAL WELL COSTS | $3, 659, 515 | $9, 245, 295 | $6, 969, 758 |

Confidential Business Information



3/30/22

Exhibit 13 to 5/9/23 SDR

Exhibit 8

# AUTHORITY FOR EXPENDITURE

SLAWSON exploration company, inc.

| | | | |
|---|---|---|---|
| WELL: | PIKE FEDERAL 1 SLH | OPERATOR: | SLAWSON EXPLORATION CO, INC |
| LOCATION: | SESE Section 4-151N-92W | COUNTY/STATE: | MOUNTRAIL/NORTH DAKOTA |
| PURPOSE: | Drill and complete a Bakken single lateral horizontal well on 2560 acre spacing | | |
| AFE#: | 05665 | | |
| CREATED: | July 30, 2014 | | |
| ACCT DATE: | 3/2022 | | |

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 26, 080 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 274, 241 |
| 095 | HEALTH/SAFETY/ENVIRONMENT | | | 25 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 68, 554 |
| 105 | DRILLING SUPERVISION | 68, 800 | 68, 800 | 62, 186 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 27, 018 |
| 120 | WATER | 20, 000 | 20, 000 | 35, 395 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 231, 455 |
| 150 | FOOTAGE __,___FT @ $__.__/FT | | | |
| 160 | DAYWORK 38 DAYS @ $21,000/DAY | 798, 000 | 798, 000 | 625, 678 |
| 175 | CREW LODGING & PER DIEM | 62, 700 | 62, 700 | 4, 800 |
| 180 | RIG FUEL AND BOILER | 282, 625 | 282, 625 | 61, 124 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 475, 000 | 475, 000 | 310, 599 |
| 200 | DRILL BITS | 75, 000 | 75, 000 | 83, 795 |
| 210 | SUBSURFACE RENTAL EQUIPMENT | 190, 000 | 190, 000 | 187, 657 |
| 215 | DIRECTIONAL DRILLING SERVICES | 448, 000 | 448, 000 | 347, 251 |
| 230 | SURFACE EQUIPMENT RENTALS | 266, 000 | 266, 000 | 288, 880 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 24, 219 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 57, 132 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 79, 946 |
| 320 | MUD LOGGING SERVICES | 28, 000 | 28, 000 | 24, 175 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 28, 000 | 28, 000 | 24, 175 |
| 350 | FREIGHT & TRUCKING | 171, 000 | 213, 750 | 74, 898 |
| 360 | CONTRACT LABOR | 152, 000 | 228, 000 | 186, 385 |
| 365 | FISHING SERVICES | | | 5, 640 |
| 370 | ADMINISTRATIVE OVERHEAD | 28, 500 | 33, 500 | 19, 956 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 27, 275 |
| 385 | COMMUNICATIONS | 28, 500 | 28, 500 | 109 |
| 390 | MISCELLANEOUS | | | 18 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 64, 991 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 53, 849 |
| 430 | COMPL RIG 10 DAYS @ $20,000/DAY | | 200, 000 | 98, 843 |
| 440 | COMPLETION TOOL RENTALS | | 50, 000 | 105, 126 |
| 450 | CASED HOLE LOGS & PERFORATING | | 300, 000 | 121, 406 |
| 455 | WATER FOR STIMULATION | | 300, 000 | 489, 303 |
| 460 | FORMATION STIMULATION | | 1, 950, 000 | 1, 733, 982 |
| 470 | COMPLETION SUPERVISION | | 35, 000 | 45, 851 |
| 490 | SALES TAX ON EQUIPMENT | 24, 615 | 117, 750 | 62, 436 |
| | TOTAL INTANGIBLES | $3, 764, 740 | $6, 887, 625 | $5, 934, 453 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 49, 088 |
| 630 | INTERMEDIATE __,___' OF __ _/_" | | | 14, 433 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 315, 928 |
| 700 | LINER 10,000' OF 4-1/2" 13.5# P- | | 200, 000 | 109, 973 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 3, 385 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 9, 625 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 38, 485 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 515, 000 | 254, 786 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 101, 995 |
| 820 | PUMPING UNIT | | 200, 000 | 171, 780 |
| 830 | PRIME MOVER | | 50, 000 | 32, 604 |
| 840 | SUCKER RODS | | 40, 000 | 24, 228 |
| 850 | SUBSURFACE PUMP | | 10, 000 | 14, 139 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 159, 102 |
| 880 | COMBUSTOR | | 50, 000 | 23, 354 |
| 890 | OIL STOCK TANKS | | 50, 000 | 64, 728 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 45, 900 |
| 930 | LABOR & TRUCKING | | 75, 000 | 155, 864 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 5, 438 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | 47, 347 |
| | TOTAL TANGIBLES | $492, 300 | $1, 862, 715 | $1, 642, 182 |
| | TOTAL WELL COSTS | $4, 257, 040 | $8, 750, 340 | $7, 576, 635 |

Confidential Business Information

Exhibit 13 to 5/9/23 SDR

Exhibit 8

# AUTHORITY FOR EXPENDITURE

SLAWSON exploration company, inc.

**WELL:** IRONBANK 4-14-13TFH **OPERATOR:** SLAWSON EXPLORATION CO, INC **AFE#:** 05495

**LOCATION:** NENW Section 14-154N-99W **COUNTY/STATE:** WILLIAMS/NORTH DAKOTA **CREATED:** February 26, 2014

**PURPOSE:** Drill and complete a Three Forks single lateral horizontal well on 960 acre spacing **ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 4, 400 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 314, 589 |
| 095 | HEALTH/SAFETY/ENVIRONMENT | | | 13 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 118, 931 |
| 105 | DRILLING SUPERVISION $ | 59, 200 | 59, 200 | 55, 446 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 33, 864 |
| 120 | WATER | 20, 000 | 20, 000 | 61, 474 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 167, 713 |
| 160 | DAYWORK 32 DAYS @ $21,000/DAY | 672, 000 | 672, 000 | 579, 600 |
| 175 | CREW LODGING & PER DIEM | 52, 800 | 52, 800 | 44, 310 |
| 180 | RIG FUEL AND BOILER $ | 217, 600 | 217, 600 | 127, 835 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 400, 000 | 400, 000 | 192, 656 |
| 200 | DRILL BITS | 65, 000 | 65, 000 | 81, 561 |
| 210 | SUBSURFACE RENTAL EQUIPMENT $ | 160, 000 | 160, 000 | 196, 353 |
| 215 | DIRECTIONAL DRILLING SERVICES $ | 330, 000 | 330, 000 | 283, 517 |
| 230 | SURFACE EQUIPMENT RENTALS $ | 208, 000 | 208, 000 | 240, 665 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 30, 219 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 66, 263 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 38, 073 |
| 320 | MUD LOGGING SERVICES | 22, 000 | 22, 000 | 15, 980 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 22, 000 | 22, 000 | 15, 980 |
| 350 | FREIGHT & TRUCKING | 128, 000 | 192, 000 | 58, 948 |
| 360 | CONTRACT LABOR | 120, 000 | 180, 000 | 191, 875 |
| 365 | FISHING SERVICES | | | 4, 163 |
| 370 | ADMINISTRATIVE OVERHEAD | 24, 000 | 27, 500 | 14, 872 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 40, 847 |
| 385 | COMMUNICATIONS | 24, 000 | 24, 000 | 7, 007 |
| 390 | MISCELLANEOUS | | | 117 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 76, 581 |
| 430 | COMPL. RIG 7 DAYS @ $20,000/DAY W | | 140, 000 | 110, 246 |
| 435 | COILED TUBING SERVICES | | 262, 500 | 126, 400 |
| 440 | COMPLETION TOOL RENTALS | | 35, 000 | 98, 745 |
| 450 | CASED HOLE LOGS & PERFORATING | | 375, 000 | 230, 711 |
| 455 | WATER FOR STIMULATION | | 450, 000 | 345, 389 |
| 460 | FORMATION STIMULATION | | 2, 812, 500 | 1, 743, 325 |
| 470 | COMPLETION SUPERVISION | | 24, 500 | 39, 660 |
| 490 | SALES TAX ON EQUIPMENT 5% | 24, 615 | 109, 380 | 58, 733 |
| | TOTAL INTANGIBLES | $3, 167, 215 | $7, 549, 980 | $5, 817, 061 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 60, 029 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 383, 467 |
| 700 | LINER 7,500' OF 4-1/2" 13.5# P- | | 150, 000 | 113, 686 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 3, 454 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 8, 795 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 66, 856 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 400, 000 | 70, 874 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 98, 160 |
| 820 | PUMPING UNIT | | 200, 000 | 164, 529 |
| 830 | PRIME MOVER ELECTRICITY + MO | | 50, 000 | 31, 166 |
| 840 | SUCKER RODS | | 40, 000 | 29, 688 |
| 850 | SUBSURFACE PUMP | | 7, 600 | 31, 331 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 90, 053 |
| 880 | COMBUSTOR | | 50, 000 | |
| 890 | OIL STOCK TANKS | | 50, 000 | 70, 079 |
| 900 | SEPARATORS | | | 8, 885 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 54, 775 |
| 930 | LABOR & TRUCKING | | 75, 000 | 116, 659 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 18, 003 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 695, 315 | $1, 420, 489 |
| | TOTAL WELL COSTS | $3, 659, 515 | $9, 245, 295 | $7, 237, 550 |

Confidential Business Information





3/30/22

Exhibit 13 to 5/9/23 SDR

Exhibit 8

# AUTHORITY FOR EXPENDITURE

SLAWSON exploration company, inc.

**WELL:** IRONBANK 6-14-13TFH **OPERATOR:** SLAWSON EXPLORATION CO, INC **AFE#:** 05539

**LOCATION:** NESW Section 14-154N-99W **COUNTY/STATE:** WILLIAMS/NORTH DAKOTA **CREATED:** March 28, 2014

**PURPOSE:** Drill and complete a Three Forks single lateral horizontal well on 960 acre spacing **ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 2, 279 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 387, 572 |
| 095 | HEALTH/SAFETY/ENVIRONMENT | | | 10 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 111, 240 |
| 105 | DRILLING SUPERVISION $ | 59, 200 | 59, 200 | 86, 396 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 21, 060 |
| 120 | WATER | 20, 000 | 20, 000 | 81, 159 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 225, 147 |
| 160 | DAYWORK 32 DAYS @ $21,000/DAY | 672, 000 | 672, 000 | 652, 117 |
| 175 | CREW LODGING & PER DIEM | 52, 800 | 52, 800 | 60, 602 |
| 180 | RIG FUEL AND BOILER $ | 217, 600 | 217, 600 | 188, 111 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 400, 000 | 400, 000 | 246, 470 |
| 200 | DRILL BITS | 65, 000 | 65, 000 | 119, 334 |
| 210 | SUBSURFACE RENTAL EQUIPMENT $ | 160, 000 | 160, 000 | 297, 639 |
| 215 | DIRECTIONAL DRILLING SERVICES $ | 330, 000 | 330, 000 | 399, 805 |
| 230 | SURFACE EQUIPMENT RENTALS $ | 208, 000 | 208, 000 | 348, 515 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 32, 766 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 67, 097 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 43, 805 |
| 320 | MUD LOGGING SERVICES | 22, 000 | 22, 000 | 22, 133 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 22, 000 | 22, 000 | 17, 035 |
| 350 | FREIGHT & TRUCKING | 128, 000 | 192, 000 | 111, 528 |
| 360 | CONTRACT LABOR | 120, 000 | 180, 000 | 223, 601 |
| 370 | ADMINISTRATIVE OVERHEAD | 24, 000 | 27, 500 | 14, 781 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 42, 213 |
| 385 | COMMUNICATIONS | 24, 000 | 24, 000 | 13, 096 |
| 390 | MISCELLANEOUS | | | 1, 369 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 70, 277 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 2, 502 |
| 430 | COMPL. RIG 7 DAYS @ $20,000/DAY W | | 140, 000 | 66, 108 |
| 435 | COILED TUBING SERVICES | | 262, 500 | |
| 440 | COMPLETION TOOL RENTALS | | 35, 000 | 70, 376 |
| 450 | CASED HOLE LOGS & PERFORATING | | 375, 000 | 173, 384 |
| 455 | WATER FOR STIMULATION | | 450, 000 | 479, 598 |
| 460 | FORMATION STIMULATION | | 2, 812, 500 | 1, 708, 673 |
| 470 | COMPLETION SUPERVISION | | 24, 500 | 37, 142 |
| 490 | SALES TAX ON EQUIPMENT 5% | 24, 615 | 109, 380 | 62, 422 |
| | TOTAL INTANGIBLES | $3, 167, 215 | $7, 549, 980 | $6, 487, 362 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 64, 786 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 386, 798 |
| 700 | LINER 7,500' OF 4-1/2" 13.5# P- | | 150, 000 | 125, 245 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 2, 625 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 9, 250 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 64, 285 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 400, 000 | 65, 267 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 74, 381 |
| 820 | PUMPING UNIT | | 200, 000 | 115, 430 |
| 830 | PRIME MOVER ELECTRICITY + MO | | 50, 000 | 31, 935 |
| 840 | SUCKER RODS | | 40, 000 | 29, 618 |
| 850 | SUBSURFACE PUMP | | 7, 600 | 6, 448 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 85, 664 |
| 880 | COMBUSTOR | | 50, 000 | 11, 925 |
| 890 | OIL STOCK TANKS | | 50, 000 | 65, 650 |
| 900 | SEPARATORS | | | 8, 885 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 54, 113 |
| 930 | LABOR & TRUCKING | | 75, 000 | 147, 289 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 12, 524 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 695, 315 | $1, 362, 118 |
| | TOTAL WELL COSTS | $3, 659, 515 | $9, 245, 295 | $7, 849, 480 |

Confidential Business Information

# AUTHORITY FOR EXPENDITURE

SLAWSON exploration company, inc.

**WELL:** IRONBANK 7-14-13TFH
**OPERATOR:** SLAWSON EXPLORATION CO, INC
**AFE#:** 05540
**LOCATION:** NESW Section 14-154N-99W
**COUNTY/STATE:** WILLIAMS/NORTH DAKOTA
**CREATED:** March 28, 2014
**PURPOSE:** Drill and complete a Three Forks single lateral horizontal well on 960 acre spacing
**ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 2, 279 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 268, 289 |
| 095 | HEALTH/SAFETY/ENVIRONMENT | | | 10 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 111, 240 |
| 105 | DRILLING SUPERVISION $ | 59, 200 | 59, 200 | 49, 698 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 23, 805 |
| 120 | WATER | 20, 000 | 20, 000 | 35, 232 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 209, 353 |
| 160 | DAYWORK 32 DAYS @ $21,000/DAY | 672, 000 | 672, 000 | 649, 225 |
| 175 | CREW LODGING & PER DIEM | 52, 800 | 52, 800 | 41, 780 |
| 180 | RIG FUEL AND BOILER $ | 217, 600 | 217, 600 | 230, 614 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 400, 000 | 400, 000 | 202, 276 |
| 200 | DRILL BITS | 65, 000 | 65, 000 | 51, 213 |
| 210 | SUBSURFACE RENTAL EQUIPMENT $ | 160, 000 | 160, 000 | 335, 421 |
| 215 | DIRECTIONAL DRILLING SERVICES $ | 330, 000 | 330, 000 | 328, 159 |
| 230 | SURFACE EQUIPMENT RENTALS $ | 208, 000 | 208, 000 | 230, 103 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 26, 782 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 98, 577 |
| 320 | MUD LOGGING SERVICES | 22, 000 | 22, 000 | 19, 293 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 22, 000 | 22, 000 | 19, 293 |
| 350 | FREIGHT & TRUCKING | 128, 000 | 192, 000 | 51, 651 |
| 360 | CONTRACT LABOR | 120, 000 | 180, 000 | 114, 656 |
| 370 | ADMINISTRATIVE OVERHEAD | 24, 000 | 27, 500 | 15, 406 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 42, 374 |
| 385 | COMMUNICATIONS | 24, 000 | 24, 000 | 2, 739 |
| 390 | MISCELLANEOUS | | | 55 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 71, 647 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 2, 502 |
| 430 | COMPL. RIG 7 DAYS @ $20,000/DAY W | | 140, 000 | 75, 999 |
| 435 | COILED TUBING SERVICES | | 262, 500 | |
| 440 | COMPLETION TOOL RENTALS | | 35, 000 | 61, 278 |
| 450 | CASED HOLE LOGS & PERFORATING | | 375, 000 | 228, 334 |
| 455 | WATER FOR STIMULATION | | 450, 000 | 895, 043 |
| 460 | FORMATION STIMULATION | | 2, 812, 500 | 2, 077, 508 |
| 470 | COMPLETION SUPERVISION | | 24, 500 | 77, 443 |
| 490 | SALES TAX ON EQUIPMENT 5% | 24, 615 | 109, 380 | 63, 037 |
| | TOTAL INTANGIBLES | $3, 167, 215 | $7, 549, 980 | $6, 712, 314 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 64, 626 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 389, 951 |
| 700 | LINER 7,500' OF 4-1/2" 13.5# P- | | 150, 000 | 126, 161 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 2, 685 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 9, 250 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 69, 299 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 400, 000 | 61, 323 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 70, 607 |
| 820 | PUMPING UNIT | | 200, 000 | 115, 430 |
| 830 | PRIME MOVER ELECTRICITY + MO | | 50, 000 | 31, 935 |
| 840 | SUCKER RODS | | 40, 000 | 30, 102 |
| 850 | SUBSURFACE PUMP | | 7, 600 | 6, 447 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 85, 424 |
| 880 | COMBUSTOR | | 50, 000 | 11, 925 |
| 890 | OIL STOCK TANKS | | 50, 000 | 65, 650 |
| 900 | SEPARATORS | | | 8, 885 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 54, 113 |
| 930 | LABOR & TRUCKING | | 75, 000 | 143, 664 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 12, 524 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 695, 315 | $1, 360, 001 |
| | TOTAL WELL COSTS | $3, 659, 515 | $9, 245, 295 | $8, 072, 315 |

Confidential Business Information

3/30/22

Exhibit 13 to 5/9/23 SDR

Exhibit 8

# AUTHORITY FOR EXPENDITURE

slawson exploration company, inc.

**WELL:** BOOTLEG 7-14-15TFH **OPERATOR:** SLAWSON EXPLORATION CO, INC **AFE#:** 05538

**LOCATION:** NESW Section 14-154N-99W **COUNTY/STATE:** WILLIAMS/NORTH DAKOTA **CREATED:** May 14, 2014

**PURPOSE:** Drill and complete a Three Forks single lateral horizontal well on 960 acre spacing **ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 3, 436 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 227, 622 |
| 095 | HEALTH/SAFETY/ENVIRONMENT | | | 600 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 107, 129 |
| 105 | DRILLING SUPERVISION $ | 59, 200 | 59, 200 | 55, 901 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 20, 510 |
| 120 | WATER | 20, 000 | 20, 000 | 77, 998 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 114, 767 |
| 160 | DAYWORK 32 DAYS @ $21,000/DAY | 672, 000 | 672, 000 | 672, 500 |
| 175 | CREW LODGING & PER DIEM | 52, 800 | 52, 800 | 50, 301 |
| 180 | RIG FUEL AND BOILER $ | 217, 600 | 217, 600 | 260, 784 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 400, 000 | 400, 000 | 192, 867 |
| 200 | DRILL BITS | 65, 000 | 65, 000 | 112, 392 |
| 210 | SUBSURFACE RENTAL EQUIPMENT $ | 160, 000 | 160, 000 | 204, 902 |
| 215 | DIRECTIONAL DRILLING SERVICES $ | 330, 000 | 330, 000 | 347, 948 |
| 230 | SURFACE EQUIPMENT RENTALS $ | 208, 000 | 208, 000 | 291, 875 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 27, 733 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 44, 446 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 34, 083 |
| 320 | MUD LOGGING SERVICES | 22, 000 | 22, 000 | 17, 980 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 22, 000 | 22, 000 | 17, 980 |
| 350 | FREIGHT & TRUCKING | 128, 000 | 192, 000 | 48, 850 |
| 360 | CONTRACT LABOR | 120, 000 | 180, 000 | 178, 946 |
| 370 | ADMINISTRATIVE OVERHEAD | 24, 000 | 27, 500 | 13, 111 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 39, 067 |
| 385 | COMMUNICATIONS | 24, 000 | 24, 000 | 7, 342 |
| 390 | MISCELLANEOUS | | | 119 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 59, 752 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 330 |
| 425 | WIRELINE SERVICES | | | 12, 463 |
| 430 | COMPL. RIG 7 DAYS @ $20,000/DAY W | | 140, 000 | 14, 169 |
| 435 | COILED TUBING SERVICES | | 262, 500 | 128, 458 |
| 440 | COMPLETION TOOL RENTALS | | 35, 000 | 53, 558 |
| 450 | CASED HOLE LOGS & PERFORATING | | 375, 000 | 238, 966 |
| 455 | WATER FOR STIMULATION | | 450, 000 | 362, 607 |
| 460 | FORMATION STIMULATION | | 2, 812, 500 | 1, 653, 471 |
| 470 | COMPLETION SUPERVISION | | 24, 500 | 48, 799 |
| 490 | SALES TAX ON EQUIPMENT 5% | 24, 615 | 109, 380 | 60, 964 |
| | TOTAL INTANGIBLES | $3, 167, 215 | $7, 549, 980 | $5, 804, 726 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 59, 666 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 378, 751 |
| 700 | LINER 7,500' OF 4-1/2" 13.5# P- | | 150, 000 | 113, 699 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 2, 524 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 8, 574 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 70, 353 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 400, 000 | 60, 749 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 108, 488 |
| 820 | PUMPING UNIT | | 200, 000 | 159, 868 |
| 830 | PRIME MOVER ELECTRICITY + MO | | 50, 000 | 31, 166 |
| 840 | SUCKER RODS | | 40, 000 | 28, 685 |
| 850 | SUBSURFACE PUMP | | 7, 600 | 76, 658 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 119, 235 |
| 880 | COMBUSTOR | | 50, 000 | 7, 950 |
| 890 | OIL STOCK TANKS | | 50, 000 | 58, 500 |
| 900 | SEPARATORS | | | 6, 885 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 54, 500 |
| 930 | LABOR & TRUCKING | | 75, 000 | 128, 074 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 10, 738 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 695, 315 | $1, 485, 063 |
| | TOTAL WELL COSTS | $3, 659, 515 | $9, 245, 295 | $7, 289, 789 |

Confidential Business Information



3/30/22

Exhibit 13 to 5/9/23 SDR

Exhibit 8

# AUTHORITY FOR EXPENDITURE

slawson exploration company, inc.

| | | | | | |
|---|---|---|---|---|---|
| **WELL:** | BOOTLEG 6-14-15TFH | **OPERATOR:** | SLAWSON EXPLORATION CO, INC | **AFE#:** | 05537 |
| **LOCATION:** | NESW Section 14-154N-99W | **COUNTY/STATE:** | WILLIAMS/NORTH DAKOTA | **CREATED:** | May 14, 2014 |
| **PURPOSE:** | Drill and complete a Three Forks single lateral horizontal well on 960 acre spacing | | | **ACCT DATE:** | 3/2022 |

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 3, 119 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 239, 295 |
| 095 | HEALTH/SAFETY/ENVIRONMENT | | | 600 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 107, 129 |
| 105 | DRILLING SUPERVISION $ | 59, 200 | 59, 200 | 56, 117 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 20, 510 |
| 120 | WATER | 20, 000 | 20, 000 | 71, 013 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 122, 387 |
| 160 | DAYWORK 32 DAYS @ $21,000/DAY | 672, 000 | 672, 000 | 679, 900 |
| 175 | CREW LODGING & PER DIEM | 52, 800 | 52, 800 | 45, 488 |
| 180 | RIG FUEL AND BOILER $ | 217, 600 | 217, 600 | 153, 712 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 400, 000 | 400, 000 | 238, 589 |
| 200 | DRILL BITS | 65, 000 | 65, 000 | 118, 623 |
| 210 | SUBSURFACE RENTAL EQUIPMENT $ | 160, 000 | 160, 000 | 210, 060 |
| 215 | DIRECTIONAL DRILLING SERVICES $ | 330, 000 | 330, 000 | 382, 223 |
| 230 | SURFACE EQUIPMENT RENTALS $ | 208, 000 | 208, 000 | 224, 261 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 25, 258 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 45, 593 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 41, 830 |
| 320 | MUD LOGGING SERVICES | 22, 000 | 22, 000 | 19, 772 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 22, 000 | 22, 000 | 19, 772 |
| 350 | FREIGHT & TRUCKING | 128, 000 | 192, 000 | 72, 352 |
| 360 | CONTRACT LABOR | 120, 000 | 180, 000 | 169, 744 |
| 370 | ADMINISTRATIVE OVERHEAD | 24, 000 | 27, 500 | 12, 295 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 40, 666 |
| 385 | COMMUNICATIONS | 24, 000 | 24, 000 | 7, 049 |
| 390 | MISCELLANEOUS | | | 1, 797 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 70, 205 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 8, 075 |
| 425 | WIRELINE SERVICES | | | 12, 435 |
| 430 | COMPL. RIG 7 DAYS @ $20,000/DAY W | | 140, 000 | 13, 872 |
| 435 | COILED TUBING SERVICES | | 262, 500 | 160, 048 |
| 440 | COMPLETION TOOL RENTALS | | 35, 000 | 57, 342 |
| 450 | CASED HOLE LOGS & PERFORATING | | 375, 000 | 231, 380 |
| 455 | WATER FOR STIMULATION | | 450, 000 | 267, 841 |
| 460 | FORMATION STIMULATION | | 2, 812, 500 | 1, 638, 204 |
| 470 | COMPLETION SUPERVISION | | 24, 500 | 35, 034 |
| 480 | SALES TAX ON EQUIPMENT 5% | 24, 615 | 109, 380 | 61, 537 |
| | TOTAL INTANGIBLES | $3, 167, 215 | $7, 549, 980 | $5, 685, 127 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 60, 543 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 379, 370 |
| 700 | LINER 7,500' OF 4-1/2" 13.5# P- | | 150, 000 | 113, 055 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 3, 244 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 6, 324 |
| 740 | PRODUCTION OR LINER INCL. HGR. | | | 10, 800 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 70, 273 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 400, 000 | 45, 552 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 98, 340 |
| 820 | PUMPING UNIT | | 200, 000 | 161, 805 |
| 830 | PRIME MOVER ELECTRICITY + MO | | 50, 000 | 31, 166 |
| 840 | SUCKER RODS | | 40, 000 | 28, 611 |
| 850 | SUBSURFACE PUMP | | 7, 600 | 51, 920 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 122, 820 |
| 880 | COMBUSTOR | | 50, 000 | 7, 950 |
| 890 | OIL STOCK TANKS | | 50, 000 | 58, 500 |
| 900 | SEPARATORS | | | 6, 885 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 54, 500 |
| 930 | LABOR & TRUCKING | | 75, 000 | 131, 482 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 10, 738 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 695, 315 | $1, 453, 878 |
| | TOTAL WELL COSTS | $3, 659, 515 | $9, 245, 295 | $7, 139, 005 |

Confidential Business Information

CAR 000256



3/30/22

# AUTHORITY FOR EXPENDITURE

slawson exploration company, inc.

**WELL:** JORE FEDERAL 2-12H (WBOO) **OPERATOR:** WHITE BUTTE OIL OPERATIONS LLC **AFE#:** 05600

**LOCATION:** NWNW Section 12-151N-95W **COUNTY/STATE:** MCKENZIE/NORTH DAKOTA **CREATED:** June 23, 2014

**PURPOSE:** Drill and complete a Bakken single lateral horizontal well on 640 acre spacing **ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 171, 044- |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 405, 877 |
| 095 | HEALTH/SAFETY/ENVIRONMENT | | | 94 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 222, 255 |
| 105 | DRILLING SUPERVISION | 46, 400 | 46, 400 | 52, 955 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 17, 898 |
| 120 | WATER | 20, 000 | 20, 000 | 93, 988 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 50, 713 |
| 150 | FOOTAGE __,___FT @ $__.__/FT | | | 23, 758 |
| 160 | DAYWORK 24 DAYS @ $21,000/DAY | 504, 000 | 504, 000 | 693, 520 |
| 175 | CREW LODGING & PER DIEM | 39, 600 | 39, 600 | |
| 180 | RIG FUEL AND BOILER | 163, 200 | 163, 200 | 172, 507 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 300, 000 | 300, 000 | 369, 593 |
| 200 | DRILL BITS | 50, 000 | 50, 000 | 89, 157 |
| 210 | SUBSURFACE RENTAL EQUIPMENT | 120, 000 | 120, 000 | 159, 420 |
| 215 | DIRECTIONAL DRILLING SERVICES | 210, 000 | 210, 000 | 218, 717 |
| 230 | SURFACE EQUIPMENT RENTALS | 156, 000 | 156, 000 | 373, 690 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 28, 745 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 59, 085 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 68, 976 |
| 320 | MUD LOGGING SERVICES $ | 14, 000 | 14, 000 | 22, 717 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES $ | 14, 000 | 14, 000 | 22, 717 |
| 350 | FREIGHT & TRUCKING $ | 96, 000 | 144, 000 | 176, 129 |
| 360 | CONTRACT LABOR $ | 90, 000 | 135, 000 | 193, 088 |
| 370 | ADMINISTRATIVE OVERHEAD $ | 18, 000 | 21, 500 | 26, 457 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 34, 330 |
| 385 | COMMUNICATIONS | 18, 000 | 18, 000 | 31 |
| 390 | MISCELLANEOUS | | | 13 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 58, 663 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 9, 400 |
| 425 | WIRELINE SERVICES | | | 10, 242 |
| 430 | COMPL. RIG 7 DAYS @ $20,000/DAY W | | 140, 000 | 38, 047 |
| 435 | COILED TUBING SERVICES | | 175, 000 | 18, 554 |
| 440 | COMPLETION TOOL RENTALS | | 35, 000 | 105, 480 |
| 450 | CASED HOLE LOGS & PERFORATING | | 250, 000 | 198, 608 |
| 455 | WATER FOR STIMULATION | | 300, 000 | 226, 147 |
| 460 | FORMATION STIMULATION | | 1, 875, 000 | 1, 869, 934 |
| 470 | COMPLETION SUPERVISION | | 24, 500 | 34, 304 |
| 490 | SALES TAX ON EQUIPMENT | 24, 615 | 106, 880 | 52, 854 |
| | TOTAL INTANGIBLES | $2, 501, 815 | $5, 551, 080 | $6, 027, 619 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 52, 148 |
| 630 | INTERMEDIATE __,___' OF __ _/_" | | | 15, 221 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 329, 037 |
| 700 | LINER 5,000' OF 4-1/2" 13.5# P- | | 100, 000 | 58, 677 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 66, 431 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 400, 000 | 62, 126 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 103, 499 |
| 820 | PUMPING UNIT | | 200, 000 | 24, 689 |
| 830 | PRIME MOVER ELECTRICITY + MOTO | | 50, 000 | 21, 322 |
| 840 | SUCKER RODS | | 40, 000 | 1, 180 |
| 850 | SUBSURFACE PUMP | | 7, 600 | |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 342, 612 |
| 880 | COMBUSTOR | | 50, 000 | 23, 850 |
| 890 | OIL STOCK TANKS | | 50, 000 | 80, 962 |
| 900 | SEPARATORS | | | 4, 646 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 111, 636 |
| 930 | LABOR & TRUCKING | | 75, 000 | 147, 060 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 11, 760 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 645, 315 | $1, 456, 856 |
| | TOTAL WELL COSTS | $2, 994, 115 | $7, 196, 395 | $7, 484, 475 |

Confidential Business Information

Exhibit 13 to 5/9/23 SDR

Exhibit 8

# AUTHORITY FOR EXPENDITURE

SLAWSON exploration company, inc.

**WELL:** REVOLVER 7-35TFH
**OPERATOR:** SLAWSON EXPLORATION CO, INC
**AFE#:** 05664

**LOCATION:** SWSE Section 35-151N-92W
**COUNTY/STATE:** MOUNTRAIL/NORTH DAKOTA
**CREATED:** July 30, 2014

**PURPOSE:** Drill and complete a Three Forks single lateral horizontal well on 640 acre spacing
**ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 8, 350 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 290, 416 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 132, 074 |
| 105 | DRILLING SUPERVISION | 46, 400 | 46, 400 | 65, 031 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 23, 422 |
| 120 | WATER | 20, 000 | 20, 000 | 33, 705 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 277, 290 |
| 160 | DAYWORK 24 DAYS @ $21,000/DAY | 504, 000 | 504, 000 | 486, 832 |
| 175 | CREW LODGING & PER DIEM | 39, 600 | 39, 600 | 4, 620 |
| 180 | RIG FUEL AND BOILER | 163, 200 | 163, 200 | 246, 611 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 300, 000 | 300, 000 | 301, 346 |
| 200 | DRILL BITS | 50, 000 | 50, 000 | 69, 160 |
| 210 | SUBSURFACE RENTAL EQUIPMENT | 120, 000 | 120, 000 | 193, 139 |
| 215 | DIRECTIONAL DRILLING SERVICES | 210, 000 | 210, 000 | 269, 217 |
| 230 | SURFACE EQUIPMENT RENTALS | 156, 000 | 156, 000 | 196, 082 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 49, 993 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 62, 382 |
| 320 | MUD LOGGING SERVICES | 14, 000 | 14, 000 | 14, 149 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | 4, 500 |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 14, 000 | 14, 000 | 14, 149 |
| 350 | FREIGHT & TRUCKING | 96, 000 | 144, 000 | 72, 508 |
| 360 | CONTRACT LABOR | 90, 000 | 135, 000 | 109, 605 |
| 370 | ADMINISTRATIVE OVERHEAD | 18, 000 | 22, 000 | 10, 421 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 24, 148 |
| 385 | COMMUNICATIONS | 18, 000 | 18, 000 | 49 |
| 390 | MISCELLANEOUS | | | 475 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 36, 925 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 6, 000 |
| 430 | COMPL. RIG 8 DAYS @ $20,000/DAY | | 160, 000 | 19, 787 |
| 440 | COMPLETION TOOL RENTALS | | 40, 000 | 51, 295 |
| 450 | CASED HOLE LOGS & PERFORATING | | 200, 000 | 25, 913 |
| 455 | WATER FOR STIMULATION | | 200, 000 | 197, 883 |
| 460 | FORMATION STIMULATION | | 1, 200, 000 | 1, 079, 001 |
| 470 | COMPLETION SUPERVISION | | 28, 000 | 12, 068 |
| 490 | SALES TAX ON EQUIPMENT | 24, 615 | 105, 675 | 58, 254 |
| | TOTAL INTANGIBLES | $2, 501, 815 | $4, 578, 875 | $4, 446, 800 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 44, 674 |
| 630 | INTERMEDIATE __,___' OF __ _/_" | | | 14, 646 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 315, 482 |
| 700 | LINER 5,000' OF 4-1/2" 13.5# P- | | 100, 000 | 70, 301 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 2, 125 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 9, 610 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 60, 743 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 375, 000 | 287, 107 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 68, 728 |
| 820 | PUMPING UNIT | | 200, 000 | 165, 623 |
| 830 | PRIME MOVER | | 50, 000 | 31, 166 |
| 840 | SUCKER RODS | | 40, 000 | 31, 502 |
| 850 | SUBSURFACE PUMP | | 8, 500 | 22, 015 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 66, 937 |
| 880 | COMBUSTOR | | 50, 000 | 23, 850 |
| 890 | OIL STOCK TANKS | | 50, 000 | 32, 500 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 45, 900 |
| 930 | LABOR & TRUCKING | | 75, 000 | 114, 515 |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 5, 880 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | |
| | TOTAL TANGIBLES | $492, 300 | $1, 621, 215 | $1, 413, 304 |
| | TOTAL WELL COSTS | $2, 994, 115 | $6, 200, 090 | $5, 860, 104 |

Confidential Business Information

# AUTHORITY FOR EXPENDITURE

SLAWSON exploration company, inc.

**WELL:** PHOENIX 2-18H
**OPERATOR:** SLAWSON EXPLORATION CO, INC
**AFE#:** 05689
**LOCATION:** SWSW Section 18-152N-91W
**COUNTY/STATE:** MOUNTRAIL/NORTH DAKOTA
**CREATED:** August 19, 2014
**PURPOSE:** Drill and complete a Bakken single lateral horizontal well on 640 acre spacing
**ACCT DATE:** 3/2022

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 18, 831 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 237, 153 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 65, 215 |
| 105 | DRILLING SUPERVISION | 46, 400 | 46, 400 | 26, 219 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 17, 000 |
| 120 | WATER | 20, 000 | 20, 000 | 8, 548 |
| | DRILLING CONTRACT | | | |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 41, 397 |
| 160 | DAYWORK 24 DAYS @ $21,000/DAY | 504, 000 | 504, 000 | 396, 931 |
| 175 | CREW LODGING & PER DIEM | 39, 600 | 39, 600 | 6, 035 |
| 180 | RIG FUEL AND BOILER | 163, 200 | 163, 200 | 142, 504 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 300, 000 | 300, 000 | 250, 427 |
| 200 | DRILL BITS | 50, 000 | 50, 000 | 86, 953 |
| 210 | SUBSURFACE RENTAL EQUIPMENT | 120, 000 | 120, 000 | 146, 337 |
| 215 | DIRECTIONAL DRILLING SERVICES | 210, 000 | 210, 000 | 285, 539 |
| 230 | SURFACE EQUIPMENT RENTALS | 156, 000 | 156, 000 | 160, 514 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 34, 085 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 64, 015 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 54, 990 |
| 320 | MUD LOGGING SERVICES | 14, 000 | 14, 000 | 11, 529 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 14, 000 | 14, 000 | 11, 529 |
| 350 | FREIGHT & TRUCKING | 96, 000 | 144, 000 | 65, 190 |
| 360 | CONTRACT LABOR | 90, 000 | 135, 000 | 161, 442 |
| 370 | ADMINISTRATIVE OVERHEAD | 18, 000 | 22, 000 | 9, 233 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 20, 388 |
| 385 | COMMUNICATIONS | 18, 000 | 18, 000 | 10, 981 |
| 390 | MISCELLANEOUS | | | |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 62, 925 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 4, 915 |
| 430 | COMPL. RIG 8 DAYS @ $20,000/DAY | | 160, 000 | 13, 625 |
| 440 | COMPLETION TOOL RENTALS | | 40, 000 | 43, 937 |
| 450 | CASED HOLE LOGS & PERFORATING | | 200, 000 | 19, 333 |
| 455 | WATER FOR STIMULATION | | 200, 000 | 309, 897 |
| 460 | FORMATION STIMULATION | | 1, 200, 000 | 624, 911 |
| 470 | COMPLETION SUPERVISION | | 28, 000 | 13, 164 |
| 490 | SALES TAX ON EQUIPMENT | 24, 615 | 105, 675 | 61, 710 |
| | TOTAL INTANGIBLES | $2, 501, 815 | $4, 578, 875 | $3, 487, 402 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 50, 793 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 331, 789 |
| 700 | LINER 5,000' OF 4-1/2" 13.5# P- | | 100, 000 | 66, 588 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 3, 425 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 10, 000 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 44, 399 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 375, 000 | 186, 197 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 65, 769 |
| 820 | PUMPING UNIT | | 200, 000 | 115, 555 |
| 830 | PRIME MOVER | | 50, 000 | 33, 864 |
| 840 | SUCKER RODS | | 40, 000 | 26, 457 |
| 850 | SUBSURFACE PUMP | | 8, 500 | 8, 195 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 91, 321 |
| 880 | COMBUSTOR | | 50, 000 | 12, 150 |
| 890 | OIL STOCK TANKS | | 50, 000 | 64, 116 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 77, 482 |
| 930 | LABOR & TRUCKING | | 75, 000 | 94, 919 |
| 940 | MISC. LEASE EQUIPMENT | | | 135- |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 5, 600 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | 1, 250 |
| | TOTAL TANGIBLES | $492, 300 | $1, 621, 215 | $1, 289, 734 |
| | TOTAL WELL COSTS | $2, 994, 115 | $6, 200, 090 | $4, 777, 136 |

Confidential Business Information

Exhibit 13 to 5/9/23 SDR

Exhibit 8

# AUTHORITY FOR EXPENDITURE

SLAWSON exploration company, inc.

| | | | |
|---|---|---|---|
| **WELL:** PHOENIX 1 SLH | **OPERATOR:** SLAWSON EXPLORATION CO, INC | **AFE#:** 05691 | |
| **LOCATION:** SWSW Section 18-152N-91W | **COUNTY/STATE:** MOUNTRAIL/NORTH DAKOTA | **CREATED:** August 19, 2014 | |
| **PURPOSE:** Drill and complete a Bakken single lateral horizontal well on 1280 acre spacing | | **ACCT DATE:** 3/2022 | |

| | INTANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| 080 | SURVEYS AND PERMITS | 25, 000 | 25, 000 | 4, 544 |
| 090 | DAMAGES, RIGHT-OF-WAY, & CLEANUP | 35, 000 | 80, 000 | 215, 764 |
| 100 | LOCATION COST, ROADS, & DIRTWORK | 200, 000 | 200, 000 | 66, 573 |
| 105 | DRILLING SUPERVISION | 46, 400 | 46, 400 | 46, 138 |
| 110 | CONDUCTOR HOLE AND SERVICES | 22, 000 | 28, 000 | 17, 000 |
| 120 | WATER | 20, 000 | 20, 000 | 42, 361 |
| | DRILLING CONTRACT | | | |
| 130 | TURNKEY CONTRACT | | | 473 |
| 140 | MOVE: RIG UP & RIG DOWN | 150, 000 | 150, 000 | 85, 363 |
| 160 | DAYWORK 24 DAYS @ $21,000/DAY | 504, 000 | 504, 000 | 363, 285 |
| 175 | CREW LODGING & PER DIEM | 39, 600 | 39, 600 | 6, 318 |
| 180 | RIG FUEL AND BOILER | 163, 200 | 163, 200 | 102, 301 |
| 190 | DRILLING MUD,ADDITIVES,SALT MUD FUE | 300, 000 | 300, 000 | 211, 479 |
| 200 | DRILL BITS | 50, 000 | 50, 000 | 67, 115 |
| 210 | SUBSURFACE RENTAL EQUIPMENT | 120, 000 | 120, 000 | 143, 342 |
| 215 | DIRECTIONAL DRILLING SERVICES | 210, 000 | 210, 000 | 298, 044 |
| 230 | SURFACE EQUIPMENT RENTALS | 156, 000 | 156, 000 | 231, 720 |
| 260 | SURFACE CEMENT & CEMENTING | 20, 000 | 20, 000 | 37, 565 |
| 270 | INTERMEDIATE CEMENT & CEMENTING | 60, 000 | 60, 000 | 67, 236 |
| 280 | PRODUCTION CEMENT & CEMENTING | | | 60, 973 |
| 320 | MUD LOGGING SERVICES | 14, 000 | 14, 000 | 19, 963 |
| 330 | OPEN HOLE LOGS | 21, 000 | 21, 000 | |
| 340 | GEOLOGICAL & ENGINEERING SERVICES | 14, 000 | 14, 000 | 13, 562 |
| 350 | FREIGHT & TRUCKING | 96, 000 | 144, 000 | 75, 720 |
| 360 | CONTRACT LABOR | 90, 000 | 135, 000 | 255, 107 |
| 370 | ADMINISTRATIVE OVERHEAD | 18, 000 | 22, 000 | 9, 305 |
| 380 | INSURANCE | 20, 000 | 20, 000 | 20, 388 |
| 385 | COMMUNICATIONS | 18, 000 | 18, 000 | 2, 086 |
| 390 | MISCELLANEOUS | | | 73 |
| 410 | CASING CREWS/PU LD MACHINE | 65, 000 | 85, 000 | 70, 077 |
| 420 | CEMENT SQUEEZE & MISC PUMP | | | 5, 070 |
| 430 | COMPL. RIG 8 DAYS @ $20,000/DAY | | 160, 000 | 18, 095 |
| 435 | COILED TUBING SERVICES | | | 100, 713 |
| 440 | COMPLETION TOOL RENTALS | | 40, 000 | 54, 607 |
| 450 | CASED HOLE LOGS & PERFORATING | | 200, 000 | 18, 500 |
| 455 | WATER FOR STIMULATION | | 200, 000 | 239, 617 |
| 460 | FORMATION STIMULATION | | 1, 200, 000 | 707, 395 |
| 470 | COMPLETION SUPERVISION | | 28, 000 | 22, 924 |
| 490 | SALES TAX ON EQUIPMENT | 24, 615 | 105, 675 | 61, 382 |
| | TOTAL INTANGIBLES | $2, 501, 815 | $4, 578, 875 | $3, 762, 178 |

| | TANGIBLES | DRY HOLE | PRODUCER | ACTUALS |
|---|---|---|---|---|
| | CASING | | | |
| 610 | SURFACE 1,750' OF 9-5/8" 36# J-5 | 49, 000 | 49, 000 | 50, 197 |
| 640 | INTERMEDIATE 10,100' OF 7" 32# P | 383, 800 | 383, 800 | 343, 997 |
| 700 | LINER 5,000' OF 4-1/2" 13.5# P- | | 100, 000 | 74, 986 |
| | FLOAT EQUIPMENT | | | |
| 720 | SURFACE CASING | 2, 500 | 2, 500 | 3, 425 |
| 730 | INTERMEDIATE CASING | 12, 000 | 12, 000 | 5, 755 |
| | TUBING | | | |
| 770 | 9,700' OF 2-7/8" 6.5# L-80 | | 67, 415 | 44, 802 |
| 790 | PACKERS, CASING PACKERS, & ANCHORS | | 375, 000 | 160, 820 |
| 800 | CASINGHEAD, TUBINGHEAD, & XMAS TREE | 45, 000 | 57, 500 | 62, 129 |
| 820 | PUMPING UNIT | | 200, 000 | 115, 987 |
| 830 | PRIME MOVER | | 50, 000 | 33, 659 |
| 840 | SUCKER RODS | | 40, 000 | 26, 407 |
| 850 | SUBSURFACE PUMP | | 8, 500 | 8, 053 |
| 860 | SURFACE VALVES, FITTINGS & PIPELINE | | 30, 000 | 89, 656 |
| 880 | COMBUSTOR | | 50, 000 | 12, 150 |
| 890 | OIL STOCK TANKS | | 50, 000 | 65, 316 |
| 910 | HEATER TREATER OR GUN BBL. | | 48, 000 | 77, 482 |
| 930 | LABOR & TRUCKING | | 75, 000 | 96, 567 |
| 940 | MISC. LEASE EQUIPMENT | | | 135- |
| 960 | WATER TANK & SALT WATER DISPOSAL EQ | | 12, 500 | 5, 600 |
| 980 | PIPELINE CONNECTIONS | | 10, 000 | 1, 250 |
| | TOTAL TANGIBLES | $492, 300 | $1, 621, 215 | $1, 278, 103 |
| | TOTAL WELL COSTS | $2, 994, 115 | $6, 200, 090 | $5, 040, 281 |

Confidential Business Information



CAR 000260

3/30/22

Exhibit 13 to 5/9/23 SDR

Exhibit 9

**Crestwood Midstream Partners LP/Arrow Pipeline LLC**
**Authorization for Expenditure**
**Well Connect Project Estimate**

Arrow Midstream Holdings, LLC
Arrow Pipeline, LLC

| | | | | |
|---|---|---|---|---|
| **Project Name** | Slawson Jore | | **Project #** | |
| **Project Manager** | Kyle Smith | | **AFE Amount** | $2,942,171 |
| **Producer** | Slawson | | **AFE Type** | Full Scope |

| WBS | Description of Expenditure | Quantity | Full Scope - Original | Supplemental | Total Budget | Shared Cost/Well |
|---|---|---|---|---|---|---|
| 501 | Project Management Labor | 1 | $ 15,000 | $ - | $ 15,000 | $ 1,363.64 |
| 502 | Operations & Maintenance Internal Labor | 1 | $ 25,000 | $ - | $ 25,000 | $ 2,272.73 |
| 503 | Company Expenses (Pcard Expenses) | 0 | $ - | $ - | $ - | $ - |
| **510** | **Contract Engineering, Land Survey, Consulting Services** | | $ - | $ - | $ - | $ - |
| 511 | Outside Engineering | 1 | $ 5,000 | $ - | $ 5,000 | $ 454.55 |
| 512 | Land Survey | 6,180 | $ 162,080 | $ - | $ 162,080 | $ 14,734.55 |
| 516 | Geotechnical Drilling and Testing | | $ - | $ - | $ - | $ - |
| **520** | **Environmental, Health, and Safety** | | $ - | $ - | $ - | $ - |
| 521 | Natural Resources Permitting | 6,180 | $ 15,450 | $ - | $ 15,450 | $ 1,404.55 |
| 522 | Cultural Resources Permitting | | $ - | $ - | $ - | $ - |
| 524 | PSM / RMP / PHA | | $ - | $ - | $ - | $ - |
| 525 | Air Compliance | | $ - | $ - | $ - | $ - |
| 527 | Environmental Inspection | | $ - | $ - | $ - | $ - |
| **530** | **Land and ROW Acquisition and Leases** | | $ - | $ - | $ - | $ - |
| 531 | ROW Agent Fees | 6,180 | $ 47,310 | $ - | $ 47,310 | $ 4,300.91 |
| 532 | Land Acquisition Fees | 6,180 | $ 92,700 | $ - | $ 92,700 | $ 8,427.27 |
| 536 | Government and Public Affairs | 1 | $ 16,440 | $ - | $ 16,440 | $ 1,494.55 |
| **540** | **Contract Construction Management** | | $ - | $ - | $ - | $ - |
| 541 | Contract Inspection Services | 60 | $ 150,000 | $ - | $ 150,000 | $ 13,636.36 |
| 543 | Commissioning / Start-up Support | 1 | $ 5,000 | $ - | $ 5,000 | $ 454.55 |
| 544 | Radiographic Inspection | 50 | $ 125,000 | $ - | $ 125,000 | $ 11,363.64 |
| 545 | Lab Services | | $ - | $ - | $ - | $ - |
| 546 | Testing Services | | $ - | $ - | $ - | $ - |
| **550** | **Construction** | | $ - | $ - | $ - | $ - |
| 551 | General / Mechanical Construction | 100 | $ 85,000 | $ - | $ 85,000 | $ 7,727.27 |
| 552 | Pipeline Construction (including Hot Taps & Pig L/R) | 5,780 | $ 725,800 | $ - | $ 725,800 | $ 65,981.82 |
| 553 | Electrical / Instrumentation Construction | 3 | $ 111,900 | $ - | $ 111,900 | $ 10,172.73 |
| 554 | Site Civil / Structural Construction | 3 | $ 40,500 | $ - | $ 40,500 | $ 3,681.82 |
| 555 | HDD / Boring Construction | 400 | $ 72,000 | $ - | $ 72,000 | $ 6,545.45 |
| **560** | **Materials and Equipment** | | $ - | $ - | $ - | $ - |
| 561 | Foundations | | $ - | $ - | $ - | $ - |
| 565 | Line Pipe | 6,180 | $ 166,556 | $ - | $ 166,556 | $ 15,141.45 |
| 566 | Pipe Bends, Fittings, Bolts & Flanges | 1 | $ 41,639 | $ - | $ 41,639 | $ 3,785.36 |
| 567 | Valves & Valve Actuators | 1 | $ 93,000 | $ - | $ 93,000 | $ 8,454.55 |
| 568 | Packaged Piping Assembly or Skid | 2 | $ 90,000 | $ - | $ 90,000 | $ 8,181.82 |
| 572 | Pumps & Drivers | 1 | $ 60,000 | $ - | $ 60,000 | $ 5,454.55 |
| 573 | Electric Motors, Engines, Turbines, Generators | | $ - | $ - | $ - | $ - |
| 575 | Storage Vessels and Tanks | | $ - | $ - | $ - | $ - |
| 576 | Measurement (2 Oil LACT; 1 Gas Meter Skid) | 3 | $ 487,326 | $ - | $ 487,326 | $ 44,302.36 |
| 578 | Cathodic Protection | | $ - | $ - | $ - | $ - |
| 579 | Electrical | 3 | $ 42,000 | $ - | $ 42,000 | $ 3,818.18 |
| 580 | Instrumentation & Controls | | $ - | $ - | $ - | $ - |
| 581 | SCADA / Comm / IT Equipment | | $ - | $ - | $ - | $ - |
| 582 | Heat Tracing, Insulation & Fireproofing | | $ - | $ - | $ - | $ - |
| 583 | Protective Coatings | | $ - | $ - | $ - | $ - |
| **590** | **Other and Miscellaneous** | | $ - | $ - | $ - | $ - |
| 599 | Contingency (10%) | | $ 267,470 | $ - | $ 267,470 | $ 24,315.46 |
| **X** | **TOTAL PROJECT ESTIMATE** | | **$ 2,942,171** | **$ -** | **$ 2,942,171** | **$ 267,470.10** |
| XX | Estimated Adder For Winter Construction | | $ 394,560 | $ - | $ 394,560 | $ 35,869.09 |

**Notes:**

| | |
|---|---|
| Line 576 | LACT building (5,000 BPD capacity) is based on a Coriolis Meter for oil flow measurement and includes a charge pump, booster pump, and all associated piping in a skid-mounted, fully enclosed and heated building |
| Line 576 | Meter Building includes 3" Daniel Orifice meter run with a Total Flow computer for gas flow measurement |
| Line X | Represents the total multi-well pad pipeline connection costs that are shared equally with each individual well connection on the respective pad. |
| Line XX | Construction based on normal rates for construction in the summer. Operator will be invoiced for Winter Construction adder in the event construction occurs during the winter months. The commencement of construction shall be at the sole discretion of Crestwood. |

| LACT Prices | | Gas/Water Meter Prices | |
|---|---|---|---|
| $ 221,163 | 5000 BPD | $ 84,443 | 3" Gas/2" Water |
| $ 401,620 | 5000/2500 BPD | $ 99,449 | 2" & 3" Gas/2" Water |
| $ 390,400 | 2500/2500 BPD | $ 57,560 | 2" Water Only |
| $ 357,264 | 1000/1000 BPD | $ 45,000 | 3" Dual Gas Only |

Confidential Business Information

Exhibit 13 to 5/9/23 SDR

Exhibit 10

# Clarks Creek Bakken Field – Wells Producing 9/2014 to 12/2016
## Hypothetical Fieldwide Gathering System
## Contemporaneous Wells Only




Confidential Business Information

Bottom-Hole Location of Preexisting Wells

Bottom-Hole Location of Contemporaneous Wells

Example Gathering system to gather Flared volumes from Wells
Estimate of 25,883' of Line-Pipe

# UNITED STATES DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
# WASHINGTON, D.C. 20240

IN REPLY REFER TO:
3162.7-1(d) (610)

January 3, 1992

**Instruction Memorandum No. 92-91**
**Expires: 9/30/93**

**To:** All State Directors

**From:** Director

**Subject:** Policy for Avoidably Lost Gas - Onshore Federal and Indian Oil and Gas Leases

The current procedures to be followed in implementing the Bureau of Land Management's (BLM) policy for avoidably lost gas were set forth in Notice to Lessees and Operators No. 4A (NTL-4A), dated January 1, 1980, as modified by Instruction Memorandum (IM) No. 87-652, dated August 17, 1987. These procedures specify how the resultant monetary obligation is to be calculated whenever the BLM determines that gas has been avoidably lost, i.e., full value for that gas so lost prior to October 22, 1984, and royalty value thereafter, except as modified by the penultimate paragraph of both Section I.B. and II.B., and the last paragraph of both Section I.D. and II.D., IM No. 87-652. These four sections were incorporated to implement the Secretary of the Interior's policy decision of August 1, 1986, that full value compensatory be assessed whenever an operator, after a reasonable period of time and due notice, continues to vent or flare gas which the authorized officer determines to be economically feasible to capture, i.e., avoidably lost. These provisions are retained by this IM.

The Interior Board of Land Appeals' (Board) decision in <u>Mobil Exploration & Producing U.S., Inc.</u> (119 IBLA 76, April 5, 1991), copy attached, ruled that 43 CFR 3162.7-1(d), which became effective on October 22, 1984, and provides for royalty value only on avoidably lost gas, should be applied retroactively. The effect of this ruling is to eliminate full value compensation for gas determined to have been avoidably lost prior to October 22, 1984, except in the circumstances specified in the aforementioned paragraphs of IM No. 87-652.

The impact of applying the Board's decision in Mobil to all identified related actions now pending within the Department of the Interior (i.e., pending BLM determinations, pending State Director Reviews, pending billings by the Minerals Management Service (MMS), pending appeals to MMS from prior billings, and pending appeals to the Board from prior BLM determinations) has been analyzed. Based on that analysis, it is concluded that the BLM's policy should be modified to adopt the Board's ruling in Mobil.

In view of the foregoing policy change, the Board should be requested to remand all currently pending appeals from BLM determinations that gas was avoidably lost prior to October 22, 1984. The rationale for each such request is that the BLM wishes to reconsider the case in light of the Board's decision in Mobil. Five pending appeals in this category recently identified are:

| State Office | Appellant | Board Docket Number |
|---|---|---|
| New Mexico | Merrion O&G Corp. | IBLA 89-674 |
| | Rife Oil Properties | IBLA 91-253 |
| Utah | C.C. Company | IBLA 90-308 |
| Wyoming | Western Production Co. | IBLA 90-383 |
| | Maxus Exploration | IBLA 91-49 |

A copy of this IM is being provided to the MMS's Appeals and Royalty Compliance Divisions to assure that this change in BLM policy will be applied to related matters under their respective jurisdictions. Subsequently, this office will furnish the MMS's Appeals Division with recommendations concerning the disposition of six pending appeals from prior MMS billings for gas alleged to have been avoidably lost. A copy of these recommendations will be provided to each State Director since we intend to recommend that five of these cases be remanded to the appropriate State Director for determinations in accordance with this IM. Such remands will assure a proper determination based on the revised procedures, and will provide the opportunity to correct certain procedural errors identified in the case files of the five appeals to be remanded. More specifically, the procedural errors identified are as follows:

1. Each of the five cases originated from audits external to the BLM. In each instance, the records contain no official determination by the BLM that gas had been avoidably lost or, if so, the determination was based solely on the single NTL-4A criterion of the operator not having obtained prior approval to vent/flare the gas, rather than on the

economic criteria instituted with the issuance of IM No. 87-652 on August 17, 1987. Since the BLM has exclusive jurisdiction in this regard, no avoidable loss can be said to have occurred absent an official determination of avoidable loss made by the BLM in accordance with its controlling policy and related procedures.

2. In two of the cases, the operator was billed for gas vented/flared prior to the time first established by NTL-4A and retained in IM No. 87-652. Both of these documents, as well as this IM, provide that for wells completed prior to January 1, 1980, the earliest effective date of any assessment for avoidably lost gas is to be April 1, 1980. For wells completed on or after January 1, 1980, the earliest possible date for such an assessment is the day next following the expiration date of the well's initial, authorized test period. Thus, for a well completed for production on January 1, 1980, followed by the customary 30-day test period, the effective date of any resultant assessment would be February 1, 1980.

The BLM's policy remains that gas produced from or allocable to a Federal or Indian lease may not be vented or flared absent the authorized officer's prior written approval without incurring a liability to compensate the United States or the Indian lessor for any portion of that gas which the authorized officer determines to have been avoidably lost.

The revised procedures set forth below are to be followed in all remanded, pending, and future cases for determining whether vented or flared gas has been avoidably lost and, if so, the basis for the resultant assessment (full value compensation or royalty value). These procedures are the same as those contained in IM No. 87-652, modified to adopt the Board's decision in Mobil and to update the previous instructions as a result of events which occurred after the issuance of IM No. 87-652. These procedures will remain in effect until Onshore Oil and Gas Order No. 9 (Waste Prevention and Beneficial Use of Oil and Gas) is finalized, unless earlier superseded by new written instructions. The draft of Onshore Oil and Gas Order No. 9, previously reviewed by the State Directors, will be revised appropriately to reflect the foregoing, and will be published in the Federal Register for public comment as soon as possible.

I. Wells completed prior to January 1, 1980.

A. No avoidable loss has occurred and no assessment shall result if:

1. The gas was being captured as of April 1, 1980; or

2. An application to continue the venting or flaring as uneconomic was received on or before March 31, 1980, and was approved; or

3. A plan was submitted on or before March 31, 1980, to eliminate the venting or flaring within a year of the plan's submittal date, and the commitment to do so was honored timely.

B. Where none of the I.A. criteria was satisfied timely, and no application subsequently has been submitted to continue the venting or flaring as uneconomic, the operator shall be sent a notice by certified mail. The notice shall allow 60 days from receipt in which to submit an application to justify its position that it was uneconomic to capture the gas, both at the time of application and as of April 1, 1980. If an application to continue the venting or flaring previously was filed, but after March 31, 1980, and regardless of whether final action has been taken thereon, the operator shall be sent a notice by certified mail allowing 60 days from receipt in which to submit data in support of its position that it was uneconomic to have captured the gas as of April 1, 1980. Once the appropriate 60-day period has expired, one of the following shall result:

1. If the authorized officer agrees that it was uneconomic to have captured the gas, both at the time of application and as of April 1, 1980, no avoidable loss has occurred and no assessment shall result.

2. If the authorized officer agrees that it was uneconomic to capture the gas at the time of application but determines that it was economic to have done so as of April 1, 1980, an avoidable loss has occurred, and the resultant assessment shall be based on the following:

As appropriate to the timeframe during which the avoidable loss occurred, royalty value on and after April 1, 1980, to be terminated at any time after

April 1, 1980, that an approval is granted to continue the venting or flaring as uneconomic.

3. Where no application to continue the venting or flaring previously was filed and no such application was filed within the 60-day period allowed; or the operator responds to the notice by advising of the intent to capture the gas at a future date (Note: Since no capture plan was submitted timely, later advice of the intent to capture at a future date does not result in a 1-year grace period thereafter in which to do so); or the authorized officer determines that it was economic to have captured the gas, both at the time of application and as of April 1,1980, an avoidable loss has occurred. The resultant assessment shall be based on the following:

As appropriate to the timeframe during which the avoidable loss occurred, royalty value on and after April 1, 1980, to be terminated at any time after April 1, 1980, that the gas is captured or approval is granted to continue the venting or flaring as uneconomic.

Each notice of an avoidable loss determination under I.B.3. also shall advise the operator that, if the gas is not being captured within 60 days of receipt, full value will be assessed thereafter until the gas is captured or approval is granted to continue the venting or flaring as uneconomic.

All prior determinations of avoidable loss involving cases that meet the criteria of this item I.B. shall be reviewed and, if necessary, appropriate action shall be taken to conform those determinations to the above guidance.

C. An avoidable loss has occurred when none of the I.A. criteria was satisfied timely, but the gas is captured before any notice is issued under I.B. The resultant assessment shall be based on the following:

As appropriate to the timeframe during which the avoidable loss occurred,

royalty value on and after April 1, 1980, to be terminated at any time after April 1, 1980, that the gas is captured.

D. An avoidable loss has occurred whenever the gas was not being captured as of April 1, 1980, if:

1. An application to continue the venting or flaring was received on or before March 31, 1980, but was rejected because it was considered economically feasible to have captured the gas at that time; or

2. A plan to eliminate the venting or flaring within 1 year of its submittal date was received on or before March 31, 1980, but the commitment to do so was not honored timely.

The resultant assessment shall be based on the following:

As appropriate to the timeframe during which the avoidable loss occurred, royalty value on and after April 1, 1980 (except as modified by the following paragraph), to be terminated at any time after April 1, 1980, that the gas is captured or approval is granted to continue the venting or flaring as uneconomic.

In any existing case meeting the criteria of this item I.D. in which the gas still is being vented or flared without approval, the operator shall be given notice by certified mail that, within 60 days of its receipt, capture of the gas must be occurring or an approvable application to continue the venting or flaring as uneconomic must be received, otherwise full value will be assessed thereafter until the gas is captured or approval is granted to continue the venting or flaring as uneconomic.

II. Wells completed on or after January 1, 1980.

A. No avoidable loss has occurred and no assessment shall result if:

1. The gas was being captured on or before the day next following the expiration date of the initial, authorized test period, i.e., 30 days or 50 MMcf, whichever first occurs,

unless a longer test period was approved by the authorized officer; or

2. An application to continue the venting or flaring as uneconomic was received on or before the expiration date of the initial, authorized test period and was approved; or

3. A plan was submitted on or before the expiration date of the initial, authorized test period to eliminate the venting or flaring within 1 year of the plan's submittal date, and the commitment to do so was honored timely.

B. Where none of the II.A. criteria is satisfied timely, and no application subsequently is submitted to continue the venting or flaring as uneconomic, the operator shall be sent a notice by certified mail. The notice shall allow 60 days from receipt in which to submit an application to justify its position that it was uneconomic to capture the gas, both at the time of application and as of the expiration date of the initial, authorized test period. If an application to continue the venting or flaring previously was filed, but after the expiration date of the initial, authorized test period, and regardless of whether final action has been taken thereon, the operator shall be sent a notice by certified mail allowing 60 days from receipt in which to submit data in support of its position that it was uneconomic to have captured the gas as of the expiration date of the initial, authorized test period. Once the appropriate 60-day period has expired, one of the following shall result:

1. If the authorized officer agrees that it was uneconomic to have captured the gas, both at the time of application and as of the expiration date of the initial, authorized test period, no avoidable loss has occurred and no assessment shall result.

2. If the authorized officer agrees that it was uneconomic to capture the gas at the time of application but determines that it was economic to have done so as of the expiration date of the initial, authorized test period, an avoidable loss has occurred, and the resultant assessment shall be based on the following:

As appropriate to the timeframe during which the avoidable loss occurred, royalty value on and after the expiration date of the initial, authorized test period, to be terminated at any time after the expiration date of the initial, authorized test period that approval is granted to continue the venting or flaring as uneconomic.

3. Where no application to continue the venting or flaring previously was filed and no such application was filed within the 60-day period allowed; or the operator responds to the notice by advising of the intent to capture the gas at a future date (Note: Since no capture plan was submitted timely, later advice of the intent to capture at a future date does not result in a 1-year grace period thereafter in which to do so); or the authorized officer determines that it was economic to have captured the gas, both at the time of application and as of the expiration date of the initial, authorized test period, an avoidable loss has occurred. The resultant assessment shall be based on the following:

As appropriate to the timeframe during which the avoidable loss occurred, royalty value on and after the expiration date of the initial, authorized test period, to be terminated at any time after the expiration date of the initial, authorized test period that the gas is captured or approval is granted to continue the venting or flaring as uneconomic.

Each notice of avoidable loss determination under II.B.3., also shall advise the operator that, if the gas is not being captured within the appropriate time after receipt (60 days or more -- see last paragraph of II.D.), full value will be assessed thereafter until the gas is captured or approval is granted to continue the venting or flaring as uneconomic.

All prior determinations of avoidable loss involving cases that meet the criteria of this item II.B. shall be reviewed and, if necessary, appropriate action shall be taken to conform those determinations to the above guidance.

C. An avoidable loss has occurred when none of the II.A. criteria is satisfied timely, but the gas is captured before any notice is issued under II.B. The resultant assessment shall be based on the following:

> As appropriate to the timeframe during which the avoidable loss occurred, royalty value on and after the expiration date of the initial, authorized test period, to be terminated at any time after the expiration date of the initial, authorized test period that the gas is captured.

D. An avoidable loss has occurred whenever the gas is not being captured on or before the day next following the expiration date of the initial, authorized test period, if:

1. An application to continue the venting or flaring was received on or before the expiration date of the initial, authorized test period, but was rejected because it was considered economically feasible to capture the gas at that time; or

2. A plan to eliminate the venting or flaring within 1 year of its submittal date was received on or before the expiration date of the initial, authorized test period, but the commitment to do so was not honored timely.

The resultant assessment shall be based on the following:

> As appropriate to the timeframe during which the avoidable loss occurred, royalty value on and after the expiration date of the initial, authorized test period (except as modified by following paragraph), to be terminated at any time after the expiration date of the initial, authorized test period that the gas is captured or approval is granted to continue the venting or flaring as uneconomic.

In any existing case meeting the criteria of this item II.D. in which the gas still is being vented or flared without approval and such unauthorized

venting or flaring has continued for a year or more after it first became appropriate to assess royalty value, a notice in that regard shall be sent to the operator by certified mail. The notice shall advise that, within 60 days of its receipt, capture of the gas must be occurring or an approvable application to continue the venting or flaring as uneconomic must be received, otherwise full value will be assessed thereafter until the gas is captured or approval is granted to continue the venting or flaring as uneconomic. Similar notifications shall be issued promptly in those existing cases where the assessment of royalty value first became appropriate less than a year previous. These notices shall require capture of the gas or the submission of an approvable application to continue the venting or flaring as uneconomic by the end of that 1-year period or, where less than 60 days remain in that year, within 60 days of receipt of the notice, otherwise full value will be assessed thereafter until the gas is captured or approval is granted to continue the venting or flaring as uneconomic. In future cases, approvals of timely filed plans to capture or rejections of timely filed applications to continue the venting or flaring as uneconomic shall include language to this effect.

The rationale for permitting an operator to demonstrate later under I.B. or II.B. that it was uneconomic to capture the gas at the appropriate critical point in time is that if, in fact, it was not economic to do so at that time, no monetary obligation should attach solely by reason of a failure to have filed a timely application to continue the venting or flaring. In most, if not all cases of unauthorized venting or flaring, operators have reported and continue to report monthly the volumes of gas being vented or flared. In many instances, however, no action was taken to compel compliance with the applicable requirements until months or even years after the onset of the unauthorized venting or flaring. Thus, when it would have been uneconomic to capture the gas as of the critical point in time, the balance weighs on the BLM's failure to react timely to the monthly reports, rather than on the operator's failure to seek a timely approval to continue the venting or flaring as uneconomic, since no economic loss has been suffered. The balance weighs on the operator's failure, however, when it would have been economic to have captured gas at the critical time.

The feasibility of capturing gas at any point shall be based on the economics of the operator's total operation on the lease, unitized area, or communitized tract rather than on

the total production of the well or wells from which the gas is being vented or flared or only on the gas production from such well(s), i.e., one must consider not only the value of the gas being vented or flared, but also the value of the liquefiable hydrocarbons entrained in the vented or flared wet gas stream, and the oil and other gas which is being captured or sold from that lease, unitized area, or communitized tract.

With respect to the foregoing paragraph, it should be kept in mind that what is determined to be economically feasible at a given point in time may not be economically viable at a later point. Thus, where an operator continues to vent or flare gas, even though it is being assessed for such loss, a continuation of such practice may be approved later without the operator incurring any further monetary obligation if the authorized officer subsequently determines that it is then no longer economically feasible to capture the gas. It also is probable that there will be some instances where the venting or flaring of gas has been or will be approved because the economics at that time did not warrant its capture but where, due to changed circumstances, it becomes economic to do so at a later date. In that event, the procedures in I. or II., as appropriate, are to be followed to conclusion and result in a new determination.

All approvals granted should be made effective the first of the month in which the complete application or plan is filed. An approval to continue the venting or flaring always should be conditioned to the effect that said approval is based on present circumstances.

All notices served on operators shall be by certified mail, and those which relate to determinations of avoidable loss shall cite the operator's rights to seek administrative relief.

An additional effort also is required to ensure that all existing but presently unknown cases of unauthorized venting or flaring, as well as future cases, will be identified quickly and prompt corrective action initiated to compel the submittal of a capture plan or an application to continue the venting or flaring as uneconomic. Obviously, operators need to be made more aware of our requirements in this regard and of the consequences which can result from their failure to comply with those requirements.

We know that most offices incorporate some type of notice as to the BLM's requirements regarding the venting or flaring of gas in their approvals of Applications for Permit to Drill (APD). However, it is apparent that these notices have not accomplished their objective in many instances. Thus, all

future APD's to drill a new well or to plug back or deepen an existing well and which may result in the completion or recompletion in one or more oil-bearing zones likely to contain associated gas are to include a specific, stipulated condition of approval the same or similar to the following:

> Gas produced from this well may not be vented or flared beyond an initial, authorized test period of ____*____ days or 50 MMcf following its (completion) (recompletion), whichever first occurs, without the prior, written approval of the authorized officer. Should gas be vented or flared without approval beyond the test period authorized above, you may be directed to shut-in the well until the gas can be captured or approval to continue the venting or flaring as uneconomic is granted, and you shall be required to compensate the lessor for that portion of the gas vented or flared without approval which is determined to have been avoidably lost.
>
> * 30 days, unless a longer test period specifically is approved by the authorized officer.

It is suggested that this stipulation be (1) separate and apart from all other stipulated conditions of approval; (2) attached to the face of the APD itself; and (3) highlighted in a manner to draw attention to it, such as underscoring the language in red ink. The use of such a separate, highlighted stipulation, prominently attached to the face of each approved APD, should increase the level of operator compliance in this regard.

It will remain incumbent on the BLM to identify quickly those situations in which an operator fails to comply timely and to require prompt corrective action. If we are to do so, inspectors must be particularly sensitive to identifying and reporting to their supervisors any instances of unauthorized venting or flaring encountered, and an increased effort must be made to otherwise identify unauthorized venting or flaring by a review of all Monthly Reports of Operations data promptly on their receipt from MMS.

Since the MMS is responsible for billing and collecting all assessments resulting from the BLM's determinations that gas has been avoidably lost, it must be advised at the appropriate time of all such determinations. Guidance in this respect was provided by IM No. 88-146, dated December 17, 1987. Nothing has occurred in the interim to warrant a revision of that guidance.

Should you require any clarification or have questions not addressed by this IM or the attachment, please communicate those in writing to this office (610) or call Eddie Wyatt, Division of Fluid Mineral Lease and Reservoir Management, directly at 653-2127 (FTS) or (202) 653-2127 (Commercial).

Hillary A. Oden
Assistant Director,
Energy and Mineral Resources

1 Attachment
1 - 1 119 IBLA 76 (7 PP)

Exhibit 14 to 5/9/23 SDR

United States Department of the Interior
OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF LAND APPEALS
4015 WILSON BOULEVARD
ARLINGTON, VIRGINIA 22203

TAKE PRIDE IN AMERICA

IN REPLY REFER TO:

MOBIL EXPLORATION & PRODUCING U.S., INC.

IBLA 90-208 Decided April 5, 1991

Appeal from a decision by the Wyoming Acting Deputy State Director, Bureau of Land Management, affirming a decision by the Platte River Resource Area Manager assessing a Federal lessee the full value of vented gas found to have been avoidably lost. WY-90-04.

Reversed in part, affirmed in part, and remanded.

1. Oil and Gas Leases: Generally--Oil and Gas Leases: Royalties: Payments

   A finding that a lessee must pay the United States for the full value of vented gas that was avoidably lost from 1980 to 1984 is reversed, because 43 CFR 3162.7-1(d), issued in October 1984, changed Departmental policy to require that compensation for avoidably lost gas shall be limited to payment of the royalty value of gas so vented. Because the 1984 regulation changed the prior policy, which had been to assess vented gas at full value, affected lessees who would benefit by the amended rule are allowed the benefit of the change.

2. Administrative Authority: Generally--Appeals: Jurisdiction--Board of Land Appeals--Judicial Review

   A statute establishing time limitations for commencement of civil actions for damages by the United States does not apply to limit administrative review within the Department of the Interior.

APPEARANCES: Robert A. Luettgen, Esq., Dallas, Texas, and Charles L. Kaiser, Esq., Denver, Colorado, for appellant; Michael F. Deneen, Esq., Office of the Regional Solicitor, Denver, Colorado, for the Bureau of Land Management.

OPINION BY ADMINISTRATIVE JUDGE ARNESS

Mobil Exploration & Producing U.S., Inc. (Mobil), has appealed from an October 25, 1989, decision by the Wyoming Acting Deputy State Director, Division of Mineral Resources, Bureau of Land Management (BLM), finding that Mobil should pay the United States the full value of gas vented from the Bear Creek No. 1 well on lease No. WYW-089382 from April 1, 1980, to October 21, 1984. It is undisputed that the gas was vented without authorization. The only question before us on appeal is whether compensation should be paid for the full value of the vented gas, or whether payment of the royalty value for the gas would satisfy the requirements of law.

On August 3, 1989, BLM's Platte River Resource Area Manager notified Mobil that an audit of the Bear Creek Unit revealed that Mobil had avoidably lost gas which it had reported flared because of compressor failure. The Area Manager found that:

> We have calculated the maximum allowable flared volumes under the provisions of NTL-4A and determined from that figure any excess flared volumes * * *. From this analysis we have determined that between the dates of April 1, 1980 thru October 21, 1984, that avoidably lost gas (excess flared volume) total 9,139 MCF. You will be assessed full value on this amount of production. Since

> October 21, 1984 to the present, we have determined avoidably lost gas totaled 19,791 MCF. You will be assessed royalty value of this amount of production.

From this decision, Mobil appealed to the State Director, whose office conducted a hearing on October 11, 1989. The Acting Deputy State Director set aside so much of the Area Manager's decision as assessed compensatory royalty from January 1985 to September 1987, but, pertinent to this appeal, affirmed the determination that full value should be assessed from April 1980 to October 21, 1984, explaining, concerning this aspect of the case, that:

> We agree with the Area Manager's interpretation. The longstanding practice of assessing compensation that equals the full value of the avoidably lost gas is clearly stated in the Mineral Leasing Act of 1920, as amended in 1931, Section 1(h). Apparently, at that time, and in an attempt to discourage waste, the Department deemed it necessary to assess full value compensation for avoidably lost gas. The fact that the percentage value due the government exceeds the royalty rate may be construed as a "penalty." As oil and gas prices began to rise in the late 70's and early 80's, the Department concluded that assessing only the royalty value for avoidably lost gas would be a sufficient deterrent, in most cases, to insure that an operator would not waste gas that is economically feasible to market. We affirm the Area Manager's decision to assess compensation that equals the full value of the avoidably lost gas for the period from April 1, 1980, to October 22, 1984 (the effective date of the revised regulations at 43 CFR 3162.7-1(d).

(Decision at 3).

Pertinently, 43 CFR 3162.7-1(d) provides that one in the position of Mobil "shall be liable for royalty payments on * * * gas lost or wasted from a lease." BLM argues that this regulation, however, may not be applied

retroactively, because to do so would disparage other provisions of the Mineral Leasing Act not repealed by enactment of the Federal Oil and Gas Royalty Management Act (FOGRMA), 30 U.S.C. §§ 1701-1757 (1988), the statute implemented by 43 CFR 3162.7-1(d).

[1] Similar arguments were rejected by this Board in Conoco, 115 IBLA 105 (1990), where it was urged that retroactive application of a rule more generous to a Federal lessee than the rule it replaced would be in derogation of past policy in effect before the rule change. Rejecting this argument and a parallel contention that retroactive application of the new rule would overrule past decisions of the Department that implemented the prior rule, we found that "the Department may, in the absence of intervening rights of others or prejudice to the interests of the United States, apply the amendment to pending cases." Id. at 106. Insofar as the argument that to do so would derogate the effect of prior law, we reasoned that "[i]t [the prior rule] has now been amended; thus, the law has changed. The only question is whether [the appellant] should have the benefit of the change. * * * there is ample authority for providing an affected party with the benefits of a regulatory change." Id. at 107 n.3.

We also gave retroactive effect to policy changes in the administration of oil and gas royalty payments involving vented gas in Ladd Petroleum Corp., 107 IBLA 5 (1989). In that case, compensation for avoidably lost gas was at issue. Setting aside the BLM decision finding that payment was due the United States Government as described by NTL-4A Part I, we ordered BLM to reconsider whether the gas had been avoidably lost in light of the

fact that Departmental policy had changed. We explained that, while the new policy had not been in effect when the decision under review had issued, the regulatory change made necessary a reconsideration of the question of payment because the newly promulgated rules

> reflect the present policy of BLM concerning the proper application of NTL-4A and the regulations on which it is based to make determinations of avoidably lost gas. In the past, this Board has applied an amended version of a regulation to a pending matter if to do so would benefit the affected party, and if there were no countervailing public policy reasons or intervening rights. James E. Strong, 45 IBLA 386 (1980). The rationale for such an action is equally appropriate here where BLM has indicated a change in its policy regarding the application of NTL-4A concerning avoidably lost gas which would benefit appellants, and there are no countervailing regulations, public policy considerations, or intervening rights. See Somont Oil Co., Inc., 91 IBLA 137 (1986).

Id. at 8.

The case under review is such a case. As we pointed out in Conoco, supra, to give retroactive application to the 1984 regulation in this case also permits us to avoid an inequitable inconsistency in administration of this gas lease, since to do otherwise would allow assessment of two different rates of compensation for gas vented at the No. 1 well although the only distinction between the two very different charges is the passage of an instant of time at midnight on October 21, 1984. On the record before us, we find that the the application of 43 CFR 3162.7-1(d) will not adversely affect intervening rights or prejudice the interests of the United States, and is not in derogation of prior law, but a proper implementation of existing law after amendment.

[2] Mobil also argues that the limitation on actions provided by 28 U.S.C. § 2415 (1988), bars recovery of compensation on gas flared by Mobil before August 3, 1983. This statute, which governs civil actions for money damages brought by the United States, does not affect the administration of this Federal lease by BLM. Whether the manner in which the flared gas audit was conducted was so slow that it would bar recovery in some hypothetical suit for damages we are unable to say, nor is it "within our authority to decide" such a question. Alaska Statebank, 111 IBLA 300, 312 (1989). An appeal to this Board is in no sense the commencement of an action for damages: it is the continuation and conclusion of administrative review that began in the Area BLM office with the audit of Mobil's operation of the Bear Creek Unit No. 1 well. Our review is conducted on behalf of the Secretary, pursuant to Departmental regulation, and is not a commencement of an action for damages. The purpose of our review in the instant case is limited to a determination, on the record before us, of how compensation due the United States should be calculated. See 43 CFR 4.1. We do not hold that there are no limits on the time that may be spent in administrative review, but only find that, in this case, there has been no showing that any limit on such review set by law has been infringed. On March 1, 1989, Mobil was placed on notice that an audit of the No. 1 well had taken place. Thereafter, it has vigorously defended its interests before the Department. There has been no showing that it was denied the right to participate effectively in the administration of the affected lease. See generally Leo Titus, Sr., 89 IBLA 323, 92 I.D. 578 (1985).

Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 CFR 4.1, the decision appealed from is reversed in part, affirmed in part, and the case file is remanded to permit computation of the amount of royalty due on gas avoidably lost from Bear Creek Unit No. 1 well between April 1, 1980, and October 21, 1984.

Franklin D. Arness
Administrative Judge

I concur:

James L. Byrnes
Administrative Judge

Exhibit 15 to 5/9/23 SDR

BLM

United States Department of the Interior
Bureau of Land Management

Environmental Assessment
DOI-BLM-MT-C030-2016-0212-EA
(Previously DOI-BLM-MT-C030-2013-229-EA)

June 1, 2016

**Project Title:** Sundry Notice Flaring Requests

**Location:** North Dakota Field Office
99 23rd Avenue West, Suite A
Dickinson, ND 58601-2619

1.0 PURPOSE AND NEED ..... 4
1.1 Introduction ..... 4
1.2 Purpose and Need for the Proposed Action ..... 6
1.3 The Decision to be Made ..... 6
1.4 Conformance with Land Use Plan(s) ..... 7
1.5 Public Scoping and Identification of Issues ..... 7
1.6 Issues Not Analyzed ..... 8
2.0 DESCRIPTION OF ALTERNATIVES ..... 9
2.1 Alternative A (No Action): ..... 9
2.2 Alternative B (Proposed Action-BLM Preferred): ..... 9
2.3 Alternative Considered But Dismissed from Further Analysis ..... 10
3.0 AFFECTED ENVIRONMENT ..... 11
3.1 Introduction ..... 11
3.2 General Description of the Affected Environment ..... 11
3.3 Air Resources ..... 11
3.4 Visual Resources ..... 19
3.5 Cultural Resources ..... 19
3.6 Native American Religious Concerns ..... 20
3.7 Fluid Minerals ..... 21
3.8 Socio-Economic Conditions ..... 22
4.0 ENVIRONMENTAL IMPACTS ..... 28
4.1 Assumptions and Methodology ..... 28
4.2 Reasonably Foreseeable Development ..... 29
4.3 Alternative A (No Action Alternative) ..... 29
4.4 Alternative B (Proposed Action BLM Preferred Alternative) ..... 30
5.0 CONSULTATION AND COORDINATION ..... 39
5.1 Persons, Agencies, and Organizations Consulted ..... 39
5.2 Summary of Public Participation ..... 39
6.0 BIBLIOGRAPHY ..... 41
Appendix A. Pending Sundry Notices in the NDFO. ..... 44
Appendix B. Standard Conditions of Approval for Flaring Requests ..... 72
Appendix C. Reasonably Foreseeable Development for this EA and Gas Capture Projections by Year ..... 73

Appendix D. Flaring Emissions ........................................................................ 77

Appendix E. Viewshed Analysis Method for Historic Properties ........................................ 81

**North Dakota Field Office**
**DOI-BLM-MT-C030-2016-0212-EA**

# 1.0 PURPOSE AND NEED

## 1.1 Introduction

This Environmental Assessment (EA) has been modified based on the results of a State Director Review. The EA now better describes the proposed action and decision to be made by the BLM, and clarifies that royalty determination will be made on a case-by-case basis as a separate decision on each Sundry Notice (SN) request to flare. Modifications are made throughout the document as a result of the changes to the purpose and need/proposed action.

This modified EA has been prepared to disclose and analyze the environmental consequences of SN requests pending review to flare oil-well gas from BLM administered oil wells in western North Dakota. Reasonably foreseeable requests for BLM administered oil wells in the same geographic areas will also be analyzed in the EA. If necessary, additional coordination would be conducted with the proper surface management agency (SMA) for SNs requiring mitigation. Royalty determination will not be part of this EA, and will be completed for each SN request in accordance with NTL-4A as a separate review.

The BLM anticipates additional flaring requests in the future as a result of development. This broader suite of anticipated flaring requests would be temporally and spatially related to the past and ongoing flaring activities, and would require a series of associated subsequent decisions.

In accordance with Instruction Memorandum No. MT-95-025, this EA does not apply to private and state wells approved and administered by the State of North Dakota that have been committed to Federal units or communitization agreements. However, NTL-4A continues to apply to private and state wells committed to Federal units or communitization agreements.

Oil production on Federal and Indian mineral estates has dramatically expanded in western North Dakota in the past several years with horizontal drilling and hydraulic fracturing of the Bakken and Three Forks Formations. The "Bakken" play primarily produces oil, and a by-product of oil production in the Bakken is natural gas. Gas produced during oil production is called associated gas. During oil and gas production, it may be necessary to burn or release natural gas for a number of operational reasons, including lowering the pressure to ensure safety. Burning natural gas is known as flaring, while releasing natural gas directly into the atmosphere is called venting. Each has different environmental impacts.

In addition to the operational reasons for flaring and venting, in areas where the primary purpose of drilling is to produce oil, producers flare or vent associated natural gas because no local market exists for the gas and transporting it to a market may not be economically feasible. Natural gas prices are a major determinant of whether associated gas is flared, vented or sold. Associated natural gas would be sold if prices were high enough over a long enough period to justify building the infrastructure to transport the gas to a market.

Under the general requirements for onshore oil and gas operations (43 CFR 3162.1), an operator shall comply with applicable laws and regulations. These include, but are not limited to, conducting all operations in a manner that results in maximum ultimate economic recovery of oil and gas with minimum waste.

Notice to Lessees & Operators of Onshore Federal & Indian Oil and Gas Leases (NTL-4A) Royalty or Compensation for Oil and Gas Lost, Instruction Memorandum No. WO 97-652, and Instruction Memorandum WO No. 92-91 provide the BLM authority to allow venting or flaring of oil-well gas under certain conditions. Specifically in NTL-4A, an operator must request approval to vent or flare produced oil well gas by submitting:

1) *an evaluation report supported by engineering, geologic, and economic data which demonstrates to the satisfaction of the Supervisor that the expenditures necessary to market or beneficially use such gas are not economically justified and that conservation of the gas, if required, would lead to the premature abandonment of recoverable oil reserves and ultimately to a greater loss of equivalent energy than would be recovered if the venting or flaring were permitted to continue, or*
2) *an action plan that will eliminate flaring of gas within 1 year from the date of application.*

The Operator submits a Form 3160-5, Sundry Notices and Reports on Wells that details the notice of intent to flare gas. The BLM is currently developing a national rule that will update and replace NTL-4A. The new rule will focus on waste prevention and royalty collection (the authorities inherent with the BLM).

Most flaring in western North Dakota occurs either because the well is connected to infrastructure with inadequate capacity to handle the volumes of gas or the well is not connected to natural gas gathering lines. Various factors such as surface ownership and permitting review time make pipeline permitting challenging.

The BLM North Dakota Field Office (NDFO) is highly engaged in facilitating pipeline infrastructure, some of which would help to address flaring of oil-well gas. However, the NDFO has seen an increase in the number of SN applications requesting to flare oil-well gas from Federal and Indian wells throughout western North Dakota. The requests to flare vary and require review to ensure compliance with NTL-4A. Limited staff, increased number of Applications for Permit to Drill (APDs) and the need for an environmental assessment of flaring impacts, have resulted in approximately 2,211 SN applications requesting flaring approval for Federal and Indian oil wells throughout western North Dakota.

As of June 1, 2014, the North Dakota Industrial Commission (NDIC) adopted a new policy, and was revised on September 24, 2015, Order 24665, for reducing gas flaring. This requirement is for all wells which will be drilled in the Bakken, Three Forks, and Three Forks/Bakken or Sanish Pools. The policy requires that a Gas Capture Plan (GCP) must accompany all APDs submitted to NDIC. The GCP has various requirements that must be met by prior to approval of APD. These plans aim to ensure that all options for capturing gas are fully evaluated before a well is drilled. The state of North Dakota began implementing its policy in 2014 by requiring operators

to meet flaring reduction targets according to a prescribed timeline. For operators that do not meet the targets, the state policy provides for the restriction of oil production until the targets are met.

In addition to the new NDIC policy, a "Flaring Task Force" was formed under the North Dakota Petroleum Council (NDPC) composed of industry representatives, State of North Dakota representatives and others, intending to pool knowledge and experience to better optimize the resource at the wellhead and improve existing infrastructure to capture and transport gas for processing. The group focused on educating the public while working with stakeholder groups, governments, the Three Affiliated Tribes (Fort Berthold Reservation), researchers, and landowners.

## 1.2 Purpose and Need for the Proposed Action

The need for the action is established by the BLM's responsibility under the National Environmental Policy Act (NEPA) and NTL-4A to evaluate Federal and Indian SNs requesting to flare oil-well gas. The BLM has approximately 2,211 SNs pending review some of which have flared in the past and some are flaring at the present time. This review would allow BLM to determine the social and environmental impacts from flaring and identify any needed mitigation measures, allow private individuals or companies to continue developing oil and gas resources in accordance to Federal regulations, and at the same time meet the requirement identified in the Energy Policy Act, Sec. 362(2), Federal Oil and Gas Leasing Reform Act of 1987, and the Mineral Leasing Act of 1920, Sec. 17. Companies with pending flaring sundry notices have received approved APDs from the BLM, and are authorized to sell the oil and gas in public markets.

## 1.3 The Decision to be Made

The BLM will determine the environmental and social impacts from flaring (past, present and reasonably foreseeable) and identify any design features/mitigation measures that may need to be applied to future flaring, as well as Conditions of Approval. The BLM has the authority to protect the viewsheds of cultural and historic properties for federally administered wells on both federal and non-federal surface under the National Historic Preservation Act (NHPA), and 36 CFR 800 – Protection of Historic Properties. In addition, mitigation requirements for venting and flaring within the viewsheds of historic or cultural properties are authorized under the NEPA, section 6.8.4.

The BLM is evaluating and analyzing the current and future flaring because the activity is an integral part of BLM's oil and gas program under authority of Federal Land Policy and Management Act (FLPMA) of 1976 and to disclose the cumulative impact of flaring.

### 1.4 Conformance with Land Use Plan(s)

This EA is tiered to the information and analysis and conforms to the decisions contained in the North Dakota RMP Desktop Document, April 1988, Chapter 4 page 11, and its' associated Environmental Impact Statement (EIS), the governing land use plan for the NDFO.

Analysis of the impacts from flaring oil-well gas is documented in this EA, and was conducted by BLM staff in the Eastern Montana/Dakotas District, North Dakota Field Office, and Montana State Office who relied on professional knowledge of the areas involved, review of current databases, file information, and operator input to ensure that appropriate considerations were made.

Analyzing the impacts from flaring and determining potential mitigation measures would not be in conflict with any local, county, or state laws or plans.

### 1.5 Public Scoping and Identification of Issues

Public scoping for this project was conducted by posting the proposed action on the NDFO website - NEPA notification log. Therefore, scoping was initiated August 30, 2013, the date the EA was assigned a number and posted to the NEPA notification log. Refer to Chapter 5 of this EA for a more complete summary of comments received and consultation/coordination.

Site-specific resource concerns were identified by the BLM through the preliminary review process conducted during the internal scoping period. The BLM focuses its analysis on "issues that are truly significant to the action in question, rather than amassing needless detail" (40 CFR 1500.1(b)). Issues have a relationship with the proposed action; are within the scope of analysis; and are amenable to scientific analysis.

The interdisciplinary team reviewed the proposed action and determined three issues that would have an effect on particular resources. The resources carried forward through analysis in this EA are air resources, greenhouse gas emission and climate change, visual setting of cultural or historical properties, Native American Religious Concerns, and socioeconomic conditions.

- Issue – Flaring emissions

  The BLM recognizes air as a valuable natural and public resource that needs to be protected through prudent management and appropriate mitigation. Where a BLM-authorized activity has the potential to affect the air resource, this activity must be managed appropriately, consistent with BLM planning objectives and in compliance with the Clean Air Act.

  According to EPA Emission Inventory Improvement documents (EPA 1999), oil field emissions encompass three primary areas: combustion, fugitive, and vented. Flaring falls under the combustion area, and those emissions include $SO_2$, ozone precursors called

volatile organic compounds (VOCs), greenhouse gases (GHGs), and hazardous air pollutants (HAPs).

- Issue – Effects on the visual setting of historical properties

  Flaring has the potential to alter the characteristics of a significant cultural or historic property by introducing visual, atmospheric or audible elements that diminish the integrity of the property's setting or feeling. Though the effect on all historic properties were considered, an Interdisciplinary Team developed a viewshed of the Killdeer Mountain Battlefield State Historic Site, Elkhorn Ranch within Theodore Roosevelt National Park, the Lynch Knife River Flint Quarry, the Chateau de Mores State Historical Site, the Fort Buford State Historic Site, the Fort Union Trading Post National Historic Site, the Fort Dilts State Historic Site, and the Lewis & Clark National Historic Trail to understand the potential effects from flaring. The BLM has the authority and responsibility to protect the viewsheds of cultural and historic properties for federally administered wells on both federal and non-federal surface under the NHPA and 36 CFR 800 – Protection of Historic Properties. In addition, mitigation requirements for venting and flaring within the viewsheds of historic or cultural properties are authorized under the NEPA, section 6.8.4

## 1.6 Issues Not Analyzed

The BLM considered the following issues but did not analyze those in further detail because they were determined to not be present or not potentially impacted by this project: Areas of Critical Environmental Concern (ACEC), Farmlands (Prime & Unique), Floodplains, Invasive, Non-native weed species, Threatened, Endangered, or Candidate Plant Species, Threatened, Endangered, or Candidate Animal Species, Wastes (Hazardous or Solid), Water Quality (Drinking/Ground), Wild and Scenic Rivers, Livestock Grazing, Woodland/Forestry, Vegetation including Special Status Plant Species, Fish and Wildlife including Special Status Species, Soils, Recreation, Geology, Paleontology, Lands/Access, Fuels/Fire Management, Wilderness Characteristics.

The determination of royalty revenue on each SN request would be in accordance with NTL-4A on a case-by-case basis. Thus, the EA contains no further discussion of flaring approvals or royalty issues.

# 2.0 DESCRIPTION OF ALTERNATIVES

## 2.1 Alternative A (No Action):

The No Action Alternative would be to analyze approximately 2,211 pending SN requests to flare gas from Federal and Indian oil wells as submitted by the operator on a case-by-case basis in accordance with NEPA and NTL-4A. This would mean the analysis would also occur on a case-by-case basis without consideration of the environmental conditions of a larger area in the western portion of North Dakota; this would also take longer because the same analysis would have to be done for each SN request (i.e., discussing impacts to air quality in every SN request NEPA document versus disclosing impacts to air quality from all 2,211 SN requests and the reasonably foreseeable development scenario). Each SN request would have an individual NEPA document to analyze impacts from the individual request. Impacts and mitigation measures would be limited to the small geographic area of the individual request. Surface management would remain the same and ongoing oil and gas production would continue on surrounding Federal, Indian, private, and State leases. Future flaring SN requests would also be analyzed on a case-by-case basis.

## 2.2 Alternative B (Proposed Action-BLM Preferred):

Operators continue to submit SN requests to flare as part of their operations in the Bakken area. The Proposed Action would be for BLM to analyze approximately 2,211 pending SN requests (Appendix A) to flare gas from Federal and Indian oil wells along with disclosing the reasonably foreseeable impacts from flaring in the western portion of North Dakota, and identify mitigation measures for future flaring (Map 1).

Below is a list of potential mitigation measures that the BLM could apply, as appropriate, to **future** flaring requests, in addition to the COAs listed in Appendix B, For past flaring refer to Chapter 4 for the disclosure of the impacts to cultural resources.

- Construct a gathering pipeline which will ultimately be connected to a trunk pipeline;
- Liquefy the gas on location and store on location until it can be transported via truck to a pipeline injection location;
- Reinject the natural gas into a formation for possible future use;
- Reinject the natural gas into the reservoir for secondary enhanced oil recovery;
- Beneficial use on lease;
- Camouflaging of flare using vegetation or architectural structures;
- Reducing flare stack height;
- Restriction of active flaring at night
- Coordination with the appropriate SMA would be required for future flaring requests within the viewshed of a cultural or historic property for mitigation.

## 2.3 Alternative Considered But Dismissed from Further Analysis

Approving all SN requests to flare oil-well gas from Federal and Indian wells as submitted by the operator without individual analysis would not be in accordance with BLM policy and regulations. This alternative would not allow BLM to properly evaluate each request to flare in accordance to NEPA and NTL-4A, and apply necessary mitigation measures when necessary.

# 3.0 AFFECTED ENVIRONMENT

## 3.1 Introduction

This chapter describes the existing environment (i.e., the physical, biological, social, and economic values and resources) within the Williston Basin in western North Dakota (Map 1). For this environmental analysis, the Williston Basin in western North Dakota is considered the area of analysis that could be affected by implementation of the alternatives described in Chapter 2. Each resource description will be analyzed further in Chapter 4.

Only those aspects of the existing environment that are potentially impacted by this project are described in detail. The aspects of the existing environment that were determined to not be present or not potentially impacted by this project are listed in Section 1.6 above.

## 3.2 General Description of the Affected Environment

The western portion of North Dakota is comprised of gently rolling hills, buttes, badlands, wetlands, riparian areas, and river breaks. These lands are primarily privately owned and are mainly utilized for agricultural uses. These lands have limitations from crop production and are generally rangelands or pasture lands.

The BLM manages approximately 57,400 surface acres of public land in North Dakota and has oil and gas management responsibilities for 1,082,000 acres of Federal subsurface and approximately 546,000 acres of Indian Trust subsurface, mostly on the Fort Berthold reservation. Federal and Indian minerals represent approximately 7 percent of total Bakken/Three Forks mineral estate. The BLM and BIA split management responsibility on Indian lands, with the BIA managing leasing and surface use, and the BLM managing oversight of oil and gas drilling and production activities. Similarly, the BLM and USDA Forest Service split management responsibilities on Forest Service lands, approximately 1,025,000 acres, with the Forest Service managing leasing and surface use, and the BLM managing oversight of oil and gas drilling and production activities.

## 3.3 Air Resources

Air resources include air quality, air quality related values (AQRVs), and greenhouse gas (GHG) emissions affecting climate change.

The U.S. Environmental Protection Agency (USEPA) has the primary responsibility for setting minimum air quality standards, including seven criteria air pollutants subject to National Ambient Air Quality Standards (NAAQS). Pollutants regulated under NAAQS include carbon monoxide (CO), lead, nitrogen dioxide ($NO_2$), ozone, particulate matter with a diameter less than or equal to 10 microns ($PM_{10}$), particulate matter with a diameter less than or equal to 2.5 microns ($PM_{2.5}$), and sulfur dioxide ($SO_2$). Two additional pollutants, nitrogen oxides ($NO_x$) and volatile organic compounds (VOCs), are regulated because they form ozone in the atmosphere. Air quality is determined by pollutant emissions and emission characteristics, atmospheric chemistry, dispersion meteorology, and terrain. AQRVs include effects on soil and water, such as sulfur and nitrogen deposition, lake acidification, and aesthetic effects, such as visibility.

In addition to USEPA federal regulations, air quality is also regulated by the North Dakota Department of Health, Division of Air Quality. This agency develops state-specific regulations and issues air quality permits to emission sources.

Climate is the composite of generally prevailing weather conditions of a particular region throughout the year, averaged over a series of years. Climate change includes both historic and predicted climate shifts that are beyond normal weather variations.

### 3.3.1 Air Quality

Air quality is monitored at State and Local Air Monitoring Systems (SLAMS) monitors within the following counties with oil and gas activity: Billings, Burke, Dunn, and McKenzie. The USEPA air quality index (AQI) is an index used for reporting daily air quality to the public. The index tells how clean or polluted an area's air is and whether associated health effects might be a concern. The USEPA calculates the AQI for five criteria air pollutants regulated by the Clean Air Act (CAA): ground-level ozone, PM, CO, $SO_2$, and $NO_2$. For each of these pollutants, USEPA has established NAAQS to protect public health. An AQI value of 100 generally corresponds to the primary ambient standard for the pollutant. The following terms help interpret the AQI information:

- **Good** – The AQI value is between 0 and 50. Air quality is considered satisfactory and air pollution poses little or no risk.
- **Moderate** – The AQI is between 51 and 100. Air quality is acceptable; however, for some pollutants there may be a moderate health concern for a very small number of people. For example, people who are unusually sensitive to ozone may experience respiratory symptoms.
- **Unhealthy for Sensitive Groups** – When AQI values are between 101 and 150, members of "sensitive groups" may experience health effects. These groups are likely to be affected at lower levels than the general public. For example, people with lung disease are at greater risk from exposure to ozone, while people with either lung disease or heart disease are at greater risk from exposure to particle pollution. The general public is not likely to be affected when the AQI is in this range.
- **Unhealthy** – The AQI is between 151 and 200. Everyone may begin to experience some adverse health effects, and members of the sensitive groups may experience more serious effects.
- **Very Unhealthy** – The AQI is between 201 and 300. This index level would trigger a health alert signifying that everyone may experience more serious health effects.

AQI data show that there is little risk to the general public from air quality in the analysis area (Table 3.3.1). Based on available aggregate data for state-operated monitors in Billings, Burke, Dunn, and McKenzie counties for years 2011–2013, at least 92 percent of the days were rated "good." The three-year median daily AQIs were 33, 34, 31, and 35 for the Billings, Burke, Dunn, and McKenzie county monitors. Table 3.3.1 does not include data from monitors located at industrial sites.

**Table 3.3.1 USEPA Air Quality Index Reports**

| County[1] | # Days in Period | # Days Rated Good or No Data | Percent of Days Rated Good or No Data | # Days Rated Moderate | # Days Rated Unhealthy for Sensitive Groups | # Days Rated Unhealthy | # Days Rated Very Unhealthy |
|---|---|---|---|---|---|---|---|
| Billings | 1,096 | 1,091 | 99% | 5 | 0 | 0 | 0 |
| Burke | 1,094 | 1,006 | 92% | 88 | 0 | 0 | 0 |
| Dunn | 1,023 | 968 | 95% | 55 | 0 | 0 | 0 |
| McKenzie | 1,096 | 1,005 | 92% | 90 | 0 | 0 | 1 |

Source: USEPA 2014. AirData website (http://www.epa.gov/airdata/ad_rep_aqi.html, accessed August 19, 2014).
[1] Monitor names and station identifiers are as follows:

The Billings County monitor is the Painted Canyon monitor at the Theodore Roosevelt National Park North Unit (38-007-002).

The Burke County monitor is located in the Lostwood Wilderness (38-013-004).

The Dunn County monitor is located in Dunn Center (38-025-003).

The McKenzie County monitor is located at the Theodore Roosevelt National Park North Unit (38-053-002).

The area managed by the NDFO is designated as an attainment area for all NAAQS. Maximum concentrations as a percentage of the NAAQS are summarized in Table 3.3.2 based on 2013 monitoring data. Gaseous pollutant concentrations are provided in terms of parts per million (ppm) or parts per billion (ppb), while particulate concentrations are provided in terms of micrograms per cubic meter ($\mu g/m^3$). Data are not provided for CO and lead, which are not monitored at these sites. Data from multiple SLAMS monitoring locations are provided, including monitors in the Lostwood Wilderness (Burke County) and Theodore Roosevelt National Park North Unit (McKenzie County). A non-SLAMS monitoring site is maintained by the National Park Service at the Theodore Roosevelt National Park South Unit in Billings County.

Figure 3.3.1 provides air quality trend data based on monitoring data provided by the North Dakota Department of Health for years 2006-2013. Although oil and gas activity has increased substantially during the last several years, ambient concentrations have remained relatively stable or have decreased slightly, with the exception of $PM_{10}$, which increased substantially in Dunn County from 2010 to 2011 and has remained at the higher level. Additional air quality regulations that reduce emissions from many types of sources and operator efforts to control emissions have maintained good air quality in the area.

In addition, a new policy adopted in June 2014, and revised on September 24, 2015 by the North Dakota Industrial Commission (NDIC) will further limit VOC, GHG, and $NO_x$ emissions from flaring of gas associated with oil wells. NDIC Order 24665 requires operators to capture greater percentages of gas at North Dakota Bakken Formation wells in order to meet gas capture targets of 77% by January 1, 2015, 80% by April 1, 2016, 85% by November 1, 2016, 88% by November 1, 2018, and 91% by November 1, 2020. Gas capture targets may be met by routing gas to pipeline for sale, usage of gas at the well site, or through the beneficial use of gas (e.g. electrical power generation).

**Table 3.3.2 2013 Monitored Concentrations Representative of the Study Area**

| Pollutant | Averaging Time | Applicable Standard (Format) | Ambient Concentrations[a] (Billings, Burke, Dunn, McKenzie, Williston[b] Counties) | Percentages of NAAQS (Billings, Burke, Dunn, McKenzie, Williston[b] Counties) |
|---|---|---|---|---|
| CO | 1 hour | 35 ppm (2nd highest) | NA, NA, NA, NA, NA | NA, NA, NA, NA, NA |
| | 8 hour | 9 ppm (2nd highest) | NA, NA, NA, NA, NA | NA, NA, NA, NA, NA |
| Lead | 24 hour | 150 (3-month avg.) | NA, NA, NA, NA, NA | NA, NA, NA, NA, NA |
| $NO_2$ | 1 hour | 100 ppb (98th percentile) | NA, 17, 10, 10 | NA, 17%, 10%, 10% |
| $O_3$ | 8 hour | 0.075 ppm, (4th highest daily maximum) | 0.059, 0.058, 0.056, 0.058. 0.059 | 79%, 77%, 75%, 77%, 79% |
| $PM_{10}$ | 24 hour | 150 μg/$m^3$ (2nd highest) | NA, 37.0, 74.0, 19.0, 76.0 | NA, 25%, 49%, 13%, 51% |
| $PM_{2.5}$ | 24 hour | 35 μg/$m^3$ (98th percentile) | 11, 15, 15, 11, 22 | 31%, 43%, 43%, 31%, 63% |
| | Annual | 12 μg/$m^3$ (weighted mean) | 4.4, 6.8, 5.5, 6.5, 9.6 | 37%, 57%, 46%, 54%, 80% |
| $SO_2$ | 1 hour | 75 ppb (99th percentile) | NA, 28, 9, 9, NA | NA, 37%, 12%, 12%, NA |

Source: NDDOH 2014.

NA = not available.

[a] These values represent a 3-year average or a single year depending on the format of the NAAQS. Three-year averages of annual values are needed to determine NAAQS compliance for the $NO_2$, $O_3$, $PM_{10}$, 24-hour $PM_{2.5}$, and $SO_2$ standards.

[b] The monitor in Williston County began operating in 2013.

The order requires that after September 30, 2014, all existing and completed wells in the Bakken, Bakken/Three Forks, and/or Three Forks Pool be evaluated for compliance. A well is in compliance with the order if the gas capture percentage is consistent with the gas capture targets. If gas capture targets are not met, well production is limited to 100 or 200 barrels of oil per day depending on site-specific activities. Exemptions are allowed for: (1) wells that have received an exemption to North Dakota Century Code Section 38-08-06.4; (2) the first horizontal well completed in a Bakken, Bakken/Three Forks, and/or Three Forks Pool non-overlapping spacing unit; or (3) the first 90 days commencing on the first day oil is produced through well-head equipment into tanks from the ultimate producing interval after casing has been run.

**Figure 3.3.2 Air Quality Trends**




Sources: Data derived from NDDOH 2006, 2007, 2008, 2009, 2010, 2012a, 2012b, 2013, 2014.

**Figure 3.3.3 Visibility Trends in Nearby Class I Areas**







Source: Data derived from IMPROVE 2014.

Air resources also include visibility, which can be assessed in terms of the standard visual range (in kilometers or miles) that a person can distinguish a large dark object. Visibility degradation is primarily due to anthropogenic sulfate, nitrate, and particulate emissions and wildfires. Air pollutants affecting visibility can be transported hundreds of miles. Figure 3.3.3 illustrates visibility trends based on IMPROVE monitoring data from 2003-2013 at the two Class I areas in North Dakota: Lostwood Wilderness and Theodore Roosevelt National Park. Because visibility is highly variable throughout the year, it is characterized by three groupings: the clearest 20% days, average 20% days, and haziest 20% days. Monitoring data for the Lostwood Wilderness are not available for 2010-2013. A slight improving trend in visibility is apparent at Theodore Roosevelt National Park. At the Lostwood Wilderness, there was no apparent trend from 2003 to 2010.

Sulfur, nitrogen, and acid deposition rates in the study area are among the lowest in the nation, as measured at the Theodore Roosevelt National Park South Unit during 2012 (NADP 2013). Dry deposition was 2 kilograms per hectare (kg/ha) for sulfate and 3 kg/ha for nitrate. Nitrogen and sulfur wet deposition were 173 equivalents per hectare. Precipitation pH was 5.8, which EPA does not consider acidic. Hydrogen ion wet deposition was extremely low at less than 0.01 kg/ha. Lake acidification is unlikely with these deposition values and to date has not been reported at lakes in the area.

### 3.3.2 Climate Change

Climate change is defined by the Intergovernmental Panel on Climate Change (IPCC) as "a change in the state of the climate that can be identified (e.g., by using statistical tests) by changes in the mean and/or the variability of its properties, and persist for an extended period, typically decades or longer. Climate change may be due to natural internal processes or external forcings such as modulations of the solar cycles, volcanic eruptions and persistent anthropogenic changes in the composition of the atmosphere or in land use (IPCC 2013)." Climate change and climate science are discussed in detail in the *Climate Change Supplementary Information Report for Montana, North Dakota, and South Dakota* (BLM 2010). This document is incorporated by reference into this EA.

The IPCC states, "Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, sea level has risen, and the concentrations of greenhouse gases have increased (IPCC 2013)." The global average surface temperature has increased approximately 1.5°F from 1880 to 2012 (IPCC 2013). Warming has occurred on land surfaces, oceans and other water bodies, and in the troposphere (lowest layer of earth's atmosphere, up to 4-12 miles above the earth). Other indications of global climate change described by the IPCC (BLM 2010) include:

- Rates of surface warming increased in the mid-1970s and the global land surface has been warming at about double the rate of ocean surface warming since then;
- Eleven of the last 12 years rank among the 12 warmest years on record since 1850;
- Lower-tropospheric temperatures have slightly greater warming rates than the earth's surface from 1958-2005.

Earth has a natural greenhouse effect wherein naturally occurring gases such as water vapor, carbon dioxide ($CO_2$), methane ($CH_4$), and nitrous oxide ($N_2O$) absorb and retain heat. Without the natural greenhouse effect, earth would be approximately 60°F cooler (BLM 2010). Current ongoing global climate change is caused, in part, by the atmospheric buildup of GHGs, which may persist for decades or even centuries. Each GHG has a global warming potential that accounts for the intensity of each GHG's heat trapping effect and its longevity in the atmosphere (BLM 2010). Emissions of GHGs such as $CO_2$, methane, $N_2O$, and halocarbons since the start of the industrial revolution have substantially increased atmospheric concentrations of these compounds compared to background levels. At such elevated concentrations, these compounds absorb more energy from the earth's surface and re-emit a larger portion of the earth's heat back to the earth rather than allowing the heat to escape into space than would be the case under more natural conditions of background GHG concentrations.

A number of activities contribute to the phenomenon of climate change, including emissions of GHGs (especially $CO_2$ and methane) from fossil fuel development, large wildfires, activities using combustion engines, changes to the natural carbon cycle, and changes to radiative forces and reflectivity (albedo). It is important to note that GHGs will have sustained climatic impact over different temporal scales due to their differences in global warming potential (described above) and lifespans in the atmosphere. For example, $CO_2$ may last 50 to 200 years in the atmosphere while methane has an average atmospheric life time of 12 years (BLM 2010). Based on the global warming potentials put forth in EPA regulations (40 *Code of Regulations* Part 98), companies must report GHG emissions using global warming potentials of 1 for $CO_2$, 25 for methane, and 298 for $N_2O$. The BLM uses these global warming potentials to provide consistent comparisons with federal GHG emission inventories.

Climate change impacts will occur at global, national, regional, and local scales. The USEPA identifies western North Dakota as part of the Great Plains region. The following summary characterizes potential changes identified by the U.S. Climate Change Science Program (CCSP 2008) that are expected to occur at the regional scale (BLM 2010).

- The region is expected to experience warmer temperatures with less snowfall.
- Temperatures are expected to increase more in winter than in summer, more at night than in the day, and more in the mountains than at lower elevations.
- Earlier snowmelt means that peak stream flow will be earlier, weeks before the peak needs of ranchers, farmers, recreationalist, and others. In late summer, rivers, lakes, and reservoirs will be drier.
- More frequent, more severe, and possibly longer-lasting droughts are expected to occur.
- Crop and livestock production patterns will shift northward; less soil moisture due to increased evaporation may increase irrigation needs.
- Large-scale shifts have already occurred in the ranges of many species and the timing of the seasons and animal migrations. These shifts will continue. Climate changes include the arrival of spring an average of 10 days to 2 weeks earlier through much of the U.S. compared to 20 years ago. Multiple bird species now migrate north earlier in the year.
- Air quality will be degraded due to increased particulate matter in the air as drier, less vegetated soils experience wind erosion.
- Fires, insect epidemics, disease pathogens, and invasive weed species have increased and these trends are likely to continue. Changes in timing of precipitation and earlier runoff will increase fire risks.
- Grasslands and rangelands will expand into previously forested areas

Additional projected changes associated with climate change in North Dakota include (BLM 2010):

- Temperature increases in North Dakota are predicted to be between 3 to 5°F at mid-21st century. As the mean temperature rises, more heat waves are predicted to occur.
- Precipitation is expected to increase during winter and spring, decrease slightly in summer, and remain relatively unchanged in the fall.
- For the western portion of the state, annual median runoff is expected to decrease between 2 and 5 percent by mid-21st century.
- Crop yields may increase in North Dakota due to predicted temperature increases.

- North Dakota's Prairie Pothole wetlands are expected to decline in quality, due to their shallow depths and rapid evaporation rates. Shrinking wetlands may lead to decreased waterfowl populations.
- Wildland fire risk is predicted to continue to increase due to climate change effects on temperature, precipitation, and wind. One study predicted an increase of 393 percent in the median annual area burned by wildland fires in the western portion of North Dakota, based on a 1°C global average temperature increase.

While long-range regional changes will occur within the NDFO, it is impossible to predict precisely when these changes will occur.

## 3.4 Visual Resources

The Federal Land Policy and Management Act requires that the BLM consider the scenic values of public land as a resource that merits management and preservation, as determined through the land use planning process. Visual Resource Management (VRM) classifications are only applied to BLM-administered surface.

The North Dakota Field Office did not assign VRM classifications in the current Resource Management Plan. However, the following general objective and management actions were approved in the RMP:

RMP Objective: "To maintain visual qualities wherever possible."

RMP Management Actions:

- Consider impacts to the visible landscape during all phases of land use planning.
- Ensure that the high visual qualities of National Park Service Units are considered in cooperation with the NPS when a specific mineral lease or developmental action is proposed that potentially affects existing visual qualities.

## 3.5 Cultural Resources

The BLM is responsible for identifying, protecting, managing, and enhancing cultural resources located on public lands, or that may be affected by a BLM undertaking on BLM-administered or non-federal lands, in accordance with the National Historic Preservation Act (NHPA) of 1966, as amended. Cultural resources are defined as prehistoric or historic district, site, building, structure, or object significant in American history, architecture, archeology, engineering, and culture (36 CFR 60.1). Cultural resources also refer to artifacts, records, remains, and properties of traditional religious and cultural importance to an Indian tribe (36 CFR 800.16(l)(1)).

Cultural resources are evaluated with reference to their eligibility for listing on the National Register of Historic Places (NRHP). Each resource is considered on a case-by-case basis. Common prehistoric resource types in North Dakota include stone circles, stone cairns, rock art, lithic artifacts, pottery remains, earthlodge villages, rock alignments, bone concentrations, eagle-

trapping pits, and lithic procurement areas. Common historic site types in North Dakota are material remains of human life or activities over 50 years in age including homesteads, farmsteads, dumps, schools, roads, railroad grades, trails, trading posts, and military forts.

There are a number of areas designated as National Historic Landmarks or State Historic Sites within the Williston Basin of western North Dakota. They include the:

- Killdeer Mountain Battlefield State Historic Site,
- Elkhorn Ranch site within Theodore Roosevelt National Park,
- Lynch Knife River Flint Quarry site,
- Chateau de Mores State Historical Site,
- Fort Buford State Historic Site,
- Fort Union Trading Post National Historic Site,
- Fort Dilts State Historic Site, and
- Lewis & Clark National Historic Trail.

## 3.6 Native American Religious Concerns

The BLM's management of Native American Religious concerns is guided through Manual 8120: *Tribal Consultation under Cultural Resources Authorities* and Handbook 8120-1: *Guidelines for Conducting Tribal Consultation*. Generally, areas of concern to Native Americans are referred to as "Traditional Cultural Properties" (TCPs) which are defined as cultural properties eligible for the National Register of Historic Places because of its association with cultural practices or beliefs that (a) are rooted in that community's history and (b) are important in maintaining the continuing cultural identity of the community.

There are several locations within the Williston Basin in western North Dakota that are a concern to Native Americans. Cultural resources associated with Native American ceremonies, religious practices, and important events in history have the highest probability of being of religious or of cultural concern to Native Americans. Common sites of concern are burials, rock art, monumental rock features, eagle catching pits, sweat lodges, offering and prayer loci, battle sites, and stone rings (Deaver 1995:3.11 – 3.25).

The Mandan, Hidatsa, and Arikara Nation attach religious and cultural significance to the Missouri River (Murray et al 2011; Sundstom 1997:7), Black Butte (Deaver 1995), and the Blue Buttes (Deaver 1995:4.66). In addition, Grassy Butte, Bullion Butte, the Sentinel Buttes, and the Little Missouri River were the setting for Hidatsa, Mandan, and Arikara myths (Sundstom 1997:6-8). It is likely that the Killdeer Mountain Battlefield and Cannonball River are of concern to many of the Sioux tribes (Sundstom 1997:8).

Bowers (1965:12) identifies specific buttes associated with the Hidatasa Earthnaming Bundle. The ceremonies tied to the Earthnaming Bundle were linked to specific spirts (e.g., Buffalo), and were residents of named buttes and the adjacent prairies in North Dakota. For example, spirts were associated with the Killdeer Mountains, Rosebud Butte and at least a dozen more buttes (i.e.., White Butte, Singing Butte, Ghost Singing Butte, Crow Butte, Fox Singing Butte, Little Heart Buttel, Heart Singing Butte, Square Butte, Buffalo Home Butte, Lone Butte, Opposite Butte and Dog Den Butte).

## 3.7 Fluid Minerals

Oil and gas exploration and development in North Dakota has been concentrated in the Williston Basin western portion of North Dakota. The Williston Basin covers approximately 200,000 square miles of western North Dakota, northwestern South Dakota, eastern Montana, southern Saskatchewan, and extreme southwestern Manitoba. As of June 2015, there are approximately 12,383 active oil/gas wells in western North Dakota (Table 3.7.1).

**Table 3.7.1. Total number of wells in the area of analysis.**

| Well Status | Federal Wells | Private and State Wells | Indian Wells | Total |
|---|---|---|---|---|
| Active Oil/Gas Wells | 1,795 | 10,126 | 462 | **12,383** |
| Permitted/Drilling/Constructed | 184 | 954 | 131 | **1,269** |
| Temporarily Abandoned/ Abandoned/Plugged/Inactive | 2,209 | 11,417 | 200 | **13,826** |
| **TOTAL** | **4,188** | **22,497** | **793** | **27,478** |

Source: NDIC GIS database, accessed June 10, 2015.

Current technology allows wells to be drilled horizontally from the same well pad, resulting in multi-well pads composed of wells from multiple lease owners (e.g. Federal, Indian, Private, State). Multi-well pads are commonly used for producing Bakken or Three Forks Formation wells in the Williston Basin. They are typically larger in size to accommodate both drilling and production operations of multiple wells, but reduce the overall surface disturbance on a per well basis. Production facilities can be used by all the wells in the same communitization agreement (CA) or lease. In order for multiple CAs or leases to produce to common storage tanks or through a single gas sales meter, an operator must apply for and receive BLM approval for commingling of production.

Communitization agreements are federal agreements used for development of Bakken or Three Forks Formation wells in the Williston Basin. A CA allows for the development of a separate lease or a portion of a lease that cannot be independently developed and operated in conformity with the state established well spacing or well development program The leases within a CA are typically composed of multiple mineral lease owners (e.g. Federal, Indian, Private, State) sharing in the costs and benefits of the well drilled in the spacing unit. Like multi-well pads, CAs reduce the amount of surface disturbance and eliminate unnecessary wells, roads, pipelines, and lease equipment while improving mineral drainage and protecting correlative rights. As of June, 2015 there were 1,026 Federal CAs and 443 Indian CAs in the North Dakota Field Office.

Wells in the Williston Basin will produce at the highest gas rate in the first few years of production, and then they will steadily decline and produce lower volumes of gas for the remaining life of the well. There are multiple reasons for an operator to request flaring of associated oil-well gas. Some of those include:

- the operator has submitted a one-year gas capture plan in accordance to NTL-4A;

- the operator is unable to obtain a Right-of-Way from the surface owner(s) (private, government agency, or Indian) to install a natural gas gathering line;
- the well is connected to a gas sales line with inadequate capacity to handle the volumes of gas being produced;
- the gas produced does not meet standards for gas processing, the well produces a low gas volume for which a gas processing contract cannot be obtained; or
- the well is in a remote location with no current or future gas transmission plans.

An application for flaring of oil well gas would include an evaluation report supported by engineering, geologic, and economic data which demonstrates to the satisfaction of the Authorized Officer that flaring is justified in accordance to NTL-4A.

Most flaring in North Dakota occurs because the well is connected to gas sales pipelines with inadequate capacity to handle the volumes of gas being produced. This results in oil wells flaring associated gas sporadically throughout the year. The length of time an operator flares due to inadequate capacity varies and can be of short duration.

As of June 1, 2014, the NDIC adopted a new policy, Order 24665, to reduce gas flaring. This Order was revised on September 24, 2015. The Order requires all wells which produce from the Bakken, Three Forks, and Three Forks/Bakken or Sanish Pools to reduce the volume of gas flare by specified percentages and deadlines. The policy requires that all APDs submitted to NDIC must be accompanied by a Gas Capture Plan (GCP). The GCP has various requirements that must be met prior to approval of an APD. These plans aim to ensure that all options for capturing gas are fully evaluated before a well is drilled. The State policy also requires that operators meet flaring reduction targets according to a prescribed timeline. For operators that do not meet the targets, the state policy provides for the restriction of oil production until the targets are met. The revised Order requires that by January 1, 2015, gas capture rates should be at 77 percent allowing 23 percent to be flared; and by November 1, 2020, gas capture rate should be at least 91 percent allowing 9 percent to be flared. In the March 2016 NDIC Director's Cut report, gas capture rates were at 87 percent capture, meeting the percent required in the policy.

## 3.8 Socio-Economic Conditions

Oil and gas development, which includes the extraction of oil and gas, drilling of wells, and support activities, has significantly increased in North Dakota over the last decade as exploration in the Bakken Formation has intensified. Leasing, exploration, development and production of federal minerals stimulates economic activity within the state, influencing employment, income, and public revenues.

The analysis area for socio-economic conditions includes the following counties: Billings, Bowman, Burke, Divide, Dunn, Golden Valley, McKenzie, McLean, Mountrail, Stark, and Williams counties. The 2014 population for the analysis area was 107,907 residents with Billings County having the fewest residents (901) and Williams County the most (32,130) (Table 3.8.1) Unemployment rates are relatively low, ranging from 1.2 percent to 4.2 percent (Table 3.8.1). Both Billings and McLean counties have unemployment rates (3.0 and 4.2 percent respectively) higher than the average for North Dakota (2.8 percent). In 2014 there was an average of 97,379 jobs in the analysis area with a majority of them in Stark and Williams counties (Labor Market

Information Center 2015). A majority of jobs in Dunn, McKenzie, Mountrail, and Williams counties were in the mining, oil and gas extraction; construction; and transportation and warehousing industries (Table 3.8.1). Oil and gas development is often associated with increased jobs in construction and transportation due to building energy infrastructure and truck hauling of materials such as water and waste.

Annual wages associated with jobs in these three industries tend to relatively high-for example annual wages for mining, oil and gas extraction industry ranged from $106,932 in Williams County to $97,244 in Mountrail County (Labor Market Information Center 2015). This highlights energy development as a major contributor to many of the local economies in the analysis area in terms of jobs and income.

Forty-nine percent of the federal revenues collected in association to oil and gas development (e.g. bonus bids, rent, and royalties) is redistributed back to the state of production. The state then redistributes these monies with half going towards North Dakota public education/school and the other half being returned to the county of production. This revenue helps fund county functions such as enforcing laws, administering justice, collecting and disbursing tax funds, providing for orderly elections, maintaining roads and highways, providing fire protection, and keeping records. Other county functions that may be funded include operating clinics/hospitals, county libraries, county airports, local landfills, and county health systems.

Based on sales year data, the amount of revenues associated with federal oil and gas activities in the analysis area counties redistributed back to North Dakota in 2014 was approximately $104,419,578 (ONRR 2015). Revenues associated with gas avoidably lost to flaring or venting occurred in Burke and Dunn counties with a total of $405 being received by the federal government in 2014 (ONRR 2015). As discussed in Section 1.2 and 1.3 above, the BLM has the authority to allow venting or flaring of an oil-well gas under certain conditions pursuant to NTL-4A. Through the review process of the SN applications, the BLM will determine whether each request is an avoidable loss of gas or unavoidable loss of gas.

Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, states “each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations…” (Executive Order 12989).

Minority populations as defined by Council on Environmental Quality (CEQ) guidance under the National Environmental Policy Act (CEQ 1997) include individuals in the following population groups: American Indian or Alaskan Native; Asian or Pacific Islander; Black, not of Hispanic origin; or Hispanic. A minority population is identified where “(a) the minority population of the

**Table 3.8.1** Analysis Area Social and Economic Conditions.

| | North Dakota | Billings County | Bowman County | Burke County | Divide County | Dunn County | Golden Valley County | McKenzie County | McLean County | Mountrail County | Stark County | Williams County |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Population (2014)[1] | 739,482 | 901 | 3,247 | 2,245 | 2,432 | 4,399 | 1,825 | 10,996 | 9,578 | 9,782 | 30,372 | 32,130 |
| Unemployment Rate, Annual Average (2014)[2] | 2.8% | 3.0% | 1.8% | 2.8% | 1.5% | 1.3% | 2.2% | 1.5% | 4.2% | 1.3% | 1.6% | 1.2% |
| Percent of Total Jobs by Industry (2014 average annual)[3] | | | | | | | | | | | | |
| Agriculture, Forestry, Fishing and Hunting | 1.0% | **** | 3.1% | 0.0% | 0.0% | 0.3% | 3.9% | 0.4% | 1.4% | 0.1% | 0.2% | **** |
| Mining, Quarrying, and Oil and Gas Extraction | 6.7% | 9.2% | 7.6% | 8.2% | 13.3% | 32.8% | **** | 18.2% | **** | 20.4% | 20.9% | 35.5% |
| Utilities | 0.8% | **** | **** | **** | **** | 0.2% | **** | 0.6% | **** | **** | 0.4% | 0.6% |
| Construction | 7.8% | 1.7% | 11.0% | 9.0% | 3.7% | 16.2% | 2.3% | 22.0% | 6.8% | 15.8% | 9.4% | 11.6% |
| Manufacturing | 5.8% | 0.0% | 1.7% | 0.0% | **** | **** | **** | 0.1% | **** | **** | 5.5% | 1.2% |
| Wholesale Trade | 6.1% | **** | 13.1% | 7.2% | **** | 2.3% | 14.4% | 4.7% | 8.5% | 4.8% | 7.0% | 7.8% |
| Retail Trade | 11.4% | 4.0% | 11.1% | 6.0% | 8.4% | 4.7% | 9.0% | 5.9% | 7.7% | 8.2% | 9.9% | 6.4% |
| Transportation and Warehousing | 5.0% | 9.5% | 3.4% | 21.0% | 16.0% | 13.2% | 8.1% | 17.9% | 2.6% | 20.6% | 8.8% | 9.1% |
| Information | 1.5% | 0.0% | 1.2% | **** | **** | **** | **** | **** | **** | **** | 1.1% | 0.5% |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Finance and Insurance | 4.0% | na | 4.5% | 3.5% | 2.9% | 0.7% | 4.8% | 1.1% | 3.7% | 1.2% | 1.8% | 1.0% |
| Real Estate and Rental and Leasing | 1.3% | **** | **** | 0.5% | 1.3% | 1.4% | na | 1.6% | 0.7% | 0.3% | 2.0% | 3.7% |
| Professional and Technical Services | 3.8% | 0.7% | 2.1% | 1.3% | 1.9% | 3.7% | 3.9% | 2.9% | 0.7% | 3.1% | 2.9% | 3.0% |
| Management of Companies and Enterprises | 1.2% | na | **** | **** | na | na | na | **** | **** | **** | 0.2% | **** |
| Administrative and Waste Services | 3.2% | 1.3% | **** | **** | 2.8% | 1.1% | 0.0% | 1.0% | 0.8% | 1.0% | 2.3% | 2.6% |
| Educational Services | 0.5% | 0.0% | 0.0% | 0.0% | **** | na | **** | 0.1% | **** | 0.0% | 0.3% | 0.2% |
| | North Dakota | Billings County | Bowman County | Burke County | Divide County | Dunn County | Golden Valley County | McKenzie County | McLean County | Mountrail County | Stark County | Williams County |
| Health Care and Social Assistance | 12.5% | 0.0% | 15.7% | 2.1% | **** | **** | 17.0% | 2.8% | 11.5% | 3.1% | 7.4% | 3.5% |
| Arts, Entertainment, and Recreation | 1.0% | **** | 0.8% | 0.8% | **** | 0.4% | **** | 0.6% | 1.1% | **** | 0.8% | 0.2% |
| Accommodation and Food Services | 8.1% | 11.3% | 7.2% | 4.6% | 8.6% | 5.2% | 3.5% | 5.8% | 6.1% | 4.1% | 7.4% | 6.0% |
| Other Services (except Public Administration) | 2.8% | 1.2% | 2.1% | 1.8% | 1.2% | 2.5% | 4.4% | 2.2% | 1.7% | 1.2% | 2.8% | 1.5% |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Government (federal, state, local) | 15.4% | 29.2% | 14.5% | 29.0% | 17.0% | 9.2% | 25.6% | 12.0% | 23.4% | 11.8% | 8.9% | 5.1% |
| Percent Population (All Ages) Below Poverty Level[4] (2013) | | | | | | | | | | | | |
| | 11.6% | 8.2% | 8.0% | 9.5% | 9.0% | 9.6% | 11.7% | 9.9% | 10.6% | 11.5% | 8.7% | 7.8% |
| Race Alone[1] (2014) | | | | | | | | | | | | |
| White | 89.1% | 95.0% | 95.8% | 96.5% | 96.6% | 85.9% | 96.7% | 81.7% | 90.6% | 68.7% | 93.9% | 90.0% |
| Black or African American | 2.1% | 0.6% | 0.3% | 0.6% | 0.7% | 0.6% | 0.8% | 1.2% | 0.3% | 0.9% | 1.7% | 2.4% |
| American Indian and Alaska Native | 5.4% | 0.4% | 2.5% | 1.0% | 0.7% | 9.7% | 1.2% | 14.1% | 7.2% | 27.2% | 1.3% | 3.9% |
| Asian | 1.3% | 3.7% | 0.2% | 0.6% | 0.7% | 1.5% | 0.2% | 0.7% | 0.1% | 0.3% | 1.4% | 0.8% |
| Native Hawaiian and Other Pacific Islander | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% |
| Two or More Races[1] (2014) | 2.0% | 0.3% | 1.1% | 1.3% | 1.2% | 2.3% | 0.9% | 2.3% | 1.8% | 2.9% | 1.6% | 2.9% |
| Hispanic[1] (2014) | 3.2% | 1.8% | 4.7% | 2.1% | 3.9% | 3.8% | 2.7% | 6.8% | 2.1% | 6.2% | 4.9% | 5.2% |
| Total Minority[5] (2014) | 13.4% | 6.3% | 7.3% | 5.5% | 7.0% | 17.0% | 5.8% | 23.5% | 10.5% | 35.2% | 10.5% | 14.5% |

Source: [1]U.S. Census Bureau 2015. [2]Bureau of Labor Statistics 2015. [3]Labor Market Information Center 2015. [4]U.S. Census Bureau 2014. [5] Total minority is calculated as: (Total Population - Non-Hispanic White Alone population)/Total Population. The term "total minority population" refers to the part of the total population which is not classified by the race/ethnicity category Non-Hispanic White Alone by the U.S. Census Bureau. This definition is most inclusive of populations that may be considered as a minority population under EO 12898.

affected area exceeds 50 percent or (b) the minority population percentage of the affected area is meaningfully greater…" (CEQ 1997). Additionally, "[a] minority population also exists if there is more than one minority group present and the minority percentage, as calculated by aggregating all minority persons, meets one of the above-stated thresholds" (CEQ 1997). Low-income populations are determined by the U.S. Census Bureau based upon poverty thresholds developed every year.

U.S. Census data are used to determine whether the populations residing in the analysis area constitute an "environmental justice population" through meeting either of the following criteria:

- At least one-half of the population is of minority or low-income status; or
- The percentage of population that is of minority or low-income status is at least 10 percentage points higher than for the entire State of North Dakota.

Table 3.8.1 indicates the State of North Dakota has 11.6 percent of the population living below the poverty level in 2013 and a total minority population of 13.4 percent in 2014. None of the counties met the criteria above for low-income environmental justice populations. McKenzie and Mountrail counties have total minority populations that meet the criteria for constituting environmental justice populations. In 2014, Mountrail County met the criteria with a total minority percent of 35.2 and an American Indian/Alaska Native percent of 27.2 whereas the State of North Dakota has 13.4 percent of total minority and 5.4 percent of the population as American Indian/Alaska Native (Table 3.8.1). McKenzie County had a total minority percent of 23.5 percent which was largely driven by the American Indian/Alaska Native race and Hispanic or Latino ethnicity (14.1 and 6.8 percent respectively).

# 4.0 ENVIRONMENTAL IMPACTS

## 4.1 Assumptions and Methodology

The analytical assumptions and methodology listed below were developed by BLM resource specialists and petroleum engineers who relied on professional judgment of the resource and knowledge of flaring activity within the Williston Basin in western North Dakota. The BLM used production and GIS data from the BLM and NDIC databases to identify well locations, status, and production information.

BLM took into consideration NDIC Order 24665 to develop assumptions for this EA. The revised Order requires that by January 1, 2015, gas capture rate should be at 77 percent allowing 23 percent to be flared; and by November 1, 2020, gas capture rate should be at least 91 percent allowing 9 percent to be flared. See Appendix C for further details on the methodology and application of assumptions to determine gas production rates and quantities for this EA.

The BLM assumes that all operators will comply with applicable laws, regulations and BLM requirements. Under the general requirements for onshore oil and gas operations (43 CFR 3162.1), an operator shall comply with applicable laws and regulations. These include, but are not limited to, conducting all operations in a manner that results in maximum ultimate economic recovery of oil and gas with minimum waste. The NTL-4A provides the BLM authority to allow flaring of oil well gas and to make the determination as whether the gas may, or may not be royalty bearing.

The BLM assumes that no additional surface disturbance would occur as a result of evaluating the flaring requests and potential mitigation measures and Conditions Of Approval (COAs). When necessary, the BLM would coordinate with the appropriate SMA during the NEPA reviews.

The BLM assumes that all wells that have sold natural gas associated with oil production are connected to a natural gas gathering pipeline to transport gas to a processing plant.

Based on the type of flaring SN request, one well may have multiple SN requests submitted for BLM review. The impacts to each resource may be associated to the number of SN requests submitted or the number of wells within the analysis area. Therefore, each resource will identify when the number of SN requests is being used as part of the impact analysis and when the number of wells is being used as part of the impact analysis.

For this EA, 192 wells are not connected to a sales pipeline. These 192 wells have 268 associated flaring sundry notices submitted. The BLM assumes 5 percent of the pending SN requests representing 10 wells would be required to capture and market the oil-well gas; therefore, gas would be intermittently based on pipeline capacity. The BLM assumes 80 percent of the pending sundry notices representing 154 wells would flare for a designated period of time (i.e. 1-year gas capture plan, ROW approval, etc.) which would result in gas capture upon installation of infrastructure and intermittent flaring based on pipeline restrictions. The BLM assumes 15 percent of the pending sundry notices representing 29 wells would flare long-term (i.e. remote

location, poor gas quality, low gas volume, etc.).Wells flaring long term would be subjected to NDIC operator flaring limits.

For this EA, the BLM assumes the average thousand cubic feet (MCF) of gas flared by an oil well per day in North Dakota is approximately 121 MCF per day. This chapter describes the environmental effects (direct, indirect, and cumulative) that would result from the alternatives. Environmental consequences are discussed below by alternative to the extent possible at this time for the resources described in Chapter 3. As per NEPA regulations at 40 CFR 1502.14(f), 40 CFR 1502.16(h), and 40 CFR 1508.20, mitigation measures to reduce, avoid, or minimize potential impacts of the proposed action are identified by resource below.

## 4.2 Reasonably Foreseeable Development

The Reasonably Foreseeable Development (RFD) scenario for this EA is based on information and assumptions contained in the RFD developed in 2009, revised in 2011 for the NDFO Resource Management Plan (RMP), and revised again in 2014 for the NDFO RMP to consider the increased rate of development in the Williston Basin portion of North Dakota (Map 1). The 2014 RFD revision contains projections of oil and gas wells for the western portion of the NDFO area. This information was used in the analysis of this EA.

The 2014 RFD revision took into consideration the assumptions and methodology from the previous reports completed. It also incorporated current changes in development that resulted in an increase projection of oil and gas development for the next 20 years. For this EA, only the first 5 years of projected development was used to complete this environmental analysis. In the next 5 years, the 2014 RFD revision projects a baseline total of 6,648 wells to be producing wells in the western portion of North Dakota. Of those 6,648 total wells, 1,263 are Federal, 399 are Indian, and 4,986 are Fee/State administered wells.

Based on 2014 RFD, for the next five years, the BLM assumes a total of 6,648 wells are projected to produce gas and flare an average 121 MCFPD per well. The gas capture percentages requirements from NDIC Order 24665 were applied to the projected number of wells for the next five years to identify projected capture and projected flared short-term and long-term by year. See Appendix C for specific percentages and projections per year.

## 4.3 Alternative A (No Action Alternative)

### 4.3.1 Direct Effects Common to All Resources

Under Alternative A, the 2,211 pending SN requests and future SN requests would be reviewed and responded to on a case-by-case basis in accordance with NEPA and NTL-4A. Each SN request would have an individual NEPA document analyzing impacts from an individual request.

The direct and indirect impacts would be similar to those described in Section 4.4 Alternative B; however, completing individual NEPA reviews would limit the scale and scope of analysis, not adequately disclose cumulative effects, and increase review time for all requests. Increased review time frames would lead to inefficiency and result in a backlog of pending SN requests. Not processing requests to flare in a timely manner would also limit BLM's opportunity to mitigate environmental impacts at the time they are occurring. Surface management would

remain the same and ongoing oil and gas development would continue on surrounding Federal, private, and State leases. Future flaring SN requests submitted by operators and identification of environmental mitigation measures would be completed on a case-by-case basis.

**4.3.2.2 Cumulative Effects Common to All Resources:**
The cumulative effects would be the similar to those described in Section 4.4.6. Cumulative Impacts Alternative B; however, reviews for current and future flaring requests, and the identification of environmental mitigation measures would be completed on a case-by-case basis. This would result in inefficiencies and a continual backlog of pending SN requests.

## 4.4 Alternative B (Proposed Action BLM Preferred Alternative)

### 4.4.1 Air Resources

#### *4.4.1.1 Air Quality*

Associated gas flaring is a combustion process, creating primarily $CO_2$, water vapor, and combustion by-products that can include hazardous air pollutants (HAPs). Flaring does not combust all organic compounds because it is an incomplete process. Flares must meet North Dakota Department of Health and EPA requirements. EPA's New Source Performance Standards (NSPS) in 40 CFR §60.18 and National Emission Standards for Hazardouse Air Pollutants (NESHAPS) in 40 CFR 63.11, include equipment design and operational standards for flares and requires they be operated and maintained consistent with "good air pollution control practices". This has been interpreted to mean a destruction efficiency of 98 percent. The NSPS also require no visible emissions, except for up to 5 minutes every 2 hours.

Appendix D contains criteria air pollutant and HAP emission calculations for flared gas on a pound per million standard cubic foot (lb/MMSCF) basis and annual basis in terms of short tons per year. The calculations use associated gas composition and assume that 2 percent of the gas passes through the flare without combustion and 98 percent is completely combusted. Annual emissions for the year with the greatest quantity of flared gas are shown in Table 4.4.1. The emissions are compared to statewide North Dakota criteria pollutant emissions, provided as a percentage of EPA's year 2011 National Emissions Inventory (NEI).

Table 4.4.1. Criteria and Hazardous Air Pollutant Annual Emissions

| Pollutant | Annual Emissions (short tons/year) | | Flaring Emissions as a Percent of total ND Emissions (Year 2019) |
|---|---|---|---|
| | Maximum Annual Flaring Emissions (2019) | North Dakota (2011 NEI) | |
| $PM_{10}$ | 343 | 365,857 | <1% |
| $PM_{2.5}$ | 343 | 90,086 | <1% |
| NOx | 4,825 | 163,788 | 4% |

| | | | |
|---|---|---|---|
| $SO_2$ | 5,213 | 1,074,343 | ≤1% |
| CO | 3,794 | 488,511 | 1% |
| VOC | 18,810 | 281,219 | 9% |
| HAPs | 834 | N/A | N/A |

NEI = National Emissions Inventory
Short tons = 2,000 lb
Source: EPA 2015.

As shown in Table 4.4.1, criteria air pollutant emissions from flaring would constitute a small percentage of statewide emissions. These emissions represent an increase in emissions in the specific locations where flaring would be allowed under this alternative. However, the emissions may or may not represent an increase in the region, given the flaring reductions required by the NDIC.

Flaring emissions would occur over a wide geographic area covering many counties with relatively flat terrain and with good pollutant dispersion characteristics. Given the good air quality in the planning area, flaring emissions are not expected to affect air quality.

Flaring is not expected to cause visible plumes, except for short periods of time. Some impacts to visibility due to emissions of fine particulate, $NO_x$, and $SO_2$ could potentially occur because these pollutants can contribute to regional haze. Because the net increase in these pollutants cannot be estimated due to regional reductions in flaring, impacts to regional haze are difficult to predict.

#### *4.4.1.2 Greenhouse Gas Emissions at the NDFO and Project Scales*

The primary GHGs of concern emitted by flaring are $CO_2$, $CH_4$, and $N_2O$. Associated gas that bypasses the flare consists of approximately 70 percent by volume $CH_4$ (WRAP 2014). The total climate change effect of aggregated GHGs is estimated in terms of carbon dioxide equivalent ($CO_2e$), which is calculated by multiplying the quantity of each GHG by its global warming potential (GWP) and summing the results. In order to make meaningful comparisons to EPA emission inventories, regulatory GWPs from 40 CFR Part 98, Table A-1 are used in the calculations. These GWPs reflect the 100-year impact of GHG emissions and are equal to 1 for $CO_2$, 25 for $CH_4$, and 298 for $N_2O$. For every molecule of $CH_4$ that is flared, one molecule of $CO_2$ is produced and for every metric ton of $CH_4$ flared, approximately 2.9 metric tons of $CO_2$ are formed. Put in terms of $CO_2e$, each metric ton of $CH_4$ flared is equivalent to 25 metric tons of $CO_2e$ entering the flare and results in 2.9 metric tons of $CO_2e$ exiting the flare. Flaring converts a high GWP gas to a lower GWP gas.

Other GWPs based on different time frames can be used by the reader by selecting desired GWP values and multiplying them by the emissions of each individual GHG.

Appendix D provides an estimate of GHG emissions on a pound per million standard cubic foot (lb/MMSCF) basis and an annual basis in terms of short tons per year and metric tons per year. Table 4.4.2 summarizes GHG emissions in terms of individual GHG emissions and as $CO_2e$.

Table 4.4.2 Greenhouse Gas Annual Emissions

| GHG | Maximum Annual Flaring Emissions (Year 2019) (short tons/year) | (metric tons/year) |
|---|---|---|
| $CO_2$ | 5,420,767 | 4,917,611 |
| $CH_4$ | 16,884 | 15,317 |
| $N_2O$ | 99 | 90 |
| **$CO_2$e** | **5,437,750** | **5,327,400** |

Short tons = 2,000 lb
Metric tons = 2,205 lb

Flaring GHG emissions can be put into context by comparing them to state and national GHG emission inventories. An EPA inventory of GHG emissions emitted by large sources in North Dakota estimates emissions at 37,003,286 metric tons per year (EPA 2015a). This number does not include emissions from residential heating, vehicular travel, and other sources with small emissions on a per household or per vehicle basis. Alternative B flaring emissions would be 20 percent of this large-source North Dakota emission inventory. A more comprehensive national inventory including nearly all types of GHG emissions estimates national $CO_2$e emissions of 6.673 billion metric tons per year for 2013 (EPA 2015b). Alternative B flaring emissions would be 0.11 percent of this national inventory.

***4.4.1.3 Climate Change***

Flaring releases increased GHG emissions into the atmosphere because no energy benefit, such as electricity production or resident heating, is obtained from the flaring process. Additional natural gas must be produced and combusted in order to provide these energy benefits. Under Alternative B, atmospheric GHG concentrations would be slightly greater than they would be otherwise. However, given the small percentage of GHG emissions compared to state and national emission inventories, the global change would be extremely small.

The extent of climate effects due to the increase in GHG emissions is also difficult to predict because the change in emissions is so small. Climate change models cannot differentiate global, regional, state, and local climate impacts for changes at this scale. Furthermore, impacts to human health and ecosystems cannot be accurately predicted due to these small emission changes.

***4.4.1.4 Mitigation***

When compared with venting associated gas, flaring is a form of mitigation because it destroys most VOCs and HAPs in the gas by converting them to $CO_2$ and other compounds. As described earlier, flaring also mitigates GHG emissions by converting a high GWP gas ($CH_4$) to a low GWP gas ($CO_2$).

Air pollutant and climate change impacts could be minimized or mitigated by capturing the associated gas.

### 4.4.2 Visual Resources

#### *4.4.2.1 Direct and Indirect Effects*

There are no SN requests to flare on BLM administered lands; therefore, approval of the 2,211 SN requests to flare on existing facilities would have no impacts to visual resources on BLM administered lands.

Potential impacts from future flaring requests from BLM administered wells and State administered wells throughout western North Dakota would include the introduction of visual contrast and degradation of scenic quality by the artificial lighting of the landscape that may otherwise be unlit. It is expected that the majority of flaring requests would be short term (less than 5 years) and result in negligible impacts due to existing infrastructure on the existing well pad (e.g. tanks, pump jacks, heater-treaters, etc.), application of NDIC Order 24665, increased beneficial use gas, and the decrease in gas production over the life of the well.

#### *4.4.2.2 Mitigation*

Application and implementation of the facility design features/mitigation measures addressed in the proposed action would provide the necessary measures to protect visual resources when a SN request to flare is proposed on BLM administered lands. Additional site specific mitigation measures for future requests to flare on BLM administered lands, would be determined on a case-by-case basis to maintain the visual qualities or scenic value of the area.

For future Federal APDs on BLM administered surface, the BLM would apply appropriate BLM best management practices for visual resources, which would serve to mitigate flaring activities on the well pad. Mitigation measures applied to the APD would include, but not be limited to, proper site selection, reduction of visibility, and selecting color(s)/color schemes that blend with the background. Repetition of form, line, color and texture when designing projects would reduce contrasts between landscape and development. This would be managed as part of the Surface Use Plan of the APD.

### 4.4.3 Cultural Resources

#### *4.4.3.1 Direct and Indirect Effects*

The 2,211 requests to flare located on existing facilities, would not introduce new elements to the landscape.

Of the 2,211 SN requests located on existing facilities, there are no requests to flare gas within the viewsheds of the Chateau de Mores State Historical Site, the Fort Dilts State Historic Site, and the Lynch Knife River Flint Quarry site.

Of the 2,211 SN requests, there are no requests with ongoing flaring on existing facilities within the viewsheds of the Killdeer Mountain Battlefield State Historic Site, the Fort Buford State Historic Site, the Fort Union Trading Post National Historic Site, or the Lewis & Clark National Historic Trail.

Of the 2,211 SN requests, there is one request to flare on the Morgan Draw Federal 1 well facility which is not connected to a pipeline and has ongoing flaring within the viewshed of Theodore Roosevelt Greater Elkhorn Ranchlands. The well is located on U.S. Forest Service Land and is not connected to a pipeline to transport and market the gas to a processing facility. Production for the last four years shows this well has produced 1,860 mcf, beneficially put to use 1,483 mcf to operate the existing facility; therefore, flared a total of 377 mcf of gas. Flaring from this well is infrequent and occurs with extremely low volumes (average 8 mcf per month) throughout the year. With the current rate of flaring on an existing well pad, this specific well would not introduce new elements to the landscape. Therefore, flaring from this well would not have the potential to affect cultural, scientific, or historic resources.

Potential impacts from future flaring requests or future APDs have the potential to introduce visual, atmospheric or audible elements that would diminish the integrity of a property's setting and feeling. However, applying mitigation measures would minimize and/or eliminate impacts to the visual, atmospheric or audible elements of a historic or cultural property’s setting.

#### *4.4.3.2 Mitigation*

The BLM has the authority to protect the viewsheds of cultural and historic properties for federally administered wells on both federal and non-federal surface under the NHPA and 36 CFR 800 – Protection of Historic Properties. In addition, mitigation requirements for venting and flaring within the viewsheds of historic or cultural properties are authorized under the NEPA, section 6.8.4.

The pending 2,211 SN requests on existing locations would not require the application or implementation of design features/mitigation measures. Application and implementation of the project design features/mitigation measures would be applied to future flaring requests with the potential to introduce visual, atmospheric or audible elements diminishing the integrity of a property's setting and feeling. Project design features/mitigation measures would provide the necessary measures to avoid, minimize, or mitigate impacts to cultural or historic properties. Site specific mitigation measures, including design features proposed by the operator would be developed during review of the application to avoid, minimize, or mitigate potential impacts to historic or cultural properties and their setting.

Application of standard lease terms, stipulations, and cultural lease notices on the APD would provide additional mechanisms to protect historic properties that may be affected by flaring. The NDFO would conduct necessary viewshed analysis, outlined in Appendix E, to identify potential impacts to a historic property’s setting or feel and where viewshed is integral to the sites integrity and therefore its eligibility to the NRHP. Site specific mitigation measures could include but are not limited to the project design features/mitigation measures addressed in the proposed action to avoid, minimize or mitigate impacts to a historic property’s setting or feel in accordance with Section 106.

### 4.4.4 Native American Religious Concerns

#### *4.4.4.1 Direct and Indirect Effects*

The 2,211 requests to flare located on existing facilities would not impact Native American religious concerns. Flaring on an existing location would not interfere with the performance of traditional ceremonies and rituals pursuant to the American Indian Religious Freedom Act (AIRFA) or EO 13007 and would not prevent tribes from visiting sacred sites or prevent possession of sacred objects.

Potential impacts from future flaring requests or future APDs submitted for BLM review have the potential to introduce visual, atmospheric or audible elements with possible impacts for Native American Religious Concerns and/or interference with performance of traditional ceremonies and rituals.

#### *4.4.4.2 Mitigation*

Mitigation would be the same as section 4.4.3.2 above. The NDFO would continue to invite interested parties to consult about historic properties of religious and cultural significance to Native Americans.

### 4.4.5 Socio-Economic Conditions

#### *4.4.5.1 Direct and Indirect Effects*

For the 2,211 SN requests, the BLM would determine avoidable/unavoidable gas loss in accordance with NTL-4A and apply administrative COAs on a case-by-case basis and as a separate decision on each SN. Future flaring requests will be evaluated when the operator has submitted a SN with the appropriate supporting data to be reviewed in accordance with NTL-4A. Application of mitigation measures to future APDs could result in a slight increase in cost to the operators; however, this would be determined at the time BLM analyzes the APD and associated NEPA document, and would depend on several factors such as proposed facilities, topography, proximity to historic properties, etc.

In regards to the American Indian/Alaska Natives environmental justice populations, the 2,211 requests to flare located on existing facilities would not impact Native American religious concerns. Flaring on an existing location would not interfere with the performance of traditional ceremonies and rituals pursuant to the American Indian Religious Freedom Act (AIRFA) or EO 13007 and would not prevent tribes from visiting sacred sites or prevent possession of sacred objects.

#### *4.4.5.2 Mitigation*

Mitigation for the American Indian/Alaska Natives environmental justice populations would be the same as section 4.4.4.2 and 4.4.3.2. The NDFO would continue to invite interested parties to consult about historic properties' that are of religious and cultural significance to Native Americans.

### 4.4.6 Cumulative Impacts- Alternative B

Cumulative impacts are those impacts resulting from the incremental impact of an action when added to other past, present, and reasonably foreseeable actions regardless of what agency or

person undertakes such other actions (40 CFR 1508.7). This section describes cumulative impacts associated with this project on resources.

#### *4.4.6.1 Past, Present and Reasonably Foreseeable Future Actions*

Past, present, or reasonably foreseeable future actions that affect the same components of the environment as the Proposed Action, are: drilling and producing of new and existing wells on state, private, Indian, and Federal minerals, installation of new infrastructure and roads, and utility rights-of-way. Additional flaring of gas from state, private, Federal and Indian oil-wells is expected but in lower volumes for short duration due to the requirements in NDIC Order 24665. The revised Order requires that by January 1, 2015, gas capture rate should be at 77 percent allowing 23 percent to be flared; and by November 1, 2020, gas capture rate should be at least 91 percent allowing 9 percent to be flared.

#### *4.4.6.2 Cumulative Impacts by Resource*

Cumulative effects for all resources in the NDFO are described in the final RMP/EIS (pgs. 22 to 28). Anticipated flaring activity associated with the SNs being analyzed in this EA is described in this cumulative effects analysis for air resources, socio-economic conditions, cultural resources, and visual resources.

Anticipated development activities associated with the SN requests considered in this EA is within the range of assumptions used and effects described in this cumulative effects analysis for resources other than air resources, economic, cultural resources, and visual resources.

#### *4.4.6.3 Greenhouse Gas Emissions and Cumulative Impacts on Climate Change*

GHG emission cumulative impacts are extremely difficult to predict due to the many sources of GHG emissions at the local, state, national, and global scales. Within the planning area, cumulative GHG emissions from oil and gas operations are expected to decline as greater percentages of associated gas are captured due to recent NDIC regulations. Oil and gas companies are also reducing GHG emissions due to GHG emission reporting programs and public pressure.

Regional, state, and national GHG emissions are expected to decline due to recently promulgated EPA regulations that reduce vehicle emissions and proposed regulations, such as the Clean Power Plan, that will significantly reduce GHG emissions from power plants.

Substantial global GHG emissions reductions are becoming more likely as more nations are recognizing climate change impacts to their resources and economics and as they are imposing regulations to reduce these emissions.

Given these changes on such large scales, it is difficult to determine if global cumulative GHG emissions will increase or decrease.

#### *4.4.6.4 Cumulative Impacts of Climate Change*

Cumulative climate change impacts on human health, ecosystems, and economies will depend on GHG emissions, atmospheric GHG concentrations, and the ability to mitigate climate change impacts by developing more resilient systems. Due to the longevity of GHGs in the atmosphere,

climate change impacts will continue to increase for many years, regardless of whether global GHG emissions increase, decrease, or remain stable over the next 5-6 years.

#### *4.4.6.5 Cumulative Impacts to Visual Resources*

While impacts to visual resources are assumed to be short term in nature for each individual request, the location of the impacts would shift across the landscape over time with additional development and contribute to cumulative visual effects in the project area.

#### *4.4.6.6 Cumulative Impacts to Cultural Resources*

Cultural resources have been affected by past and current land uses such as agricultural development, transportation development, and mineral development which continue to impact resource values today throughout western North Dakota. From the 2,211 SN requests, there are 102 SN requests for wells that are connected to pipelines and have flared oil well gas within the viewshed of the following five areas. The numbers of SN requests are as follows:

- 75 requests in the Lewis & Clark National Historic Trail;
- 6 requests in the Fort Union Trading Post National Historic Site;
- 2 requests in the Killdeer Mountain Battlefield State Historic Site;
- 2 requests in the Theodore Roosevelt Greater Elkhorn Ranchlands; and
- 17 requests in the Fort Buford State Historic Site.

Although the proposed action does not involve surface disturbing activities, if future development occurs in high volumes without design features or mitigation measures outside of site boundaries or within their viewshed, flaring activities on existing well pads would contribute to impacts on a site's setting and feel. However, the implementation of NDIC Order 24665 in North Dakota would curtail production if capture rates are not met by operators. Over time, this would result in a change of pace in oil and gas development and minimize or eliminate the need to flare on existing oil well locations. This, in conjunction with site specific requirements on an APD or SN request to flare, would provide the protection needed to eliminate, minimize or mitigate impacts to a site's setting and feeling.

#### *4.4.6.7 Cumulative Impacts to Native American Religious Concerns*

Cultural resources associated with Native American ceremonies, religious practices, and important events in history have the highest probability of being of religious or of cultural concern to Native Americans. These cultural resources have been affected by past and current land uses such as agricultural development, transportation development, and mineral development throughout western North Dakota. Site specific mitigation measures for future APDs or SN requests to flare would be identified during tribal consultation for each project, in conjunction with the implementation of NDIC Order 24665, which would serve to eliminate, minimize, or mitigate impacts to cultural resources associated with Native American Religious Concerns.

#### *4.4.6.8 Cumulative Impacts to Socio-Economic Conditions*

The implementation of NDIC Order 24665 in North Dakota would curtail production if capture rates are not met by operators. Over time, this would result in a change of pace in oil and gas development and minimize or eliminate the need to flare on existing oil well locations. These changes can impact the royalties received from the development of federal minerals or from vented or flared oil well gas.

The analysis area for cumulative impacts includes numerous additional counties with current wells. Three of these additional counties-Benson, Rolette and Sioux counties, meet the criteria for low-income environmental justice populations and for American Indian/Alaska Native environmental justice populations. Flaring on an existing location would not interfere with the performance of traditional ceremonies and rituals pursuant to the American Indian Religious Freedom Act (AIRFA) or EO 13007 and would not prevent tribes from visiting sacred sites or prevent possession of sacred objects. The NDFO would continue to invite interested parties to consult about historic properties' that are of religious and cultural significance to Native Americans.

# 5.0 CONSULTATION AND COORDINATION

## 5.1 Persons, Agencies, and Organizations Consulted

Public scoping for this project was conducted by posting the proposed action on the NDFO website - NEPA notification log. Therefore, scoping was initiated August 30, 2013, the date the EA was assigned a number and posted to the NEPA notification log.

To address the pending SN requests, the BLM coordinated with various entities to gather information, and develop review protocols to address these requests in accordance with NTL-4A. This included a workshop, sponsored by NDPC, with NDPC members, Mandan, Hidatsa and Arikara Three Affiliated Tribes Chairman Fox, operators, midstream pipeline companies, and state oil and gas entities to discuss development, infrastructure, and issues in the ND Williston Basin, in addition, to the past, present, and future flaring activities and gas capture methods/options. Operators were also individually consulted to clarify the details of their SN requests to flare oil-well gas from Federal and Indian wells.

The BLM consults with the State Historic Preservation Office (SHPO) and Native American Tribes under Section 106 of the National Historic Preservation Act (NHPA). On June 24, 2015, the NDFO sent formal consultation and determination letters to the State Historic Preservation Officer (SHPO) of North Dakota. On July 8, 2015, the SHPO concurred with the NDFO's finding of "No Historic Properties Affected" (ND SHPO Ref: 15-0835).

On June 29, 2015, the NDFO invited seventeen federally recognized Indian tribes to consult about the NDFO's oil and gas program and the flaring of natural gas. The NDFO sent letters with maps inviting 17 Tribal Historical Preservation Officers (THPOs) or the respective cultural contacts to submit issues and concerns BLM should consider in the environmental analysis. The following were invited: Flandreau Santee Sioux Tribe, Fort Belknap Indian Community, Crow Tribe, Oglala Sioux Tribe, Mandan, Hidatsa, and Arikara Nation, Sisseton-Wahpeton Oyate Tribes, Rosebud Sioux Tribe, Lower Sioux Indian Community, Lower Brule Sioux Tribe, Yankton Sioux Tribe, Spirt Lake Tribe, Turtle Mountain Band of Chippewa, Cheyenne River Sioux Tribe, Northern Cheyenne Tribe, Standing Rock Sioux Tribe, Fort Peck Assiniboine and Sioux Tribes, and the Crow Creek Sioux Tribe. To date, the Fort Belknap Indian Community has requested to be consulted on future NDFO APDs.

## 5.2 Summary of Public Participation

Public scoping for this project was conducted by posting the proposed action on the NDFO website - NEPA notification log. Therefore, scoping was initiated August 30, 2013, the date the EA was assigned a number, DOI-BLM-MT-C030-2013-229-EA, and posted to the NEPA notification log. No comments were received from the public. Three SDRs were submitted on the Decision Record signed on August 25, 2015. As a result of the SDRs, modifications were made throughout this EA (DOI-BLM-MT-C030-2016-229-EA) to clarify the proposed action and decision to be made by the BLM. In addition to the modifications, the NDFO is posting the revised EA, DOI-BLM-MT-C030-2016-229-EA, for a 30-day public comment period and notified interested parties of its posting on the BLM e-Planning website.

**Table 5.1. List of Preparers**

| Name | Title | Responsible for the Following Section(s) |
|---|---|---|
| Susan Bassett | Air Resource Specialist | Air Resources, Climate Change |
| Melissa Hovey | Air Resource Specialist | Air Resources, Climate Change |
| Jessica Montag | Economist | Socio-Economic Conditions |
| Irma Nansel | Planning and Envir. Coor. | Project Lead |
| Margaret Ward | NEPA Coordinator | NEPA |
| Dale Manchester | Petroleum Engineer | Fluid Minerals, RFD |
| Barney Whiteman | Petroleum Engineer | Fluid Minerals, RFD |
| Beth Poindexter | Petroleum Engineer | Fluid Minerals |
| Paul Kelley | Natural Resource Specialist | Visual Resources |
| Sean Berry | Archaeologist | Cultural Resources, Native American Religious Concerns |

## 6.0 BIBLIOGRAPHY

Bowers, Alfred
1965 Hidatasa Social and Ceremonial Organization. Smithsonian Institution. Bureau of American Ethnology, Bulletin 194.

Bureau of Labor Statistics, 2015. Local Area Unemployment Statistics (LAUS).

CEQ (Council on Environmental Quality), 1997. Environmental Justice: Guidance Under the National Environmental Policy Act. Washington D.C., 40 p.

Deaver Sherri, and Ann Kooistra-Manning
1992 Ethnographic Overview of the McKenzie, Medora, Sioux, Ashland and Bearthooth Ranger Districts of the Custer National Forest. Ethnoscience, submitted to the Custer National Forest, Billings.

Interagency Monitoring of Protected Visual Environments (IMPROVE)
2014. *IMPROVE and RHR (Regional Haze Rule) Summary Data Website*. Accessed August 19. http://vista.cira.colostate.edu/improve/Data/IMPROVE/summary_data.htm

Intergovernmental Panel on Climate Change (IPCC)
2013. Climate Change 2013: The Physical Science Basis. Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change. [Stocker, T.F., D. Qin, G.-K. Plattner, M. Tignor, S.K. Allen, J. Boschung, A. Nauels, Y. Xia, V. Bex and P.M. Midgley (eds.)]. Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA, 1535 pp.

Labor Market Information Center, 2015. 1990-2014 Employment and Wages by Industry Dataset. Labor Market Information Center, Job Service North Dakota, Workforce Intelligence Network, QCEW Unit. Last Updated June 2015. Accessed from https://www.ndworkforceintelligence.com/gsipub/index.asp?docid=354

Murray, Wendy Field; Maria Nieves Zedeno, Kacy L. Hollenback, Calvin Grinnel and Elgin Crows Breast
2011 The Remaking of Lake Sakakawea: Locating Cultural Viability in Negative Heritage on the Missouri River. American Ethnologist, Vol. 38, No. 3:468-483.

National Atmospheric Deposition Program (NADP)
2013. 2012 Annual Summary. NADP Data Report 2013-01. Illinois State Water Survey, University of Illinois at Urbana-Champaign, IL.

North Dakota Department of Health (NDDOH)
2014. Annual Report: North Dakota air Quality Monitoring Data Summary for 2013. August.2014.

North Dakota Industrial Commission GIS database
https://www.dmr.nd.gov/OaGIMS/viewer.htm. Accessed June 10, 2015.

ONRR (Office of Natural Resources Revenue), 2015. 2014 Sales Year Data by County. Data provided per special request to ONRR.

Sundstrom, Linea.
1997 Ethnogeographic Gazetteer of the Northern Great Plains. Nebraska Nationl Forest, Chadron, NE and Custer National Forest, Billings, MT

U.S. Census Bureau, 2015. Annual Estimates of the Resident Population by Sex, Race, and Hispanic Origin for the United States, States, and Counties: April 1, 2010 to July 1, 2014. Population Division. Release date: June 2015. Accessed from U.S. Census Bureau, American FactFinder.

U.S. Census Bureau, 2014. 2013 Poverty and Median Household Income Estimates-Counties, States, and National. Small Area Income and Poverty Estimates (SAIPE) Program. Release date: December 2014.

U.S. Climate Change Science Program
2008. Our Changing Planet: The U.S. Climate Change Science Program for Fiscal Year 2009. July. https://www.whitehouse.gov/sites/default/files/microsites/ostp/ocp2009.pdf

U.S. Department of the Interior, Bureau of Land Management.
2010. Climate Change Supplementary Information Report for Montana, North Dakota, and South Dakota, Bureau of Land Management. October.

U.S. Environmental Protection Agency
2014. AirData Website. Accessed August 19, 2014. http://www.epa.gov/airdata/

U.S. Environmental Protection Agency
2015a. EPA Facility Level GHG Emissions Data website. Accessed July 14, 2015. http://ghgdata.epa.gov/ghgp/main.do

U.S. Environmental Protection Agency
2015b. Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2013. EPA 430-R-15-004. April 15, 2015. http://www.epa.gov/climatechange/ghgemissions/usinventoryreport.html

U.S. Environmental Protection Agency
2015c. The 2011 National Emissions Inventory (NEI), Version 2 updated March 4, 2015. Accessed July 14, 2015. http://www.epa.gov/ttn/chief/net/2011inventory.html

Western Regional Air Partnership (WRAP)
2015. Williston Basin Emissions Inventory Project website. Accessed July 14. http://www.wrapair2.org/ND-SD-MT.aspx

Exhibit 15 to 5/9/23 SDR






CAR 000325

Exhibit 15 to 5/9/23 SDR

## Appendix A. Pending Sundry Notices in the NDFO.

| | WELL-ID | COUNTY | | | WELL-ID | COUNTY |
|---|---|---|---|---|---|---|
| 1 | 0904ERH NERU | BILLINGS | | 1125 | 34-9TFH CLEMENS | BILLINGS |
| 2 | 2901H NERU | BILLINGS | | 1126 | 34-12TFH SMITH | BILLINGS |
| 3 | 14-22H MOSSER | BILLINGS | | 1127 | 12-12TFH SCHNEI | BILLINGS |
| 4 | 34-11TFH PRONGH | BILLINGS | | 1128 | 21-2-1H EVONIUK | BILLINGS |
| 5 | 44-11PH PRONGHO | BILLINGS | | 1129 | 21-36TFH TEDDY | BILLINGS |
| 6 | 14-11PH PRONGHO | BILLINGS | | 1130 | 21-14TFH PRONGH | BILLINGS |
| 7 | 44-20TFH DRY CR | BILLINGS | | 1131 | 21-14 CL PH PRO | BILLINGS |
| 8 | 31-10TFH DEMORE | BILLINGS | | 1132 | 21-16TFH PRONGH | BILLINGS |
| 9 | 24-24TFH DRS FE | BILLINGS | | 1133 | 41-16PH PRONGHO | BILLINGS |
| 10 | 11-25PH DRS FED | BILLINGS | | 1134 | 21-26TFH TALKIN | BILLINGS |
| 11 | 21-28TFH REDMON | BILLINGS | | 1135 | 41-26PH TALKING | BILLINGS |
| 12 | 31-28PH REDMOND | BILLINGS | | 1136 | 14-12PH DULETSK | BILLINGS |
| 13 | 11-28PH REDMOND | BILLINGS | | 1137 | 34-11PH DULETSK | BILLINGS |
| 14 | 11-7TFH ELLISON | BILLINGS | | 1138 | 44-11PH DULETSK | BILLINGS |
| 15 | 21-13TFH PRONGH | BILLINGS | | 1139 | 44-11PH DULETSK | BILLINGS |
| 16 | 11-8TFH KORDON | BILLINGS | | 1140 | 44-32TFH TEDDY | BILLINGS |
| 17 | 11-8TFH KORDON | BILLINGS | | 1141 | 21-24TFH TEDDY | BILLINGS |
| 18 | 14-11PH DULETSK | BILLINGS | | 1142 | 34-10PH PRONGHO | BILLINGS |
| 19 | 11-20TFH TEDDY | BILLINGS | | 1143 | 44-10PH PRONGHO | BILLINGS |
| 20 | 34-35-1H BASARA | BILLINGS | | 1144 | 14-10PH PRONGHO | BILLINGS |
| 21 | 41-15PH PRONGHO | BILLINGS | | 1145 | 34-9PH PRONGHOR | BILLINGS |
| 22 | 21-15PH PRONGHO | BILLINGS | | 1146 | 44-9PH PRONGHOR | BILLINGS |
| 23 | 11-15PH PRONGHO | BILLINGS | | 1147 | 11-27PH TALKING | BILLINGS |
| 24 | 31-5PH BABECK | BILLINGS | | 1148 | 41-14H BUCKHORN | BILLINGS |
| 25 | 41-5PH BABECK | BILLINGS | | 1149 | 10-1 FEDERAL | BILLINGS |
| 26 | 11-5PH BABECK F | BILLINGS | | 1150 | 31-16H BUCKHORN | BILLINGS |
| 27 | 11-17TFH ANDERS | BILLINGS | | 1151 | 15-1102H VANVIL | BURKE |
| 28 | 11-17TFH ANDERS | BILLINGS | | 1152 | 1-15H TORGESON | DIVIDE |
| 29 | 2 MORGAN DR FED | BILLINGS | | 1153 | 1-1H GULBRANSON | DIVIDE |
| 30 | 1-22 VOODOO | BILLINGS | | 1154 | 1-30H ROSENVOLD | DIVIDE |
| 31 | 1807 BSMU | BILLINGS | | 1155 | 3-30H-3 ROSENVO | DIVIDE |
| 32 | 3108 BSMU | BILLINGS | | 1156 | 8-5-161-98H-1PB | DIVIDE |
| 33 | 3006 BSMU | BILLINGS | | 1157 | 160-98H 1XP KAR | DIVIDE |
| 34 | 1806 BSMU | BILLINGS | | 1158 | 4-3-34-3H3 MOCC | DUNN |
| 35 | 3204 BSMU | BILLINGS | | 1159 | 4-3-34-4H MOCCA | DUNN |
| 36 | 1707 BSMU | BILLINGS | | 1160 | 4-3-34-4H MOCCA | DUNN |
| 37 | 1910 BSMU | BILLINGS | | 1161 | 03-16H HORSE CA | DUNN |
| 38 | 21-1TFH WANNER | BILLINGS | | 1162 | 102-16H HORSE C | DUNN |
| 39 | 1 MORGAN DRAW F | BILLINGS | | 1163 | 16-9H ALISIA FO | DUNN |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 40 | 7 ELKHORN FED A | BILLINGS | | 1164 | 16-9H ALISIA FO | DUNN |
| 41 | 3 MORGAN DRAW B | BILLINGS | | 1165 | 1-22H WILD TURK | DUNN |
| 42 | 2 BUCKHORN FED | BILLINGS | | 1166 | 43X-5 JORGENSON | DUNN |
| 43 | 23-5H BUCKHORN | BILLINGS | | 1167 | 43X-5 DEEP CREE | DUNN |
| 44 | 36-1 STATE | BILLINGS | | 1168 | 16-3-11H MOCCAS | DUNN |
| 45 | 31-3PH MCDONALD | BILLINGS | | 1169 | 14-20H ROHDE US | DUNN |
| 46 | 31-3PH MCDONALD | BILLINGS | | 1170 | 14-20H ROHDE US | DUNN |
| 47 | 41-27PH TALKING | BILLINGS | | 1171 | 22A-27-2H FORT | DUNN |
| 48 | 21-27PH TALKING | BILLINGS | | 1172 | 16-3H MOCCASIN | DUNN |
| 49 | 3-11F US | BILLINGS | | 1173 | 16-3H MOCCASIN | DUNN |
| 50 | 2-14XH FRANKS C | BILLINGS | | 1174 | 14-16H BIRDSBIL | DUNN |
| 51 | 4-22 GOLDEN MOS | BILLINGS | | 1175 | 14-16H BIRDSBIL | DUNN |
| 52 | 2-12 US | BILLINGS | | 1176 | 4-15H PATRICIA | DUNN |
| 53 | 1-10 T.R.FEDERA | BILLINGS | | 1177 | 4-15H PATRICIA | DUNN |
| 54 | 41-22H TRMU | BILLINGS | | 1178 | 24X-6 LOIS FED | DUNN |
| 55 | 14-14H TRMU | BILLINGS | | 1179 | 34X-35D BOOMER | DUNN |
| 56 | 12-12H TRMU | BILLINGS | | 1180 | 34X-35H BOOMER | DUNN |
| 57 | 21-14H TR MADIS | BILLINGS | | 1181 | 14-7H JOSEPH SC | DUNN |
| 58 | 44X-15H TRMU | BILLINGS | | 1182 | 14-7H JOSEPH SC | DUNN |
| 59 | 13X-22H TRMU | BILLINGS | | 1183 | 13-34-28-1H MOC | DUNN |
| 60 | 34X-23H TRMU | BILLINGS | | 1184 | 13-34-28-1H MOC | DUNN |
| 61 | 22X-16H TRMU | BILLINGS | | 1185 | 13-34-28-2H MOC | DUNN |
| 62 | 24X-12H TRMU | BILLINGS | | 1186 | 13-34-28-2H MOC | DUNN |
| 63 | 1-23H FRANKS CR | BILLINGS | | 1187 | 1A-12-1H FORT B | DUNN |
| 64 | 2-26 MOSSER | BILLINGS | | 1188 | 1A-12-2H FORT B | DUNN |
| 65 | 1-27 HAMILL | BILLINGS | | 1189 | 24X-13B BRANDVI | DUNN |
| 66 | 3-27 HAMILL | BILLINGS | | 1190 | 24X-13F BRANDVI | DUNN |
| 67 | 2-25 MOSSER | BILLINGS | | 1191 | 14-21-16-2HS TW | DUNN |
| 68 | 30-26H MOSSER | BILLINGS | | 1192 | 14-21-16-2HS TW | DUNN |
| 69 | 41X-27H TRMU | BILLINGS | | 1193 | 1-06-01H-149-92 | DUNN |
| 70 | 41-22H TRMU | BILLINGS | | 1194 | 2-06-01H-149-92 | DUNN |
| 71 | 24X-12H TRMU | BILLINGS | | 1195 | 21-6H CASEY KUK | DUNN |
| 72 | 1-23H FRANKS CR | BILLINGS | | 1196 | 41-6H 2 IVAN HE | DUNN |
| 73 | 2-14XH FRANKS C | BILLINGS | | 1197 | 21-6H CASEY KUK | DUNN |
| 74 | 31-34 MIKKELSON | BILLINGS | | 1198 | 41-6H 2 IVAN HE | DUNN |
| 75 | 11-10 CITIES SE | BILLINGS | | 1199 | 3A-10-1H FORT B | DUNN |
| 76 | 34-31H FEDERAL | BILLINGS | | 1200 | 3A-10-2H FORT B | DUNN |
| 77 | 44-28H KUKOWSKI | BILLINGS | | 1201 | 32-29H WELLS | DUNN |
| 78 | 41-18D FEDERAL | BILLINGS | | 1202 | 32-29H WELLS | DUNN |
| 79 | 41-18D FEDERAL | BILLINGS | | 1203 | 24X-36 CARUS FE | DUNN |
| 80 | 44-18TFH ASH CO | BILLINGS | | 1204 | 14-21-4H TWO SH | DUNN |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 81 | 44-18TFH ASH CO | BILLINGS | | 1205 | 14-21-4H TWO SH | DUNN |
| 82 | 11-19-1PH KJELS | BILLINGS | | 1206 | 2-24-12-1H3 TWO | DUNN |
| 83 | 11-19-1PH KJELS | BILLINGS | | 1207 | 2-24-12-1H3 TWO | DUNN |
| 84 | 11-14PH PRONGHO | BILLINGS | | 1208 | 2-24-12-2H TWO | DUNN |
| 85 | 41-30H FEDERAL | BILLINGS | | 1209 | 2-24-12-2H TWO | DUNN |
| 86 | 42-18H FEDERAL | BILLINGS | | 1210 | 3-24-12-3H3 TWO | DUNN |
| 87 | 21-5 SH BEULAH | BOWMAN | | 1211 | 3-24-12-3H3 TWO | DUNN |
| 88 | 34-34SH MARSHA | BOWMAN | | 1212 | 3-24-12-4H TWO | DUNN |
| 89 | 43-8SH WINCHEST | BOWMAN | | 1213 | 3-24-12-4H TWO | DUNN |
| 90 | 44-32SH DAVIS | BOWMAN | | 1214 | 20-24H BIRON | DUNN |
| 91 | 1-11 NJOS | BOWMAN | | 1215 | 20-24H BIRON | DUNN |
| 92 | 12-17 NH HOLECE | BOWMAN | | 1216 | 20-34H BAKER | DUNN |
| 93 | 21-8 SH DROMEDA | BOWMAN | | 1217 | 20-34H BAKER | DUNN |
| 94 | 21-5 SH BEULAH | BOWMAN | | 1218 | 34X-25A FBIR BA | DUNN |
| 95 | 32-16H FEDERAL | BURKE | | 1219 | 34X-25E FBIR BA | DUNN |
| 96 | 32-16H FEDERAL | BURKE | | 1220 | 34X-25F FBIR BA | DUNN |
| 97 | 21-3427H KANDIY | BURKE | | 1221 | 30-31H MANDAREE | DUNN |
| 98 | WELL-ID | COUNTY | | 1222 | 30-31HA MANDARE | DUNN |
| 99 | WELL-ID | COUNTY | | 1223 | 30-31HC ALFRED | DUNN |
| 100 | 2-1H GULBRANSON | DIVIDE | | 1224 | 30-31HD ALFRED | DUNN |
| 101 | 14HC ETHAN HALL | DUNN | | 1225 | 30-31HW MANDARE | DUNN |
| 102 | 14HC ETHAN HALL | DUNN | | 1226 | 30-31HY ALFRED | DUNN |
| 103 | 4-11H WOMAN CRE | DUNN | | 1227 | 30-31HZ ALFRED | DUNN |
| 104 | 4-11H WOMAN CRE | DUNN | | 1228 | 31X-19 FBIR STE | DUNN |
| 105 | 4-11H WOMAN CRE | DUNN | | 1229 | 31X-19D FBIR ST | DUNN |
| 106 | 16-44H BURR | DUNN | | 1230 | 31X-19G FBIR ST | DUNN |
| 107 | 3-18H NATHAN HA | DUNN | | 1231 | 31X-19H FBIR ST | DUNN |
| 108 | 3-18H NATHAN HA | DUNN | | 1232 | 9-1H WING | DUNN |
| 109 | 4-31H LOOK OUT | DUNN | | 1233 | 8-1H CRYING TRE | DUNN |
| 110 | 14-2H TAT | DUNN | | 1234 | 11-15H BOY CHIE | DUNN |
| 111 | 14-2H TAT | DUNN | | 1235 | 11-15TFH BOY CH | DUNN |
| 112 | 05AH NEEDLE (MW | DUNN | | 1236 | 21-15H CHASE US | DUNN |
| 113 | 1-05H SOWARD | DUNN | | 1237 | 21-15TFH TWO CR | DUNN |
| 114 | 28HC NORTH JOHN | DUNN | | 1238 | 31-15H AZURE US | DUNN |
| 115 | 28HC NORTH JOHN | DUNN | | 1239 | 31-15TFH SWIFT | DUNN |
| 116 | 28HC NORTH JOHN | DUNN | | 1240 | 21-14H GOOD BEA | DUNN |
| 117 | 16-3-11H MOCCAS | DUNN | | 1241 | 31-14H GOOD BEA | DUNN |
| 118 | 14-17H CLARA | DUNN | | 1242 | 11-4H BEARS GHO | DUNN |
| 119 | 14-17H CLARA | DUNN | | 1243 | 11-4TFH BEARS G | DUNN |
| 120 | 43X-4 KAYE | DUNN | | 1244 | 21-4H RICHANDA | DUNN |
| 121 | 43X-4 JORGENSON | DUNN | | 1245 | 29-31H BAKER | DUNN |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 122 | 43X-4B KAYE FED | DUNN | | 1246 | 29-31H BAKER | DUNN |
| 123 | 43X-4E KAYE FED | DUNN | | 1247 | 29-31H BAKER | DUNN |
| 124 | 14-33-6H TWO SH | DUNN | | 1248 | 36-35H BEAKS | DUNN |
| 125 | 14-33-6H TWO SH | DUNN | | 1249 | 36-35H BEAKS | DUNN |
| 126 | 15-1H TAT | DUNN | | 1250 | 24X-26B FBIR LA | DUNN |
| 127 | 15-1H TAT | DUNN | | 1251 | 27A-34-1H FORT | DUNN |
| 128 | 13-34-3H MOCCAS | DUNN | | 1252 | 27A-34-2H FORT | DUNN |
| 129 | 13-34-3H MOCCAS | DUNN | | 1253 | 27A-34-3H FORT | DUNN |
| 130 | 11X-20 FENTON F | DUNN | | 1254 | 22D-15-1H FORT | DUNN |
| 131 | 21X-19B GEORGE | DUNN | | 1255 | 2-1H TAT | DUNN |
| 132 | 25A-36-1H FORT | DUNN | | 1256 | 2-1H TAT | DUNN |
| 133 | 36C-25-4H FORT | DUNN | | 1257 | 2-8-17-14H3 SKU | DUNN |
| 134 | 36D-25-2H FORT | DUNN | | 1258 | 2-8-17-14H3 SKU | DUNN |
| 135 | 4-9H HIGH HAWK | DUNN | | 1259 | 2-8-17-15H SKUN | DUNN |
| 136 | 4-9H HIGH HAWK | DUNN | | 1260 | 2-8-17-15H SKUN | DUNN |
| 137 | 9C-04-3H FORT B | DUNN | | 1261 | 4-8-17-13H SKUN | DUNN |
| 138 | 9C-04-4H FORT B | DUNN | | 1262 | 4-8-17-13H SKUN | DUNN |
| 139 | 9C-04-5H FORT B | DUNN | | 1263 | 4-8-17-13H3 SKU | DUNN |
| 140 | 9D-04-1H FORT B | DUNN | | 1264 | 4-8-17-13H3 SKU | DUNN |
| 141 | 9D-04-2H FORT B | DUNN | | 1265 | 4-8-17-14H SKUN | DUNN |
| 142 | 16-15-16H TALL | DUNN | | 1266 | 4-8-17-14H3 SKU | DUNN |
| 143 | 1-06-31H-150-92 | DUNN | | 1267 | 4-8-17-14H3 SKU | DUNN |
| 144 | 34X-7 CLARENCE | DUNN | | 1268 | 14-8H FOX | DUNN |
| 145 | 34X-7C CLARENCE | DUNN | | 1269 | 1-36HC BUFFALO | DUNN |
| 146 | 34X-7B CLARENCE | DUNN | | 1270 | 1-36HC BUFFALO | DUNN |
| 147 | 34X-7H CLARENCE | DUNN | | 1271 | 1-36HD CORRAL | DUNN |
| 148 | 34X-7D CLARENCE | DUNN | | 1272 | 1-36HD CORRAL | DUNN |
| 149 | 24X-6 CAROL FED | DUNN | | 1273 | 31X-19 FBIR BIR | DUNN |
| 150 | 11X-20 JANE FE | DUNN | | 1274 | 31X-19D FBIR BI | DUNN |
| 151 | 34X-35 BOOMER | DUNN | | 1275 | 31X-19G FBIR BI | DUNN |
| 152 | 34X-35G BOOMER | DUNN | | 1276 | 31X-19H FBIR BI | DUNN |
| 153 | 1-32-29H-143-96 | DUNN | | 1277 | 15-34H BLACK HA | DUNN |
| 154 | 2-32-29H-143-96 | DUNN | | 1278 | 15-34H BLACK HA | DUNN |
| 155 | 1-12H SKUNK CRE | DUNN | | 1279 | 33-34H HELENA R | DUNN |
| 156 | 1-12H SKUNK CRE | DUNN | | 1280 | 33-34H HELENA R | DUNN |
| 157 | 34-27H WICKER | DUNN | | 1281 | 1-06-07H-147-92 | DUNN |
| 158 | 34-27H WICKER | DUNN | | 1282 | 3-06-07H-147-92 | DUNN |
| 159 | 44-19TFH CCU ME | DUNN | | 1283 | 5-06-07H-147-92 | DUNN |
| 160 | 44-19MBH CCU ME | DUNN | | 1284 | 7-06-07H-147-92 | DUNN |
| 161 | 11-30TFH CCU PR | DUNN | | 1285 | 16-2-3-13H3 SKU | DUNN |
| 162 | 14-19TFH CCU ME | DUNN | | 1286 | 16-2-3-13H3 SKU | DUNN |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 163 | 14-19MBH CCU ME | DUNN | | 1287 | 9-2-3-12HS SKUN | DUNN |
| 164 | 24-19TFH CCU ME | DUNN | | 1288 | 9-2-3-12HS SKUN | DUNN |
| 165 | 24-19MBH CCU ME | DUNN | | 1289 | 9-2-3-5H SKUNK | DUNN |
| 166 | 21-30MBH CCU PR | DUNN | | 1290 | 9-2-3-5H SKUNK | DUNN |
| 167 | 31-30TFH CCU PR | DUNN | | 1291 | 1-31-30H-150-91 | DUNN |
| 168 | 31-30MBH CCU PR | DUNN | | 1292 | 1-31-36H-150-92 | DUNN |
| 169 | 34-19TFH CCU ME | DUNN | | 1293 | 2-31-25H-150-92 | DUNN |
| 170 | 34-20MBH CCU WI | DUNN | | 1294 | 3-31-25H-150-92 | DUNN |
| 171 | 14-20MBH CCU WI | DUNN | | 1295 | 3-31-30H-150-91 | DUNN |
| 172 | 14-20TFH CCU WI | DUNN | | 1296 | 3-31-36H-150-92 | DUNN |
| 173 | 11-28TFH CCU CO | DUNN | | 1297 | 4-31-25H-150-92 | DUNN |
| 174 | 41-26TFH CCU BU | DUNN | | 1298 | 5-31-25H-150-92 | DUNN |
| 175 | 44-20MBH CCU WI | DUNN | | 1299 | 7-31-25H-150-92 | DUNN |
| 176 | 14-21TFH CCU FO | DUNN | | 1300 | 2-32-33H-148-92 | DUNN |
| 177 | 41-26MBH CCU BU | DUNN | | 1301 | 4-32-33H-148-92 | DUNN |
| 178 | 34-33H CCU CORR | DUNN | | 1302 | 3-9H BENSON | DUNN |
| 179 | 41-26H CCU BURN | DUNN | | 1303 | 3-9H BENSON | DUNN |
| 180 | 14-32H CCU POWE | DUNN | | 1304 | 3-9HA BENSON | DUNN |
| 181 | 14-34H CCU BISO | DUNN | | 1305 | 3-9HA BENSON | DUNN |
| 182 | 14-20H CCU WILL | DUNN | | 1306 | 2-06-07H-147-92 | DUNN |
| 183 | 41-27H CCU AUDU | DUNN | | 1307 | 4-06-07H-147-92 | DUNN |
| 184 | 44-31H CCU CARO | DUNN | | 1308 | 6-06-07H-147-92 | DUNN |
| 185 | 11-16H CCU FOUR | DUNN | | 1309 | 8-06-07H-147-92 | DUNN |
| 186 | 24-36H CCU COLU | DUNN | | 1310 | 1-11-02H 1 HALL | DUNN |
| 187 | 11-25H CCU NORT | DUNN | | 1311 | 1-11-02H 1 HALL | DUNN |
| 188 | 21-2TFH CCU OLY | DUNN | | 1312 | 41X-16 BIG GULC | DUNN |
| 189 | 44-34MBH CCU BI | DUNN | | 1313 | 34X-14 FBIR DAR | DUNN |
| 190 | 44-34TFH CCU BI | DUNN | | 1314 | 34X-14D FBIR DA | DUNN |
| 191 | 11-2MBH CCU OLY | DUNN | | 1315 | 34X-14H FBIR DA | DUNN |
| 192 | 11-2TFH CCU OLY | DUNN | | 1316 | 3-06-01H-149-92 | DUNN |
| 193 | 6-31-1TH BICE | DUNN | | 1317 | 4-06-01H-149-92 | DUNN |
| 194 | 0631H-3 LK-BICE | DUNN | | 1318 | 12X-19 ELAINE F | DUNN |
| 195 | 1102H-2 MCMURPH | DUNN | | 1319 | 31X-12C FBIR WA | DUNN |
| 196 | 5-7-8-1H TWO SH | DUNN | | 1320 | 31X-12D FBIR WA | DUNN |
| 197 | 5-7-8-1H TWO SH | DUNN | | 1321 | 31X-12G FBIR WA | DUNN |
| 198 | 2-24-25-15H SKU | DUNN | | 1322 | 31X-12H FBIR WA | DUNN |
| 199 | 2-24-25-15H SKU | DUNN | | 1323 | 23A-1H HAWAII 1 | DUNN |
| 200 | 2-24-25-16H SKU | DUNN | | 1324 | 23A-4H TF MAUI | DUNN |
| 201 | 2-24-25-16H SKU | DUNN | | 1325 | 23B-2H TF HILO | DUNN |
| 202 | 3-24-25-13H SKU | DUNN | | 1326 | 23B-3H KONA 148 | DUNN |
| 203 | 3-24-25-13H SKU | DUNN | | 1327 | 15HC WOUNDED FA | DUNN |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 204 | 3-24-25-14H3 SK | DUNN | | 1328 | 15HC WOUNDED FA | DUNN |
| 205 | 3-24-25-14H3 SK | DUNN | | 1329 | 1-12H BLACK HAW | DUNN |
| 206 | 34X-25 FBIR WAL | DUNN | | 1330 | 1-12H BLACK HAW | DUNN |
| 207 | 34X-25 FBIR WAL | DUNN | | 1331 | 1-12H BLACK HAW | DUNN |
| 208 | 21-4TFH BEARS G | DUNN | | 1332 | 1-12HA BLACK HA | DUNN |
| 209 | 31-4H BEARS GHO | DUNN | | 1333 | 1-12HA BLACK HA | DUNN |
| 210 | 31-4H BEARS GHO | DUNN | | 1334 | 1-12HA BLACK HA | DUNN |
| 211 | 31-4TFH BEARS G | DUNN | | 1335 | 1-12HB BLACK HA | DUNN |
| 212 | 31-4TFH BEARS G | DUNN | | 1336 | 1-12HB BLACK HA | DUNN |
| 213 | 12-10-11-9H SKU | DUNN | | 1337 | 1-12HB BLACK HA | DUNN |
| 214 | 12-10-11-9H SKU | DUNN | | 1338 | 1-12HD BLACK HA | DUNN |
| 215 | 12-10-11-9H3 SK | DUNN | | 1339 | 1-12HD BLACK HA | DUNN |
| 216 | 12-10-11-9H3 SK | DUNN | | 1340 | 1-12HW BLACK HA | DUNN |
| 217 | 24X-27A FBIR GU | DUNN | | 1341 | 1-12HW BLACK HA | DUNN |
| 218 | 24X-27A FBIR GU | DUNN | | 1342 | 1-12HW BLACK HA | DUNN |
| 219 | 24X-27B FBIR GU | DUNN | | 1343 | 1-12HY BLACK HA | DUNN |
| 220 | 24X-27B FBIR GU | DUNN | | 1344 | 1-12HY BLACK HA | DUNN |
| 221 | 24X-27ER FBIR G | DUNN | | 1345 | 1-12HZ BLACK HA | DUNN |
| 222 | 24X-27F FBIR GU | DUNN | | 1346 | 1-12HZ BLACK HA | DUNN |
| 223 | 3-1H OLSON (DWO | DUNN | | 1347 | 12X-19 ALWIN FE | DUNN |
| 224 | 34-1H HAY DRAW | DUNN | | 1348 | 33-12H ELK CREE | DUNN |
| 225 | 14-8H FOX | DUNN | | 1349 | 34-12H BUFFALO | DUNN |
| 226 | 15-32H PACKINEA | DUNN | | 1350 | 14-12TFH DEEP C | DUNN |
| 227 | 15-32H PACKINEA | DUNN | | 1351 | 21-13TFH DEEP C | DUNN |
| 228 | 1-19-18H 1 HALL | DUNN | | 1352 | 31X-19 ERNEST F | DUNN |
| 229 | 1-19-18H 1 HALL | DUNN | | 1353 | 21X-10 FBIR YEL | DUNN |
| 230 | 11X-10 FBIR SMI | DUNN | | 1354 | 21X-10 FBIR IRO | DUNN |
| 231 | 11X-10A FBIR SM | DUNN | | 1355 | 29A-32-3H FORT | DUNN |
| 232 | 11X-10E FBIR SM | DUNN | | 1356 | 29A-32-4H FORT | DUNN |
| 233 | 11X-10F FBIR SM | DUNN | | 1357 | 29A-32-5H FORT | DUNN |
| 234 | 1-32-29H-150-91 | DUNN | | 1358 | 29B-32-1H FORT | DUNN |
| 235 | 3-32-29H-150-91 | DUNN | | 1359 | 29B-32-2H FORT | DUNN |
| 236 | 31X-9A FBIR YOU | DUNN | | 1360 | 12-7-8-8H SKUNK | DUNN |
| 237 | 31X-9B FBIR YOU | DUNN | | 1361 | 12-7-8-8H SKUNK | DUNN |
| 238 | 31X-9E FBIR YOU | DUNN | | 1362 | 12-7-8-9H SKUNK | DUNN |
| 239 | 31X-9F FBIR YOU | DUNN | | 1363 | 12-7-8-9H SKUNK | DUNN |
| 240 | 1-32-33H-148-92 | DUNN | | 1364 | 12-7-8-9H3 SKUN | DUNN |
| 241 | 3-32-33H-148-92 | DUNN | | 1365 | 12-7-8-9H3 SKUN | DUNN |
| 242 | 1-04-03H-149-91 | DUNN | | 1366 | 24X-8B FBIR HUN | DUNN |
| 243 | 3-04-03H-149-91 | DUNN | | 1367 | 24X-8E FBIR HUN | DUNN |
| 244 | 14-23HA MABEL L | DUNN | | 1368 | 29B-32H ARABIAN | DUNN |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 245 | 14-23HB MABEL L | DUNN | | 1369 | 9HD EDWARD GOOD | DUNN |
| 246 | 14-23HX MABEL L | DUNN | | 1370 | 9HD EDWARD GOOD | DUNN |
| 247 | 23-14HC SKUNK C | DUNN | | 1371 | 1-04-33H-150-92 | DUNN |
| 248 | 23-14HC SKUNK C | DUNN | | 1372 | 1-04-33H-150-92 | DUNN |
| 249 | 18C-07-1H DUET | DUNN | | 1373 | 2-04-33H-150-92 | DUNN |
| 250 | 18C-07-1H DUET | DUNN | | 1374 | 2-04-33H-150-92 | DUNN |
| 251 | 18C-07-2H TF HA | DUNN | | 1375 | 3-04-33H-150-92 | DUNN |
| 252 | 18C-07-2H TF HA | DUNN | | 1376 | 14C-13H TOBACCO | DUNN |
| 253 | 18D-07-3H CHORD | DUNN | | 1377 | 1-06-05H-149-92 | DUNN |
| 254 | 18D-07-3H CHORD | DUNN | | 1378 | 1-06-32H-150-92 | DUNN |
| 255 | 18D-07-4H TF MU | DUNN | | 1379 | 2-06-05H-149-92 | DUNN |
| 256 | 18D-07-4H TF MU | DUNN | | 1380 | 2-06-32H-150-92 | DUNN |
| 257 | 18D-07-4H TF MU | DUNN | | 1381 | 3-06-32H-150-92 | DUNN |
| 258 | 06B-05-4H TF HU | DUNN | | 1382 | 4-06-31H-150-92 | DUNN |
| 259 | 2-31H LIKES EAG | DUNN | | 1383 | 4-06-32H-150-92 | DUNN |
| 260 | 05CH TF GRAY WO | DUNN | | 1384 | 5-06-05H-149-92 | DUNN |
| 261 | 5-24H BUFFALO R | DUNN | | 1385 | 1-03-02H-149-92 | DUNN |
| 262 | 13-18-17-16H3 S | DUNN | | 1386 | 1-03-34H-150-92 | DUNN |
| 263 | 13-18-17-16H3 S | DUNN | | 1387 | 1-03-35H-150-92 | DUNN |
| 264 | 13-18-17-9H SKU | DUNN | | 1388 | 2-03-02H-149-92 | DUNN |
| 265 | 13-18-17-9H SKU | DUNN | | 1389 | 2-03-35H-150-92 | DUNN |
| 266 | 16-26-27-12H MO | DUNN | | 1390 | 3-03-02H-149-92 | DUNN |
| 267 | 16-26-27-12H MO | DUNN | | 1391 | 3-03-34H-150-92 | DUNN |
| 268 | 16-26-27-13H3 M | DUNN | | 1392 | 3-03-35H-150-92 | DUNN |
| 269 | 16-26-27-13H3 M | DUNN | | 1393 | 4-03-02H-149-92 | DUNN |
| 270 | 31X-11C FBIR GO | DUNN | | 1394 | 4-03-35H-150-92 | DUNN |
| 271 | 16-2-3-13H SKUN | DUNN | | 1395 | 19-18HB ALFRED | DUNN |
| 272 | 16-2-3-13H SKUN | DUNN | | 1396 | 19-18HC ALFRED | DUNN |
| 273 | 14-31TFH GORHMA | DUNN | | 1397 | 19-18HD ALFRED | DUNN |
| 274 | 24-31MBH GORHMA | DUNN | | 1398 | 19-18HW MAGGIE | DUNN |
| 275 | FAC HALLIDAY CT | DUNN | | 1399 | 19-18HW MAGGIE | DUNN |
| 276 | 1-11-02H 1 HALL | DUNN | | 1400 | 19-18HW MAGGIE | DUNN |
| 277 | 1-11-02H 1 HALL | DUNN | | 1401 | 19-18HY ALFRED | DUNN |
| 278 | 1-11-02H 1 HALL | DUNN | | 1402 | 19-18HZ ALFRED | DUNN |
| 279 | 1-11-02H 1 HALL | DUNN | | 1403 | 28A-33-1H FORT | DUNN |
| 280 | 1-11-02H 1 HALL | DUNN | | 1404 | 28A-33-2H FORT | DUNN |
| 281 | 1-11-02H 1 HALL | DUNN | | 1405 | 33D-28-4H FORT | DUNN |
| 282 | 35HA PAUL PETER | DUNN | | 1406 | 33D-28-5H FORT | DUNN |
| 283 | 35HA PAUL PETER | DUNN | | 1407 | 22-27HC SARAH Y | DUNN |
| 284 | 35HC PAUL PETER | DUNN | | 1408 | 22-27HC SARAH Y | DUNN |
| 285 | 35HC PAUL PETER | DUNN | | 1409 | 36-25HA GOOD BI | DUNN |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 286 | 35HD PAUL PETER | DUNN | | 1410 | 36-25HA GOOD BI | DUNN |
| 287 | 35HD PAUL PETER | DUNN | | 1411 | 36-25HB GOOD BI | DUNN |
| 288 | 13X-13B FBIR NE | DUNN | | 1412 | 36-25HB GOOD BI | DUNN |
| 289 | 13X-13B FBIR NE | DUNN | | 1413 | 36-25HC GOOD BI | DUNN |
| 290 | 24X-21B FBIR BL | DUNN | | 1414 | 36-25HC GOOD BI | DUNN |
| 291 | 24X-21B FBIR BL | DUNN | | 1415 | 36-25HD GOOD BI | DUNN |
| 292 | 2-05-04H-148-91 | DUNN | | 1416 | 36-25HW GOOD BI | DUNN |
| 293 | 4-05-04H-148-91 | DUNN | | 1417 | 36-25HW GOOD BI | DUNN |
| 294 | 2-32-29H-150-91 | DUNN | | 1418 | 36-25HX GOOD BI | DUNN |
| 295 | 4-32-29H-150-91 | DUNN | | 1419 | 36-25HZ GOOD BI | DUNN |
| 296 | 20C-21-4H FORT | DUNN | | 1420 | 149-93-33C-28H | DUNN |
| 297 | 20C-21-5H FORT | DUNN | | 1421 | 33C-28H TF CALY | DUNN |
| 298 | 20C-21-6H FORT | DUNN | | 1422 | 21A-22H CHOKECH | DUNN |
| 299 | 21A-20-1H FORT | DUNN | | 1423 | 21C-22H TF BLUE | DUNN |
| 300 | 21A-20-2H FORT | DUNN | | 1424 | 21C-22H WORMWOO | DUNN |
| 301 | 21A-20-3H FORT | DUNN | | 1425 | 16-10-3-3H MOCC | DUNN |
| 302 | 2-04-03H-149-91 | DUNN | | 1426 | 16-10-3-3H MOCC | DUNN |
| 303 | 4-04-03H-149-91 | DUNN | | 1427 | 16-10-3-3H3 MOC | DUNN |
| 304 | 11X-11 TUCKERMA | DUNN | | 1428 | 16-10-3-3H3 MOC | DUNN |
| 305 | 11X-11B TUCKERM | DUNN | | 1429 | 142-94 (DWOA) F | DUNN |
| 306 | 11X-11F TUCKERM | DUNN | | 1430 | 142-94 (DWOA) F | DUNN |
| 307 | 11X-11A TUCKERM | DUNN | | 1431 | 142-94 (DWOA) F | DUNN |
| 308 | 31X-2 FBIR HUNT | DUNN | | 1432 | 41X-16 DAKOTA F | DUNN |
| 309 | 44X-32C FBIR HE | DUNN | | 1433 | 14-11-2-3H MOCC | DUNN |
| 310 | 41X-1C FBIR GRI | DUNN | | 1434 | 14-11-2-3H MOCC | DUNN |
| 311 | 21X-6B FBIR GEO | DUNN | | 1435 | 14-11-2-3H3 MOC | DUNN |
| 312 | 34X-33C FBIR GR | DUNN | | 1436 | 14-11-2-3H3 MOC | DUNN |
| 313 | 3-04-33H-150-92 | DUNN | | 1437 | 15D-16H TF BULL | DUNN |
| 314 | 4-04-33H-150-92 | DUNN | | 1438 | 41-5H EAGLE USA | DUNN |
| 315 | 4-04-33H-150-92 | DUNN | | 1439 | 23-36H GARY BEL | DUNN |
| 316 | 5-04-33H-150-92 | DUNN | | 1440 | 23-36H GARY BEL | DUNN |
| 317 | 5-04-33H-150-92 | DUNN | | 1441 | 42-35H CHARGING | DUNN |
| 318 | 7-04-33H-150-92 | DUNN | | 1442 | 42-35H CHARGING | DUNN |
| 319 | 7-04-33H-150-92 | DUNN | | 1443 | 6-7HC FETTIG (M | DUNN |
| 320 | 24X-8A FBIR BEA | DUNN | | 1444 | 6-7HC FETTIG (M | DUNN |
| 321 | 24X-8B FBIR BEA | DUNN | | 1445 | 43-26H FREDERIC | DUNN |
| 322 | 24X-8E FBIR BEA | DUNN | | 1446 | 1-10-11H-149-91 | DUNN |
| 323 | 14C-13H TF PUMP | DUNN | | 1447 | 1-10-15H-149-91 | DUNN |
| 324 | 2-35HC INDEPEND | DUNN | | 1448 | 2-10-11H-149-91 | DUNN |
| 325 | 2-35HC INDEPEND | DUNN | | 1449 | 3-10-11H-149-91 | DUNN |
| 326 | 2-35HD INDEPEND | DUNN | | 1450 | 3-10-15H-149-9 | DUNN |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 327 | 2-35HI INDEPEND | DUNN | | 1451 | 4-10-11H-149-91 | DUNN |
| 328 | 2-35HY INDEPEND | DUNN | | 1452 | 42-5TFH BEAR DE | DUNN |
| 329 | 2-35HZ INDEPEND | DUNN | | 1453 | 34-7H ROEHR USA | DUNN |
| 330 | 20-17HA MARTIN | DUNN | | 1454 | 34-7H ROEHR USA | DUNN |
| 331 | 20-17HB MARTIN | DUNN | | 1455 | 2-06-31H-150-92 | DUNN |
| 332 | 20-17HC MARTIN | DUNN | | 1456 | 3-06-31H-150-92 | DUNN |
| 333 | 20-17HD MARTIN | DUNN | | 1457 | 14X-36F TAT STA | DUNN |
| 334 | 20-17HF MARTIN | DUNN | | 1458 | 14-10H SHERALEE | DUNN |
| 335 | 20-17HW MARTIN | DUNN | | 1459 | 14-10H SHERALEE | DUNN |
| 336 | 20-17HX MARTIN | DUNN | | 1460 | 1-19-18H-143-94 | DUNN |
| 337 | 20-17HZ MARTIN | DUNN | | 1461 | 1-30H HARRIS FE | DUNN |
| 338 | 2-27H HAWKINSON | DUNN | | 1462 | 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H-1 | DUNN |
| 339 | 2-34H WHITMAN | DUNN | | 1463 | 44-10H TYSVER F | DUNN |
| 340 | 3-27H HAWKINSON | DUNN | | 1464 | 34-11H T KUPPER | DUNN |
| 341 | 3-34H WHITMAN | DUNN | | 1465 | 14-11H T.KUPPER | DUNN |
| 342 | 31-30HA CHARLES | DUNN | | 1466 | 34-11H T KUPPER | DUNN |
| 343 | 31-30HA CHARLES | DUNN | | 1467 | 14-11H T.KUPPER | DUNN |
| 344 | 31-30HB CHARLES | DUNN | | 1468 | 31X-33H MARTIN | DUNN |
| 345 | 31-30HB CHARLES | DUNN | | 1469 | 21X-33E MARTIN | DUNN |
| 346 | 31-30HX CHARLES | DUNN | | 1470 | 21X-33A MARTIN | DUNN |
| 347 | 31-30HX CHARLES | DUNN | | 1471 | 21X-33F MARTIN | DUNN |
| 348 | 2215H-1 MC-HEIN | DUNN | | 1472 | 21X-33B MARTIN | DUNN |
| 349 | 6-04-33H-150-92 | DUNN | | 1473 | 41-4H OSCAR STO | DUNN |
| 350 | 6-04-33H-150-92 | DUNN | | 1474 | 41-4H OSCAR STO | DUNN |
| 351 | 8-04-33H-150-92 | DUNN | | 1475 | 16-34-2H MOCCAS | DUNN |
| 352 | 8-04-33H-150-92 | DUNN | | 1476 | 16-34-2H MOCCAS | DUNN |
| 353 | 30B-31H NET 149 | DUNN | | 1477 | 34-7H DAVID BEC | DUNN |
| 354 | 30B-31H NET 149 | DUNN | | 1478 | 24-7H DAVID BEC | DUNN |
| 355 | 1-05-08H-147-92 | DUNN | | 1479 | 34-7H DAVID BEC | DUNN |
| 356 | 3-05-08H-147-92 | DUNN | | 1480 | 24-7H DAVID BEC | DUNN |
| 357 | 5-7-8-1H3 TWO S | DUNN | | 1481 | 1-22-10H CHARGI | DUNN |
| 358 | 5-7-8-1H3 TWO S | DUNN | | 1482 | 1-22-10H CHARGI | DUNN |
| 359 | 2-19H JOSEPH EA | DUNN | | 1483 | 1-22-23H CHARGI | DUNN |
| 360 | 2-19H JOSEPH EA | DUNN | | 1484 | 1-22-23H CHARGI | DUNN |
| 361 | 41X-29 INGA FED | DUNN | | 1485 | 14-14-10-2H CHA | DUNN |
| 362 | 41X-29D INGA FE | DUNN | | 1486 | 14-14-10-2H CHA | DUNN |
| 363 | 41X-29H INGA FE | DUNN | | 1487 | 14-14-10-2H3 CH | DUNN |
| 364 | 41X-29C INGA FE | DUNN | | 1488 | 14-14-10-2H3 CH | DUNN |
| 365 | 19C-18H KNUCKLE | DUNN | | 1489 | 14-14-10-3H3 CH | DUNN |
| 366 | 19C-18H KNUCKLE | DUNN | | 1490 | 14-14-10-3H3 CH | DUNN |
| 367 | 04B-03HTF SERGE | DUNN | | 1491 | 14-14-24-16H3 C | DUNN |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 368 | 41X-6 WILLIAM | DUNN | | 1492 | 14-14-24-16H3 C | DUNN |
| 369 | 41X-6C WILLIAM | DUNN | | 1493 | 15-14-11-4H CHA | DUNN |
| 370 | 41X-6H WILLIAM | DUNN | | 1494 | 15-14-11-4H CHA | DUNN |
| 371 | 12X-5 TEDDY FED | DUNN | | 1495 | 15-14-24-16H CH | DUNN |
| 372 | 15D-16H CATFISH | DUNN | | 1496 | 15-14-24-16H CH | DUNN |
| 373 | 147-93-18B-19H | DUNN | | 1497 | 15-21-16-2H CHA | DUNN |
| 374 | 147-93-18B-19H | DUNN | | 1498 | 15-21-16-2H CHA | DUNN |
| 375 | 18B-19H TF PYGM | DUNN | | 1499 | 15-21-16-2H3 CH | DUNN |
| 376 | 18B-19H TF PYGM | DUNN | | 1500 | 15-21-16-2H3 CH | DUNN |
| 377 | 16-1H LINCOLN U | DUNN | | 1501 | 15-21-16-3H3 CH | DUNN |
| 378 | 28-33HC HOWLING | DUNN | | 1502 | 15-21-16-3H3 CH | DUNN |
| 379 | 28-33HC HOWLING | DUNN | | 1503 | 15-22-15-3H3 CH | DUNN |
| 380 | 9-1H POINT USA | DUNN | | 1504 | 15-22-15-3H3 CH | DUNN |
| 381 | 9-1H POINT USA | DUNN | | 1505 | 15-22-15-3H3 CH | DUNN |
| 382 | 41-2H HUBER USA | DUNN | | 1506 | 15-22-15-4H CHA | DUNN |
| 383 | 41-2H HUBER USA | DUNN | | 1507 | 15-22-15-4H CHA | DUNN |
| 384 | 15-2H HOPKINS U | DUNN | | 1508 | 15-22-15-4H CHA | DUNN |
| 385 | 44-34H WERRE TR | DUNN | | 1509 | 16-21-16-1H CHA | DUNN |
| 386 | 14-10H LUCILLE | DUNN | | 1510 | 16-21-16-1H CHA | DUNN |
| 387 | 27-2 FENTON | DUNN | | 1511 | 16-21-16-1H3 CH | DUNN |
| 388 | 34-2 KNUTSON-WE | DUNN | | 1512 | 16-21-16-1H3 CH | DUNN |
| 389 | 3-1 MARTIN | DUNN | | 1513 | 16-21-16-1HA CH | DUNN |
| 390 | 27-1 BEAR CREEK | DUNN | | 1514 | 16-21-16-1HA CH | DUNN |
| 391 | 3-1 BEAR CREEK | DUNN | | 1515 | 16-34H MOCCASIN | DUNN |
| 392 | 11-2 BRANDVIK | DUNN | | 1516 | 16-34H MOCCASIN | DUNN |
| 393 | 11-2 BRANDVIK | DUNN | | 1517 | 1-31H SKACHENKO | DUNN |
| 394 | 11-2H PORCUPINE | DUNN | | 1518 | 11X-28B THORP F | DUNN |
| 395 | 44-10H VIANI US | DUNN | | 1519 | 11X-28F THORP F | DUNN |
| 396 | 14X-10A STROMME | DUNN | | 1520 | 11X-28B THORP F | DUNN |
| 397 | 14X-10 STROMME | DUNN | | 1521 | 11X-28F THORP F | DUNN |
| 398 | 31-18H IRENE KO | DUNN | | 1522 | 16-8-7H TWO SHI | DUNN |
| 399 | 11-18H IRENE KO | DUNN | | 1523 | 16-8-7H TWO SHI | DUNN |
| 400 | 31-18H IRENE KO | DUNN | | 1524 | 14-1H QUILLIAM | DUNN |
| 401 | 11-18H IRENE KO | DUNN | | 1525 | 16-8-16H TWO SH | DUNN |
| 402 | 32-4HBKCE FEDER | GOLDEN VALLEY | | 1526 | 16-8-16H TWO SH | DUNN |
| 403 | 1-20-1A BOYCE F | GOLDEN VALLEY | | 1527 | 14-21-33-15H TW | DUNN |
| 404 | 11-13TFH DRY CR | GOLDEN VALLEY | | 1528 | 14-21-33-15H TW | DUNN |
| 405 | 21-1PH ELLISON | GOLDEN VALLEY | | 1529 | 14-21-33-16H3 T | DUNN |
| 406 | 21-1PH ELLISON | GOLDEN VALLEY | | 1530 | 14-21-33-16H3 T | DUNN |
| 407 | 42-26 STONE RAN | GOLDEN VALLEY | | 1531 | 14-33-28H TWO S | DUNN |
| 408 | 14-24H FEDERAL | GOLDEN VALLEY | | 1532 | 14-33-28H TWO S | DUNN |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 409 | 41-16H STATE | GOLDEN VALLEY | | 1533 | 32-34H VOIGHT | DUNN |
| 410 | 14-12H FEDERAL | GOLDEN VALLEY | | 1534 | 17D-08-1H FORT | DUNN |
| 411 | 41-24H PETERSON | GOLDEN VALLEY | | 1535 | 17D-08-2H FORT | DUNN |
| 412 | 41-19H BN | GOLDEN VALLEY | | 1536 | 13X-5A NYGAARD | DUNN |
| 413 | 14-7H FEDERAL | GOLDEN VALLEY | | 1537 | 11X-20 THELMA F | DUNN |
| 414 | 519 ANTELOPE-MA | MCKENZIE | | 1538 | 21X-19F BANG FE | DUNN |
| 415 | 519 ANTELOPE-MA | MCKENZIE | | 1539 | 11X-20 ROBERT F | DUNN |
| 416 | 519HR ANTELOPE- | MCKENZIE | | 1540 | 21-4H GERALD TU | DUNN |
| 417 | 520HR ANTELOPE- | MCKENZIE | | 1541 | 21-4H GERALD TU | DUNN |
| 418 | 520HR ANTELOPE- | MCKENZIE | | 1542 | 31-4H JUDY TUHY | DUNN |
| 419 | 520HR ANTELOPE- | MCKENZIE | | 1543 | 41-4H LBM TUHY | DUNN |
| 420 | 523 ANTELOPE-MA | MCKENZIE | | 1544 | 44-19H BOB TUHY | DUNN |
| 421 | 523 ANTELOPE-MA | MCKENZIE | | 1545 | 11-18H GEORGE T | DUNN |
| 422 | 523 ANTELOPE-MA | MCKENZIE | | 1546 | 44-19H BOB TUHY | DUNN |
| 423 | C522 ANTELOPE-M | MCKENZIE | | 1547 | 11-18H GEORGE T | DUNN |
| 424 | H-517HR AMU (DW | MCKENZIE | | 1548 | 34-7H KNUDSVIG | DUNN |
| 425 | H-517HR AMU (DW | MCKENZIE | | 1549 | 24-7H KNUDSVIG | DUNN |
| 426 | H-517HR AMU (DW | MCKENZIE | | 1550 | 34-7H KNUDSVIG | DUNN |
| 427 | H-521 AMU | MCKENZIE | | 1551 | 24-7H KNUDSVIG | DUNN |
| 428 | 2-13H CROSS | MCKENZIE | | 1552 | 41X-28 SCHETTLE | DUNN |
| 429 | 2-13H CROSS | MCKENZIE | | 1553 | 41X-28 SCHETTLE | DUNN |
| 430 | 17-44H DANKS | MCKENZIE | | 1554 | 34X-28G ESTHER | DUNN |
| 431 | 17-44H DANKS | MCKENZIE | | 1555 | 34X-28C ESTHER | DUNN |
| 432 | 16-3H BENSON | MCKENZIE | | 1556 | 5-11H FREDERICK | DUNN |
| 433 | 16-3H BENSON | MCKENZIE | | 1557 | 14-10H HANSEN R | DUNN |
| 434 | 103-17H CLARKS | MCKENZIE | | 1558 | 44-10H HANSEN R | DUNN |
| 435 | 6D-4-4H MCKENZI | MCKENZIE | | 1559 | 44-10TFH HANSEN | DUNN |
| 436 | 6D-4-4H MCKENZI | MCKENZIE | | 1560 | 34-10TFH HANSEN | DUNN |
| 437 | 6D-4-4H MCKENZI | MCKENZIE | | 1561 | 14-10H HANSEN R | DUNN |
| 438 | 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H-1 | MCKENZIE | | 1562 | 44-10H HANSEN R | DUNN |
| 439 | 4-25H NATHAN HA | MCKENZIE | | 1563 | 44-10TFH HANSEN | DUNN |
| 440 | 4-25H NATHAN HA | MCKENZIE | | 1564 | 34-10TFH HANSEN | DUNN |
| 441 | 1-10H MANDAREE | MCKENZIE | | 1565 | 6-31H FREDERICK | DUNN |
| 442 | 5D-4-4HR USA | MCKENZIE | | 1566 | 11-1TFH ELLISON | GOLDEN VALLEY |
| 443 | 5D-4-4HR USA | MCKENZIE | | 1567 | 14-23H FEDERAL | GOLDEN VALLEY |
| 444 | 5D-4-4HR USA | MCKENZIE | | 1568 | 44-33TFH BANNER | GOLDEN VALLEY |
| 445 | 1-29H MOBERG | MCKENZIE | | 1569 | 44-33TFH BANNER | GOLDEN VALLEY |
| 446 | 29-32-2H MOBERG | MCKENZIE | | 1570 | 44-23TFH BELL L | GOLDEN VALLEY |
| 447 | 29-32-3H MOBERG | MCKENZIE | | 1571 | 44-23TFH BELL L | GOLDEN VALLEY |
| 448 | 12X-20 MARIANA | MCKENZIE | | 1572 | 20-41H DANKS | MCKENZIE |
| 449 | 12X-20C MARIANA | MCKENZIE | | 1573 | 20-41H DANKS | MCKENZIE |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 450 | 12X-20H MARIANA | MCKENZIE | | 1574 | 4-30H BEAR DEN | MCKENZIE |
| 451 | 12X-20G2 MARIAN | MCKENZIE | | 1575 | A203X CMNU | MCKENZIE |
| 452 | 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H-1 | MCKENZIE | | 1576 | D407X CMNU | MCKENZIE |
| 453 | B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H1 | MCKENZIE | | 1577 | A203X CMNU | MCKENZIE |
| 454 | 15A-22-7H FORT | MCKENZIE | | 1578 | D407X CMNU | MCKENZIE |
| 455 | 15B-22-3H FORT | MCKENZIE | | 1579 | A203X CMNU | MCKENZIE |
| 456 | 15B-22-4H FORT | MCKENZIE | | 1580 | D407X CMNU | MCKENZIE |
| 457 | 15B-22-5H FORT | MCKENZIE | | 1581 | A203X CMNU | MCKENZIE |
| 458 | 15B-22-6H FORT | MCKENZIE | | 1582 | D407X CMNU | MCKENZIE |
| 459 | 22D-15-1H FORT | MCKENZIE | | 1583 | F208XHR BBMU | MCKENZIE |
| 460 | 22D-15-1H FORT | MCKENZIE | | 1584 | G208 BBMU | MCKENZIE |
| 461 | 22D-15-2H FORT | MCKENZIE | | 1585 | 0 BBMU | MCKENZIE |
| 462 | 22D-15-2H FORT | MCKENZIE | | 1586 | 7-1X SILURIAN 7 | MCKENZIE |
| 463 | 13-3H ROLLEFSTA | MCKENZIE | | 1587 | 6-1 SILURIAN 6 | MCKENZIE |
| 464 | 14-3H2 ROLLEFST | MCKENZIE | | 1588 | 7-1X SILURIAN 7 | MCKENZIE |
| 465 | 7-3H1 ROLLEFSTA | MCKENZIE | | 1589 | 6-1 SILURIAN 6 | MCKENZIE |
| 466 | 8-3H3 ROLLEFSTA | MCKENZIE | | 1590 | 7-1X SILURIAN 7 | MCKENZIE |
| 467 | 9-3H ROLLEFSTAD | MCKENZIE | | 1591 | 6-1 SILURIAN 6 | MCKENZIE |
| 468 | 24-12H INGA | MCKENZIE | | 1592 | 7-1X SILURIAN 7 | MCKENZIE |
| 469 | 14-12H INGA | MCKENZIE | | 1593 | 3328H-1 BB-EIDE | MCKENZIE |
| 470 | 24-12H INGA | MCKENZIE | | 1594 | 3328H-2 BB-EIDE | MCKENZIE |
| 471 | 14-12H INGA | MCKENZIE | | 1595 | 3328H-1 BB-EIDE | MCKENZIE |
| 472 | 24-12H INGA | MCKENZIE | | 1596 | 3328H-2 BB-EIDE | MCKENZIE |
| 473 | 14-12H INGA | MCKENZIE | | 1597 | 3328H-1 BB-EIDE | MCKENZIE |
| 474 | 5-3-10BH PONCHO | MCKENZIE | | 1598 | 3328H-2 BB-EIDE | MCKENZIE |
| 475 | 13-23/14H KIRKL | MCKENZIE | | 1599 | 41X-30 BURNS FE | MCKENZIE |
| 476 | 14-10H ZACHERY | MCKENZIE | | 1600 | 34X-31-1 USA | MCKENZIE |
| 477 | 14-10H ZACHERY | MCKENZIE | | 1601 | 33-11H AUDREY R | MCKENZIE |
| 478 | 41-14MBH OLE BO | MCKENZIE | | 1602 | 33-11H RED TIPP | MCKENZIE |
| 479 | 34X-36G RUBY ST | MCKENZIE | | 1603 | 44X-31H CHARLSO | MCKENZIE |
| 480 | 6-24H ROCHESTER | MCKENZIE | | 1604 | 2-09H MANDAREE | MCKENZIE |
| 481 | 1-5H GARFIELD | MCKENZIE | | 1605 | 2-36H HENDRICKS | MCKENZIE |
| 482 | 101-1819H CLARK | MCKENZIE | | 1606 | 17C-08-1H FORT | MCKENZIE |
| 483 | 11-0706H CLARKS | MCKENZIE | | 1607 | 17C-08-2H FORT | MCKENZIE |
| 484 | 12-0719H CLARKS | MCKENZIE | | 1608 | 17C-08-3H FORT | MCKENZIE |
| 485 | 13-1806H CLARKS | MCKENZIE | | 1609 | 17C-08-4H FORT | MCKENZIE |
| 486 | 14-1819H CLARKS | MCKENZIE | | 1610 | 17D-08-5H FORT | MCKENZIE |
| 487 | 16-0706H CLARKS | MCKENZIE | | 1611 | 17D-08-6H FORT | MCKENZIE |
| 488 | 27-34H KYW | MCKENZIE | | 1612 | 17D-08-7H FORT | MCKENZIE |
| 489 | 27-34H KYW | MCKENZIE | | 1613 | 12-1H HUNTS ALO | MCKENZIE |
| 490 | 34-27HB GOOD VO | MCKENZIE | | 1614 | 12-1H HUNTS ALO | MCKENZIE |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 491 | 34-27HD GOOD VO | MCKENZIE | | 1615 | 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H-1 | MCKENZIE |
| 492 | 34-27HZ GOOD VO | MCKENZIE | | 1616 | 2-35H BOHMBACH | MCKENZIE |
| 493 | 5-2 1H FOREMAN | MCKENZIE | | 1617 | 41-14MBH AMANDA | MCKENZIE |
| 494 | 03-0805H CLARKS | MCKENZIE | | 1618 | 41-14MBH AMANDA | MCKENZIE |
| 495 | 100-0805H CLARK | MCKENZIE | | 1619 | 41-14MBH AMANDA | MCKENZIE |
| 496 | 15-0805H CLARKS | MCKENZIE | | 1620 | 1-29H OLE | MCKENZIE |
| 497 | 15-0805H CLARKS | MCKENZIE | | 1621 | 21-5H WRIGHT FE | MCKENZIE |
| 498 | 12-26H DEBBIE B | MCKENZIE | | 1622 | 21-5-2H WRIGHT | MCKENZIE |
| 499 | 12-26H DEBBIE B | MCKENZIE | | 1623 | 21-14MBH CRATER | MCKENZIE |
| 500 | 14C-11-1H FORT | MCKENZIE | | 1624 | 31-14MBH CRATER | MCKENZIE |
| 501 | 14C-11-2H FORT | MCKENZIE | | 1625 | 41-14TFH CRATER | MCKENZIE |
| 502 | 14D-11-3H FORT | MCKENZIE | | 1626 | 31X-9 LUNDIN FE | MCKENZIE |
| 503 | 14D-11-4H FORT | MCKENZIE | | 1627 | 05-31H BEAR DEN | MCKENZIE |
| 504 | 150-94-3B-10-1H | MCKENZIE | | 1628 | 1-26/35H PAUL | MCKENZIE |
| 505 | 150-94-3B-10-1H | MCKENZIE | | 1629 | 2-26-35TH PAUL | MCKENZIE |
| 506 | 150-94-3B-10-2H | MCKENZIE | | 1630 | 2-26-35BH PAUL | MCKENZIE |
| 507 | 12-35H WINDY BO | MCKENZIE | | 1631 | 1-26-35BH PAUL | MCKENZIE |
| 508 | 31-11NWH THOMPS | MCKENZIE | | 1632 | 4-35-26BH ZORRO | MCKENZIE |
| 509 | 08-1621H BEAR D | MCKENZIE | | 1633 | 3-35-26BH ZORRO | MCKENZIE |
| 510 | 103-21H BEAR DE | MCKENZIE | | 1634 | 27-34-26-35LL Z | MCKENZIE |
| 511 | 103-21H BEAR DE | MCKENZIE | | 1635 | 9-04H MANDAREE | MCKENZIE |
| 512 | 104-2116H BEAR | MCKENZIE | | 1636 | 9-04H MANDAREE | MCKENZIE |
| 513 | 104-2116H BEAR | MCKENZIE | | 1637 | 35-26H MORSETTE | MCKENZIE |
| 514 | 17-16H BEAR DEN | MCKENZIE | | 1638 | 35-26H MORSETTE | MCKENZIE |
| 515 | 18-21H BEAR DEN | MCKENZIE | | 1639 | 35-26HD MORSETT | MCKENZIE |
| 516 | 18-21H BEAR DEN | MCKENZIE | | 1640 | 35-26HX MORSETT | MCKENZIE |
| 517 | 19-2116H BEAR D | MCKENZIE | | 1641 | 35-26HZ MORSETT | MCKENZIE |
| 518 | 19-2116H BEAR D | MCKENZIE | | 1642 | 14-14H JONES US | MCKENZIE |
| 519 | 24-1621H BEAR D | MCKENZIE | | 1643 | 11-29H GOODALL | MCKENZIE |
| 520 | 18-19HC PLENTY | MCKENZIE | | 1644 | 11-29H GOODALL | MCKENZIE |
| 521 | 18-19HC PLENTY | MCKENZIE | | 1645 | 13-23H TAT USA | MCKENZIE |
| 522 | 3-21H BLUE BUTT | MCKENZIE | | 1646 | 34-22H TAT USA | MCKENZIE |
| 523 | 3-21H BLUE BUTT | MCKENZIE | | 1647 | 14-21/16H LEVAN | MCKENZIE |
| 524 | 16-7H WOLD | MCKENZIE | | 1648 | 10-15H PAYETTE | MCKENZIE |
| 525 | 16-7H WOLD | MCKENZIE | | 1649 | 11-3H DANKS USA | MCKENZIE |
| 526 | 12X-21 ROEDESKE | MCKENZIE | | 1650 | 11-3H DANKS USA | MCKENZIE |
| 527 | 44X-1 DWYER FED | MCKENZIE | | 1651 | 10-3H2 ROLLEFST | MCKENZIE |
| 528 | 4-2425H WEST CL | MCKENZIE | | 1652 | 11-3H1 ROLLEFST | MCKENZIE |
| 529 | 5-2425H WEST CL | MCKENZIE | | 1653 | 12-3H3 ROLLEFST | MCKENZIE |
| 530 | 1-3-10H BARNSTO | MCKENZIE | | 1654 | 31-4H CROW FLIE | MCKENZIE |
| 531 | 33-4 1-H SEDLAC | MCKENZIE | | 1655 | 31-4H CROW FLIE | MCKENZIE |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 532 | 43-34H OLD HICK | MCKENZIE | | 1656 | 1-35H SEATTLE | MCKENZIE |
| 533 | 31-13MBH AIDEN | MCKENZIE | | 1657 | 13-35H LUELLA | MCKENZIE |
| 534 | 31-13H AIDEN | MCKENZIE | | 1658 | 16X-35HB JAMES | MCKENZIE |
| 535 | 31-13MBH AIDEN | MCKENZIE | | 1659 | 16X-35HA JAMES | MCKENZIE |
| 536 | 31-13H AIDEN | MCKENZIE | | 1660 | 16-35H JAMES | MCKENZIE |
| 537 | 31-13MBH AIDEN | MCKENZIE | | 1661 | 3-3/10H GABBERT | MCKENZIE |
| 538 | 1-20H BUELINGO | MCKENZIE | | 1662 | 3-3-10BH PONCHO | MCKENZIE |
| 539 | 11-1H JOSEPH | MCKENZIE | | 1663 | 4-3-10BH PONCHO | MCKENZIE |
| 540 | 31-11SWH THOMPS | MCKENZIE | | 1664 | 1-3-10BH PONCHO | MCKENZIE |
| 541 | 4-20/21H MOBERG | MCKENZIE | | 1665 | 1-3-10TH PONCHO | MCKENZIE |
| 542 | 44-23H WOLSKI | MCKENZIE | | 1666 | 2-3-10BH PONCHO | MCKENZIE |
| 543 | 21X-28 EDWARD ( | MCKENZIE | | 1667 | 2-3-10TH PONCHO | MCKENZIE |
| 544 | 149-98-11-2-3H | MCKENZIE | | 1668 | 31-20H QUALE US | MCKENZIE |
| 545 | 149-98-11-2-2H | MCKENZIE | | 1669 | 10B-2-4H USA | MCKENZIE |
| 546 | 149-98-11-2-10H | MCKENZIE | | 1670 | 10B-2-4H USA | MCKENZIE |
| 547 | 13-24ENH WOLFF | MCKENZIE | | 1671 | 10B-2-4H USA | MCKENZIE |
| 548 | 1-3H JOHNSON | MCKENZIE | | 1672 | 13A-24-3H FORT | MCKENZIE |
| 549 | 1-3H JOHNSON | MCKENZIE | | 1673 | 13A-24-4H FORT | MCKENZIE |
| 550 | 31-30HA RUBY *( | MCKENZIE | | 1674 | 13B-24-1H FORT | MCKENZIE |
| 551 | 31-30HB RUBY (M | MCKENZIE | | 1675 | 44-32H CHARLSON | MCKENZIE |
| 552 | 31-30HB RUBY (M | MCKENZIE | | 1676 | 28-44H SHERWOOD | MCKENZIE |
| 553 | 31-30HW RUBY (M | MCKENZIE | | 1677 | 28-44H SHERWOOD | MCKENZIE |
| 554 | 31-30HX RUBY (M | MCKENZIE | | 1678 | 28D-21H TF MILE | MCKENZIE |
| 555 | 15-22 1H BORSET | MCKENZIE | | 1679 | 28D-21H TF MILE | MCKENZIE |
| 556 | 15-22 1H BORSET | MCKENZIE | | 1680 | 4-12/13H DAILEY | MCKENZIE |
| 557 | 21-4H TARPON FE | MCKENZIE | | 1681 | 18B-19-1H FORT | MCKENZIE |
| 558 | 21-4-1H TARPON | MCKENZIE | | 1682 | 18B-19-1H FORT | MCKENZIE |
| 559 | 21-4-3H TARPON | MCKENZIE | | 1683 | 18B-19-2H FORT | MCKENZIE |
| 560 | 11-4TFH FLATLAN | MCKENZIE | | 1684 | 18B-19-2H FORT | MCKENZIE |
| 561 | 11-4HR FLATLAND | MCKENZIE | | 1685 | 18B-19-3H FORT | MCKENZIE |
| 562 | 21-30H WADE 530 | MCKENZIE | | 1686 | 18B-19-3H FORT | MCKENZIE |
| 563 | 20HC CORN STALK | MCKENZIE | | 1687 | 2-1HB PATRICIA | MCKENZIE |
| 564 | 20HC CORN STALK | MCKENZIE | | 1688 | 2-1HB PATRICIA | MCKENZIE |
| 565 | 20HC CORN STALK | MCKENZIE | | 1689 | 16-22H LUCY LON | MCKENZIE |
| 566 | 20HD CORN STALK | MCKENZIE | | 1690 | 16-22H LUCY LON | MCKENZIE |
| 567 | 20HD CORN STALK | MCKENZIE | | 1691 | 26-35H SPOTTED | MCKENZIE |
| 568 | 20HD CORN STALK | MCKENZIE | | 1692 | 26-35H SPOTTED | MCKENZIE |
| 569 | 33-28H GERALD H | MCKENZIE | | 1693 | 29-32H DELORES | MCKENZIE |
| 570 | 33-28H GERALD H | MCKENZIE | | 1694 | 29-32H DELORES | MCKENZIE |
| 571 | 15-8H STEVENSON | MCKENZIE | | 1695 | 29-32HA LUCY EV | MCKENZIE |
| 572 | 15-8H STEVENSON | MCKENZIE | | 1696 | 29-32HB LUCY EV | MCKENZIE |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 573 | 15-8HD STEVENSO | MCKENZIE | | 1697 | 29-32HX LUCY EV | MCKENZIE |
| 574 | 15-8HD STEVENSO | MCKENZIE | | 1698 | 16-24H RUBIA | MCKENZIE |
| 575 | 31-31H LEWIS FE | MCKENZIE | | 1699 | 16-24H RUBIA | MCKENZIE |
| 576 | 3-12H KUHN FEDE | MCKENZIE | | 1700 | 14-11H MANDAREE | MCKENZIE |
| 577 | 1-12H KUHN | MCKENZIE | | 1701 | 14-11H MANDAREE | MCKENZIE |
| 578 | 2-25-36-15H KOA | MCKENZIE | | 1702 | 9C-10-1H FORT B | MCKENZIE |
| 579 | 2-25-36-14H3 KO | MCKENZIE | | 1703 | 9C-10-2H FORT B | MCKENZIE |
| 580 | 2-25-36-16H3 KO | MCKENZIE | | 1704 | 9C-10-3H FORT B | MCKENZIE |
| 581 | 2-25-36-15H KOA | MCKENZIE | | 1705 | 42X-12 ALBERT F | MCKENZIE |
| 582 | 2-25-36-14H3 KO | MCKENZIE | | 1706 | 24-13H2 BEAR DE | MCKENZIE |
| 583 | 2-25-36-16H3 KO | MCKENZIE | | 1707 | 24-13H2 BEAR DE | MCKENZIE |
| 584 | 1-21H SAND CREE | MCKENZIE | | 1708 | 41X-5G NELSON F | MCKENZIE |
| 585 | 1-23H SAND CREE | MCKENZIE | | 1709 | 100-2413H WEST | MCKENZIE |
| 586 | 1-4H BOULDER | MCKENZIE | | 1710 | 101-2425H WEST | MCKENZIE |
| 587 | 15-33/28H TAT | MCKENZIE | | 1711 | 102-2413H WEST | MCKENZIE |
| 588 | 4-33-28BH TAT | MCKENZIE | | 1712 | 1-2413H WEST CL | MCKENZIE |
| 589 | 3-33-28TH TAT | MCKENZIE | | 1713 | 1-2413H WEST CL | MCKENZIE |
| 590 | 3-33-28BH TAT | MCKENZIE | | 1714 | 2-2425H WEST CL | MCKENZIE |
| 591 | 2-33-28TH TAT ( | MCKENZIE | | 1715 | 3-2413H WEST CL | MCKENZIE |
| 592 | 15-33/28H TAT | MCKENZIE | | 1716 | 1-19-20H STOCKE | MCKENZIE |
| 593 | 13-35/26H TAT | MCKENZIE | | 1717 | 1-19-20H STOCKE | MCKENZIE |
| 594 | 2-35-26TH TAT | MCKENZIE | | 1718 | 1-19-20H STOCKE | MCKENZIE |
| 595 | 3-35-26BH TAT | MCKENZIE | | 1719 | 1-19-20H STOCKE | MCKENZIE |
| 596 | 4-35-26BH TAT | MCKENZIE | | 1720 | 9-5-6-5H KOALA | MCKENZIE |
| 597 | 13-35/26H TAT | MCKENZIE | | 1721 | 9-5-6-12H3 KOAL | MCKENZIE |
| 598 | 23-14HZ KATE SO | MCKENZIE | | 1722 | 8-5-6-5H3 KOALA | MCKENZIE |
| 599 | 23-14HZ KATE SO | MCKENZIE | | 1723 | 9-5-6-5H KOALA | MCKENZIE |
| 600 | 12-18H ANDERSON | MCKENZIE | | 1724 | 9-5-6-12H3 KOAL | MCKENZIE |
| 601 | 12-18H ANDERSON | MCKENZIE | | 1725 | 1-27HA SAND CRE | MCKENZIE |
| 602 | 04-20H BEAR DEN | MCKENZIE | | 1726 | 11-27TFH MOSSER | MCKENZIE |
| 603 | 07-17H BEAR DEN | MCKENZIE | | 1727 | 14X-11 MONDAK F | MCKENZIE |
| 604 | 100-2017H BEAR | MCKENZIE | | 1728 | 11X-14 MONDAK F | MCKENZIE |
| 605 | 101-2019H BEAR | MCKENZIE | | 1729 | 27-34H WOLF | MCKENZIE |
| 606 | 102-1708H BEAR | MCKENZIE | | 1730 | 27-34H WOLF | MCKENZIE |
| 607 | 108-1708H BEAR | MCKENZIE | | 1731 | 24X-12 MONDAK F | MCKENZIE |
| 608 | 20-1708H BEAR D | MCKENZIE | | 1732 | 32-29 1H LARSEN | MCKENZIE |
| 609 | 23-2019H BEAR D | MCKENZIE | | 1733 | 15-5H SORENSON | MCKENZIE |
| 610 | 15-12-1-2H GRIZ | MCKENZIE | | 1734 | 15-5H SORENSON | MCKENZIE |
| 611 | 1-5-8H BEAR BUT | MCKENZIE | | 1735 | 2-12H KUHN | MCKENZIE |
| 612 | 1-5-8H BEAR BUT | MCKENZIE | | 1736 | 1-12H KUHN | MCKENZIE |
| 613 | 1-5-8H BEAR BUT | MCKENZIE | | 1737 | 2-12H KUHN | MCKENZIE |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 614 | 1-5-8H BEAR BUT | MCKENZIE | | 1738 | 3-25-13-3H EAST | MCKENZIE |
| 615 | 1-5-8H BEAR BUT | MCKENZIE | | 1739 | 3-25-36-15H EAS | MCKENZIE |
| 616 | 150-94-06B-07H | MCKENZIE | | 1740 | 21X-29 VIOLET | MCKENZIE |
| 617 | 22C-15-2H USA 1 | MCKENZIE | | 1741 | 11-18H KLINE FE | MCKENZIE |
| 618 | 1-11-2H BEAR BU | MCKENZIE | | 1742 | 22-15HB SWEET G | MCKENZIE |
| 619 | 1-11-2H BEAR BU | MCKENZIE | | 1743 | 22-15HB SWEET G | MCKENZIE |
| 620 | 1-11-2H BEAR BU | MCKENZIE | | 1744 | 32-29H BEARSTAI | MCKENZIE |
| 621 | 1-11-2H BEAR BU | MCKENZIE | | 1745 | 32-29H BEARSTAI | MCKENZIE |
| 622 | 1-11-2H BEAR BU | MCKENZIE | | 1746 | 44-35H MISSOURI | MCKENZIE |
| 623 | 26B-35-1H KLOSE | MCKENZIE | | 1747 | 3-11H FLORIDA | MCKENZIE |
| 624 | 13-12HW LINSETH | MCKENZIE | | 1748 | 1-11H FLORIDA | MCKENZIE |
| 625 | 13-12HW LINSETH | MCKENZIE | | 1749 | 2-11H FLORIDA | MCKENZIE |
| 626 | 41X-6 JORGENSON | MCKENZIE | | 1750 | 3-14H ALPHA (M | MCKENZIE |
| 627 | 21X-13 BADLANDS | MCKENZIE | | 1751 | 1-14H ALPHA (M | MCKENZIE |
| 628 | 14X-34 BENNIE P | MCKENZIE | | 1752 | 2-14H ALPHA | MCKENZIE |
| 629 | 34X-14 FEDERAL | MCKENZIE | | 1753 | 1-27H AKRON | MCKENZIE |
| 630 | 34X-14 JOHNSRUD | MCKENZIE | | 1754 | 4-34H AKRON | MCKENZIE |
| 631 | 24-1H KLOSE (DW | MCKENZIE | | 1755 | 1-6H TODD | MCKENZIE |
| 632 | 24X-32 DEDRICK | MCKENZIE | | 1756 | 100-2501H HAWKE | MCKENZIE |
| 633 | 44-33 4-9H SLAS | MCKENZIE | | 1757 | 100-2501H HAWKE | MCKENZIE |
| 634 | 31-4-1H JOHNSTO | MCKENZIE | | 1758 | 102-2501H HAWKE | MCKENZIE |
| 635 | 41-25 25-30H HA | MCKENZIE | | 1759 | 1-2501H HAWKEYE | MCKENZIE |
| 636 | 14-22-15-4H3 GR | MCKENZIE | | 1760 | 11-5SEH JOHNSON | MCKENZIE |
| 637 | 15-33H WOLD | MCKENZIE | | 1761 | 11-4SH LUNDIN | MCKENZIE |
| 638 | 152-97-13-24-1H | MCKENZIE | | 1762 | 03A-10H EMERALD | MCKENZIE |
| 639 | 152-97-13-24-1H | MCKENZIE | | 1763 | 1-4-9H BEAR BUT | MCKENZIE |
| 640 | 152-97-13-24-2H | MCKENZIE | | 1764 | 1-4-9H BEAR BUT | MCKENZIE |
| 641 | 152-97-13-24-3H | MCKENZIE | | 1765 | 1-4-9H BEAR BUT | MCKENZIE |
| 642 | 13-24-10H DARLE | MCKENZIE | | 1766 | 1-4-9H BEAR BUT | MCKENZIE |
| 643 | 1-2H MONROE | MCKENZIE | | 1767 | 33DHTF COYOTE | MCKENZIE |
| 644 | 1-26-35H BERG T | MCKENZIE | | 1768 | 33DHTF COYOTE | MCKENZIE |
| 645 | 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H-1 | MCKENZIE | | 1769 | 14X-36 ROLFSRUD | MCKENZIE |
| 646 | 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H-1 | MCKENZIE | | 1770 | 43X-19 VAN DYKE | MCKENZIE |
| 647 | 25-26H CLIFFSID | MCKENZIE | | 1771 | 43X-19 WALTON | MCKENZIE |
| 648 | 1819H-1 HA-SANF | MCKENZIE | | 1772 | 43X-19 VAN DYKE | MCKENZIE |
| 649 | 1819H-1 HA-SANF | MCKENZIE | | 1773 | 43X-19 WALTON | MCKENZIE |
| 650 | 11-2 1H SKORPIL | MCKENZIE | | 1774 | 41X-19G WALTON | MCKENZIE |
| 651 | 15-11H NELSON | MCKENZIE | | 1775 | 41X-19H WALTON | MCKENZIE |
| 652 | 6-17H JAMESTOWN | MCKENZIE | | 1776 | 41X-19D WALTON | MCKENZIE |
| 653 | 7-17H JAMESTOWN | MCKENZIE | | 1777 | 41X-15 ALKALI C | MCKENZIE |
| 654 | 1-6-7H BEAR BUT | MCKENZIE | | 1778 | 18-19H ROLFSRUD | MCKENZIE |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 655 | 1-6-7H BEAR BUT | MCKENZIE | | 1779 | 04A-09H PRAIRIE | MCKENZIE |
| 656 | 1-6-7H BEAR BUT | MCKENZIE | | 1780 | 04A-09H PRAIRIE | MCKENZIE |
| 657 | 1-6-7H BEAR BUT | MCKENZIE | | 1781 | 04A-09H TF BOBC | MCKENZIE |
| 658 | 1-6-7H BEAR BUT | MCKENZIE | | 1782 | 04A-09H TF BOBC | MCKENZIE |
| 659 | 15-22-34-15H SM | MCKENZIE | | 1783 | 150-94-04A-09H | MCKENZIE |
| 660 | 15-22-34-15H SM | MCKENZIE | | 1784 | 150-94-04A-09H | MCKENZIE |
| 661 | 19-18 1-H GARMA | MCKENZIE | | 1785 | 1-11-2H BEAR BU | MCKENZIE |
| 662 | 19-18 2TFH GARM | MCKENZIE | | 1786 | 1-31-30H WOLVER | MCKENZIE |
| 663 | 19-18 3H GARMAN | MCKENZIE | | 1787 | 4-31-30TFH WOLV | MCKENZIE |
| 664 | 19-18 4TFH GARM | MCKENZIE | | 1788 | 2-31-30H WOLVER | MCKENZIE |
| 665 | 23-25 30-29H HA | MCKENZIE | | 1789 | 31-14H BRADFIEL | MCKENZIE |
| 666 | 1-11H PASADENA | MCKENZIE | | 1790 | 21-30H JOANNE Q | MCKENZIE |
| 667 | 11-29TFH ANNIE | MCKENZIE | | 1791 | 21-30TFH JOANNE | MCKENZIE |
| 668 | 21-29H CHUCK QU | MCKENZIE | | 1792 | 149-94-33D-28H | MCKENZIE |
| 669 | 21-29TFH SCOTT | MCKENZIE | | 1793 | 149-94-33D-28H | MCKENZIE |
| 670 | 3-4H SCHMITZ | MCKENZIE | | 1794 | 33D-28H NIMBUS | MCKENZIE |
| 671 | 24-34-1H AKOVEN | MCKENZIE | | 1795 | 33D-28H NIMBUS | MCKENZIE |
| 672 | 44-14MBH ULW OL | MCKENZIE | | 1796 | 33D-28H NIMBUS | MCKENZIE |
| 673 | 06A-18H COURAGE | MCKENZIE | | 1797 | 7D-6-1H FORT BE | MCKENZIE |
| 674 | 06A-18H TF PRID | MCKENZIE | | 1798 | 7D-6-2H FORT BE | MCKENZIE |
| 675 | 06B-18H TF HONO | MCKENZIE | | 1799 | 7D-6-3H FORT BE | MCKENZIE |
| 676 | 1-1-12H BOWLINE | MCKENZIE | | 1800 | 7D-6-4H FORT BE | MCKENZIE |
| 677 | 1-1-12H BOWLINE | MCKENZIE | | 1801 | 1-25H NILS | MCKENZIE |
| 678 | 1-1-12H BOWLINE | MCKENZIE | | 1802 | 23-14 1-H ABELM | MCKENZIE |
| 679 | 1-1-12H BOWLINE | MCKENZIE | | 1803 | 34X-34 WHITE FE | MCKENZIE |
| 680 | 1-1-12H BOWLINE | MCKENZIE | | 1804 | 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H-1 | MCKENZIE |
| 681 | 1-1-12H BOWLINE | MCKENZIE | | 1805 | 13-16TFH FLICKA | MCKENZIE |
| 682 | 1-1-12H BOWLINE | MCKENZIE | | 1806 | 14-16H DARREL Q | MCKENZIE |
| 683 | 1-1-12H BOWLINE | MCKENZIE | | 1807 | 14-16TFH CHEETA | MCKENZIE |
| 684 | 1-15-16H BEAR B | MCKENZIE | | 1808 | 31-26MBH HAMMER | MCKENZIE |
| 685 | 1-15-16H BEAR B | MCKENZIE | | 1809 | 3-2413H HAWKEYE | MCKENZIE |
| 686 | 1-15-16H BEAR B | MCKENZIE | | 1810 | 3-2413H HAWKEYE | MCKENZIE |
| 687 | 149-97-30-31-3H | MCKENZIE | | 1811 | 3-2413H HAWKEYE | MCKENZIE |
| 688 | 149-97-30-31-1H | MCKENZIE | | 1812 | 21-6 6-7H TRUE | MCKENZIE |
| 689 | 149-97-30-31-2H | MCKENZIE | | 1813 | 4-9H SCHMITZ | MCKENZIE |
| 690 | 31-30 1H YOUNG | MCKENZIE | | 1814 | 22-15 1-H HILLY | MCKENZIE |
| 691 | 31-30 1H YOUNG | MCKENZIE | | 1815 | 2-15H DAHL FEDE | MCKENZIE |
| 692 | 34X-12B CHARLSO | MCKENZIE | | 1816 | 15-11H DAHL | MCKENZIE |
| 693 | 14-22MBH JACKSO | MCKENZIE | | 1817 | 13-14H PAULSON | MCKENZIE |
| 694 | 34-9H CONNER | MCKENZIE | | 1818 | 24-10H ROEN FED | MCKENZIE |
| 695 | 34-9H CONNER | MCKENZIE | | 1819 | 1-2H LAZORENKO | MCKENZIE |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 696 | 152-94-18B-19H | MCKENZIE | | 1820 | 13X-35R SAKAKAW | MCKENZIE |
| 697 | 18B-19H TF HOGN | MCKENZIE | | 1821 | 41-25NWH ERICKS | MCKENZIE |
| 698 | 1-9H ANGUS *(MW | MCKENZIE | | 1822 | 3-1H 3WX | MCKENZIE |
| 699 | 11-2-1H HEISER | MCKENZIE | | 1823 | 3-1H 3WX | MCKENZIE |
| 700 | 36-31H TF1 LIBE | MCKENZIE | | 1824 | 1H SC-1WX8 | MCKENZIE |
| 701 | 152-96-9-4-3H A | MCKENZIE | | 1825 | 1H SC-1WX8 | MCKENZIE |
| 702 | 152-96-9-4-10H | MCKENZIE | | 1826 | 1H SC-1WX8 | MCKENZIE |
| 703 | 152-96-9-4-3H A | MCKENZIE | | 1827 | 1-27H SALERS *( | MCKENZIE |
| 704 | 30-19 1H EVELAN | MCKENZIE | | 1828 | 2-27H SALERS (M | MCKENZIE |
| 705 | 31-6 1H GYDA (M | MCKENZIE | | 1829 | 3-27H SALERS FE | MCKENZIE |
| 706 | 30-31 1-H BRODE | MCKENZIE | | 1830 | 29-20 1-TFH ELD | MCKENZIE |
| 707 | 30-31 2H BRODER | MCKENZIE | | 1831 | 29-20 1-TFH ELD | MCKENZIE |
| 708 | 30-31 3H BRODER | MCKENZIE | | 1832 | 3-34 1H LUND | MCKENZIE |
| 709 | 30-31 4TFH BROD | MCKENZIE | | 1833 | 3-34 1H LUND | MCKENZIE |
| 710 | 30-31 1-H BRODE | MCKENZIE | | 1834 | 1-33H POLK | MCKENZIE |
| 711 | 25-36 1H SAX | MCKENZIE | | 1835 | 18B-2H USA (MWP | MCKENZIE |
| 712 | 25-36 3H SAX | MCKENZIE | | 1836 | 18B-1H USA *(M | MCKENZIE |
| 713 | 25-36 4TFH SAX | MCKENZIE | | 1837 | 14-22MBH DAYTON | MCKENZIE |
| 714 | 3031147102-BTF | MCKENZIE | | 1838 | 14-22MBH DAYTON | MCKENZIE |
| 715 | 41-11H BICENTEN | MCKENZIE | | 1839 | 44-33H CHARLSON | MCKENZIE |
| 716 | 44-31H BUCKHORN | MCKENZIE | | 1840 | 44X-20E BULLY F | MCKENZIE |
| 717 | 54-1 SILURIAN 5 | MCKENZIE | | 1841 | 44X-20F BULLY F | MCKENZIE |
| 718 | 54-1 SILURIAN 5 | MCKENZIE | | 1842 | 44X-20A BULLY F | MCKENZIE |
| 719 | 54-1 SILURIAN 5 | MCKENZIE | | 1843 | 44X-20B BULLY F | MCKENZIE |
| 720 | 54-1 SILURIAN 5 | MCKENZIE | | 1844 | 31-28H JAIR | MCKENZIE |
| 721 | 10-1 DEVONIAN 1 | MCKENZIE | | 1845 | 31-28H JAIR | MCKENZIE |
| 722 | 10-1 DEVONIAN 1 | MCKENZIE | | 1846 | 21-3 3-10H TRUE | MCKENZIE |
| 723 | 10-1 DEVONIAN 1 | MCKENZIE | | 1847 | 41-5H GREGORY W | MCKENZIE |
| 724 | 9-1 SIL UNIT 9 | MCKENZIE | | 1848 | 1-3-10H BOWLINE | MCKENZIE |
| 725 | 9-1 SIL UNIT 9 | MCKENZIE | | 1849 | 1-3-10H BOWLINE | MCKENZIE |
| 726 | 9-1 SIL UNIT 9 | MCKENZIE | | 1850 | 1-3-10H BOWLINE | MCKENZIE |
| 727 | 3-16H COLUMBUS | MCKENZIE | | 1851 | 1-3-10H BOWLINE | MCKENZIE |
| 728 | 12-12H BICENTEN | MCKENZIE | | 1852 | 1-3-10H BOWLINE | MCKENZIE |
| 729 | 1-28 WRRMU | MCKENZIE | | 1853 | 1-3-10H BOWLINE | MCKENZIE |
| 730 | 4-28 WRRMU | MCKENZIE | | 1854 | 1-3-10H BOWLINE | MCKENZIE |
| 731 | 1-29 WRRMU | MCKENZIE | | 1855 | 1-3-10H BOWLINE | MCKENZIE |
| 732 | 7-28H WRRMU | MCKENZIE | | 1856 | 1-3-10H BOWLINE | MCKENZIE |
| 733 | 31-26H ROUGHRID | MCKENZIE | | 1857 | 1-3-10H BOWLINE | MCKENZIE |
| 734 | 13-19 ERRMU | MCKENZIE | | 1858 | 32D-29H MONARCH | MCKENZIE |
| 735 | 4-12R ERRMU | MCKENZIE | | 1859 | 32D-29H TF VICE | MCKENZIE |
| 736 | 1-18 ERRMU | MCKENZIE | | 1860 | 14-22MBH JACKSO | MCKENZIE |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 737 | 2-18 ERRMU | MCKENZIE | | 1861 | 25-36 5H SAX | MCKENZIE |
| 738 | 24-2HR ERRMU | MCKENZIE | | 1862 | 25-36 6TFH SAX | MCKENZIE |
| 739 | 13-19 ERRMU | MCKENZIE | | 1863 | 1-12 1H SKARSTO | MCKENZIE |
| 740 | 14-32H GRASSY B | MCKENZIE | | 1864 | 7-6 1-H JOHNSTO | MCKENZIE |
| 741 | 30-31H SNOWSHOE | MCKENZIE | | 1865 | 7-6 2TFH JOHNST | MCKENZIE |
| 742 | 24-4 USA | MCKENZIE | | 1866 | 7-6 7H JOHNSTON | MCKENZIE |
| 743 | 5C-2-3 CHARLSON | MCKENZIE | | 1867 | 1-18-17TFH MAUS | MCKENZIE |
| 744 | 5C-2-3 CHARLSON | MCKENZIE | | 1868 | 7-18-17H MAUSER | MCKENZIE |
| 745 | 5C-2-3 CHARLSON | MCKENZIE | | 1869 | 8-5 2H RICHARD | MCKENZIE |
| 746 | 1-21H MANTLE | MCKENZIE | | 1870 | 3-23H ANTELOPE | MCKENZIE |
| 747 | 33-35 2H MB1 TR | MCKENZIE | | 1871 | 4-23H ANTELOPE | MCKENZIE |
| 748 | 31-32 TRUE FEDE | MCKENZIE | | 1872 | 3-35H BOHMBACH | MCKENZIE |
| 749 | 31-32 TRUE FEDE | MCKENZIE | | 1873 | 4-35H BOHMBACH | MCKENZIE |
| 750 | 21X-24 101 FEDE | MCKENZIE | | 1874 | 9-4H WOLF | MCKENZIE |
| 751 | 14X-31 MCKENZIE | MCKENZIE | | 1875 | 5-8H SAFELY USA | MCKENZIE |
| 752 | 1-28H KILLEBREW | MCKENZIE | | 1876 | 5-8H SAFELY USA | MCKENZIE |
| 753 | 1-27H MCGWIRE | MCKENZIE | | 1877 | 1-2-11H BOWLINE | MCKENZIE |
| 754 | 1-17H ROBINSON | MCKENZIE | | 1878 | 1-2-11H BOWLINE | MCKENZIE |
| 755 | 1-20H MAYS | MCKENZIE | | 1879 | 1-2-11H BOWLINE | MCKENZIE |
| 756 | 1-18H BANKS | MCKENZIE | | 1880 | 1-2-11H BOWLINE | MCKENZIE |
| 757 | 1-24H GEHRIG | MCKENZIE | | 1881 | 1-2-11H BOWLINE | MCKENZIE |
| 758 | 1-13H OTT | MCKENZIE | | 1882 | 3-10-2-11LL ERN | MCKENZIE |
| 759 | 1-29H JACKSON | MCKENZIE | | 1883 | 41-6SWH SERRAHN | MCKENZIE |
| 760 | 23X-3 FEDERAL | MCKENZIE | | 1884 | 1-1H IVERSON TR | MCKENZIE |
| 761 | 1-9H CARTER | MCKENZIE | | 1885 | 6A-7-1H USA 1 | MCKENZIE |
| 762 | 3-28HR FEDERAL | MCKENZIE | | 1886 | 26-1 SILURIAN 2 | MCKENZIE |
| 763 | 3-28HR FEDERAL | MCKENZIE | | 1887 | F24-34-2H AKOVE | MCKENZIE |
| 764 | 1-8H GONZALEZ | MCKENZIE | | 1888 | 24-30H STORM FE | MCKENZIE |
| 765 | 1-7H RIPKIN, JR | MCKENZIE | | 1889 | 14-19-23 USA | MCKENZIE |
| 766 | 1-4H NETTLES | MCKENZIE | | 1890 | 1X-18 MULE CREE | MCKENZIE |
| 767 | 1-5H BENCH | MCKENZIE | | 1891 | 1-34H MCKENZIE | MCKENZIE |
| 768 | 1-1H HODGES | MCKENZIE | | 1892 | 21-10SH SAND CR | MCKENZIE |
| 769 | 1-22H MCGRIFF | MCKENZIE | | 1893 | 1-23H WINFIELD | MCKENZIE |
| 770 | 44X-16 STATE FE | MCKENZIE | | 1894 | 5-9H ANGUS FEDE | MCKENZIE |
| 771 | 1-12H KINGMAN | MCKENZIE | | 1895 | 4-9H ANGUS FEDE | MCKENZIE |
| 772 | 1-31H DAVIS | MCKENZIE | | 1896 | 2-9H ANGUS (MWP | MCKENZIE |
| 773 | 44X-4 TRACY FED | MCKENZIE | | 1897 | 1-23H2 ANTELOPE | MCKENZIE |
| 774 | 14X-34 DRANNEN | MCKENZIE | | 1898 | 2-23H ANTELOPE | MCKENZIE |
| 775 | 14X-34 CRYSTAL | MCKENZIE | | 1899 | 14D-4-1H USA | MCKENZIE |
| 776 | 11X-34 HATTER | MCKENZIE | | 1900 | 14D-4-1H USA | MCKENZIE |
| 777 | 21-25MBH AIDEN | MCKENZIE | | 1901 | 14D-4-1H USA | MCKENZIE |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 778 | 21-25MBH AIDEN | MCKENZIE | | 1902 | 27-22 1TFH CAYK | MCKENZIE |
| 779 | 31-29H HILMAN | MCKENZIE | | 1903 | 1-27H PVT. GIBS | MCKENZIE |
| 780 | 31-29H HILMAN | MCKENZIE | | 1904 | 15-33-28-2H KOA | MCKENZIE |
| 781 | 31-29H HILMAN | MCKENZIE | | 1905 | 15-33-28-2H3 KO | MCKENZIE |
| 782 | 03-04 1H YAUCH | MCKENZIE | | 1906 | 15-33-28-2H KOA | MCKENZIE |
| 783 | 1-27H COLAVITO | MCKENZIE | | 1907 | 15-33-28-2H3 KO | MCKENZIE |
| 784 | 24-23H KNUTE | MCKENZIE | | 1908 | 14X-35H CHARLSO | MCKENZIE |
| 785 | 8-5 1-H RICHARD | MCKENZIE | | 1909 | 0409H-1 AN NORB | MCKENZIE |
| 786 | 35-26 2H KNIGHT | MCKENZIE | | 1910 | 0409H-1 AN NORB | MCKENZIE |
| 787 | 35-26 3TFH KNIG | MCKENZIE | | 1911 | 2-32H HARMS | MCKENZIE |
| 788 | 35-26 1H KNIGHT | MCKENZIE | | 1912 | 1-32H HARMS | MCKENZIE |
| 789 | 35-26 4H KNIGHT | MCKENZIE | | 1913 | 2D-3-1H USA | MCKENZIE |
| 790 | 35-26 1H KNIGHT | MCKENZIE | | 1914 | 2D-3-1H USA | MCKENZIE |
| 791 | 31-16-4H FINSAA | MCKENZIE | | 1915 | 2D-3-1H USA | MCKENZIE |
| 792 | 31-16-3H FINSAA | MCKENZIE | | 1916 | 1-35H CLARK | MCKENZIE |
| 793 | 44-19-1RTF TARP | MCKENZIE | | 1917 | 44X-10 ALKALI C | MCKENZIE |
| 794 | 44-19-2RTF TARP | MCKENZIE | | 1918 | 1-2H MYRMIDON | MCKENZIE |
| 795 | 44-19-2RH TARPO | MCKENZIE | | 1919 | 1-2H MYRMIDON | MCKENZIE |
| 796 | 44-19TFHU TARPO | MCKENZIE | | 1920 | 2-36H BEAR DEN | MCKENZIE |
| 797 | 44-19-1RH TARPO | MCKENZIE | | 1921 | 42X-36 DAKOTA | MCKENZIE |
| 798 | 44-19-3RTF TARP | MCKENZIE | | 1922 | 4-25H HENDERSON | MCKENZIE |
| 799 | 28-21-1-H STUBB | MCKENZIE | | 1923 | 4-1H HENDERSON | MCKENZIE |
| 800 | 4-11H KODIAK FE | MCKENZIE | | 1924 | 4-36H STATE | MCKENZIE |
| 801 | 1-27H-R GRIZZLY | MCKENZIE | | 1925 | 4-13H LEVANG | MCKENZIE |
| 802 | 1-34H PVT. FRAZ | MCKENZIE | | 1926 | 3-9H ANGUS (MWP | MCKENZIE |
| 803 | 24-20-3RTF TARP | MCKENZIE | | 1927 | 1-08H-149-90 MH | MCLEAN |
| 804 | 24-20-1H TARPON | MCKENZIE | | 1928 | 2-04-03H-149-90 | MCLEAN |
| 805 | 24-20-2RTF TARP | MCKENZIE | | 1929 | 1-32-31H-150-90 | MCLEAN |
| 806 | 24-20-2RH TARPO | MCKENZIE | | 1930 | 21-16H WALDOCK | MCLEAN |
| 807 | 24-20-1RTF TARP | MCKENZIE | | 1931 | 31-16H BLACK HA | MCLEAN |
| 808 | 41-3-1H SKAAR F | MCKENZIE | | 1932 | 34-9H DRIVER US | MCLEAN |
| 809 | 41-3-2H SKAAR F | MCKENZIE | | 1933 | 1-05-06H-149-90 | MCLEAN |
| 810 | 41-3-3H SKAAR F | MCKENZIE | | 1934 | 6-05-06H-149-90 | MCLEAN |
| 811 | 41-3TFHU SKAAR | MCKENZIE | | 1935 | 2-05-06H-149-90 | MCLEAN |
| 812 | 41-3TFH SKAAR F | MCKENZIE | | 1936 | 5-05-06H-149-90 | MCLEAN |
| 813 | 32-29H LARS ROT | MCKENZIE | | 1937 | 2-07-18H-149-90 | MCLEAN |
| 814 | 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H-1 | MCKENZIE | | 1938 | 5-29-30H-150-90 | MCLEAN |
| 815 | 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H-2 | MCKENZIE | | 1939 | 34-7H GOODBIRD | MCLEAN |
| 816 | 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H-1 | MCKENZIE | | 1940 | 44-7H GOODBIRD | MCLEAN |
| 817 | 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H-2 | MCKENZIE | | 1941 | 44-7H GOODBIRD | MCLEAN |
| 818 | 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H-1 | MCKENZIE | | 1942 | 1-18H-150-90 MH | MCLEAN |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 819 | 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H-2 | MCKENZIE | | 1943 | 21-5H FISHER US | MOUNTRAIL |
| 820 | 11B-2-2H USA | MCKENZIE | | 1944 | 21-5H FISHER US | MOUNTRAIL |
| 821 | 11B-2-2H USA | MCKENZIE | | 1945 | 41-5H FISHER US | MOUNTRAIL |
| 822 | 11B-2-2H USA | MCKENZIE | | 1946 | 41-5H FISHER US | MOUNTRAIL |
| 823 | 41-5-2H GREGORY | MCKENZIE | | 1947 | 16-15H PENNINGT | MOUNTRAIL |
| 824 | 1-2H YORK | MCKENZIE | | 1948 | 16-15H PENNINGT | MOUNTRAIL |
| 825 | 1-25H GASS | MCKENZIE | | 1949 | 21-3H HENRY CHA | MOUNTRAIL |
| 826 | 1-09-16H-149-90 | MCLEAN | | 1950 | 21-3H HENRY CHA | MOUNTRAIL |
| 827 | 1-19H-150-90 MH | MCLEAN | | 1951 | 31-3TFH HENRY C | MOUNTRAIL |
| 828 | 2-13-14H-150-91 | MCLEAN | | 1952 | 41-3H HENRY CHA | MOUNTRAIL |
| 829 | 1-29-30H-150-90 | MCLEAN | | 1953 | 0310H-1 EN LABA | MOUNTRAIL |
| 830 | 2-29-30H-150-90 | MCLEAN | | 1954 | 0310H-2 EN-LABA | MOUNTRAIL |
| 831 | 1-13-14H-150-91 | MCLEAN | | 1955 | 0310H-3 EN-LABA | MOUNTRAIL |
| 832 | 1-01-02H-149-91 | MCLEAN | | 1956 | 16-4H VAN HOOK | MOUNTRAIL |
| 833 | 5-13-14H-150-91 | MCLEAN | | 1957 | 16-4H VAN HOOK | MOUNTRAIL |
| 834 | 2-01-02H-149-91 | MCLEAN | | 1958 | 4HC VAN HOOK R/ | MOUNTRAIL |
| 835 | 14-8H TORGERSON | MCLEAN | | 1959 | 16-9H BRUNSELL | MOUNTRAIL |
| 836 | 34-8H SITTING O | MCLEAN | | 1960 | 16-9H BRUNSELL | MOUNTRAIL |
| 837 | 11-17H ONE FEAT | MCLEAN | | 1961 | 11-1H HOWARD US | MOUNTRAIL |
| 838 | 31-17H ONE FEAT | MCLEAN | | 1962 | 11-1H HOWARD US | MOUNTRAIL |
| 839 | 2-32-31H-150-90 | MCLEAN | | 1963 | 34-12H TARA JO | MOUNTRAIL |
| 840 | 11-28H THOMAS M | MCLEAN | | 1964 | 34-12TFH TARA J | MOUNTRAIL |
| 841 | 21-28H THOMAS M | MCLEAN | | 1965 | 12-32TFH KNIFE | MOUNTRAIL |
| 842 | 14-34H VORWERK | MCLEAN | | 1966 | 44-34H WENINGER | MOUNTRAIL |
| 843 | 5-32-31H-150-90 | MCLEAN | | 1967 | 44-34H WENINGER | MOUNTRAIL |
| 844 | 6-32-31H-150-90 | MCLEAN | | 1968 | 41-8H BETTY SHO | MOUNTRAIL |
| 845 | 11-16H ELLA USA | MOUNTRAIL | | 1969 | 41-8H BETTY SHO | MOUNTRAIL |
| 846 | 11-16H ELLA USA | MOUNTRAIL | | 1970 | 43-8H WALJEN US | MOUNTRAIL |
| 847 | 34-21H JERRY PE | MOUNTRAIL | | 1971 | 43-8TFH WALTOM | MOUNTRAIL |
| 848 | 34-21H JERRY PE | MOUNTRAIL | | 1972 | 14-23H SPOTTED | MOUNTRAIL |
| 849 | 12-27TFH LEE FE | MOUNTRAIL | | 1973 | 14-23H SPOTTED | MOUNTRAIL |
| 850 | 11-4H MHA USA | MOUNTRAIL | | 1974 | 14-23HC GEORGE | MOUNTRAIL |
| 851 | 11-4TFH MHA USA | MOUNTRAIL | | 1975 | 14-23HC GEORGE | MOUNTRAIL |
| 852 | 41-4H RAYMOND U | MOUNTRAIL | | 1976 | 14-23HD GEORGE | MOUNTRAIL |
| 853 | 41-4H RAYMOND U | MOUNTRAIL | | 1977 | 14-23HD GEORGE | MOUNTRAIL |
| 854 | 21-2H GLADYS US | MOUNTRAIL | | 1978 | 14-23HW SPOTTED | MOUNTRAIL |
| 855 | 21-2H GLADYS US | MOUNTRAIL | | 1979 | 14-23HY SPOTTED | MOUNTRAIL |
| 856 | 31-2H WILLIAM U | MOUNTRAIL | | 1980 | 14-23HZ GEORGE | MOUNTRAIL |
| 857 | 31-2TFH WILLIAM | MOUNTRAIL | | 1981 | 14-23HZ GEORGE | MOUNTRAIL |
| 858 | 13-32H KNIFE RI | MOUNTRAIL | | 1982 | 34-5H JASPER L | MOUNTRAIL |
| 859 | 13-32TFH KNIFE | MOUNTRAIL | | 1983 | 34-5H JASPER L | MOUNTRAIL |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 860 | 34-31H FLADELAN | MOUNTRAIL | | 1984 | 11-18H BAKER US | MOUNTRAIL |
| 861 | 21-6TFH JESSICA | MOUNTRAIL | | 1985 | 11-18TFH BAKER | MOUNTRAIL |
| 862 | 21-6TFH JESSICA | MOUNTRAIL | | 1986 | 31-18H ARVID BA | MOUNTRAIL |
| 863 | 31-6H EVERETT F | MOUNTRAIL | | 1987 | 31-18H ARVID BA | MOUNTRAIL |
| 864 | 31-6H EVERETT F | MOUNTRAIL | | 1988 | 11-16H LUTHER U | MOUNTRAIL |
| 865 | 41-6H EVERETT F | MOUNTRAIL | | 1989 | 11-16H LUTHER U | MOUNTRAIL |
| 866 | 41-6H EVERETT F | MOUNTRAIL | | 1990 | 31-16H LUTHER U | MOUNTRAIL |
| 867 | 14-23H ROGSTAD | MOUNTRAIL | | 1991 | 31-16H LUTHER U | MOUNTRAIL |
| 868 | 13-3TFH BURL TT | MOUNTRAIL | | 1992 | 1-12H OLSON | MOUNTRAIL |
| 869 | 34-4H JONES | MOUNTRAIL | | 1993 | 1-12H OLSON | MOUNTRAIL |
| 870 | 42-4TFH BILL TT | MOUNTRAIL | | 1994 | 1-12HW OLSON | MOUNTRAIL |
| 871 | 41-4H GORDON TT | MOUNTRAIL | | 1995 | 12-1HC OLSON *( | MOUNTRAIL |
| 872 | 1-34-35H-152-92 | MOUNTRAIL | | 1996 | 12-1HD OLSON (M | MOUNTRAIL |
| 873 | 7-21H COTTONWOO | MOUNTRAIL | | 1997 | 12-1HD OLSON (M | MOUNTRAIL |
| 874 | 1-11-14H 1 TRUL | MOUNTRAIL | | 1998 | 12-1HY OLSON (M | MOUNTRAIL |
| 875 | 1-11-14H 1 TRUL | MOUNTRAIL | | 1999 | 11-2HC GEORGE E | MOUNTRAIL |
| 876 | 1-11-14H 1 TRUL | MOUNTRAIL | | 2000 | 11-2HZ GEORGE E | MOUNTRAIL |
| 877 | 1-11-14H 1 TRUL | MOUNTRAIL | | 2001 | 2-11H MASON | MOUNTRAIL |
| 878 | 1-11-14H 1 TRUL | MOUNTRAIL | | 2002 | 2-11H MASON | MOUNTRAIL |
| 879 | 1-11-14H 1 TRUL | MOUNTRAIL | | 2003 | 2-11H MASON | MOUNTRAIL |
| 880 | 2-33-4H LUNKER | MOUNTRAIL | | 2004 | 2-11HA MASON *( | MOUNTRAIL |
| 881 | 24-7H GALEN FOX | MOUNTRAIL | | 2005 | 2-11HW-R MASON | MOUNTRAIL |
| 882 | 24-7H GALEN FOX | MOUNTRAIL | | 2006 | 2-11HW-R MASON | MOUNTRAIL |
| 883 | 31-6TFH OREN US | MOUNTRAIL | | 2007 | 2-11HX MASON (M | MOUNTRAIL |
| 884 | 31-6TFH OREN US | MOUNTRAIL | | 2008 | 2-11HX MASON (M | MOUNTRAIL |
| 885 | 41-6H CUMMINGS | MOUNTRAIL | | 2009 | 31-2H URAN | MOUNTRAIL |
| 886 | 41-6TFH CUMMING | MOUNTRAIL | | 2010 | 21-2TFH LUCKY O | MOUNTRAIL |
| 887 | 35-4H KING (DWO | MOUNTRAIL | | 2011 | 21-2H LUCKY ONE | MOUNTRAIL |
| 888 | 2-35-4H 2 KING | MOUNTRAIL | | 2012 | 31-2H URAN | MOUNTRAIL |
| 889 | 2-35-4H 2 KING | MOUNTRAIL | | 2013 | 21-2TFH LUCKY O | MOUNTRAIL |
| 890 | 35-4H KING (DWO | MOUNTRAIL | | 2014 | 21-2H LUCKY ONE | MOUNTRAIL |
| 891 | 35-4H KING (DWO | MOUNTRAIL | | 2015 | 24-11H MYLO WOL | MOUNTRAIL |
| 892 | 2-35-4H 2 KING | MOUNTRAIL | | 2016 | 34-11TFH JENSON | MOUNTRAIL |
| 893 | 35-4H KING (DWO | MOUNTRAIL | | 2017 | 24HD COYOTE NEC | MOUNTRAIL |
| 894 | 2-35-4H 2 KING | MOUNTRAIL | | 2018 | 24HD COYOTE NEC | MOUNTRAIL |
| 895 | 2-35-4H 2 KING | MOUNTRAIL | | 2019 | 15-22HC ARIKARA | MOUNTRAIL |
| 896 | 2-35-4H 2 KING | MOUNTRAIL | | 2020 | 10-3H STATE OF | MOUNTRAIL |
| 897 | 2-35-4H 2 KING | MOUNTRAIL | | 2021 | 10-3H STATE OF | MOUNTRAIL |
| 898 | 35-4H KING (DWO | MOUNTRAIL | | 2022 | 10-3H STATE OF | MOUNTRAIL |
| 899 | 11-15H-22 HELEN | MOUNTRAIL | | 2023 | 10-3HA STATE OF | MOUNTRAIL |
| 900 | 15-22H JERRY | MOUNTRAIL | | 2024 | 10-3HC STATE OF | MOUNTRAIL |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 901 | 13-24H FBIR | MOUNTRAIL | | 2025 | 10-3HC STATE OF | MOUNTRAIL |
| 902 | 13-24H FBIR | MOUNTRAIL | | 2026 | 10-3HW STATE OF | MOUNTRAIL |
| 903 | 13-24HA GLENN F | MOUNTRAIL | | 2027 | 10-3HZ STATE OF | MOUNTRAIL |
| 904 | 13-24HC FBIR (M | MOUNTRAIL | | 2028 | 10-3HZ STATE OF | MOUNTRAIL |
| 905 | 13-24HD FBIR (M | MOUNTRAIL | | 2029 | 1-18-7H 1 MCGAH | MOUNTRAIL |
| 906 | 13-24HW GLENN F | MOUNTRAIL | | 2030 | 1-18-7H 1 MCGAH | MOUNTRAIL |
| 907 | 13-24HX GLENN F | MOUNTRAIL | | 2031 | 1-18-7H 1 MCGAH | MOUNTRAIL |
| 908 | 13-24HZ FBIR (M | MOUNTRAIL | | 2032 | 1-18-7H 1 MCGAH | MOUNTRAIL |
| 909 | 1-24-25H 1 PALE | MOUNTRAIL | | 2033 | 1-18-7H 1 MCGAH | MOUNTRAIL |
| 910 | 1-24-25H 1 PALE | MOUNTRAIL | | 2034 | 1-18-7H 1 MCGAH | MOUNTRAIL |
| 911 | 1-24-25H 1 PALE | MOUNTRAIL | | 2035 | 1-18-7H 1 MCGAH | MOUNTRAIL |
| 912 | 13-14H MANDAN | MOUNTRAIL | | 2036 | 1-27H-152-92 FE | MOUNTRAIL |
| 913 | 1-18-7H 1 MCGAH | MOUNTRAIL | | 2037 | 14-6TFX ROHDE F | MOUNTRAIL |
| 914 | 1-18-7H 1 MCGAH | MOUNTRAIL | | 2038 | 15-22H ADAM GOO | MOUNTRAIL |
| 915 | 16-21H ELK | MOUNTRAIL | | 2039 | 15-22H ADAM GOO | MOUNTRAIL |
| 916 | 16-21HC DANCING | MOUNTRAIL | | 2040 | 15-22H ADAM GOO | MOUNTRAIL |
| 917 | 16-21HC DANCING | MOUNTRAIL | | 2041 | 15-22HC ADAM GO | MOUNTRAIL |
| 918 | 16-21HD DANCING | MOUNTRAIL | | 2042 | 15-22HD ADAM GO | MOUNTRAIL |
| 919 | 16-21HD DANCING | MOUNTRAIL | | 2043 | 15-22HW ADAM GO | MOUNTRAIL |
| 920 | 16-21HW ELK *(M | MOUNTRAIL | | 2044 | 15-22HX ADAM GO | MOUNTRAIL |
| 921 | 16-21HX ELK (MW | MOUNTRAIL | | 2045 | 15-22HY ADAM GO | MOUNTRAIL |
| 922 | 16-21HZ DANCING | MOUNTRAIL | | 2046 | 1-13-12H PALERM | MOUNTRAIL |
| 923 | 16-21HZ DANCING | MOUNTRAIL | | 2047 | 1-13-12H PALERM | MOUNTRAIL |
| 924 | 11-17H ELK USA | MOUNTRAIL | | 2048 | 1-13-12H PALERM | MOUNTRAIL |
| 925 | 21-17H LONGORIA | MOUNTRAIL | | 2049 | 1-13-12H PALERM | MOUNTRAIL |
| 926 | 21-17TFH WHEELE | MOUNTRAIL | | 2050 | 1-13-12H PALERM | MOUNTRAIL |
| 927 | 31-17H CONKLIN | MOUNTRAIL | | 2051 | 1-13-12H PALERM | MOUNTRAIL |
| 928 | 31-17TFH SNOW B | MOUNTRAIL | | 2052 | 21-17H RED FEAT | MOUNTRAIL |
| 929 | 41-17TFH BIG EA | MOUNTRAIL | | 2053 | 21-17H RED FEAT | MOUNTRAIL |
| 930 | 4-33 1-H WRIGHT | MOUNTRAIL | | 2054 | 31-17H RED FEAT | MOUNTRAIL |
| 931 | 4-33 4H WRIGHT | MOUNTRAIL | | 2055 | 31-17H RED FEAT | MOUNTRAIL |
| 932 | 4-33 3TFH WRIGH | MOUNTRAIL | | 2056 | 14-9XH LOCKEN | MOUNTRAIL |
| 933 | 4-33 2TFH WRIGH | MOUNTRAIL | | 2057 | 11-27H2 VACHAL | MOUNTRAIL |
| 934 | 4-33 5H WRIGHT | MOUNTRAIL | | 2058 | 10-27H3 VACHAL | MOUNTRAIL |
| 935 | 14-23H LIBERTY | MOUNTRAIL | | 2059 | 5-8HD DORA SMIT | MOUNTRAIL |
| 936 | 19-23H LIBERTY | MOUNTRAIL | | 2060 | 5-8HD DORA SMIT | MOUNTRAIL |
| 937 | 13-14H LIBERTY | MOUNTRAIL | | 2061 | 5-8HW MARY R SM | MOUNTRAIL |
| 938 | 18-14H LIBERTY | MOUNTRAIL | | 2062 | 5-8HX MARY R SM | MOUNTRAIL |
| 939 | 1-13-12H PALERM | MOUNTRAIL | | 2063 | 5-8HY DORA SMIT | MOUNTRAIL |
| 940 | 1-13-12H PALERM | MOUNTRAIL | | 2064 | 5-8HY DORA SMIT | MOUNTRAIL |
| 941 | 34X-36 SORKNESS | MOUNTRAIL | | 2065 | 2932H-1 EN-WEYR | MOUNTRAIL |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 942 | 14-4-3XH WALDOC | MOUNTRAIL | | 2066 | 2932H-2 EN-WEYR | MOUNTRAIL |
| 943 | 34-3 1-H AFSETH | MOUNTRAIL | | 2067 | 14-29XH SMITH F | MOUNTRAIL |
| 944 | 34-3 1-H AFSETH | MOUNTRAIL | | 2068 | 14-29TFX ELSIE | MOUNTRAIL |
| 945 | 10-11 1-H ESTHE | MOUNTRAIL | | 2069 | 14-29TFX ELMER | MOUNTRAIL |
| 946 | 10-11 4TFH ESTH | MOUNTRAIL | | 2070 | 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H-1 | MOUNTRAIL |
| 947 | 10-11 3H ESTHER | MOUNTRAIL | | 2071 | 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H-1 | MOUNTRAIL |
| 948 | 10-11 2TFH ESTH | MOUNTRAIL | | 2072 | 16-21-22H JON R | MOUNTRAIL |
| 949 | 10-11 7H ESTHER | MOUNTRAIL | | 2073 | 16-21-22H JON R | MOUNTRAIL |
| 950 | 10-11 6TFH ESTH | MOUNTRAIL | | 2074 | 5792 24-9H EMIE | MOUNTRAIL |
| 951 | 3-25H1 REHAK | MOUNTRAIL | | 2075 | 5792 24-9H EMIE | MOUNTRAIL |
| 952 | 1-25H REHAK | MOUNTRAIL | | 2076 | 9-4HZ BRUNSELL | MOUNTRAIL |
| 953 | 2-25H REHAK | MOUNTRAIL | | 2077 | 44-33H EARL PEN | MOUNTRAIL |
| 954 | 3-25H1 REHAK | MOUNTRAIL | | 2078 | 2-26-35H JUGARD | MOUNTRAIL |
| 955 | 4-25H REHAK FED | MOUNTRAIL | | 2079 | 6-26-35TFH JUGA | MOUNTRAIL |
| 956 | 5-25H1 REHAK FE | MOUNTRAIL | | 2080 | 41-4H TOLLEFSON | MOUNTRAIL |
| 957 | 3-25H1 REHAK | MOUNTRAIL | | 2081 | 21-28H JACK PEN | MOUNTRAIL |
| 958 | 4-25H REHAK FED | MOUNTRAIL | | 2082 | 41-28H SKOGSTAD | MOUNTRAIL |
| 959 | 5-25H1 REHAK FE | MOUNTRAIL | | 2083 | 21-28H JACK PEN | MOUNTRAIL |
| 960 | 7-25H REHAK FED | MOUNTRAIL | | 2084 | 41-28H SKOGSTAD | MOUNTRAIL |
| 961 | 6-25H1 REHAK FE | MOUNTRAIL | | 2085 | 34-22H BOTTLESO | MOUNTRAIL |
| 962 | 1-27H VACHAL | MOUNTRAIL | | 2086 | 14-22H SHIRLEY | MOUNTRAIL |
| 963 | 2-27H VACHAL | MOUNTRAIL | | 2087 | 34-22H BOTTLESO | MOUNTRAIL |
| 964 | 3-27H1 VACHAL | MOUNTRAIL | | 2088 | 14-22H SHIRLEY | MOUNTRAIL |
| 965 | 5-27H1 VACHAL | MOUNTRAIL | | 2089 | 41-15TFH RUDOLP | MOUNTRAIL |
| 966 | 5-27H1 VACHAL | MOUNTRAIL | | 2090 | 2019H-1 EN MOLL | MOUNTRAIL |
| 967 | 4-27H VACHAL | MOUNTRAIL | | 2091 | 2019H-1 EN MOLL | MOUNTRAIL |
| 968 | 8-27H VACHAL | MOUNTRAIL | | 2092 | 44-19H CHARLES | MOUNTRAIL |
| 969 | 7-27H VACHAL | MOUNTRAIL | | 2093 | 42-8-2TFH RODNE | MOUNTRAIL |
| 970 | 6-27H1 VACHAL | MOUNTRAIL | | 2094 | 21-33TFH SELMA | MOUNTRAIL |
| 971 | 9-27H2 VACHAL | MOUNTRAIL | | 2095 | 21-33H LEVI FED | MOUNTRAIL |
| 972 | 5-8H MARY R SMI | MOUNTRAIL | | 2096 | 25-0107H LIBERT | MOUNTRAIL |
| 973 | 5-8H MARY R SMI | MOUNTRAIL | | 2097 | 106-0107H LIBER | MOUNTRAIL |
| 974 | 5-8H MARY R SMI | MOUNTRAIL | | 2098 | 25-0107H LIBERT | MOUNTRAIL |
| 975 | 5-8HC DORA SMIT | MOUNTRAIL | | 2099 | 106-0107H LIBER | MOUNTRAIL |
| 976 | 5-8HC DORA SMIT | MOUNTRAIL | | 2100 | 1102H-1 RS AGRI | MOUNTRAIL |
| 977 | 8-5 1-H ROGER S | MOUNTRAIL | | 2101 | 1102H-1 RS AGRI | MOUNTRAIL |
| 978 | 8-5 1-H ROGER S | MOUNTRAIL | | 2102 | 24-20H SHOBE | MOUNTRAIL |
| 979 | 8-5 5H ROGER SO | MOUNTRAIL | | 2103 | 41-17H RANDI US | MOUNTRAIL |
| 980 | 8-5 1-H ROGER S | MOUNTRAIL | | 2104 | 24-20H SHOBE | MOUNTRAIL |
| 981 | 8-5 2TFH ROGER | MOUNTRAIL | | 2105 | 41-17H RANDI US | MOUNTRAIL |
| 982 | 8-5 3H ROGER SO | MOUNTRAIL | | 2106 | 34-31H JAY SAND | MOUNTRAIL |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 983 | 8-5 6TFH ROGER | MOUNTRAIL | | 2107 | 24-31TFH JAHNKE | MOUNTRAIL |
| 984 | 3526H-1 EN SORE | MOUNTRAIL | | 2108 | 24-31H JAHNKE U | MOUNTRAIL |
| 985 | 1-10-11-12H PER | MOUNTRAIL | | 2109 | 34-31H JAY SAND | MOUNTRAIL |
| 986 | 19-2523H VAN HO | MOUNTRAIL | | 2110 | 24-31TFH JAHNKE | MOUNTRAIL |
| 987 | 126-2523H VAN H | MOUNTRAIL | | 2111 | 24-31H JAHNKE U | MOUNTRAIL |
| 988 | 3-4-33H PURCELL | MOUNTRAIL | | 2112 | 44-31TFH KEITH | MOUNTRAIL |
| 989 | 3-4-33H 3 JACKS | MOUNTRAIL | | 2113 | 11-4H PETERSON | MOUNTRAIL |
| 990 | 3-4-33H PURCELL | MOUNTRAIL | | 2114 | 11-4TFH FOREMAN | MOUNTRAIL |
| 991 | 3-4-33H 3 JACKS | MOUNTRAIL | | 2115 | 21-4H BREHM | MOUNTRAIL |
| 992 | 44-31H BARTLESO | MOUNTRAIL | | 2116 | 21-4TFH FOREMAN | MOUNTRAIL |
| 993 | 44-31H BARTLESO | MOUNTRAIL | | 2117 | 41-4H PENNINGTO | MOUNTRAIL |
| 994 | 41-24TFX ROGGEN | MOUNTRAIL | | 2118 | 11-4-2H BREHM | MOUNTRAIL |
| 995 | 41-28H BLANCHET | MOUNTRAIL | | 2119 | 41-4TFH PENNING | MOUNTRAIL |
| 996 | 4-9HA ROGGENBUC | MOUNTRAIL | | 2120 | 41-4TFH PENNING | MOUNTRAIL |
| 997 | 4-9HW ROGGENBUC | MOUNTRAIL | | 2121 | 31-4H PENNINGTO | MOUNTRAIL |
| 998 | 4-9HX ROGGENBUC | MOUNTRAIL | | 2122 | 31-4H PENNINGTO | MOUNTRAIL |
| 999 | 4-9HY ROGGENBUC | MOUNTRAIL | | 2123 | 31-4TFH PENNING | MOUNTRAIL |
| 1000 | 9-4HB BRUNSELL | MOUNTRAIL | | 2124 | 31-4TFH PENNING | MOUNTRAIL |
| 1001 | 7-8-9HC EDWARD | MOUNTRAIL | | 2125 | 41-4H PENNINGTO | MOUNTRAIL |
| 1002 | 151-94-1H SANDS | MOUNTRAIL | | 2126 | 41-4H PENNINGTO | MOUNTRAIL |
| 1003 | 151-94-2HTF SAN | MOUNTRAIL | | 2127 | 41-4H PENNINGTO | MOUNTRAIL |
| 1004 | 41-25PH TALKING | STARK | | 2128 | 41-4TFH RENN | MOUNTRAIL |
| 1005 | 34-12TFH RIDL(D | STARK | | 2129 | 44-4H VAN HOOK | MOUNTRAIL |
| 1006 | 14-12PH RIDL FE | STARK | | 2130 | 34-35H ARNDT FE | MOUNTRAIL |
| 1007 | 21-15PH CYMBALU | STARK | | 2131 | 5-8H KUDRNA | STARK |
| 1008 | 11-15PH CYMBALU | STARK | | 2132 | 14-11PH KADRMAS | STARK |
| 1009 | 14-22PH PRIVRAT | STARK | | 2133 | 34-11PH KADRMAS | STARK |
| 1010 | 24-22PH PRIVRAT | STARK | | 2134 | 44-11PH KADRMAS | STARK |
| 1011 | 21-16H DIAMOND | STARK | | 2135 | 44-4PH NEWTON F | STARK |
| 1012 | 14-10PH KADRMAS | STARK | | 2136 | 44-7PH BOCK FED | STARK |
| 1013 | 34-10PH KADRMAS | STARK | | 2137 | 42-4PH NEWTON F | STARK |
| 1014 | 44-10PH KADRMAS | STARK | | 2138 | 14-23H PAVEL | STARK |
| 1015 | 21-16H WEILER | STARK | | 2139 | 17-20H NORKEN | STARK |
| 1016 | 21-16H DACKER | STARK | | 2140 | 17-20H NORKEN | STARK |
| 1017 | 21-16H DACKER | STARK | | 2141 | 0 CMU | STARK |
| 1018 | 0 BLMU | WILLIAMS | | 2142 | 0 CMU | WILLIAMS |
| 1019 | 0 TIOGA MADISON | WILLIAMS | | 2143 | 41X-21 CROWDER | WILLIAMS |
| 1020 | 0 TIOGA MADISON | WILLIAMS | | 2144 | 32-29H AUNE | WILLIAMS |
| 1021 | 0 TMU | WILLIAMS | | 2145 | 31X-16 MICHAEL | WILLIAMS |
| 1022 | 41X-21 BOUCHER | WILLIAMS | | 2146 | 11X-23 WARD | WILLIAMS |
| 1023 | 44X-18 THOMAS | WILLIAMS | | 2147 | 3526H-1 GO-FOSS | WILLIAMS |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 1024 | 44X-18 NESSON G | WILLIAMS | | 2148 | 2-17-20-15H P V | WILLIAMS |
| 1025 | 17-18H POMPEY | WILLIAMS | | 2149 | 4-17-20-13H3 P | WILLIAMS |
| 1026 | 24X-35 DONNELLY | WILLIAMS | | 2150 | 4-17-20-13H P V | WILLIAMS |
| 1027 | 29-32 1H OWAN ( | WILLIAMS | | 2151 | 4-17-20-13H3A P | WILLIAMS |
| 1028 | 29-32 1H OWAN ( | WILLIAMS | | 2152 | 4-17-20-14H P V | WILLIAMS |
| 1029 | 1-22H FASCHING | WILLIAMS | | 2153 | 2-17-20-15H P V | WILLIAMS |
| 1030 | 11X-16 TRUAX ST | WILLIAMS | | 2154 | 4-17-20-13H3 P | WILLIAMS |
| 1031 | 34X-13 BJARNE | WILLIAMS | | 2155 | 4-17-20-13H P V | WILLIAMS |
| 1032 | 1-28-33H SIIRTO | WILLIAMS | | 2156 | 4-17-20-13H3A P | WILLIAMS |
| 1033 | 1-5-8-15H P BIB | WILLIAMS | | 2157 | 4-17-20-14H P V | WILLIAMS |
| 1034 | 1-5-8-15H P BIB | WILLIAMS | | 2158 | 1-12 1H GIBBINS | WILLIAMS |
| 1035 | 1-5-8-16H3 P BI | WILLIAMS | | 2159 | 15-31H THOMPSON | WILLIAMS |
| 1036 | 1-5-8-16H3 P BI | WILLIAMS | | 2160 | 15-31H THOMPSON | WILLIAMS |
| 1037 | 58-1H 20711 SPR | WILLIAMS | | 2161 | 34-35H KAY ARNS | WILLIAMS |
| 1038 | 58-1H 20711 SPR | WILLIAMS | | 2162 | 8-0409H HARDSCR | WILLIAMS |
| 1039 | 2-3H OLSON | WILLIAMS | | 2163 | 24-20H OPAL HOL | WILLIAMS |
| 1040 | 2-3H OLSON | WILLIAMS | | 2164 | 31-30H IONE BAR | WILLIAMS |
| 1041 | 2-27H BERGSTROM | WILLIAMS | | 2165 | 23-2833H ROUND | WILLIAMS |
| 1042 | 2-27H BERGSTROM | WILLIAMS | | 2166 | 3-16-21-13H3 P | WILLIAMS |
| 1043 | 2-28H BERGSTROM | WILLIAMS | | 2167 | 2-4H OLSON | WILLIAMS |
| 1044 | 44-12H MCFARLAN | WILLIAMS | | 2168 | 2-4H OLSON | WILLIAMS |
| 1045 | 13-8-20-13H3 WI | WILLIAMS | | 2169 | 3031H-1 GO-HAUG | WILLIAMS |
| 1046 | 2-17-5-5H P VAN | WILLIAMS | | 2170 | 3-3328H HARDSCR | WILLIAMS |
| 1047 | 2-17-5-5H P VAN | WILLIAMS | | 2171 | 15-20H BECK LIV | WILLIAMS |
| 1048 | 30-19 1-H GATHM | WILLIAMS | | 2172 | 15-31H SOLBERG | WILLIAMS |
| 1049 | 21X-2 ALBERTINE | WILLIAMS | | 2173 | 15-31H SOLBERG | WILLIAMS |
| 1050 | 15-33-28-2H THO | WILLIAMS | | 2174 | 18-19-1H A TUFT | WILLIAMS |
| 1051 | 15-33-28-1H3 TH | WILLIAMS | | 2175 | 2-4H CAPSTICK | WILLIAMS |
| 1052 | 15-33-28-2H THO | WILLIAMS | | 2176 | 13-24H HARP (DW | WILLIAMS |
| 1053 | 15-33-28-1H3 TH | WILLIAMS | | 2177 | 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H-1 | WILLIAMS |
| 1054 | 1-21H GJORVEN | WILLIAMS | | 2178 | 159-102-8-5-1H | WILLIAMS |
| 1055 | 4-5H COLUMBIA | WILLIAMS | | 2179 | 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H-1 | WILLIAMS |
| 1056 | 1-5H COLUMBIA | WILLIAMS | | 2180 | 4-9 #1H MARK | WILLIAMS |
| 1057 | 2-5H COLUMBIA | WILLIAMS | | 2181 | 4-9 2TFH MARK | WILLIAMS |
| 1058 | 3-5H COLUMBIA | WILLIAMS | | 2182 | 4-9 #1H MARK | WILLIAMS |
| 1059 | 5-5H COLUMBIA | WILLIAMS | | 2183 | 1-2-11H PASTERN | WILLIAMS |
| 1060 | 7-5H COLUMBIA F | WILLIAMS | | 2184 | 31X-13C AMES | WILLIAMS |
| 1061 | 6-5H COLUMBIA F | WILLIAMS | | 2185 | 34X-34C ROSE FE | WILLIAMS |
| 1062 | 12X-18 MENDENHA | WILLIAMS | | 2186 | 2-10H SACRAMENT | WILLIAMS |
| 1063 | 3-16-21-14H P S | WILLIAMS | | 2187 | 4-10H SACRAMENT | WILLIAMS |
| 1064 | 3-16-21-13H3 P | WILLIAMS | | 2188 | 5-10H SACRAMENT | WILLIAMS |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 1065 | 3-16-21-14H P S | WILLIAMS | | 2189 | 6-10H SACRAMENT | WILLIAMS |
| 1066 | 2-4H1 ANDERSON | WILLIAMS | | 2190 | 7-10H1 SACRAMEN | WILLIAMS |
| 1067 | 3-4H ANDERSON | WILLIAMS | | 2191 | 32-29 2TFH BEAG | WILLIAMS |
| 1068 | 6-7 1H ART | WILLIAMS | | 2192 | 32-29 3H BEAGLE | WILLIAMS |
| 1069 | 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H-1 | WILLIAMS | | 2193 | 32-29 3TFH SYLV | WILLIAMS |
| 1070 | 5-10-11-8H3 P T | WILLIAMS | | 2194 | 32-29 1H SYLVES | WILLIAMS |
| 1071 | 5-10-11-8H P TH | WILLIAMS | | 2195 | 32-29 4TFH SYLV | WILLIAMS |
| 1072 | 5-10-11-1H P TH | WILLIAMS | | 2196 | 32-29 2H SYLVES | WILLIAMS |
| 1073 | 5-10-11-8H3 P T | WILLIAMS | | 2197 | 32-29 3TFH SYLV | WILLIAMS |
| 1074 | 5-10-11-8H P TH | WILLIAMS | | 2198 | 32-29 1H SYLVES | WILLIAMS |
| 1075 | 5-10-11-1H P TH | WILLIAMS | | 2199 | 32-29 4TFH SYLV | WILLIAMS |
| 1076 | 23-21H HARDSCRA | WILLIAMS | | 2200 | 32-29 2TFH BEAG | WILLIAMS |
| 1077 | 2-0817H TRENTON | WILLIAMS | | 2201 | 32-29 3H BEAGLE | WILLIAMS |
| 1078 | 16-21H MARTIN | WILLIAMS | | 2202 | 44X-7 FARM | WILLIAMS |
| 1079 | 1-1410H GARDEN | WILLIAMS | | 2203 | 11X-15B KANYER | WILLIAMS |
| 1080 | 1-32H BEAGLE | WILLIAMS | | 2204 | 11X-15F KANYER | WILLIAMS |
| 1081 | 1-22H JAGUAR | WILLIAMS | | 2205 | 41X-21 DEANGELI | WILLIAMS |
| 1082 | 20-17 1H LEOPAR | WILLIAMS | | 2206 | 7-24H2 LAWRENCE | WILLIAMS |
| 1083 | 5-8 1H SJOL | WILLIAMS | | 2207 | 10-24H2 LAWRENC | WILLIAMS |
| 1084 | 3-2734H GARDEN | WILLIAMS | | 2208 | 9-24H LAWRENCE | WILLIAMS |
| 1085 | 1-27-34H QUARNE | WILLIAMS | | 2209 | 8-24H3 LAWRENCE | WILLIAMS |
| 1086 | 1-23-14H C RASM | WILLIAMS | | 2210 | 6-24H1 LAWRENCE | WILLIAMS |
| 1087 | 1-29-32H BOYDS | WILLIAMS | | 2211 | 0106H-1 TI - IV | WILLIAMS |
| 1088 | 14-20H ANDERSON | WILLIAMS | | | | |
| 1089 | 33-28 2H BEAR C | WILLIAMS | | | | |
| 1090 | 33-28 8TFH HUSK | WILLIAMS | | | | |
| 1091 | 33-28 6H HUSKY | WILLIAMS | | | | |
| 1092 | 33-28 4TFH HUSK | WILLIAMS | | | | |
| 1093 | 33-28 2H HUSKY | WILLIAMS | | | | |
| 1094 | 33-28 8TFH HUSK | WILLIAMS | | | | |
| 1095 | 33-28 6H HUSKY | WILLIAMS | | | | |
| 1096 | 33-28 2H HUSKY | WILLIAMS | | | | |
| 1097 | 33-28 4TFH HUSK | WILLIAMS | | | | |
| 1098 | 14-13 1H TML | WILLIAMS | | | | |
| 1099 | 3TFH JAKE 2-11 | WILLIAMS | | | | |
| 1100 | 4H JAKE 2-11 (M | WILLIAMS | | | | |
| 1101 | 2-11 1H JAKE | WILLIAMS | | | | |
| 1102 | 2TFH JAKE 2-11 | WILLIAMS | | | | |
| 1103 | 2-11 6H JAKE | WILLIAMS | | | | |
| 1104 | 2-11 5TFH JAKE | WILLIAMS | | | | |
| 1105 | 1-34H1 PAMELA A | WILLIAMS | | | | |

Exhibit 15 to 5/9/23 SDR

| | | | | | | |
|---|---|---|---|---|---|---|
| 1106 | 19-20H GARY RUS | WILLIAMS | | | | |
| 1107 | 1-30H FERGUSON | WILLIAMS | | | | |
| 1108 | 7-21H PIERRE FE | WILLIAMS | | | | |
| 1109 | 6-21H1 PIERRE F | WILLIAMS | | | | |
| 1110 | 11X-16 OLSON ST | WILLIAMS | | | | |
| 1111 | 18-19 1H FIELD | WILLIAMS | | | | |
| 1112 | 18-19 2H FIELD | WILLIAMS | | | | |
| 1113 | 18-19 3H FIELD | WILLIAMS | | | | |
| 1114 | 11X-11 MARMON H | WILLIAMS | | | | |
| 1115 | 21X-2 MYRNA | WILLIAMS | | | | |
| 1116 | 2932H-3 CA-E BU | WILLIAMS | | | | |
| 1117 | 29-32H E BURDIC | WILLIAMS | | | | |
| 1118 | 31X-3 LONNIE | WILLIAMS | | | | |
| 1119 | 44X-3 MARMON HA | WILLIAMS | | | | |
| 1120 | 31X-3 LONNIE | WILLIAMS | | | | |
| 1121 | 12-7H BAKKEN | WILLIAMS | | | | |
| 1122 | 14X-12 MARSDEN | WILLIAMS | | | | |
| 1123 | 21X-12 CHRISTOP | WILLIAMS | | | | |
| 1124 | 2116H-1 BL ODEG | WILLIAMS | | | | |

## Appendix B. Standard Conditions of Approval for Flaring Requests

Below are examples of stipulations that may be used when writing Conditions of Approval on a case-by-case basis as flaring sundry notices are processed. Additional site specific COAs would be identified during the review process and applied to the approval.

1. All flaring from Fee or State wells within a federal communitization or unit agreement must comply with the requirements of NTL-4A
2. Gas flared from this well is considered (unavoidably/avoidably) lost and (no/yes) royalties are due.
3. Recompletions to new production zones will require a new application for flaring.
4. This approval to flare gas is valid until (target date provided in the capture plan) and not to exceed one year from the completion date of the well. (Dates are application dependent).
5. If flaring results in a determination of royalty due, then metering to the flare will be required at that time.
6. If flaring is required beyond the approval date you must submit a new request for flaring approval.

## Appendix C. Reasonably Foreseeable Development for this EA and Gas Capture Projections by Year

The Reasonably Foreseeable Development (RFD) scenario for this EA is based on information and assumptions contained in the RFD developed in 2009, revised in 2011 for the NDFO Resource Management Plan (RMP), and revised again in 2014 for the NDFO RMP to consider the increased rate of development in the Williston Basin portion of North Dakota. The 2014 RFD revision contains projections of oil and gas wells for the western portion of the NDFO area.

The 2014 RFD revision took into consideration the assumptions and methodology from the previous reports completed. It also incorporated current changes in development that resulted in an increase projection of oil and gas development for the next 20 years. For the RFD of this EA, only the first 5 years of projected development was used to complete this analysis. In the next 5 years, the 2014 RFD revision projects a baseline total of 6,648 wells to be producing wells in the western portion of North Dakota. Of those, 1,263 are Federal, 399 are Indian, and 4,986 are Fee/State administered wells.

Based on 2014 RFD, the BLM assumes a total of 6,648 wells are projected to produce gas and flare an average 121 MCFPD per well for the five year analysis period. The gas capture percentages requirements from NDIC revised Order 24665 were applied to the projected number of wells for each of the next five years to identify quantities of gas projected to be captured and projected to be flared short-term and long-term by year. Projections per year and percentages applied are listed below.

1st Year: 5 percent of the flared gas flow is attributed to the pending SN requests which would be required to be capture per BLM,
77 percent of the flared gas flow would be flared short-term (1-year gas capture plan, pipeline pressure)
18 percent of the flared gas flow would be flared long-term (ROW, poor gas quality, etc)

2nd Year: 3 percent of the flared gas flow is attributed to the pending SN requests which would be required to capture per BLM,
80 percent of the flared gas flow would be flared short-term (1-year gas capture plan, pipeline pressure)
17 percent of the flared gas flow would be flared long-term (ROW, poor gas quality, etc)

3rd-4th Year: 3 percent of the flared gas flow is attributed to the pending SN requests which would be required to capture per BLM,
85 percent of the flared gas flow would be flared short-term (1-year gas capture plan, pipeline pressure)
12 percent of the flared gas flow would be flared long-term (ROW, poor gas quality, etc)

5th Year: 3 percent of the flared gas flow is attributed to the pending SN requests which would be required to capture per BLM,
88 percent of the flared gas flow would be flared short-term (1-year gas capture plan, pipeline pressure)
9 percent of the flared gas flow would be flared long-term (ROW, poor gas quality, etc)

6th Year: 3 percent of the flared gas flow is attributed to the pending SN requests which would be required to capture per BLM,
88 percent of the flared gas flow would be flared short-term (1-year gas capture plan, pipeline pressure)
9 percent of the flared gas flow would be flared long-term (ROW, poor gas quality, etc)

For this analysis, short-term is defined as flaring up to 1 year, long-term is defined as greater than 1 year up to 5 years. For the 12,199 existing wells it was assumed that 80% of the produced gas is captured and 20% is flared based on data obtained from NDIC. For new wells that produce gas in years 1 through year 6, NDIC Order 24665 capture rates were assumed. This order requires that by January 1, 2015, the gas capture rate should be at 77 percent which means that 23 percent would be flared; and by November 1, 2020, the gas capture rate should be at least 91 percent which means that 9 percent would be flared. The flaring request inventory generated by BLM in 2014 was used to develop the initial assumption of 80% of flared gas flaring short term, 15% of flared gas being flared long term, and an additional 5% required to be captured by BLM in year 1. The NDIC's gas capture requirements and an assumption of an additional 3% required to be captured by BLM was assumed for years 2-6. Although BLM determines this additional requirement on a case-by-case basis, the 5% and 3% assumptions are conservative. Therefore, the short-term flaring percentages would rise over the years based upon additional infrastructure, which in turn would reduce those wells that need long-term flaring.

Based on February 2015 information maintained by NDIC (May 2015 Director's Cut), total gas production was 1,475,395 MCF/day (or 1.47 BCF/day). Total producing wells in Feb 2015 was 12,199 and the gas capture rate was at 80 percent. Therefore, it can be assume that 20 percent of the gas is flared and then apply this to all of the producing wells in the analysis area.

1,475,395 MCF per day/12,199 wells = 121 MCF per well per day

The 121 mcfpd would be an average over the life of the well. Wells in the Williston Basin will produce most of their gas in the first few years of production, and then will steadily produce low volumes of gas for the remaining life of the well.

For the EA, there are 1,943 SN requests for 1,474 wells that have flared gas and are connected to pipeline (i.e. pipeline capacity/pressure issues). There are multiple SN requests for the same well, thus unequal number of requests and wells.

There are 268 SN requests for 192 wells currently flaring gas and are not connected to a pipeline. Therefore, assumptions discussed above (80% flared short term, 15% flared long term, and 5%

additional capture by BLM) would be applied to estimate the number of wells to flare short-term, flare long-term, and those required to capture. For the SN requests for wells currently flaring, short-term would not consider pipeline capacity/pressure requests. They are being considered as part of the 1,943 SN requests for wells that flared gas. There are multiple SN requests for the same well, thus an unequal number of requests and number of wells.

The flow rates of flared gas developed using BLM's RFD, SN requests, and NDIC requirements were used to estimate air pollutant emissions and impacts to air quality (see Appendix D). The calculated flow rates for year 1 through 6 are shown in Table A2-1.

**Table C-1.** EA Reasonable Foreseeable Development and specific yearly percentages, gas capture, and gas flared estimates.

| Year (% capture required) | NDFO RFD Projected Wells to Produce Gas | Total Cumulative Wells to Produce Gas | NDIC Capture Requirement % | Calculated Average MCFPD per well | Total MCFPD | MCFPD Captured | MCFPD Flared | MCFPD required capture (5%, 3%) | MCFPD flaring short-term (1yr plan to capture gas within 1 yr and pipeline capacity/pressure) (80%,77%, 80%, 85%, 88%) | MCFPD flaring long-term (poor quality, no ROW, low quantity, etc.) (15%, 18%,17%, 12%, 9%) |
|---|---|---|---|---|---|---|---|---|---|---|
| NDIC Existing wells that produce gas | 12,199.00 | | 80 | 121 | 1,476,079.00 | 1,180,863.20 | 295,215.80 | 14,760.79 | 236,172.64 | 44,282.37 |
| | | | | | | | | | | |
| 2015 (77%) | 1,294.13 | 13,493.13 | 77 | 121 | 1,632,668.73 | 1,257,154.92 | 375,513.81 | 18,775.69 | 289,145.63 | 67,592.49 |
| 2016 (80%) | 1,236.79 | 14,729.92 | 80 | 121 | 1,782,320.32 | 1,425,856.26 | 356,464.06 | 10,693.92 | 285,171.25 | 60,598.89 |
| 2017 (85%) | 1,096.97 | 15,826.89 | 85 | 121 | 1,915,053.69 | 1,627,795.64 | 287,258.05 | 8,617.74 | 244,169.35 | 34,470.97 |
| 2018 (85%) | 1,082.59 | 16,909.48 | 85 | 121 | 2,046,047.08 | 1,739,140.02 | 306,907.06 | 9,207.21 | 260,871.00 | 36,828.85 |
| 2019 (88%) | 1,022.14 | 17,931.62 | 88 | 121 | 2,169,726.02 | 1,909,358.90 | 260,367.12 | 7,811.01 | 229,123.07 | 23,433.04 |
| 2020 (88%) | 915.01 | 18,846.63 | 88 | 121 | 2,280,442.23 | 2,006,789.16 | 273,653.07 | 8,209.59 | 240,814.70 | 24,628.78 |
| | 6,647.63 | | | | | | | | | |
| | **EA: # of Wells currently flaring with Pending SNs (not connected to a pipeline)** | | | **Calculated Average MCFPD per well** | **Total MCFPD** | **MCFPD Captured** | **MCFPD being Flared** | **MCFPD required capture (5%)** | **MCFPD expected to flare short-term (1yr plan, eventually capture gas within 1 yr) (80%)** | **MCFPD expected to flare long-term (poor quality, no ROW, low quantity, etc.) (15%)** |
| | **192** | | | 121 | 23,232.00 | 0, wells currently flaring | 23,232.00 | 1,161.60 | 18,585.60 | 3,484.80 |
| | | | | | | | | **# of EA wells required to capture (5%)** | **# of EA wells expected to flare short term (1yr plan to capture gas within 1 yr) (80%)** | **# of wells expected to flare long term (poor quality, no ROW, low quantity, etc.) (15%)** |
| | | | | | | | | 9.6 | 153.6 | 28.8 |

## Appendix D. Flaring Emissions

Flaring occurs when pipeline infrastructure is not available to capture and transport associated gas to a sales pipeline, pipeline upsets cause temporary flaring, or gas quality is not conducive to sales. North Dakota Department of Health (ND DOH) air quality regulations (NDAC 33-15-07-02) require oil and gas flaring to meet US Environmental Protection Agency (EPA) New Source Performance Standards in 40 CFR 60.18. These regulations impose operational requirements that are equivalent to 98% destruction efficiency for organic compounds.

| | | | |
|---|---|---|---|
| Heating value of associated gas | 1571 | Btu/scf | WRAP |

**Heating Value Emission Factors**

| Pollutant | Emission Factor (lb/MMBtu) | Emission Factor Source | Emission Factor (lb/MMscf) |
|---|---|---|---|
| CO | 0.37 | WRAP | 581.27 |
| NOx | 0.068 | WRAP | 106.828 |

| Emissions | Flaring (uncombusted) | | Flaring (combusted) | | Total Flaring Emissions (lb/MMscf) | Beneficial Combustion (lb/MMscf) |
|---|---|---|---|---|---|---|
| Pollutant | Emission Factor (lb/MMscf) | Emission Factor Source | Emission Factor (lb/MMscf) | Emission Factor Source | | |
| $PM_{10}$ | Negligible | Gas Analysis (GA) | 7.60 | AP 42 Section 1.4 | 7.45 | 7.60 |
| $PM_{2.5}$ | Negligible | GA | 7.60 | AP 42 Section 1.4 | 7.45 | 7.60 |
| NOx | Negligible | GA | 106.83 | WRAP | 104.69 | 106.83 |
| $SO_2$ | Negligible | GA | 115.41 | WRAP | 113.10 | 115.41 |
| CO | Negligible | GA | 84.00 | AP 42 Section 1.4 | 82.32 | 84.00 |
| VOC | 20136 | GA | 5.50 | AP 42 Section 1.4 | 408.10 | 5.50 |
| HAP | 812 | GA | 1.88 | AP 42 Section 1.4 | 18.09 | 1.88 |

| | | | | | | |
|---|---|---|---|---|---|---|
| $CO_2$ | 442 | GA | 120000.00 | AP 42 Section 1.4 | 117608.84 | 120000.00 |
| $CH_4$ | 18203 | GA | 2.30 | AP 42 Section 1.4 | 366.32 | 2.30 |
| $N_2O$ | Negligible | GA | 2.20 | AP 42 Section 1.4 | 2.16 | 2.20 |

MMscf = Million standard cubic feet

## Wellhead Gas Analysis (GA)

| Gas Component | Mole Fraction | Source | Molecular Weight | Gas Weight | Weight Percent | Weight |
|---|---|---|---|---|---|---|
| | (%) | | (lb/lb-mol) | (lb/lb-mol) | (wt%) | (lb/MMscf)) |
| Methane | 70.00 | WRAP | 16.04 | 11.23 | 42.87 | 18203 |
| Carbon Dioxide | 0.62 | MCFO | 43.99 | 0.27 | 1.04 | 442 |
| VOC | 23.00 | WRAP | 54.00 | 12.42 | 47.42 | 20136 |
| HAPs | 0.50 | ND DOH | 100.21 | 0.50 | 1.91 | 812 |
| Other Compounds (primarily ethane) | 5.88 | --- | 30.07 | 1.77 | 6.75 | 2867 |
| **Totals** | **100.00** | | **---** | **26.19** | **100.00** | **42460** |

**Sources:**
AP 42: US Environmental Protection Agency, AP 42 Fifth Edition, Volume 1, Section 1.4, Natural Gas Combustion, Supplement D, July 1998. http://www.epa.gov/ttn/chief/ap42/ch01/final/c01s04.pdf
MCFO: Gas analysis data provided by Charles Laakso, BLM Miles City Field Office, 2010.
ND DOH: North Dakota Department of Health Emission Calculation Workbook, March 2013, http://www.ndhealth.gov/aq/bakken.aspx.
WRAP: Western Regional Air Partnership, Williston Basin 2011 Baseline Emission Inventory, August 2014, http://www.wrapair2.org/ND-SD-MT.aspx.

## Total Flaring Emissions by Year and Cumulative Emissions

| | Year | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Cumulative |
| **Methane Flared (MSCF/day)** | | | | | | | |
| Short-term (no more than 1 year) | 289,146 | 285,171 | 244,169 | 260,871 | 229,123 | 240,815 | 1,549,295 |
| Long-term (5 years) | 67,592 | 60,599 | 34,471 | 36,829 | 23,433 | 24,629 | 247,553 |
| **Emissions (short tons/year)** | | | | | | | |
| $PM_{10}$ | 485 | 470 | 379 | 405 | 343 | 361 | 2,442 |
| $PM_{2.5}$ | 485 | 470 | 379 | 405 | 343 | 361 | 2,442 |
| NOx | 6,816 | 6,606 | 5,324 | 5,688 | 4,825 | 5,072 | 34,331 |
| $SO_2$ | 7,363 | 7,137 | 5,751 | 6,145 | 5,213 | 5,479 | 37,089 |
| CO | 5,359 | 5,195 | 4,186 | 4,472 | 3,794 | 3,988 | 26,995 |
| VOC | 26,570 | 25,753 | 20,753 | 22,172 | 18,810 | 19,770 | 133,828 |
| HAP | 1,178 | 1,141 | 920 | 983 | 834 | 876 | 5,932 |
| $CO_2$ | 7,656,889 | 7,421,477 | 5,980,628 | 6,389,715 | 5,420,767 | 5,697,376 | 38,566,852 |
| $CH_4$ | 23,849 | 23,116 | 18,628 | 19,902 | 16,884 | 17,746 | 120,125 |
| $N_2O$ | 140 | 136 | 110 | 117 | 99 | 104 | 707 |
| **GHG Emissions (metric tons/year)** | | | | | | | |
| $CO_2$ | 6,946,177 | 6,732,615 | 5,425,506 | 5,796,621 | 4,917,611 | 5,168,546 | 34,987,077 |
| $CH_4$ | 21,635 | 20,970 | 16,899 | 18,055 | 15,317 | 16,099 | 108,975 |
| $N_2O$ | 127 | 123 | 99 | 106 | 90 | 95 | 641 |
| $CO_2e$ | **7,525,008** | **7,293,650** | **5,877,619** | **6,279,659** | **5,327,400** | **5,599,246** | **37,902,582** |

MSCF = thousand standard cubic feet per day

CO2e emissions are calculated using 100-year global warming potentials (GWPs) of CO2 =1, CH4 = 25, and N2O = 298, as provided in EPA regulations in 40 CFR Part 98, Subpart A, Table A-1. Other GWPs can be used by multiplying the quantity of each gas by its GWP and summing the results.

## Criteria Pollutant Emission Comparison for North Dakota

| | North Dakota NEI (short tons/year) | Maximum Flaring Percent (Year 2019) | Source |
|---|---|---|---|
| $PM_{10}$ | 365,857 | 0% | EPA 2011 NEI, Version 2, March 4, 2015, http://www.epa.gov/ttnchie1/net/2011inventory.html |
| $PM_{2.5}$ | 90,086 | 1% | EPA 2011 NEI, Version 2, March 4, 2015, http://www.epa.gov/ttnchie1/net/2011inventory.html |
| NOx | 163,788 | 4% | EPA 2011 NEI, Version 2, March 4, 2015, http://www.epa.gov/ttnchie1/net/2011inventory.html |
| $SO_2$ | 1,074,343 | 1% | EPA 2011 NEI, Version 2, March 4, 2015, http://www.epa.gov/ttnchie1/net/2011inventory.html |
| CO | 488,511 | 1% | EPA 2011 NEI, Version 2, March 4, 2015, http://www.epa.gov/ttnchie1/net/2011inventory.html |
| VOC | 281,219 | 9% | EPA 2011 NEI, Version 2, March 4, 2015, http://www.epa.gov/ttnchie1/net/2011inventory.html |

NEI = National Emissions Inventory

## GHG Emission Comparison

| | $CO_2e$ (metric tons/year) | Maximum Flaring Percent (Year 2019) | Source |
|---|---|---|---|
| North Dakota GHG Emissions (2013) | 37,003,286 | 20% | EPA FLIGHT website, http://ghgdata.epa.gov/ghgp/main.do#/, data current through August 18, 2014. |
| US Emissions (2014) | 6,673,000,000 | 0.113% | U.S. Greenhouse Gas Inventory Report: 1990-2013, EPA, http://www.epa.gov/climatechange/ghgemissions/usinventoryreport.html |

## Appendix E. Viewshed Analysis Method for Historic Properties

According to Section 106 of the National Historic Preservation Act, the introduction of visual elements that diminish the integrity of a historic property's significant historic features are an example of an adverse effect (36 CFR 800.5(2)(v)). Cultural resource specialists can employ various geospatial processing programs to simulate the geographic area that is visible from a historic property's location. The simulated geographic areas are known as viewsheds.

Geospatial processing programs simulate viewsheds by employing the data contained within a digital elevation model and a historic property's Universal Transverse Mercator (UTM) coordinates. The software produces a boolean overlay that indicates geographic areas that are "true" (can be seen) or "false" (can't be seen). The variables typically employed in the analysis are the average height of a person (1.77m) or the average height of a proposed element, such as a flare stack, building, or facility.

Digital elevation models for North Dakota can be obtained from the North Dakota GIS hub found at http://www.nd.gov/gis/. The North Dakota Information Technology Department and the North Dakota GIS Technical Committee operate the GIS Hub.

The purpose of the viewshed analysis is to test two hypotheses:

Hypothesis # 1. The proposed action introduces elements that can be observed from a historic property.

Hypothesis # 2. Existing modern elements have diminished the integrity of a historic property's significant historic features.

If the viewshed analysis does not support Hypothesis # 1 then the proposed action will not introduce a visual element to the historic property.

If the viewshed analysis supports Hypothesis # 1 then the potential to introduce a visual element remains. The specialists will employ Hypothesis # 2 to analyze the historic "setting."

The historic "setting" refers to the "character of the place in which the property played its historical role" (National Register Bulletin 15). When other modern elements exist and have introduced visual elements, then the "setting" may lack the ability to convey the property's historic significance.

The viewsheds will indicate if any modern elements exist. If modern elements exist, the participants in the Section 106 process will employ the viewshed analysis and visual inspections to determine if the proposed action will introduce elements that diminish the integrity of a historic property.

Exhibit 16 to 5/9/23 SDR


# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
North Dakota Field Office
99 23rd Avenue West, Suite A
Dickinson, North Dakota 58601
http://www.blm.gov/montana-dakotas


August 3, 2020

Re: Flaring volumes from Federal Communitization Agreements and Leases for calendar year 2014 and subsequent thereto.

Dear Operator:

**At this time, the NDFO is requesting that, within 60 days of receipt of this letter, operators submit any remaining flaring sundry notices (SN) for Federal CAs and Leases, for flaring that occurred during calendar year 2014. These SN must show the *total volume flared* and *total hours flared* for the month, *either on a daily or monthly basis*. You may submit the total volumes flared and hours flared for the entire agreement or lease, or on a per well basis. Our preference is that you submit by agreement. One SN for the entire year will be sufficient, with appropriate documentation showing the monthly volumes. Total hours flared for the month and total volumes flared for the month would be ideal. Then the NDFO will assume uniform flaring per hour and make an avoidable/unavoidable determination based thereupon. If daily volumes flared and/or daily hours flared vary through the month, you are welcome to submit on a daily basis. Again, a single SN may be submitted for the entire year. It is not necessary to include tank vapor volumes in the SN. Tank vapors are considered unavoidably lost per NTL-4A. If you have previously submitted flaring requests for calendar year 2014 and beyond that are not in the format described above, please resubmit, citing the EC# that they are to replace.**

The NDFO is in the process of reviewing all sundry notices (SN) covering flaring requests prior to 2014. If you wish to submit SN covering flaring after calendar year 2014 through 2016 you may do so, following the guidelines in the preceding paragraph.

If you have questions about what you should submit or how to submit, please contact one of the engineers listed at the end of this letter.

Operators are responsible for amending Oil and Gas Operations Reports (OGORs) appropriately and reporting to the Office of Natural Resources Revenue (ONRR). For information on how to

Exhibit 16 to 5/9/23 SDR



report and pay royalties, contact your ONRR representative or, refer to the ONRR Revenue Reporter Handbook.
http://onrr.gov/ReportPay/PDFDocs/RevenueHandbook.pdf

The NDFO is very appreciative of your cooperation and patience regarding this issue. Should you have any questions regarding this matter, feel free to contact one of the engineers listed at the end of this letter.

Sincerely,

Loren Wickstrom
Field Manager

| | | |
|---|---|---|
| Abdinur Salad | asalad@blm.gov | 701-227-7757 |
| Andrew Hamilton | ahamilton@blm.gov | 701-227-7748 |
| Caitlin Heryford | cheryford@blm.gov | 701-227-7770 |
| Robert Van Sickle | rvansickle@blm.gov | 701-227-7710 |

Exhibit 17 to 5/9/23 SDR

# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Ft Berthold Agency
PO Box 370
New Town, North Dakota 58763

TAKE PRIDE IN AMERICA

IN REPLY REFER TO:
Realty Department

December 28, 2015

RECEIVED JAN 15 Slawson Exploration Co., Inc.

Coni J. Stokes
Slawson Exploration Company
1675 Broadway Ste 1600
Denver, Colorado 80202

Dear Ms. Stokes:

Enclosed is approved Communitization Agreement No. NDM 107646 previously approved on September 27, 2012. This involves Indian land in the following leases:

14-20-A04-2604 (7420A42604) 14-20-A04-2603 (7420A42603)

Slawson Exploration Company is the designated operator.

The agreement covers all of Section 12, T. 151 N., R 95 W., McKenzie County, North Dakota, for a 586.36 acre drilling and spacing unit. The CA communitizes all rights to crude oil and associated natural gas from the Clarks Creek - Bakken Formation.

The CA well is the Jore #2-12H, API#33-053-06052, located in Lot 1, Section 12, T. 151 N., R. 95 W., McKenzie County, North Dakota. This well was completed for production on September 4, 2014.

The agreement was approved on December 28, 2015 by the Superintendent, Fort Berthold Agency. The agreement is effective as of July 1, 2014. It has been designated Communitization Agreement NDM - 107646.

Should you have any questions please contact Jolene Gillies at 701-627-6522.

Sincerely,

[signature]

Superintendent

Enclosure
cc: Bureau of Land Management, ND Field Office (w/copy)
ATTN: Jane Buechler
ONRR - Minerals Revenue Management (w/copy)
ATTN: George Hutchison

Exhibit 17 to 5/9/23 SDR

# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240

Division of Energy and
Mineral Development

**MEMORANDUM**

TO: Kayla Danks, Superintendent, Bureau of Indian Affairs, Fort Berthold Agency

FROM: Jeff Hunt, Engineering Chief Branch, Division of Energy and Mineral Development (DEMD)

SUBJECT: CA NDM-107646

DATE: December 16, 2015

DEMD recommends approval of Communitization Agreement NDM-107646 for the purpose of communitization of mineral interests to develop and produce crude oil and associated gas from the Clarks Creek-Bakken Pool. The Clark Creek-Bakken Pool is defined as that accumulation of oil and gas found in the interval from 50 feet above the top of the Bakken Formation to above the top of the Birdbear Formation within the limits of the Clarks Creek Field.

This recommendation is based on review of the existing agreement, including the lease and ownership interest, spacing hearing, serial register page, and title status reports. The approval is in the best interest of the mineral owners and provides for the optimum recovery of the mineral resource while allowing for orderly development of the Clarks Creek-Bakken Pool.

Lands and associated wells included in this recommendation are described as follows: all of section 12, Township 151 North, Range 95 West, covering 586.36 acres.

| Spot | Section | Township | Range | Well Name | Well No. | API No. |
|---|---|---|---|---|---|---|
| NW | 12 | 151N | 95W | JORE FEDERAL | 2-12H | 33053060520000 |
| NW | 12 | 151N | 95W | JORE FEDERAL | 11-12TF2H | 33053069200000 |
| NW | 12 | 151N | 95W | JORE FEDERAL | 15-12TF3H | 33053069210000 |
| NW | 12 | 151N | 95W | JORE FEDERAL | 6-12TFH | 33053069220000 |
| NW | 12 | 151N | 95W | JORE FEDERAL | 10-12TF2H | 33053069230000 |
| NW | 12 | 151N | 95W | JORE FEDERAL | 1-12H | 33053069240000 |

**Please note, not all leases within the Communitization Agreement have at least 90 days or more before expiration. These leases are held by production (HBP) and have producing well(s) on them. Refer to the Lease & Tract Excel sheet to see a list of these leases and their corresponding expiration dates.**

**Also, the royalty rate for tract 2 (7420A42603, 2049) has been corrected from 18% to 22%.**

**Also, the effective date for tract 2 (7420A42603, 2049) has been corrected from November 19, 2009 to the correct effective date of April 23, 2014.**

This recommendation considers the recommendations of approval from the Bureau of Land Management (BLM).

If you have any questions please contact Sierra Squire (720)-407-0621.

Exhibit 17 to 5/9/23 SDR

# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
North Dakota Field Office
99 23rd Avenue West – Suite A
Dickinson, North Dakota 58601-2619
www.blm.gov/mt

In Reply Refer To:

CA NDM 107646
3105.2

March 18, 2015

Memorandum

To: Superintendent, Bureau of Indian Affairs, Fort Berthold Agency, PO Box 370, New Town, North Dakota 58763

From: Loren C. Wickstrom, Acting Field Manager
North Dakota Field Manager

Subject: Proposed Indian Communitization Agreement (CA) NDM 107646, McKenzie County, North Dakota

Attached (see Attachment 1) are three (3) copies of a proposed Indian CA submitted by Slawson Exploration Company, Inc. The CA covers a 586.36 -acre spacing unit approved by the North Dakota Industrial Commission (NDIC) under Order No. 25484, which covers all of Section (s) 12, Township 151 North, Range 95 West, located in McKenzie County North Dakota. The CA communitizes all rights to crude oil and associated natural gas from the Clarks Creek-Bakken Formation. The BLM has designated this proposed CA as NDM 107646.

The well associated with this proposed CA is the Jore 2-12H (API No. 33-053-06052) located in Lot 1 , Section 12, Township 151 North, Range 95 West, McKenzie County, North Dakota. The well was completed for production on September 4, 2014.

The following leases are identified as being included within the proposed CA as 14-20-A04-2604 and -2603. **Please note that the leases are not verified. Our records indicate possible new leases issued that are not included in Exhibit A or B.**

We request that your office verify the following information pertaining to both Allotted Indian and Tribal lands since the BIA is the official office of record on these leases and any updates would not be in the possession of the BLM offices:

1. **Allotted Indian and Tribal lease(s) (Contract Numbers).**

2. **Effective and expiration dates of the Allotted Indian and Tribal lease(s).**

3. **Allotted Indian and Tribal legal description as to section, township, and range.**

4. **Total Allotted Indian and Tribal Lease(s) acreage committed and percentage of interest of the recapitulation.**

5. **Royalty rates of the issued lease(s).**

6. **Verify that all current working interest owners (i.e., lessees of record and operating rights owners) of the Indian leases have signed the CA or the operator has provided a self-certification statement indicating that consents of all current working interest owners (i.e., lessees or record and operating rights owners) of the Indian leases have been obtained.**

7. **Affidavit of Mailing.**

**Please note that the leases are not verified. Our records indicate possible new leases issued that are not included in Exhibit A or B.**

**Please note the formation listed in section 1 of this agreement states "produced from the Bakken" in accordance with the NDIC spacing order, the Clarks Creek – Bakken should be the formation**

Upon completion of your review, and correction to deficiencies that we identified, the BLM recommends approval of the proposed CA since it is *in the best interest of the individual Indian mineral owner(s) and/or Tribe.* **The effective date of this agreement is July 1, 2014.** Please reference this effective date in your approval letter. Attachment 2 is a Determination-Certification-Approval (DCA) letter for your convenience.

After approval, please forward the approval letter, DCA and a copy of the CA to the Operator and the Office of Natural Resources Revenue. We also request that you provide this office with a copy of the approval letter and any corrections that may have been made to the CA. We have kept a copy of a signed CA for our files.

If you have any questions, please feel free to contact Samantha Iron Shirt, at (406) 896-5110.

2 Attachments
1 - Proposed CA NDM107646 (in its entirety)
2 – DCA (1 p)

cc: Jeff Hunt, Engineering Branch Chief
Assistant Secretary - Indian Affairs
Division of Energy and Mineral Development
13922 Denver West Parkway, Suite 200
Lakewood, CO 80401

bc:
Indian Lease(s) file (14-20-A04-2603, -2604)
NDM107646 Pending CA file

Exhibit 17 to 5/9/23 SDR

# UNITED STATES
# DEPARTMENT OF THE INTERIOR
# BUREAU OF INDIAN AFFAIRS

**Fort Berthold Agency**
**New Town, North Dakota**

## COMMUNITIZATION AGREEMENT NDM 107646

This Communitization Agreement NDM 107646, covering all of Sec. 12, T. 151 N., R. 95W, located in McKenzie County for the purpose of communitizing mineral interest for developing and producing crude oil and associated natural gas on Indian lands subject to this agreement is hereby approved, pursuant to authority delegated to the Assistant Secretary – Indian Affairs by 209 DM 8, 230 DM1, to the Great Plains Regional Director by 3 IAM 4 (Release No. 00-03), and the Superintendent, Fort Berthold Agency by Great Plains Regional Addendum 3 IAM 4.4(0)(2), Mineral Leases and Permits, (GPR(Release No. 0502).

This approval also requires submission of new or amended production reports and payment of royalties to the Office of Natural Resources Revenue (ONRR) within 30 days of the Bureau of Indian Affairs (BIA) approval date.

The Oil and Gas Operations Report (OGOR, Form MMS-4054) must be submitted for the CA, beginning with the effective date of the agreement. If you need assistance on production reporting, please contact the ONNR at 1-800-525-7922.

Production royalties must be paid and reported on The Report of Sales and Royalty Remittance (Form MMS-2014) within 30 days of the BLM approval date or the payors will be assessed interest for late payment under the Federal Oil and Gas Royalty Management Act of 1982 (see 30 CFR 218.54). If you need assistance on royalty management, please contact the ONRR at 1-800-525-9167 or (303) 231-3590.

DEC 3 0 2015

Approved Date

BIA Superintendent, Fort Berthold Agency

**Effective: July 1, 2014**

Exhibit 17 to 5/9/23 SDR

# COMMUNITIZATION AGREEMENT

CONTRACT NO. NDM-107646

THIS AGREEMENT, is entered into as of the date shown in Section 10 hereof by and between the parties subscribing, ratifying, or consenting hereto, such parties being hereinafter referred to as "parties hereto."

WITNESSETH:

WHEREAS, the Act of March 3, 1909 (35 Stat. 783), as amended by the Act of August 9, 1955, (69 Stat. 540) and the Act of May 11, 1938, (52 Stat. 347) require that all operations under oil and gas leases on tribal and/or allotted Indian lands shall be subject to the rules and regulations of the Secretary of the Interior, and the regulations issued pursuant to said statutes provide that in exercise of his judgment, the Secretary of the Interior may take into consideration among other things, the Federal laws, State laws, regulations by competent Federal or State authorities, or lawful agreements among operators regulating either drilling or production or both (25 CFR Secs. 211.28, 212.28); and

WHEREAS, it is deemed necessary in the interest of conservation of natural resources and in the interest of tribal and/or allotted lessors to communitize or pool lands covered by an Indian oil and gas lease, or any portion thereof, with other lands, whether or not included in another Indian lease, when separate tracts under such Indian lease cannot be independently developed and operated in conformity with an established well-spacing program or pattern for the field or area; and

WHEREAS, the parties hereto own working, royalty or other leasehold interests, or operating rights under the oil and gas leases and lands subject to this Agreement which cannot be independently developed and operated in conformity with the well-spacing program established for the field or area in which said lands are located; and

WHEREAS, the parties hereto desire to communitize and pool their respective mineral interests in lands subject to this agreement for the purpose of developing and producing communitized substances in accordance with the terms and conditions of this Agreement:

NOW, THEREFORE, in consideration of the premises and the mutual advantages to the parties hereto, it is mutually covenanted and agreed by and between the parties hereto as follows:

NOV 18 2015

1. The lands covered by this agreement (hereinafter referred to as "communitized area" are described as follows:

   Township 151 North, Range 95 West, 5th P.M.
   Section 12: Lots 1 (43.17), 2 (43.27), 3 (43.37), 4 (43.47), 5 (23.11), 6 (23.22), 7 (23.32), 8 (23.43), N2NE4, S2NE4, SE4

   McKenzie County, North Dakota

   Containing 586.36 acres, more or less, and this agreement shall include only the Bakken formation(s) underlying said lands, and the crude oil and associated natural gas, hereinafter referred to as "communitized substances," producible from such Clarks Creek – Bakken Pool formation(s).

2. Attached hereto, and made a part of this agreement for all purposes is Exhibit "A", a plat designating the communitized area and Exhibit "B", designating the operator of the communitized area and showing the acreage, percentage and ownership of oil and gas interests in all lands within the communitized area, and the authorization, if any, for communitizing or pooling any patented or fee lands within the communitized area. In the event technical and production data from the well indicate a temporary or proper spacing unit should be designated that is different from the drilling unit covered by this Communitization Agreement, all parties to the present Communitization Agreement agree to make the present Communitization Agreement null and

void so that a new Communitization Agreement may be signed that encompasses the area of the temporary or proper spacing unit.

3. All matters of operation shall be governed by the operator under and pursuant to the terms and provisions of this agreement. A successor operator may be designated by the owners of the working interest in the communitized area, and four (4) executed copies of a designation of successor operator shall be filed with the Authorized Officer.

4. Operator shall furnish the Secretary of the Interior, or his authorized representative, with a log and history of any well drilled on the communitized area, monthly reports of operations, statements of oil and gas sales and royalties and such other reports as are deemed necessary to compute monthly the royalty due the United States, as specified in the applicable oil and gas regulations.

5. The communitized area shall be developed and operated as an entirety, with the understanding and agreement between the parties hereto that all communitized substances produced therefrom shall be allocated among the leaseholds comprising said area in the proportion that the acreage interest of each leasehold bears to the entire acreage interest committed to this agreement.

   All proceeds, 8/8ths, attributed to unleased Federal, State, Fee or Indian land included within the CA area are to be placed in an interest earning escrow or trust account by the designated operator until the land is leased or ownership is established.

6. The royalties payable on communitized substances allocated to the individual leases comprising the communitized area and the rentals provided for in said leases shall be determined and paid on the basis prescribed in each of the individual leases. Payments of rentals under the terms of leases subject to this agreement shall not be affected by this agreement except as provided for under the terms and provisions of said leases or as may herein be otherwise provided. Except as herein modified and changed, the oil and gas leases subject to this agreement shall remain in full force and effect as originally made and issued.

7. There shall be no obligation on the lessees to offset any well or wells completed in the same formation as covered by this agreement on separate component tracts into which the communitized area is now or may hereafter be divided, nor shall any lessee be required to measure separately communitized substances by reason of the diverse ownership thereof, but the lessees hereto shall not be released from their obligation to protect said communitized area from drainage of communitized substances by a well or wells which may be drilled offsetting said area.

8. The commencement, completion, continued operation, or production of a well or wells for communitized substances on the communitized area shall be construed and considered as the commencement, completion, continued operation, or production on each and all of the lands within and comprising said communitized area, and operations or production pursuant to this agreement shall be deemed to be operations or production as to each lease committed hereto.

9. Production of communitized substances and disposal thereof shall be in conformity with allocation, allotments, and quotas made or fixed by any duly authorized person or regulatory body under applicable Federal or State statutes. This agreement shall be subject to all applicable Federal and State laws or executive orders, rules and regulations, and no party hereto shall suffer forfeiture or be liable in damages for failure to comply with any of the provisions of this agreement if such compliance is prevented by, or if such failure results from, compliance with any such laws, orders, rules or regulations.

10. This agreement shall become effective as of July 1, 2014, or from the onset of production of communitized substances, whichever is earlier, upon execution by the necessary parties, notwithstanding the date of execution, and upon approval by the Secretary of the Interior or by his duly authorized representative, and shall remain in force and effect for a period of two (2) years and for as long as communitized substances are or can be produced from the communitized area in paying quantities; provided that prior to production in paying quantities from the communitized area and upon fulfillment of all requirements of the Secretary of the Interior, or his duly authorized

representative, with respect to any dry hole or abandoned well, this agreement may be terminated at any time by mutual agreement of the parties hereto.

11. The covenants herein shall be construed to be covenants running with the land with respect to the communitized interests of the parties hereto and their successors in interests until this agreement terminates and any grant, transfer, or conveyance of any such land or interests subject hereto, whether voluntary or not, shall be and hereby is conditioned upon the assumption of all obligations hereunder by the grantee, transferee, or other successor in interest, and as to Federal land shall be subject to approval by the Secretary of the Interior, or his duly authorized representative.

12. It is agreed between the parties hereto that the Secretary of the Interior, or his duly authorized representative, shall have the right of supervision over all operations within the communitized area to the extent and degree as provided in the oil and gas leases in which owners of restricted Indian lands are the lessor and in the applicable oil and gas regulations of the Department of the Interior.

13. This agreement shall be binding upon the parties hereto and shall extend to and be binding upon their respective heirs, executors, administrators, successors, and assigns.

14. This agreement may be executed in any number of counterparts, no one of which needs to be executed by all parties, or may be ratified or consented to by separate instrument, in writing, specifically referring hereto, and shall be binding upon all parties who have executed such a counterpart, ratification or consent hereto with the same force and effect as if all parties had signed the same document.

15. Insofar as concerns the undersigned parties who hold interests in the restricted Indian land which is described in Exhibit "B" hereto, this agreement shall be subject to the approval of the Secretary of the Interior or his duly authorized representative.

16. Nondiscrimination: In connection with the performance of work under this agreement, the operator agrees to comply with all of the provisions of Section 202(1) to (7) inclusive, of Executive Order 11246 (30 F.R. 12319), as amended, except as this Agreement may be exempt from the provision of Executive Order 11246 by-law or by reason of the provision of any lease committed hereto, granting preference rights of employment to Indians.

IN WITNESS WHEREOF, the parties hereto have executed this agreement effective as set out in Paragraph 10 hereof, and have set opposite their respective names the actual date of execution.

**OPERATOR:**

Slawson Exploration Company, Inc.

Date Executed: 9/24/2014

By: [signature]
Coni J. Stokes, Vice President

Exhibit 17 to 5/9/23 SDR

**ACKNOWLEDGMENTS**

STATE OF KANSAS )
) ss
COUNTY OF SEDGWICK )

Before me, the undersigned, a Notary Public in and for said County and State, on this 24th day of September, 2014, personally appeared Coni J. Stokes, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as Vice President of SLAWSON EXPLORATION COMPANY, INC., and acknowledged to me that she executed the same as her free and voluntary act and deed, and as the free and voluntary act and deed, for the uses and purposes therein set forth.

Given under my hand and seal the day and year last above written.

My Commission Expires: October 9, 2016

Greta Sumner
Notary Public

GRETA SUMNER
Notary Public - State of Kansas
My Appt. Expires 10-9-2016

Exhibit 17 to 5/9/23 SDR

**WORKING INTEREST OWNERS:**

Sierra Resources, Inc..

By: [signature]

DEC 14 2015

STATE OF Oklahoma )
) ss
COUNTY OF Oklahoma )

Before me, the undersigned, a Notary Public in and for said County and State, on this 18th day of Nov. , 2015, personally appeared M. Scott Lund , to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as Vice President of SIERRA RESOURCES, INC. and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, and as the free and voluntary act and deed, for the uses and purposes therein set forth.

Given under my hand and seal the day and year last above written.

My Commission Expires: [signature: Edward J. Wengier]

NOTARY SEAL PUBLIC
EDWARD J. WENGIER
Notary Public
State of Oklahoma
Commission # 00005643 Expires 04/25/16

Notary Public

Forestar Petroleum Corporation

By:_________________________

STATE OF_____________ )
) ss
COUNTY OF___________ )

Before me, the undersigned, a Notary Public in and for said County and State, on this _____ day of ____________, 2015, personally appeared _________________, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as _______________ of FORESTAR PETROLEUM CORPORATION and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, and as the free and voluntary act and deed, for the uses and purposes therein set forth.

Given under my hand and seal the day and year last above written.

My Commission Expires: ______________________________

__________________________Notary Public

Exhibit 17 to 5/9/23 SDR

**WORKING INTEREST OWNERS:**

Sierra Resources, Inc..

By:_______________________

STATE OF____________ )
) ss
COUNTY OF___________ )

Before me, the undersigned, a Notary Public in and for said County and State, on this _____ day of ___________, 2015, personally appeared ________________, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as _______________ of SIERRA RESOURCES, INC. and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, and as the free and voluntary act and deed, for the uses and purposes therein set forth.
Given under my hand and seal the day and year last above written.

My Commission Expires: ___________________________________

_________________________Notary Public

Forestar Petroleum Corporation

By: [signature] KEVIN DONOHUE

STATE OF Colorado )
) ss
COUNTY OF Denver )

Before me, the undersigned, a Notary Public in and for said County and State, on this 10th day of December, 2015, personally appeared Kevin Donohue, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as VP-Land & BD of FORESTAR PETROLEUM CORPORATION and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, and as the free and voluntary act and deed, for the uses and purposes therein set forth.
Given under my hand and seal the day and year last above written.

My Commission Expires: June 2, 2019 [signature: Natalie Bell]

_________________________Notary Public

NATALIE BELL
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20114024516
MY COMMISSION EXPIRES JUNE 2, 2019

Exhibit 17 to 5/9/23 SDR

**WORKING INTEREST OWNERS:**

MBI Oil & Gas, LLC

By:_________________________

STATE OF_____________ )
) ss
COUNTY OF___________ )

Before me, the undersigned, a Notary Public in and for said County and State, on this _____ day of ____________, 2014, personally appeared _________________, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as _______________ of MBI OIL & GAS, LLC and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, and as the free and voluntary act and deed, for the uses and purposes therein set forth.
Given under my hand and seal the day and year last above written.

My Commission Expires: ______________________________________

__________________________Notary Public

Continental Resources, Inc.

By:_________________________

STATE OF_____________ )
) ss
COUNTY OF___________ )

Before me, the undersigned, a Notary Public in and for said County and State, on this _____ day of ____________, 2014, personally appeared _________________, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as _______________ of CONTINENTAL RESOURCES, INC. and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, and as the free and voluntary act and deed, for the uses and purposes therein set forth.
Given under my hand and seal the day and year last above written.

My Commission Expires: ______________________________________

__________________________Notary Public

Twin City Technical, LLC

By:________________________

STATE OF____________ )
) ss
COUNTY OF___________ )

Before me, the undersigned, a Notary Public in and for said County and State, on this _____ day of ____________, 2014, personally appeared _________________, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as _______________ of TWIN CITY TECHNICAL, LLC and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, and as the free and voluntary act and deed, for the uses and purposes therein set forth.
Given under my hand and seal the day and year last above written.

My Commission Expires: _____________________________________

__________________________Notary Public

Burlington Resources Oil & Gas Company, LP

By:________________________

STATE OF____________ )
) ss
COUNTY OF___________ )

Before me, the undersigned, a Notary Public in and for said County and State, on this _____ day of ____________, 2014, personally appeared _________________, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as _______________ of BURLINGTON RESOURCES OIL & GAS COMPANY, LP and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, and as the free and voluntary act and deed, for the uses and purposes therein set forth.
Given under my hand and seal the day and year last above written.

My Commission Expires: _____________________________________

__________________________Notary Public

Exhibit 17 to 5/9/23 SDR

Petroshale (US) Land I

By:_________________________

STATE OF_____________ )
) ss
COUNTY OF___________ )

Before me, the undersigned, a Notary Public in and for said County and State, on this _____ day of ____________, 2014, personally appeared _________________, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as _______________ of PETROSHALE (US) LAND I and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, and as the free and voluntary act and deed, for the uses and purposes therein set forth.
Given under my hand and seal the day and year last above written.

My Commission Expires: _____________________________________

__________________________Notary Public

Steven H. Harris Family Limited Partnership

By:_________________________

STATE OF_____________ )
) ss
COUNTY OF___________ )

Before me, the undersigned, a Notary Public in and for said County and State, on this _____ day of ____________, 2014, personally appeared _________________, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as _______________ of STEVEN H. HARRIS FAMILY LIMITED PARTNERSHIP and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, and as the free and voluntary act and deed, for the uses and purposes therein set forth.
Given under my hand and seal the day and year last above written.

My Commission Expires: _____________________________________

__________________________Notary Public

Oxy USA, Inc.

By:________________________

STATE OF____________ )
) ss
COUNTY OF__________ )

Before me, the undersigned, a Notary Public in and for said County and State, on this _____ day of ____________, 2014, personally appeared _________________, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as _______________ of OXY USA, INC. and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, and as the free and voluntary act and deed, for the uses and purposes therein set forth.
Given under my hand and seal the day and year last above written.

My Commission Expires: _____________________________________

__________________________Notary Public

Forestar Petroleum Corporation

By:________________________

STATE OF____________ )
) ss
COUNTY OF__________ )

Before me, the undersigned, a Notary Public in and for said County and State, on this _____ day of ____________, 2014, personally appeared _________________, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as _______________ of FORESTAR PETROLEUM CORPORATION and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, and as the free and voluntary act and deed, for the uses and purposes therein set forth.
Given under my hand and seal the day and year last above written.

My Commission Expires: _____________________________________

__________________________Notary Public

Exhibit 17 to 5/9/23 SDR

Comanche Exploration Company

By:_______________________

STATE OF____________ )
) ss
COUNTY OF__________ )

Before me, the undersigned, a Notary Public in and for said County and State, on this _____ day of ____________, 2014, personally appeared ________________, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as _______________ of COMANCHE EXPLORATION COMPANY and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, and as the free and voluntary act and deed, for the uses and purposes therein set forth.
Given under my hand and seal the day and year last above written.

My Commission Expires: ____________________________________

__________________________Notary Public

Herbaly Exploration, LLC

By:_______________________

STATE OF____________ )
) ss
COUNTY OF__________ )

Before me, the undersigned, a Notary Public in and for said County and State, on this _____ day of ____________, 2014, personally appeared ________________, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as _______________ of HERBALY EXPLORATION, LLC and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, and as the free and voluntary act and deed, for the uses and purposes therein set forth.
Given under my hand and seal the day and year last above written.

My Commission Expires: ____________________________________

__________________________Notary Public

Astrella Law, P.C.

By:_________________________

STATE OF_____________ )
) ss
COUNTY OF___________ )

Before me, the undersigned, a Notary Public in and for said County and State, on this _____ day of ____________, 2014, personally appeared _________________, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as _______________ of ASTRELLA LAW, P.C. and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, and as the free and voluntary act and deed, for the uses and purposes therein set forth.
Given under my hand and seal the day and year last above written.

My Commission Expires: ______________________________________

__________________________Notary Public

Kaizen Energy, LLC

By:_________________________

STATE OF_____________ )
) ss
COUNTY OF___________ )

Before me, the undersigned, a Notary Public in and for said County and State, on this _____ day of ____________, 2014, personally appeared _________________, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as _______________ of KAIZEN ENERGY, LLC and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, and as the free and voluntary act and deed, for the uses and purposes therein set forth.
Given under my hand and seal the day and year last above written.

My Commission Expires: ______________________________________

__________________________Notary Public

Exhibit 17 to 5/9/23 SDR

W North Fund II, LP

By:____________________________

STATE OF_______________ )
) ss
COUNTY OF____________ )

Before me, the undersigned, a Notary Public in and for said County and State, on this _____ day of _____________, 2014, personally appeared __________________, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as ________________ of W NORTH FUND II, LP and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, and as the free and voluntary act and deed, for the uses and purposes therein set forth.
Given under my hand and seal the day and year last above written.

My Commission Expires: ________________________________________

____________________________Notary Public

Vintage Oil & Gas, LLC

By:____________________________

STATE OF_______________ )
) ss
COUNTY OF____________ )

Before me, the undersigned, a Notary Public in and for said County and State, on this _____ day of _____________, 2014, personally appeared __________________, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as ________________ of VINTAGE OIL & GAS, LLC and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, and as the free and voluntary act and deed, for the uses and purposes therein set forth.
Given under my hand and seal the day and year last above written.

My Commission Expires: ________________________________________

____________________________Notary Public

Exhibit 17 to 5/9/23 SDR

**Exhibit "A"**

Attached to that certain Communitization Agreement dated Ju_ _, 2014
Section 12, T151N, R95W
Containing 586.36 acres, more or less, in McKenzie County, North Dakota

NOV 18 2015



Exhibit 17 to 5/9/23 SDR

Jore Federal 2-12H
Rare Earth Prospect

To that certain Communitization Agreement dated July 1, 2014, embracing the Bakken Formation underlying the following described lands:

Township 151 North, Range 95 West
Section 12: Lots 1 (43.17), 2 (43.27), 3 (43.37), 4 (43.47), 5 (23.11), 6 (23.22), 7 (23.32), 8 (23.43), N2NE4, S2NE4, SE4

**Operator of Communitized Area: Slawson Exploration Company, Inc.**

Containing 586.36 acres, more or less, in McKenzie, North Dakota.

NOV 18 2015

DESCRIPTION OF LEASES COMMITTED
Tract 1 – Section 12: Lots 1, 2, 3 and 4 (173.28 acres)
Tract 2 – Section 12: Lot 5, N2NE4 (103.11 acres)
Tract 3 – Section 12: Lots 6, 7 and 8, S2NE4, SE4 (309.97 acres)

**Tract 1**

| | |
|---|---|
| Lease Date: | June 5, 2013 |
| Lessor: | Coralie M. Bruegger, a/k/a Coralie Bruegger, & John Bruegger, wife & husband, Life Estate |
| Present Lessee: | MBI Oil & Gas, LLC, Slawson Exploration Company, Inc. |
| Lease Term: | 3 years |
| Lands Covered: | Township 151 North, Range 95 West<br>Section 12: Lots 1, 2, 3 and 4 |
| Number of Acres: | 173.28 Gross – Tract 1 |
| Royalty: | 20% |
| WI owners: | MBI Oil & Gas, LLC – 66.666667%<br>Slawson Exploration Company, Inc. – 33.333333% |

| | |
|---|---|
| Lease Date: | June 28, 2005 |
| Lessor: | Esther Jore, a widow |
| Present Lessee: | Continental Resources, Inc. |
| Lease Term: | 5 years |
| Lands Covered: | Township 151 North, Range 95 West<br>Section 12: Lots 1, 2, 3 and 4 |
| Number of Acres: | 173.28 Gross – Tract 1 |
| Royalty: | 16.6666667% |
| WI owners: | Continental Resources, Inc. – 100% |

Exhibit 17 to 5/9/23 SDR

Jore Federal 2-12H
Rare Earth Prospect

| | |
|---|---|
| Lease Date: | June 5, 2013 |
| Lessor: | Donald G. Olson & Sharon K. Olson, H/W, JT |
| Present Lessee: | MBI Oil & Gas, LLC, Slawson Exploration Company, Inc. |
| Lease Term: | 3 years |
| Lands Covered: | Township 151 North, Range 95 West<br>Section 12: Lots 1, 2, 3 and 4 |
| Number of Acres: | 173.28 Gross – Tract 1 |
| Royalty: | 20% |
| WI owners: | MBI Oil & Gas, LLC – 66.666667%<br>Slawson Exploration Company, Inc. – 33.333333% |

| | |
|---|---|
| Lease Date: | August 3, 2005 |
| Lessor: | Richard G. Jore |
| Present Lessee: | Continental Resources, Inc. |
| Lease Term: | 5 years |
| Lands Covered: | Township 151 North, Range 95 West<br>Section 12: Lots 1, 2, 3 and 4 |
| Number of Acres: | 173.28 Gross – Tract 1 |
| Royalty: | 16.6666667% |
| WI owners: | Continental Resources, Inc. - 100% |

NOV 18 2015

| | |
|---|---|
| Lease Date: | March 26, 2012<br>Effective May 13, 2012 |
| Lessor: | Gerald J. Elkins & Donna J. Elkins, H/W, JT |
| Present Lessee: | Continental Resources, Inc. |
| Lease Term: | 3 years |
| Lands Covered: | Township 151 North, Range 95 West<br>Section 12: Lots 1, 2, 3 and 4 |
| Number of Acres: | 173.28 Gross – Tract 1 |
| Royalty: | 20% |
| WI owners: | Continental Resources, Inc. – 100% |

| | |
|---|---|
| Lease Date: | March 13, 2014 |
| Lessor: | DFS Investments LLC |
| Present Lessee: | Twin City Technical, LLC |
| Lease Term: | 3 years |
| Lands Covered: | Township 151 North, Range 95 West<br>Section 12: Lots 1, 2, 3 and 4 |
| Number of Acres: | 173.28 Gross – Tract 1 |
| Royalty: | 20% |
| WI owners: | Twin City Technical, LLC – 100% |

Exhibit 17 to 5/9/23 SDR

Jore Federal 2-12H
Rare Earth Prospect

Lease Date: March 13, 2014
Lessor: Crescent Energy, Inc.
Present Lessee: Twin City Technical, LLC
Lease Term: 3 years
Lands Covered: Township 151 North, Range 95 West
Section 12: Lots 1, 2, 3 and 4
Number of Acres: 173.28 Gross – Tract 1
Royalty: 20%
WI owners: Twin City Technical, LLC – 100%

Lease Date: November 17, 2011
Lessor: Helen Marie Mackenzie
Present Lessee: Continental Resources, Inc.
Lease Term: 3 years
Lands Covered: Township 151 North, Range 95 West
Section 12: Lots 1, 2, 3 and 4
Number of Acres: 173.28 Gross – Tract 1
Royalty: 18.75%
WI owners: Continental Resources, Inc. – 100%

NOV 18 2015

Lease Date: November 17, 2011
Lessor: Lori Rae Kully
Present Lessee: Continental Resources, Inc.
Lease Term: 3 years
Lands Covered: Township 151 North, Range 95 West
Section 12: Lots 1, 2, 3 and 4
Number of Acres: 173.28 Gross – Tract 1
Royalty: 18.75%
WI owners: Continental Resources, Inc. – 100%

Lease Date: March 2, 2012
Lessor: Stewart E. Stadler & James J. Masar, Co-Trustees of the Gildart Trust, a Montana Revocable Trust u/t/a dated 1/2/1992
Present Lessee: Continental Resources, Inc.
Lease Term: 3 years
Lands Covered: Township 151 North, Range 95 West
Section 12: Lots 1, 2, 3 and 4
Number of Acres: 173.28 Gross – Tract 1
Royalty: 18.75%
WI owners: Continental Resources, Inc. – 100%

Exhibit 17 to 5/9/23 SDR

Jore Federal 2-12H
Rare Earth Prospect

NOV 18 2015

| | |
|---|---|
| Lease Date: | May 2, 2012<br>Effective June 11, 2012 |
| Lessor: | Pierre J. O'Rourke |
| Present Lessee: | Continental Resources, Inc. |
| Lease Term: | 3 years |
| Lands Covered: | Township 151 North, Range 95 West<br>Section 12: Lots 1, 2, 3 and 4 |
| Number of Acres: | 173.28 Gross – Tract 1 |
| Royalty: | 18.75% |
| WI owners: | Continental Resources, Inc. – 100% |

| | |
|---|---|
| Lease Date: | January 13, 2012<br>Effective June 15, 2012 |
| Lessor: | Kenneth Darrell Berlin, aka K. Darrell Berlin and Grace Frances Berlin, and Grace Esther Berlin, JT |
| Present Lessee: | Continental Resources, Inc. |
| Lease Term: | 3 years |
| Lands Covered: | Township 151 North, Range 95 West<br>Section 12: Lots 1, 2, 3 and 4 |
| Number of Acres: | 173.28 Gross – Tract 1 |
| Royalty: | 18.75% |
| WI owners: | Continental Resources, Inc. – 100% |

| | |
|---|---|
| Lease Date: | January 13, 2012<br>Effective June 15, 2012 |
| Lessor: | Karmen H. Berlin |
| Present Lessee: | Continental Resources, Inc. |
| Lease Term: | 3 years |
| Lands Covered: | Township 151 North, Range 95 West<br>Section 12: Lots 1, 2, 3 and 4 |
| Number of Acres: | 173.28 Gross – Tract 1 |
| Royalty: | 18.75% |
| WI owners: | Continental Resources, Inc. – 100% |

| | |
|---|---|
| Lease Date: | May 2, 2012 |
| Lessor: | Vera L. Krummer |
| Present Lessee: | Burlington Resources Oil & Gas Company, LP |
| Lease Term: | 3 years |
| Lands Covered: | Township 151 North, Range 95 West<br>Section 12: Lots 1, 2, 3 and 4 |
| Number of Acres: | 173.28 Gross – Tract 1 |
| Royalty: | 18.75% |
| WI owners: | Burlington Resources Oil & Gas Company, LP – 100% |

Exhibit 17 to 5/9/23 SDR

Jore Federal 2-12H
Rare Earth Prospect

NOV 18 2015

| | |
|---|---|
| Lease Date: | November 13, 2012 |
| Lessor: | William J. Strickler, a married man |
| Present Lessee: | Petroshale (US) Land I, W North Fund II, LP |
| Lease Term: | 3 years |
| Lands Covered: | Township 151 North, Range 95 West<br>Section 12: Lots 1, 2, 3 and 4 |
| Number of Acres: | 173.28 Gross – Tract 1 |
| Royalty: | 20% |
| WI owners: | Petroshale (US) Land I – 50%<br>W North Fund II, LP – 50% |

| | |
|---|---|
| Lease Date: | November 13, 2012 |
| Lessor: | William J. Strickler, Trustee of William J. Strickler Revocable Trust dated 10/20/1965 |
| Present Lessee: | Petroshale (US) Land I, W North Fund II, LP |
| Lease Term: | 3 years |
| Lands Covered: | Township 151 North, Range 95 West<br>Section 12: Lots 1, 2, 3 and 4 |
| Number of Acres: | 173.28 Gross – Tract 1 |
| Royalty: | 20% |
| WI owners: | Petroshale (US) Land I – 50%<br>W North Fund II, LP – 50% |

| | |
|---|---|
| Lease Date: | May 28, 2014 |
| Lessor: | John Mullaney, Individually and as Personal Representative of the Estate of John H. Mullaney, deceased |
| Present Lessee: | Vintage Oil & Gas, LLC |
| Lease Term: | 3 years |
| Lands Covered: | Township 151 North, Range 95 West<br>Section 12: Lots 1, 2, 3 and 4 |
| Number of Acres: | 173.28 Gross – Tract 1 |
| Royalty: | 18.75% |
| WI owners: | Vintage Oil & Gas, LLC – 100% |

| | |
|---|---|
| Lease Date: | May 28, 2014 |
| Lessor: | Mullaney Ventures, a joint venture |
| Present Lessee: | Vintage Oil & Gas, LLC |
| Lease Term: | 3 years |
| Lands Covered: | Township 151 North, Range 95 West<br>Section 12: Lots 1, 2, 3 and 4 |
| Number of Acres: | 173.28 Gross – Tract 1 |
| Royalty: | 18.75% |
| WI owners: | Vintage Oil & Gas, LLC – 100% |

Exhibit 17 to 5/9/23 SDR

Jore Federal 2-12H
Rare Earth Prospect

NOV 18 2015

| | |
|---|---|
| Lease Date: | May 5, 2014 |
| Lessor: | John R Moran, Jr, Margaret L Toal and Wells Fargo Bank, N.A. formerly known as First Interstate Bank of Denver, as Trustees of the Trust for the Hill Foundation |
| Present Lessee: | Forestar Petroleum Corporation |
| Lease Term: | 18 months |
| Lands Covered: | Township 151 North, Range 95 West<br>Section 12: Lots 1, 2, 3 and 4 |
| Number of Acres: | 173.28 Gross – Tract 1 |
| Royalty: | 20% |
| WI owners: | Forestar Petroleum Corporation – 100% |

| | |
|---|---|
| Lease Date: | February 20, 2012, but effective April 16, 2012 |
| Lessor: | Elizabeth Ann Psencik a/k/a Beth Ann Psencik f/k/a Beth Ann Martin, a married woman |
| Present Lessee: | Continental Resources, Inc. |
| Lease Term: | 3 years |
| Lands Covered: | Township 151 North, Range 95 West<br>Section 12: Lots 1, 2, 3 and 4 |
| Number of Acres: | 173.28 Gross – Tract 1 |
| Royalty: | 20% |
| WI owners: | Continental Resources, Inc. – 100% |

| | |
|---|---|
| Dated: | NONE (UNLEASED MINERALS) |
| Mineral Owners: | Jovan Dawson Trust |
| Lands Committed: | Township 151 North, Range 95 West<br>Section 12: Lots 1, 2, 3 and 4 |
| Number of Acres: | 173.28 Gross – Tract 1 |
| Royalty: | Unknown |
| WI owners: | Slawson Exploration Company, Inc. |

| | |
|---|---|
| Dated: | NONE (UNLEASED MINERALS) |
| Mineral Owners: | Joan F. Surrette |
| Lands Committed: | Township 151 North, Range 95 West<br>Section 12: Lots 1, 2, 3 and 4 |
| Number of Acres: | 173.28 Gross – Tract 1 |
| Royalty: | Unknown |
| WI owners: | Slawson Exploration Company, Inc. |

| | |
|---|---|
| Dated: | NONE (UNLEASED MINERALS) |
| Mineral Owners: | Sheila Presant |
| Lands Committed: | Township 151 North, Range 95 West<br>Section 12: Lots 1, 2, 3 and 4 |
| Number of Acres: | 173.28 Gross – Tract 1 |
| Royalty: | Unknown |
| WI owners: | Slawson Exploration Company, Inc. |

Exhibit 17 to 5/9/23 SDR

Jore Federal 2-12H
Rare Earth Prospect

NOV 18 2015

Lease Date: April 24, 2014
Lessor: TurmOil, Inc.
Present Lessee: Steven H. Harris Family Limited Partnership
Lease Term: 3 years
Lands Covered: Township 151 North, Range 95 West
Section 12: Lots 1, 2, 3 and 4
Number of Acres: 173.28 Gross – Tract 1
Royalty: 22%
WI owners: Steven H. Harris Family Limited Partnership – 100%

Lease Date: May 7, 2014
Lessor: Robert Post Johnson
Present Lessee: Twin City Technical, LLC
Lease Term: 3 years
Lands Covered: Township 151 North, Range 95 West
Section 12: Lots 1, 2, 3 and 4
Number of Acres: 173.28 Gross – Tract 1
Royalty: 20%
WI owners: Twin City Technical, LLC – 100%

Lease Date: May 7, 2014
Lessor: A. V. M., Inc.
Present Lessee: Twin City Technical, LLC
Lease Term: 3 years
Lands Covered: Township 151 North, Range 95 West
Section 12: Lots 1, 2, 3 and 4
Number of Acres: 173.28 Gross – Tract 1
Royalty: 20%
WI owners: Twin City Technical, LLC – 100%

**Tract No. 2**

BIA Contract #: 7420A42603
Allotment #: M 2049
Lease Date: September 25, 2008
Effective ~~November 19, 2008~~ April 23, 2014 SS 12/17/2015
Lessor: Heirs of Allotment M 2049 of the Three Affiliated Tribes of Indians
Present Lessee: Sierra Resources, Inc.
Lands Covered: Township 151 North, Range 95 West
Section 12: Lot 5, N2NE4
Number of Acres: 51.56 Net Acres/103.11 Gross Acres – Tract 2
Term: 5 years
Royalty: ~~18%~~ 22% SS 12/17/2015
WI owners: Sierra Resources, Inc. – 100%

Exhibit 17 to 5/9/23 SDR

Jore Federal 2-12H
Rare Earth Prospect

**Tract No. 2A**

| | |
|---|---|
| Lease Date: | February 20,2014 |
| Lessor: | Alec J. Wolff, Attorney-in-Fact for Mary Ellen Wolff, sole heir of Winifred Patricia Kelly Marsh, Dec. |
| Present Lessee: | Vintage Oil & Gas, LLC |
| Lands Covered: | Township 151 North, Range 95 West<br>Section 12: Lot 5, N2NE4 |
| Number of Acres: | 51.56 Net Acres/103.11 Gross Acres – Tract 2A |
| Term: | 3 years |
| Royalty: | 20% |
| WI owners: | Vintage Oil & Gas, LLC – 100% |

NOV 18 2015

**Tract No. 3**

| | |
|---|---|
| BIA Contract #: | 7420A42333 |
| Allotment #: | #301 M 1890 |
| Lease Date: | August 25, 2008<br>Effective/Approved October 2, 2009 |
| Lessor: | Heirs of Allotment Tract #301 M 1890 of the Three Affiliated Tribes of Indians |
| Present Lessee: | Forestar Petroleum Corporation; Comanche Exploration Company; Astrella Law, P.C.; Kaizen Energy, LLC |
| Lease Term: | 5 years |
| Lands Covered: | Township 151 North, Range 95 West<br>Section 12: Lots 6, 7 and 8, S2NE4, SE4 |
| Number of Acres: | 309.97 Gross – Tract 3 |
| Royalty: | 18% |
| WI owners: | Forestar Petroleum Corporation – 87.5%<br>Comanche Exploration Company – 7.65%<br>Herbaly Exploration, LLC – 3.6%<br>Astrella Law, P.C. – 0.4167%<br>Kaizen Energy, LLC – 0.8333% |

Exhibit 17 to 5/9/23 SDR

## RECAPITULATION

NOV 18 2015

| Tract No. | No. of Acres Committed | Percentage of Interest in Communitized Area |
|---|---|---|
| | | |
| 1 | 173.28 | 29.55% |
| 2 | 51.56 | 8.79% |
| 2A | 51.56 | 8.79% |
| 3 | 309.97 | 52.86% |
| Total | 586.36 | 100.00% |
| | | |

Exhibit 18 to 5/9/23 SDR

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**MONTANA/DAKOTAS STATE OFFICE**

| | | |
|---|---|---|
| Slawson Exploration Company, Inc. | ) ) ) ) ) | SDR No. 922-22-10 |

---

## DECLARATION OF WILLIAM MILLER

---

1. My name is William Miller. I am a Senior Reservoir Engineer for Slawson Exploration Company, Inc. ("Slawson") and am familiar with operation of Slawson's Jore (Federal) 2-12H well (the "Jore Well"). I have first-hand knowledge of the information set forth in this Declaration, which I make to the best of my knowledge.

2. This Declaration is made in support of Slawson's Request for State Director Review of a March 7, 2023 decision of the Bureau of Land Management's ("BLM") North Dakota Field Office finding that gas flared from the Jore Well was avoidably lost. Slawson's request for review was docketed as No. 922-22-10.

3. I am familiar with mechanical refrigeration units, which are used to capture natural gas liquids prior to flaring. Slawson utilized a mechanical refrigeration unit in 2018 to remove natural gas liquids from production from its Gunslinger Federal 4-1-12H well ("Gunslinger Well").

4. Mechanical refrigeration units were not widely used, or even available, in the Williston Basin between 2014 and 2016, when the flaring at issue occurred from the Jore Well. Slawson has had an operational presence in North Dakota since 1975 but did not use mechanical

refrigeration units until 2018. The Gunslinger Well represented the first time Slawson used a mechanical refrigeration unit.

5. Even if a mechanical refrigeration unit was available for the Jore Well, size constraints would have prevented Slawson from installing a mechanical refrigeration unit on the pad for the Jore Well. A mechanical refrigeration unit requires a space of approximately 100 feet by 300 feet with sufficient distance from the wellheads and/or flares to meet regulatory requirements. See Exhibit 1, Typical MRU Wellpad Layout and Piping and Instrumentation Diagrams. By contrast, the Jore Well was a polygonal well pad with total maximum dimensions of 358 feet by 460 feet. See Exhibit 2, BLM-Approved Site Facility Diagram for the Jore Well. Thus, there was not sufficient space on the pad for the Jore Well to set the equipment required for a mechanical refrigeration unit. And, Slawson could not have expanded the pad because of geographical constraints.

6. Slawson also could not have economically operated a mechanical refrigeration unit for the Jore Well because volumes of gas produced, and natural gas liquids to be recovered, were too low. Slawson's affiliate, White Butte Oil Operations, LLC ("White Butte"), considered utilizing a mechanical refrigeration unit for the Panzer 1-20MLH well. White Butte would have had to enter into a contract for at least six months that committed White Butte to an installation cost of $312,00, at least $499,290 in operational fees, and other miscellaneous costs including costs of a monitor due to operational outages. The volumes of natural gas liquids that would have been recovered from gas produced from the Jore Well would not have rendered these costs economic. For the Panzer 1-20MLH well, a forecast gas production rate beginning at 980 MSCF per dy was predicted to yield approximately 118 barrels per day of natural gas liquids which at that time would have been predicted to generate approximately $87,700 in revenue—an

insufficient amount to cover the operational fees and amortized installation cost. By comparison, the Jore Well averaged production of 318 MSCF per day between September 2014 and December 2016 ("the Flaring Period"), which means that revenue during the Flaring Period would have been insufficient to offset costs.

7. Based on Slawson's experience with a mechanical refrigeration unit at the Gunslinger Well in 2018, a mechanical refrigeration unit would not have removed all natural gas liquids from gas produced from the Jore Well prior to flaring. The mechanical refrigeration unit for the Gunslinger well experienced frequent and prolonged outages, which both minimized its effectiveness at actually removing natural gas liquids and impacted the economics described above. During warmer months (April through September), this mechanical refrigeration unit required 24/7 supervision to maximize operational times. Because the outages were partly due to issues with the compressor, a mechanical refrigeration unit would have experienced even more outages during winter months.

8. I am also familiar with the terms of leases committed to communitization agreement No. NDM 107646, from which the Jore Well produces. At least one such lease expressly limits the duration whereby the lease could be maintained in force by the payment of shut-in well payments to a cumulative five years.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 8, 2023.

William Miller

Exhibit 18 to 5/9/23 SDR




Exhibit 1 to Miller Declaration

CAR 000398

Exhibit 18 to 5/9/23 SDR






CAR_000399

Exhibit 18 to 5/9/23 SDR

Form 3160-5
(June 2015)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

FORM APPROVED
OMB NO. 1004-0137
Expires: January 31, 2018

## SUNDRY NOTICES AND REPORTS ON WELLS

***Do not use this form for proposals to drill or to re-enter an abandoned well. Use form 3160-3 (APD) for such proposals.***

***SUBMIT IN TRIPLICATE - Other instructions on page 2***

5. Lease Serial No.
FEE

6. If Indian, Allottee or Tribe Name
FORT BERTHOLD

7. If Unit or CA/Agreement, Name and/or No.

1. Type of Well
☒ Oil Well ☐ Gas Well ☐ Other

8. Well Name and No.
Multiple--See Attached

2. Name of Operator
SLAWSON EXPLORATION CO INC
Contact: TONI DOMENICO
E-Mail: TDOMENICO@whitebutteoil.COM

9. API Well No.
Multiple--See Attached

3a. Address
1675 BROADWAY SUITE 1600
DENVER, CO 80202

3b. Phone No. (include area code)
Ph: 720-457-9820
Fx: 303-592-8881

10. Field and Pool or Exploratory Area
CLARKS CREEK

4. Location of Well (*Footage, Sec., T., R., M., or Survey Description*)
Multiple--See Attached

11. County or Parish, State
MCKENZIE COUNTY, ND

12. CHECK THE APPROPRIATE BOX(ES) TO INDICATE NATURE OF NOTICE, REPORT, OR OTHER DATA

| TYPE OF SUBMISSION | TYPE OF ACTION | | | |
|---|---|---|---|---|
| ☐ Notice of Intent | ☐ Acidize | ☐ Deepen | ☐ Production (Start/Resume) | ☐ Water Shut-Off |
| ☒ Subsequent Report | ☐ Alter Casing | ☐ Hydraulic Fracturing | ☐ Reclamation | ☐ Well Integrity |
| ☐ Final Abandonment Notice | ☐ Casing Repair | ☐ New Construction | ☐ Recomplete | ☒ Other Site Facility Diagram/Security Plan |
| | ☐ Change Plans | ☐ Plug and Abandon | ☐ Temporarily Abandon | |
| | ☐ Convert to Injection | ☐ Plug Back | ☐ Water Disposal | |

13. Describe Proposed or Completed Operation: Clearly state all pertinent details, including estimated starting date of any proposed work and approximate duration thereof. If the proposal is to deepen directionally or recomplete horizontally, give subsurface locations and measured and true vertical depths of all pertinent markers and zones. Attach the Bond under which the work will be performed or provide the Bond No. on file with BLM/BIA. Required subsequent reports must be filed within 30 days following completion of the involved operations. If the operation results in a multiple completion or recompletion in a new interval, a Form 3160-4 must be filed once testing has been completed. Final Abandonment Notices must be filed only after all requirements, including reclamation, have been completed and the operator has determined that the site is ready for final inspection.

Attached, please find the site facility diagram for the referenced well.

Other federal wells on this pad are as follows:

Jore (Federal) 12-12TFH, API 3305306922, Lease 1420A042052, CA NDM 107646, Section 12, T151N-R95W, LOT1, 199 FNL & 1160 FWL, Field Clarks Creek, McKenzie County, ND

Jore (Federal 13-12TF2H, API 3305306923, Lease 1420A042052, CA NDM 107646, Section 12, T151N-R95W, LOT1, 213 FNL & 1181 FWL, Field Clarks Creek, McKenzie County, ND

QTR/QTR = LOT1

14. I hereby certify that the foregoing is true and correct.

**Electronic Submission #461825 verified by the BLM Well Information System**
**For SLAWSON EXPLORATION CO INC, sent to the Dickinson**
**Committed to AFMSS for processing by GLORIA OSTOJ on 05/03/2019 (19GJO0780SE)**

Name (*Printed/Typed*) TONI DOMENICO
Title PRODUCTION & REGULATORY TECH

Signature (Electronic Submission)
Date 04/17/2019

**THIS SPACE FOR FEDERAL OR STATE OFFICE USE**

Approved By ACCEPTED
Title ACCEPTED FOR RECORD
ACCEPTED FOR RECORD
Date 05/06/2019

Conditions of approval, if any, are attached. Approval of this notice does not warrant or certify that the applicant holds legal or equitable title to those rights in the subject lease which would entitle the applicant to conduct operations thereon.

Office Dickinson

Title 18 U.S.C. Section 1001 and Title 43 U.S.C. Section 1212, make it a crime for any person knowingly and willfully to make to any department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

(Instructions on page 2)

**** BLM REVISED ** BLM REVISED ** BLM REVISED ** BLM REVISED ** BLM REVISED ****

Exhibit 18 to 5/9/23 SDR

## Additional data for EC transaction #461825 that would not fit on the form

**Wells/Facilities, continued**

| Agreement | Lease | Well/Fac Name, Number | API Number | Location |
|---|---|---|---|---|
| FEE | FEE | JORE (FEDERAL) 1-12H | 33-053-06924-00-S1 | Sec 12 T151N R95W Lot 1 185FNL 1139FWL |
| FEE | FEE | JORE (FEDERAL) 12-12TFH | 33-053-06922-00-S1 | Sec 12 T151N R95W Lot 1 199FNL 1160FWL |
| FEE | FEE | JORE (FEDERAL) 13-12TF2H | 33-053-06923-00-X1 | Sec 12 T151N R95W Lot 1 213FNL 1181FWL |

**32. Additional remarks, continued**

CA NDM107646

Exhibit 18 to 5/9/23 SDR

**Revisions to Operator-Submitted EC Data for Sundry Notice #461825**

| | **Operator Submitted** | **BLM Revised (AFMSS)** |
|---|---|---|
| Sundry Type: | SITE<br>SR | SITE<br>SR |
| Lease: | 1420A042052 | FEE |
| Agreement: | | |
| Operator: | SLAWSON EXPLORATION COMPANY<br>1675 BROADWAY SUITE 1600<br>DENVER, CO 80202<br>Ph: 303-592-8880 | SLAWSON EXPLORATION CO INC<br>1675 BROADWAY SUITE 1600<br>DENVER, CO 80202<br>Ph: 303.592.8880 |
| Admin Contact: | TONI DOMENICO<br>PRODUCTION & REGULATORY TECH<br>E-Mail: TDOMENICO@SLAWSONCOMPANIES.COM<br><br>Ph: 720-457-9820<br>Fx: 303-592-8881 | TONI DOMENICO<br>PRODUCTION & REGULATORY TECH<br>E-Mail: TDOMENICO@whitebutteoil.COM<br><br>Ph: 720-457-9820<br>Fx: 303-592-8881 |
| Tech Contact: | TONI DOMENICO<br>PRODUCTION & REGULATORY TECH<br>E-Mail: TDOMENICO@SLAWSONCOMPANIES.COM<br><br>Ph: 720-457-9820<br>Fx: 303-592-8881 | TONI DOMENICO<br>PRODUCTION & REGULATORY TECH<br>E-Mail: TDOMENICO@whitebutteoil.COM<br><br>Ph: 720-457-9820<br>Fx: 303-592-8881 |
| Location:<br>State:<br>County: | <br>ND<br>MCKENZIE | <br>ND<br>MCKENZIE |
| Field/Pool: | CLARKS CREEK | CLARKS CREEK |
| Well/Facility: | JORE (FEDERAL) 1-12H<br>Sec 12 T151N R95W 185FNL 1139FWL | JORE (FEDERAL) 1-12H<br>Sec 12 T151N R95W Lot 1 185FNL 1139FWL<br><br>JORE (FEDERAL) 12-12TFH<br>Sec 12 T151N R95W Lot 1 199FNL 1160FWL<br>JORE (FEDERAL) 13-12TF2H<br>Sec 12 T151N R95W Lot 1 213FNL 1181FWL |

Exhibit 18 to 5/9/23 SDR




| Valve Sealing Detail | Circulating Valve | Equalizer Valve | Fill Valve | Sales Valve |
|---|---|---|---|---|
| Production | O/C | O/C | O | SC |
| Recycling | O | O/C | O/C | SC |
| Sales | SC | SC | SC | O |

Exhibit 2 to Miller Declaration

CAR 000403